IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDRA K. OMAR, *et. al.*,<br>Petitioners,<br><br>v.<br><br>FRANCIS J. HARVEY, *et. al.*,<br>Respondents. | )<br>)<br>)   CIVIL ACTION NO. 05-2374 (RMU)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## *MOTION FOR A TEMPORARY RESTRAINING ORDER*

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, Petitioners hereby apply for a Temporary Restraining Order Preventing the transfer of Shawqi Omar to the authority of any other government, sovereign, country, or agency until this Court has an opportunity to consider and decide the merits of this Petition. The grounds in support of this motion are contained in the accompanying memorandum of points and authorities.

Dated: February 2, 2005

Respectfully submitted,

*/s/ Susan L. Burke*
Susan L. Burke (D.C. Bar # 414939)
Heather L. Allred
BURKE PYLE LLC
3527 Lancaster Avenue
Philadelphia, PA 19104
Telephone:   (215) 387-4705
Facsimile:    (215) 387-4713

Joseph Margulies
MACARTHUR JUSTICE CENTER,
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 East 60th Street
Chicago, IL 60637
Telephone:   (773) 702-9560

Facsimile:   (773) 702-0771

Aziz Z. Huq
Jonathan Hafetz
BRENNAN CENTER FOR JUSTICE, NEW
YORK UNIVERSITY LAW SCHOOL
161 Avenue of the Americas
12th Floor
New York, NY  10013
Telephone:   (212) 998-6730
Facsimile:   (212) 995-4550

*Counsel for Petitioners*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDRA K. OMAR, *et. al.*, <br> Petitioners, <br> <br> v. <br> <br> FRANCIS J. HARVEY, *et. al.*, <br> Respondents. | CIVIL ACTION NO. 05-2374 (RMU) |

## *MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONERS' EX PARTE AND EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER*

Petitioners learned today that the federal government intends to transfer United States citizen Shawqi Omar out of the United States' jurisdiction and into Iraqi custody. Petitioners seek the immediate entry of a temporary restraining order to ensure that Shawqi Omar is not transferred from United States jurisdiction and control to Iraqi custody. Petitioners file this motion on an *ex parte* and emergency basis because they have reasonable grounds to believe based on the conduct to date that the government may accelerate the process in order to evade judicial scrutiny.

### STATEMENT OF FACTS

Shawqi Omar, the subject of the instant petition for writ of *habeas corpus*, is a United States citizen who has been imprisoned without charge since October 29, 2004. Petitioners filed for a writ of *habeas corpus* on Mr. Omar's behalf in this Court on December 12, 2005, asking for his immediate release. The government was served by registered mail, return receipt requested, the same day. *See Certificate of Service attached to Petition for Writ of Habeas Corpus (filed Dec. 12, 2005).*

On January 19, 2006, after a month without response from the government, Petitioners filed a motion for immediate issuance of an order to show cause. The Court granted the motion and ordered the government to show cause by January 27, 2006 why the petition should not be granted. *See Order (January 20, 2006)*. That response date was extended by consent to February 9, 2006. *See Minute Order (January 25, 2006)*.

Petitioners have now learned that the government, after being served with the habeas petition, unilaterally and without notice to counsel began to change the circumstances of Mr. Omar's detention. Immediately after the January 20 Order was entered by the Court, the United States moved Mr. Omar from Camp Bucca to Abu Ghraib. A family member visited Mr. Omar at Abu Ghraib, and learned that he subjected to some form of proceeding or hearing on or about February 3, 2006. *See Declaration of Susan L. Burke ("Burke Decl.") at ¶ 2, attached as Exhibit A*.

After learning this information, petitioners immediately alerted the government attorney, as well as the International Red Cross, that they wanted to participate in any scheduled proceeding as counsel for Mr. Omar. *Burke Decl. at ¶ 3*. It is possible and feasible for undersigned counsel to participate directly in the hearing because Abu Ghraib has a functional videolink with the United States. *Burke Decl. at ¶ 4*. Petitioners further indicated that they had a personal representative in Iraq, and requested that he be present at the scheduled proceeding to assist Mr. Omar.

Today, petitioners learned from the government that they intend to relinquish custody of Mr. Omar by transferring him to the jurisdiction of Iraq. Specifically, the government revealed that:

> Mr. Omar is currently in the custody of Multinational Force-Iraq, and *a determination was previously made to refer his case to the Central Criminal*

2

> *Court of Iraq (CCCI)*. We are informed that no hearing in his case is scheduled for Friday, February 3, 2006. We understand that when Mr. Omar appears for any hearing in the CCCI, he is afforded counsel (either retained by him/his family, or appointed by the Court). If Mr. Omar decides to use retained local counsel rather than Court-appointed counsel, we are informed that he/his family can provide to the CCCI the contact information for his retained local counsel before the hearing begins and that Court personnel will notify the retained local counsel at that time. Please be advised that, whenever scheduled, we would not be able to disclose to you the date of any hearing for security reasons (including the safety of Mr. Omar).

*Burke Decl.* at ¶ 5 (emphasis added).

Thus, the government – rather than defend Mr. Omar's prolonged military detention in this Court-- intends to transfer him to Iraqi custody despite having vowed publicly it would not transfer *any* prisoners (including Iraqi nationals) to the jurisdiction of Iraq because Iraqi authorities are torturing prisoners. Press clippings evidencing the government's statements that acknowledge that the Iraqi authorities are torturing prisoners are attached as Exhibit B.

The government is on record stating that prisoners would not be transferred to Iraqi custody. The United States envoy to Baghdad, Zalmay Khalilzad, has stated that that "U.S. officials believe that. . . the Interior Ministry has condoned torture of Sunni prisoners and increasingly used the police to settle sectarian scores." David Ignatius, *America's Message to Iraq*, The Washington Post, January 25, 2006 at A19. Other United States officials have reported that they found the Iraqi authorities had engaged in the "breaking of bones, torture with electric shock, extraction of fingernails, and cigarette burns to the neck and back" in a Baghdad detention center. Ellen Knickmeyer, *Abuse Cited In 2nd Jail Operated by Iraqi Ministry; Official Says 12 Prisoners Subjected to 'Severe Torture*, THE WASHINGTON POST, December 12, 2005 at A1.

The government knows from the letter of the law as well as from this past judicial experience that it is not permitted to render a United States citizen to another jurisdiction without

3

going through an appropriate extradition process, particularly when there is a likelihood that the citizen will be tortured as a result. Such transfers -- called "rendition," "irregular rendition," or "extraordinary rendition" -- are not permitted to be made even as to non-citizens without complying with extradition or other legal process. Indeed, numerous courts in this district have stopped the government from engaging in such unlawful transfers of *foreign nationals* to jurisdictions that practice torture. *See, e.g., Abdah v. Bush,* Civil Action No. 04-1254, 2005 WL 589812 (D.D.C. Mar. 12, 2005); *al-Marri v. Bush,* 2005 WL 774843 (D.D.C. Apr. 4, 2005). Yet here, the government is trying to engage in just such misconduct with respect to a United States citizen who is unquestionably protected the Constitution and the laws of this land. Such action is truly beyond the pale, and mandates immediate relief from this Court.

## ARGUMENT

Petitioners seek the emergency entry of a temporary restraining order ("TRO") in order to preserve the *status quo* – namely, Mr. Omar in the custody and control of the United States. Although Mr. Omar may not be safe from physical and mental harm in United States custody, petitioners still have the ability to seek the intervention of this Court to ensure adherence to the rule of law when Mr. Omar remains in United States custody. The government cannot be permitted to evade judicial scrutiny by handing Mr. Omar over to the jurisdiction of Iraq as soon as Petitioner challenges the basis of his detention in this Court. Nor can the government ignore the fact that it is on record as acknowledging that the present Iraqi government is torturing prisoners, particularly Sunni prisoners.

Petitioners clearly meet the four elements necessary for the issuance of a TRO: (1) petitioners are likely to succeed on the merits; (2) Mr. Omar will be irreparably injured -- by physical torture -- if immediate relief is withheld; (3) an injunction will not substantially harm

anyone; and (4) an injunction would further the public interest in ensuring that the United States does not willingly ignore the Constitution and the rule of law to engage in or participate in torture. *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005) (citations omitted). "The test is a flexible one[,]" and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor. *Id.*

Significantly, Mr. Omar does not seek to change the status quo – but rather to prevent a unilateral act by one party to the litigation that certainly will have the effect of prejudicing him directly, and radically changing the issues before the Court. It is well settled that this kind of conservative TRO demands a lesser showing than an effort to change the status quo. "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (citation omitted).. Further, where the balance of hardships tips decidedly toward the movant -- as it clearly does here -- it will "'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Id.* at 844.

I.  **THE COURT HAS THE POWER TO TAKE ACTION TO PRESERVE ITS JURISDICTION.**

It is well settled that a federal Court having jurisdiction to hear an action is empowered to take whatever action is necessary to preserve its jurisdiction. This much follows from Mr. Omar's constitutional right to due process under the Fifth Amendment. "[D]ue process requires, at a minimum, that . . . persons forced to settle their claims of right and duty through the judicial

5

process must be given meaningful opportunity to be heard." *Boddie v. Connecticut*, 401 U.S. 371, 377-78 (1971). Under Federal Rule of Appellate Procedure 23(a) and under the All Writs Act, 28 U.S.C. § 1651(a), a district court with habeas jurisdiction also has the power to enjoin any action that would deprive it of that jurisdiction: The Federal Rule specifically mentions transfers of petitioners as one such action. "[T]he All Writs Act, empowers a district court to issue injunctions to protect its jurisdiction." *SEC v. Vision Communs.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *see also* Fed. R. App. P. 23(a) ("pending review of a decision in a habeas corpus proceeding commenced before a court . . . the person having custody of the prisoner must not transfer custody to another unless a transfer is directed in accordance with this rule.")

Mr. Omar is a United States citizen in United States custody. Without doubt, the District Court has both jurisdiction to hear Mr. Omar's habeas claim and statutory power to enjoin the government from evading review by transferring the petitioner to foreign authorities or taking any other action to avoid this Court's jurisdiction. Without the requested injunctive relief, the government will, by taking the actions expressed in the Department of Justice's email of today's date to counsel, render meaningless Mr. Omar's constitutional right to challenge the constitutionality and legality of his confinement by U.S. authorities, by the simple expedient of handing him off to the Iraqi criminal authorities who may be beyond the jurisdiction of this Court or the United States Constitution. To allow this would be to afford the executive branch the unfettered and unchecked power to deprive summarily a United States citizen of the most fundamental constitutional protection -- without any judicial review of the conduct.

## II.   THE GOVERNMENT CANNOT EXTINGUISH HABEAS RIGHTS BY FIAT.

If the government succeeds in its plan to transfer Mr. Omar to Iraqi criminal authorities before this Court hears the merits of his habeas petition, the Court may lose any effective review

6

over the power of the executive to imprison without charge for fifteen months a United States citizen. His habeas claims would be, not just suspended, but effectively extinguished by fiat.

The federal judiciary has already stopped the government from implementing this evasive maneuver in a matter that did not even involve a United States citizen. In *Abdah v. Bush*, Civil Action No. 04-1254, a District Court ruled that that the government cannot transfer or remove a non-citizen prisoner being held at Guantanamo Bay to a location outside the Court's jurisdiction. *See Abdah v. Bush*, 2005 WL 711814 (D.D.C. March 29, 2005) ("Petitioners' transfer to another nation would assuredly deprive the court of its jurisdiction. Petitioners thus demonstrate . . . a clear likelihood of success in blocking a transfer made absent notice to, and approval from, the court.").

The government is trying to deprive Mr. Omar of his indisputable rights to procedural due process under the Fifth Amendment and Article I, section 9, clause 2 of the United States Constitution. These rights have been reaffirmed in *Hamdi v. Rumsfeld*, in which the Supreme Court set forth clear constitutional limits on the government's right to imprison citizens found on the battlefield. The Court concluded such detention was proper only "for the duration of the conflict" and that these detainees must be provided with, in part, "a fair opportunity to rebut the Government's factual assertions before a neutral decision maker." 542 U.S. 507, 601 (2004) (O'Connor, J., concurring).[1]

---

[1] There is no question that U.S. citizens have a liberty interest that this Court must defend against unconstitutional incursion from the government, regardless of the location of the person Indeed, in *Hamdi v. Rumsfeld*, the Supreme Court confirmed that even an alleged "enemy combatants," captured on an actual, real battlefield had an indefeasible liberty interest *wherever* they may be held. 542 U.S. at 530 ("We reaffirm today the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law.") That *Hamdi*'s holding was intended to include citizens detained outside U.S. territory or exclusive territorial is implicitly confirmed *inter alia* by dicta explaining that this holding is

7

The government's attempt at a middle-of-the-night transfer also violates petitioner's substantive due process right to be free of torture. *Chavez v. Martinez*, 538 U.S. 760, 773 (2003) (plurality op.); *Miller v. Fenton*, 474 U.S. 104, 109 (1985); (torture or other abusive interrogation techniques "are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause"). There can be no doubt that the government's eleventh hour transfer – commenced only after the filing of a petition for judicial review – of a United States citizen to a foreign government that the United States has publicly stated engages in torture in an effort to avoid judicial review is conduct that "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952).

Further, a transfer by the government would, in addition, violate the Convention Against Torture ("CAT"), as embodied in statutory form in the U.S. Congress in the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") of 1998. That statute states: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242(a) (1998). Yet here, it is clear that there is a strong likelihood, based on the government's own repeated admissions about the treatment of prisoners by Iraqi authorities, that Mr. Omar will be tortured if he is turned over to the Iraqi authorities.

---

designed to protect, among others, "the errant tourist, embedded journalist, or local aid worker," *id.* at 534—hardly terms used to describe U.S. citizens facing detention *within* U.S. territory.

8

### III. THERE IS A STRONG LIKELIHOOD THAT MR. OMAR WILL BE TORTURED IF HE IS TURNED OVER TO THE IRAQI AUTHORITIES.

Mr. Omar, a Sunni Muslim, likely will be tortured if he is transferred to Iraqi custody. After the recent public revelations that the Iraqi authorities were torturing persons in their custody, the United States recognized that the risk of torture and abuse in Iraqi custody was so great that several U.S. officials have spoken on record and confirmed that prisoners would not be transferred to Iraqi custody. United States envoy to Baghdad Zalmay Khalilzad stated just last month that "US officials believe that . . . the Interior Ministry has condoned torture of Sunni prisoners and increasingly used the police to settle sectarian scores." David Ignatius, *America's Message to Iraq*, The Washington Post, January 25, 2006 at A19. United States' officials reported they found the Iraqi authorities engaged in the "breaking of bones, torture with electric shock, extraction of fingernails, and cigarette burns to the neck and back" in a Baghdad detention center. Ellen Knickmeyer, *Abuse Cited In 2nd Jail Operated by Iraqi Ministry; Official Says 12 Prisoners Subjected to 'Severe Torture,* THE WASHINGTON POST, December 12, 2005 at A1, attached as Exhibit B. These freely expressed concerns about the conduct of Iraqi authorities from the Government itself suggest that the risk of torture in Iraqi hands is substantial.

Examples of these concerns abound. As recently as December 25, 2005, Major General John D. Gardner of the Army stated in an interview that the military was not going to turn over prisoners to the Iraqis. *See* Eric Schmitt and Thom Shanker, *U.S., Citing Abuse In Iraqi Prisons, Holds Detainees,* THE NEW YORK TIMES, December 25, 2005 at A1, attached as Exhibit B. Now, merely thirty-nine days later, without *any* evidence Iraqi authorities have ceased torturing prisoners, the Department of Justice, by email today, reveals to petitioners that the government intends to hand over Mr. Omar to the Iraqi authorities to be tried in an Iraqi court. Stunningly, the Government appears to believe this transfer to an authority recognized to engage in

9

widespread and systematic torture, particularly of individuals of the Sunni confession like Mr. Omar, is cause for relief, rather than a reason for deep concern.

The United States Congress and the federal judiciary have declared unambiguously that any government acts which contribute even to the *possibility* of torture will not be tolerated. FARRA sets forth "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." Pub. L. No. 105-277, § 2242(a).

The "federal courts have jurisdiction under § 2241 to consider claims arising under CAT, as implemented by FARRA." *Wang v. Ashcroft*, 320 F.3d 130, 142 (2d Cir. 2003); *see also Ogbudimpka v. Ashcroft*, 342 F. 3d 207, 220 (3rd Cir. 2003) ("[T]hose individuals whose detention violates FARRA may challenge their detention under 28 U.S.C. § 2241.").

### IV. SHAWQI OMAR, A UNITED STATES CITIZEN, MUST BE PROTECTED FROM ILLEGAL EXTRADITION

Petitioner's transfer to Iraqi custody cannot be justified by and would violate established law governing the extradition of United States citizens. Foreign extradition procedure is expressly governed by the federal extradition statute, 18 U.S.C. §§ 3181-3196, and by the applicable treaty governing extradition to the foreign nation, here the Extradition Treaty Between the United States of America and Iraq., U.S.-Iraq, June 7, 1934, 49 Stat. 3380. Extradition may occur only *after* the completion of a well-established process that provides "a legal framework" and "interpose[s] the judiciary between the executive and the individual." *Lo Duca v. United States*, 93 F.3d 1100, 1103 (2d Cir. 1996).

Specifically, when a foreign government seeks the extradition of a prisoner in United States custody, that government must first submit to a judicial officer a formal complaint seeking

an arrest warrant and setting forth the legal and factual bases for extradition. The judge must then determine, after a hearing, whether the offense is extraditable and whether there is probable cause to support the charged offense. *See* 18 U.S.C. § 3184; *see also Kirkland v. Preston*, 385 F.2d 670, 677 n.19 (D.C. Cir. 1967). Only if the warrant meets these conditions, will a court issue a certificate of extradition, 18 U.S.C. § 3186, and that determination is then subject to review by habeas corpus. *United States v. Kin-Hong*, 110 F.3d 103, 116 (1st Cir. 1997). Under *no* circumstance, may the United States extradite an individual to a country where there are substantial grounds for believing that he would be in danger of being subjected to torture. 22 C.F.R. § 95.2(a).

Petitioner's imminent, dark-of-night transfer to Iraqi custody flouts these requirements. There has been *no* formal request by Iraq to a U.S. judicial officer for a warrant seeking Petitioner's arrest; *no* judicial hearing to determine whether there is probable cause to support the charged offense; and *no* certificate issued by a judicial officer. Further, for the reasons stated above, there are substantial grounds to believe that Petitioner would be in danger of being subjected to torture if transferred to Iraqi custody.

### V. MAINTAINING THE STATUS QUO PROTECTS MR. OMAR AND DOES NOT HARM THE GOVERNMENT.

In stark contrast to the actual bodily harm and loss of opportunity for legal redress that Mr. Omar confronts, the government will not be harmed by being enjoined from transferring Mr. Omar to Iraqi custody. After all, the government held him for fifteen months without ever transferring him to Iraqi control. Now, suddenly, because the government's actions are subject to judicial scrutiny, the government wants to move Petitioner out of this Court's jurisdiction. Respondents will suffer no harm by being restrained from removing Mr. Omar until a hearing on

this matter can be held. Respondents have held Mr. Omar in military custody for fifteen months. They will surely not be harmed by continuing to do so for two weeks.

## VI. THE PUBLIC HAS AN INTEREST IN HAVING THE EXECUTIVE BRANCH BEING REQUIRED TO ABIDE BY THE RULE OF LAW AND REFRAIN FROM CAUSING THE TORTURE OF A UNITED STATES CITIZEN.

It is clear that public policy favors, embodied in the FARRA and favors restraining the executive branch of the government on the facts here. The government cannot brazenly evade the fair and due process required to determine the factual and legal basis for the imprisonment of an American citizen by simply transferring Mr. Omar to the Iraqi authorities.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant the motion for a Temporary Restraining Order and enter an Order temporarily and immediately enjoining the government from transferring Shawqi Omar out of United States' custody until this Court can hold a hearing on the underlying petition for writ of habeas corpus.

A proposed Order is attached.

Dated: February 2, 2005

Respectfully submitted,

Susan L. Burke (D.C. Bar # 414939)
Heather L. Allred
BURKE PYLE LLC
3527 Lancaster Avenue
Philadelphia, PA 19104
Telephone:    (215) 387-4705
Facsimile:    (215) 387-4713

Joseph Margulies
MACARTHUR JUSTICE CENTER,
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 East 60th Street
Chicago, IL 60637
Telephone:    (773) 702-9560
Facsimile:    (773) 702-0771

Aziz Z. Huq
Jonathan Hafetz
BRENNAN CENTER FOR JUSTICE, NEW
YORK UNIVERSITY LAW SCHOOL
161 Avenue of the Americas
12th Floor
New York, NY 10013
Telephone:    (212) 998-6730
Facsimile:    (212) 995-4550

*Counsel for Petitioner*

13