## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SANDRA K. OMAR, *et. al.*, | ) | |
| Petitioners, | ) | CIVIL ACTION NO. 05-2374 (RMU) |
| | ) | |
| v. | ) | |
| | ) | |
| FRANCIS J. HARVEY, *et. al.*, | ) | |
| Respondents. | ) | |
| | ) | |
| | ) | |

### *MOTION FOR A TEMPORARY RESTRAINING ORDER*

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, Petitioners hereby apply

for a Temporary Restraining Order Preventing the transfer of Shawqi Omar to the authority of

any other government, sovereign, country, or agency until this Court has an opportunity to

consider and decide the merits of this Petition. The grounds in support of this motion are

contained in the accompanying memorandum of points and authorities.

Dated: February __2__, 2005                    Respectfully submitted,

Susan L. Burke (D.C. Bar # 414939)
Heather L. Allred
BURKE PYLE LLC
3527 Lancaster Avenue
Philadelphia, PA 19104
Telephone:     (215) 387-4705
Facsimile:     (215) 387-4713

Joseph Margulies
MACARTHUR JUSTICE CENTER,
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 East 60th Street
Chicago, IL 60637
Telephone:     (773) 702-9560

Facsimile:     (773) 702-0771

Aziz Z. Huq
Jonathan Hafetz
BRENNAN CENTER FOR JUSTICE, NEW
YORK UNIVERSITY LAW SCHOOL
161 Avenue of the Americas
12th Floor
New York, NY  10013
Telephone:     (212) 998-6730
Facsimile:     (212) 995-4550


*Counsel for Petitioners*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SANDRA K. OMAR, *et. al.*,<br>    Petitioners,<br><br>v.<br><br>FRANCIS J. HARVEY, *et. al.*,<br>    Respondents. | )<br>)<br>)<br>)<br>)    CIVIL ACTION NO. 05-2374 (RMU)<br>)<br>)<br>)<br>)<br>)<br>) |

## *MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONERS' EX PARTE AND EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER*

Petitioners learned today that the federal government intends to transfer United States citizen Shawqi Omar out of the United States' jurisdiction and into Iraqi custody. Petitioners seek the immediate entry of a temporary restraining order to ensure that Shawqi Omar is not transferred from United States jurisdiction and control to Iraqi custody. Petitioners file this motion on an *ex parte* and emergency basis because they have reasonable grounds to believe based on the conduct to date that the government may accelerate the process in order to evade judicial scrutiny.

## STATEMENT OF FACTS

Shawqi Omar, the subject of the instant petition for writ of *habeas corpus*, is a United States citizen who has been imprisoned without charge since October 29, 2004. Petitioners filed for a writ of *habeas corpus* on Mr. Omar's behalf in this Court on December 12, 2005, asking for his immediate release. The government was served by registered mail, return receipt requested, the same day. *See Certificate of Service attached to Petition for Writ of Habeas Corpus (filed Dec. 12, 2005).*

On January 19, 2006, after a month without response from the government, Petitioners filed a motion for immediate issuance of an order to show cause. The Court granted the motion and ordered the government to show cause by January 27, 2006 why the petition should not be granted. *See Order (January 20, 2006).* That response date was extended by consent to February 9, 2006. *See Minute Order (January 25, 2006).*

Petitioners have now learned that the government, after being served with the habeas petition, unilaterally and without notice to counsel began to change the circumstances of Mr. Omar's detention. Immediately after the January 20 Order was entered by the Court, the United States moved Mr. Omar from Camp Bucca to Abu Ghraib. A family member visited Mr. Omar at Abu Ghraib, and learned that he subjected to some form of proceeding or hearing on or about February 3, 2006. *See Declaration of Susan L. Burke ("Burke Decl.") at ¶ 2, attached as Exhibit A.*

After learning this information, petitioners immediately alerted the government attorney, as well as the International Red Cross, that they wanted to participate in any scheduled proceeding as counsel for Mr. Omar. *Burke Decl. at ¶ 3.* It is possible and feasible for undersigned counsel to participate directly in the hearing because Abu Ghraib has a functional videolink with the United States. *Burke Decl. at ¶ 4.* Petitioners further indicated that they had a personal representative in Iraq, and requested that he be present at the scheduled proceeding to assist Mr. Omar.

Today, petitioners learned from the government that they intend to relinquish custody of Mr. Omar by transferring him to the jurisdiction of Iraq. Specifically, the government revealed that:

> Mr. Omar is currently in the custody of Multinational Force-Iraq, and *a determination was previously made to refer his case to the Central Criminal*

2

*Court of Iraq (CCCI)*.  We are informed that no hearing in his case is scheduled
for Friday, February 3, 2006.  We understand that when Mr. Omar appears for any
hearing in the CCCI, he is afforded counsel (either retained by him/his family, or
appointed by the Court).  If Mr. Omar decides to use retained local counsel rather
than Court-appointed counsel, we are informed that he/his family can provide to
the CCCI the contact information for his retained local counsel before the hearing
begins and that Court personnel will notify the retained local counsel at that time.
Please be advised that, whenever scheduled, we would not be able to disclose to
you the date of any hearing for security reasons (including the safety of Mr.
Omar).

*Burke Decl.  at ¶ 5* (emphasis added).

Thus, the government – rather than defend Mr. Omar's prolonged military detention in

this Court-- intends to transfer him to Iraqi custody despite having vowed publicly it  would not

transfer *any* prisoners (including Iraqi nationals) to the jurisdiction of Iraq because Iraqi

authorities are torturing prisoners.  Press clippings evidencing the government's statements that

acknowledge that the Iraqi authorities are torturing prisoners are attached as Exhibit B.

The government is on record stating that prisoners would not be transferred to Iraqi

custody.  The United States envoy to Baghdad, Zalmay Khalilzad, has stated that that "U.S.

officials believe that. . . the Interior Ministry has condoned torture of Sunni prisoners and

increasingly used the police to settle sectarian scores." David Ignatius, *America's Message to

Iraq*, The Washington Post, January 25, 2006 at A19.  Other United States officials have

reported that they found the Iraqi authorities had engaged in the "breaking of bones, torture with

electric shock, extraction of fingernails, and cigarette burns to the neck and back" in a Baghdad

detention center.  Ellen Knickmeyer, *Abuse Cited In 2nd Jail Operated by Iraqi Ministry;

Official Says 12 Prisoners Subjected to 'Severe Torture,* THE WASHINGTON POST, December 12,

2005 at A1.

The government knows from the letter of the law as well as from this past judicial

experience that it is not permitted to render a United States citizen to another jurisdiction without

3

going through an appropriate extradition process, particularly when there is a likelihood that the

citizen will be tortured as a result. Such transfers -- called "rendition," "irregular rendition," or

"extraordinary rendition" -- are not permitted to be made even as to non-citizens without

complying with extradition or other legal process. Indeed, numerous courts in this district have

stopped the government from engaging in such unlawful transfers of *foreign nationals* to

jurisdictions that practice torture. *See, e.g.*, *Abdah v. Bush,* Civil Action No. 04-1254, 2005 WL

589812 (D.D.C. Mar. 12, 2005); *al-Marri v. Bush*, 2005 WL 774843 (D.D.C. Apr. 4, 2005). Yet

here, the government is trying to engage in just such misconduct with respect to a United States

citizen who is unquestionably protected the Constitution and the laws of this land. Such action is

truly beyond the pale, and mandates immediate relief from this Court.

## ARGUMENT

Petitioners seek the emergency entry of a temporary restraining order ("TRO") in order to

preserve the *status quo* – namely, Mr. Omar in the custody and control of the United States.

Although Mr. Omar may not be safe from physical and mental harm in United States custody,

petitioners still have the ability to seek the intervention of this Court to ensure adherence to the

rule of law when Mr. Omar remains in United States custody. The government cannot be

permitted to evade judicial scrutiny by handing Mr. Omar over to the jurisdiction of Iraq as soon

as Petitioner challenges the basis of his detention in this Court. Nor can the government ignore

the fact that it is on record as acknowledging that the present Iraqi government is torturing

prisoners, particularly Sunni prisoners.

Petitioners clearly meet the four elements necessary for the issuance of a TRO: (1)

petitioners are likely to succeed on the merits; (2) Mr. Omar will be irreparably injured  -- by

physical torture -- if immediate relief is withheld; (3) an injunction will not substantially harm

4

anyone; and (4) an injunction would further the public interest in ensuring that the United States does not willingly ignore the Constitution and the rule of law to engage in or participate in torture. *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005) (citations omitted). "The test is a flexible one[,]" and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor. *Id.*

Significantly, Mr. Omar does not seek to change the status quo – but rather to prevent a unilateral act by one party to the litigation that certainly will have the effect of prejudicing him directly, and radically changing the issues before the Court. It is well settled that this kind of conservative TRO demands a lesser showing than an effort to change the status quo. "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (citation omitted).. Further, where the balance of hardships tips decidedly toward the movant -- as it clearly does here -- it will "'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Id.* at 844.

## I.    THE COURT HAS THE POWER TO TAKE ACTION TO PRESERVE ITS JURISDICTION.

It is well settled that a federal Court having jurisdiction to hear an action is empowered to take whatever action is necessary to preserve its jurisdiction. This much follows from Mr. Omar's constitutional right to due process under the Fifth Amendment. "[D]ue process requires, at a minimum, that . . . persons forced to settle their claims of right and duty through the judicial

process must be given meaningful opportunity to be heard." *Boddie v. Connecticut*, 401 U.S. 371, 377-78 (1971). Under Federal Rule of Appellate Procedure 23(a) and under the All Writs Act, 28 U.S.C. § 1651(a), a district court with habeas jurisdiction also has the power to enjoin any action that would deprive it of that jurisdiction: The Federal Rule specifically mentions transfers of petitioners as one such action. "[T]he All Writs Act, empowers a district court to issue injunctions to protect its jurisdiction." *SEC v. Vision Communs.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *see also* Fed. R. App. P. 23(a) ("pending review of a decision in a habeas corpus proceeding commenced before a court . . . the person having custody of the prisoner must not transfer custody to another unless a transfer is directed in accordance with this rule.")

Mr. Omar is a United States citizen in United States custody. Without doubt, the District Court has both jurisdiction to hear Mr. Omar's habeas claim and statutory power to enjoin the government from evading review by transferring the petitioner to foreign authorities or taking any other action to avoid this Court's jurisdiction. Without the requested injunctive relief, the government will, by taking the actions expressed in the Department of Justice's email of today's date to counsel, render meaningless Mr. Omar's constitutional right to challenge the constitutionality and legality of his confinement by U.S. authorities, by the simple expedient of handing him off to the Iraqi criminal authorities who may be beyond the jurisdiction of this Court or the United States Constitution. To allow this would be to afford the executive branch the unfettered and unchecked power to deprive summarily a United States citizen of the most fundamental constitutional protection -- without any judicial review of the conduct.

## II.    THE GOVERNMENT CANNOT EXTINGUISH HABEAS RIGHTS BY FIAT.

If the government succeeds in its plan to transfer Mr. Omar to Iraqi criminal authorities before this Court hears the merits of his habeas petition, the Court may lose any effective review

over the power of the executive to imprison without charge for fifteen months a United States citizen. His habeas claims would be, not just suspended, but effectively extinguished by fiat.

The federal judiciary has already stopped the government from implementing this evasive maneuver in a matter that did not even involve a United States citizen. In *Abdah v. Bush,* Civil Action No. 04-1254, a District Court ruled that that the government cannot transfer or remove a non-citizen prisoner being held at Guantanamo Bay to a location outside the Court's jurisdiction. *See Abdah v. Bush*, 2005 WL 711814 (D.D.C. March 29, 2005) ("Petitioners' transfer to another nation would assuredly deprive the court of its jurisdiction. Petitioners thus demonstrate . . . a clear likelihood of success in blocking a transfer made absent notice to, and approval from, the court.").

The government is trying to deprive Mr. Omar of his indisputable rights to procedural due process under the Fifth Amendment and Article I, section 9, clause 2 of the United States Constitution. These rights have been reaffirmed in *Hamdi v. Rumsfeld*, in which the Supreme Court set forth clear constitutional limits on the government's right to imprison citizens found on the battlefield. The Court concluded such detention was proper only "for the duration of the conflict" and that these detainees must be provided with, in part, "a fair opportunity to rebut the Government's factual assertions before a neutral decision maker." 542 U.S. 507, 601 (2004) (O'Connor, J., concurring).[1]

---

[1] There is no question that U.S. citizens have a liberty interest that this Court must defend against unconstitutional incursion from the government, regardless of the location of the person Indeed, in *Hamdi v. Rumsfeld* , the Supreme Court confirmed that even an alleged "enemy combatants," captured on an actual, real battlefield had an indefeasible liberty interest *wherever* they may be held. 542 U.S. at 530 ("We reaffirm today the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law.") That *Hamdi*'s holding was intended to include citizens detained outside U.S. territory or exclusive territorial is implicitly confirmed *inter alia* by dicta explaining that this holding is

The government's attempt at a middle-of-the-night transfer also violates petitioner's substantive due process right to be free of torture. *Chavez v. Martinez*, 538 U.S. 760, 773 (2003) (plurality op.); *Miller v. Fenton*, 474 U.S. 104, 109 (1985); (torture or other abusive interrogation techniques "are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause"). There can be no doubt that the government's eleventh hour transfer – commenced only after the filing of a petition for judicial review – of a United States citizen to a foreign government that the United States has publicly stated engages in torture in an effort to avoid judicial review is conduct that "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952).

Further, a transfer by the government would, in addition, violate the Convention Against Torture ("CAT"), as embodied in statutory form in the U.S. Congress in the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") of 1998. That statute states: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242(a) (1998). Yet here, it is clear that there is a strong likelihood, based on the government's own repeated admissions about the treatment of prisoners by Iraqi authorities, that Mr. Omar will be tortured if he is turned over to the Iraqi authorities.

---

designed to protect, among others, "the errant tourist, embedded journalist, or local aid worker," *id.* at 534—hardly terms used to describe U.S. citizens facing detention *within* U.S. territory.

### III.    THERE IS A STRONG LIKELIHOOD THAT MR. OMAR WILL BE TORTURED IF HE IS TURNED OVER TO THE IRAQI AUTHORITIES.

Mr. Omar, a Sunni Muslim, likely will be tortured if he is transferred to Iraqi custody. After the recent public revelations that the Iraqi authorities were torturing persons in their custody, the United States recognized that the risk of torture and abuse in Iraqi custody was so great that several U.S. officials have spoken on record and confirmed that prisoners would not be transferred to Iraqi custody. United States envoy to Baghdad Zalmay Khalilzad stated just last month that "US officials believe that . . . the Interior Ministry has condoned torture of Sunni prisoners and increasingly used the police to settle sectarian scores." David Ignatius, *America's Message to Iraq*, The Washington Post, January 25, 2006 at A19. United States' officials reported they found the Iraqi authorities engaged in the "breaking of bones, torture with electric shock, extraction of fingernails, and cigarette burns to the neck and back" in a Baghdad detention center. Ellen Knickmeyer, *Abuse Cited In 2nd Jail Operated by Iraqi Ministry; Official Says 12 Prisoners Subjected to 'Severe Torture,* THE WASHINGTON POST, December 12, 2005 at A1, attached as Exhibit B. These freely expressed concerns about the conduct of Iraqi authorities from the Government itself suggest that the risk of torture in Iraqi hands is substantial.

Examples of these concerns abound. As recently as December 25, 2005, Major General John D. Gardner of the Army stated in an interview that the military was not going to turn over prisoners to the Iraqis. *See* Eric Schmitt and Thom Shanker, *U.S., Citing Abuse In Iraqi Prisons, Holds Detainees,* THE NEW YORK TIMES, December 25, 2005 at A1, attached as Exhibit B. Now, merely thirty-nine days later, without *any* evidence Iraqi authorities have ceased torturing prisoners, the Department of Justice, by email today, reveals to petitioners that the government intends to hand over Mr. Omar to the Iraqi authorities to be tried in an Iraqi court. Stunningly, the Government appears to believe this transfer to an authority recognized to engage in

widespread and systematic torture, particularly of individuals of the Sunni confession like Mr,

Omar, is cause for relief, rather than a reason for deep concern.

The United States Congress and the federal judiciary have declared unambiguously that

any government acts which contribute even to the *possibility* of torture will not be tolerated.

FARRA sets forth "the policy of the United States not to expel, extradite, or otherwise effect the

involuntary return of any person to a country in which there are substantial grounds for believing

the person would be in danger of being subjected to torture, regardless of whether the person is

physically present in the United States." Pub. L. No. 105-277, § 2242(a).

The "federal courts have jurisdiction under § 2241 to consider claims arising under CAT,

as implemented by FARRA." *Wang v. Ashcroft*, 320 F.3d 130, 142 (2d Cir. 2003); *see also*

*Ogbudimpka v. Ashcroft*, 342 F. 3d 207, 220 (3rd Cir. 2003) ("[T]hose individuals whose

detention violates FARRA may challenge their detention under 28 U.S.C. § 2241.").

## IV.   SHAWQI OMAR, A UNITED STATES CITIZEN, MUST BE PROTECTED FROM ILLEGAL EXTRADITION

Petitioner's transfer to Iraqi custody cannot be justified by and would violate established

law governing the extradition of United States citizens.  Foreign extradition procedure is

expressly governed by the federal extradition statute, 18 U.S.C. §§ 3181-3196, and by the

applicable treaty governing extradition to the foreign nation, here the Extradition Treaty Between

the United States of America and Iraq., U.S.-Iraq, June 7, 1934, 49 Stat. 3380.  Extradition may

occur only *after* the completion of a well-established process that provides "a legal framework"

and "interpose[s] the judiciary between the executive and the individual."  *Lo Duca v. United*

*States*, 93 F.3d 1100, 1103 (2d Cir. 1996).

Specifically, when a foreign government seeks the extradition of a prisoner in United

States custody, that government must first submit to a judicial officer a formal complaint seeking

10

an arrest warrant and setting forth the legal and factual bases for extradition. The judge must then determine, after a hearing, whether the offense is extraditable and whether there is probable cause to support the charged offense. *See* 18 U.S.C. § 3184; *see also Kirkland v. Preston*, 385 F.2d 670, 677 n.19 (D.C. Cir. 1967). Only if the warrant meets these conditions, will a court issue a certificate of extradition, 18 U.S.C. § 3186, and that determination is then subject to review by habeas corpus. *United States v. Kin-Hong*, 110 F.3d 103, 116 (1st Cir. 1997). Under *no* circumstance, may the United States extradite an individual to a country where there are substantial grounds for believing that he would be in danger of being subjected to torture. 22 C.F.R. § 95.2(a).

Petitioner's imminent, dark-of-night transfer to Iraqi custody flouts these requirements. There has been *no* formal request by Iraq to a U.S. judicial officer for a warrant seeking Petitioner's arrest; *no* judicial hearing to determine whether there is probable cause to support the charged offense; and *no* certificate issued by a judicial officer. Further, for the reasons stated above, there are substantial grounds to believe that Petitioner would be in danger of being subjected to torture if transferred to Iraqi custody.

## V.    MAINTAINING THE STATUS QUO PROTECTS MR. OMAR AND DOES NOT HARM THE GOVERNMENT.

In stark contrast to the actual bodily harm and loss of opportunity for legal redress that Mr. Omar confronts, the government will not be harmed by being enjoined from transferring Mr. Omar to Iraqi custody. After all, the government held him for fifteen months without ever transferring him to Iraqi control. Now, suddenly, because the government's actions are subject to judicial scrutiny, the government wants to move Petitioner out of this Court's jurisdiction. Respondents will suffer no harm by being restrained from removing Mr. Omar until a hearing on

this matter can be held.  Respondents have held Mr. Omar in military custody for fifteen months. They will surely not be harmed by continuing to do so for two weeks.

## VI.    THE PUBLIC HAS AN INTEREST IN HAVING THE EXECUTIVE BRANCH BEING REQUIRED TO ABIDE BY THE RULE OF LAW AND REFRAIN FROM CAUSING THE TORTURE OF A UNITED STATES CITIZEN.

It is clear that public policy favors, embodied in the FARRA and favors restraining the executive branch of the government on the facts here.  The government cannot brazenly evade the fair and due process required to determine the factual and legal basis for the imprisonment of an American citizen by simply transferring Mr. Omar to the Iraqi authorities.

### CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant the motion for a Temporary Restraining Order and enter an Order temporarily and immediately enjoining the government from transferring Shawqi Omar out of United States' custody until this Court can hold a hearing on the underlying petition for writ of habeas corpus.

A proposed Order is attached.

Dated: February 2, 2005

Respectfully submitted,

Susan L. Burke (D.C. Bar # 414939)
Heather L. Allred
BURKE PYLE LLC
3527 Lancaster Avenue
Philadelphia, PA 19104
Telephone:    (215) 387-4705
Facsimile:    (215) 387-4713

Joseph Margulies
MACARTHUR JUSTICE CENTER,
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 East 60th Street
Chicago, IL  60637
Telephone:    (773) 702-9560
Facsimile:    (773) 702-0771

Aziz Z. Huq
Jonathan Hafetz
BRENNAN CENTER FOR JUSTICE, NEW
YORK UNIVERSITY LAW SCHOOL
161 Avenue of the Americas
12th Floor
New York, NY  10013
Telephone:    (212) 998-6730
Facsimile:    (212) 995-4550

*Counsel for Petitioner*



EXHIBIT
A
1:05 – CV – 02374 – RMU

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

SANDRA K. OMAR, *et. al.*,       )
           **Petitioners,**       )
                              )     **CIVIL ACTION NO. 05-2374 (RMU)**
                              )
**v.**                             )
                              )
FRANCIS J. HARVEY, *et. al.*,     )
           **Respondents.**     )
                              )
                              )

### DECLARATION OF SUSAN L. BURKE

I declare under penalty of perjury that the following is true and correct:

1.     My name is Susan L. Burke and I am the attorney of record for Petitioners Sandra K. Omar and Ahmed Omar.

2.     I learned via electronic communications from Sandra Omar that her husband Shawqi Omar had been transferred from Camp Bucca to Abu Ghraib prison on or around January 24, 2006. I learned that the purpose of the transfer was to subject Shawqi to some type of court proceedings on or about February 3, 2006. I further learned from Sandra that shortly after his transfer, Shawqi was permitted to see a family member for the first time. After learning this information, I immediately contacted the government attorney and the International Committee for the Red Cross ("ICRC"). *See Exhibit 1, copies of letters sent to the Department of Justice and the ICRC.*

3.     I learned from contacts in Iraq that there are videolink facilities within Abu Ghraib Prison.

4.     On February 2, 2006, I learned via email from government attorney Edward H. White, that:

Mr. Omar is currently in the custody of Multinational Force-Iraq, and a determination was previously made to refer his case to the Central Criminal Court of Iraq (CCCI). We are informed that no hearing in his case is scheduled for Friday, February 3, 2006. We understand that when Mr. Omar appears for any hearing in the CCCI, he is afforded counsel (either retained by him/his family, or appointed by the Court). If Mr. Omar decides to use retained local counsel rather than Court-appointed counsel, we are informed that he/his family can provide to the CCCI the contact information for his retained local counsel before the hearing begins and that Court personnel will notify the retained local counsel at that time. Please be advised that, whenever scheduled, we would not be able to disclose to you the date of any hearing for security reasons (including the safety of Mr. Omar).

*See Exhibit 2, copy of email from Edward H. White to Susan L. Burke.*

Executed on:  _2-2-06_

Susan L. Burke

EXHIBIT
1
1:05 – CV – 02374 – RMU



# Burke Pyle LLC

3527 lancaster avenue     philadelphia, pa 19104     tel: 215.387.4705     fax: 215.387.4713

January 31, 2006

**By facsimile, email and regular mail**

Delegation of the International Committee of the Red Cross
P.O. Box 3317
Al Alwiyah post office
BAGHDAD

    *Re: U.S. Detainee Shawqi Ahmad Omar, Detainee No. 200165*

To Whom It May Concern:

    We write as counsel for Shawqi Omar, a United States citizen detained by American forces with detainee number 200165. We have learned from Mr. Omar's wife that Mr. Omar is being given a "hearing" at Abu Ghraib prison on *February 3, 2006* after more than one year of captivity in Iraq. As counsel, we have sought access to this proceeding, but are deeply concerned the hearing will be held without Mr. Omar's interests being fairly represented and without independent supervision.

    We urge you to ensure an ICRC presence at the February 3 proceeding to ensure Mr. Omar's rights under the Geneva Conventions and relevant international human rights norms are respected. We understand that Greg Mueller in your office has been assigned to his case.

    United States military forces detained Mr. Omar in Baghdad on October 24, 2004. We do not know whether he received an Article V hearing. Since his arrest, Mr. Omar has been held in various military detention facilities, including Camp Bucca and Abu Ghraib. We understand from his relatives in Baghdad he was physically beaten during his arrest.

    It is vital that Mr. Omar is allowed to be present and to participate meaningfully in any hearing held to determine the lawfulness of his detention. To that end, he must have the rights to be heard, to confront fully evidence laid against, to call witnesses, and to have the assistance of counsel. It is essential that any decision be made in writing, and

Delegation of the International Committee of the Red Cross
January 31, 2006
Page 2

that both Mr. Omar and we, his counsel, be given copies. We urge you to impress on the American authorities that these rights are of vital importance.

Mr. Omar has been detained for more than a year. His family still has not received official word of the cause of the detention. To our knowledge, Mr. Omar has had no opportunity to respond to the detention. We believe he should be released as quickly as possible.

Please contact me at sburke@burkepyle.com or + 1 215 387 4709, or Aziz Huq at aziz.huq@nyu.edu or +1 212 992 8632, if you need more information.

Sincerely,

Susan L. Burke

cc:    Edward H. White, Esq.
       U.S. Department of Justice



3527 lancaster avenue     philadelphia, pa 19104     tel: 215.387.4705     fax: 215.387.4713

January 31, 2006

**By facsimile, email and regular mail**

Edward H. White, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 6110
Washington, DC 20530

     *Re: Omar v. Harvey, 05-2374*

Dear Ned:

     As you know, we represent Petitioner Shawqi Omar in the above action challenging his prolonged military detention in Iraq. We have just learned that Mr. Omar is scheduled for some kind of proceeding at the Abu Ghraib prison in Iraq on February 3, 2006 – after more than one year of captivity and less than a week before the Government's response to Mr. Omar's habeas petition is due. We write to demand that we be permitted to attend and to participate in this proceeding, and that we be provided with a writing that sets forth any charges against Mr. Omar. Our representative in Baghdad will be able to attend the proceeding.

     It is vital that Mr. Omar be present and be accorded a full opportunity to participate meaningfully in any hearing held to determine the lawfulness of his detention. To that end, he must have the opportunity to be heard, to confront fully any evidence against him, to call witnesses, and to the assistance of counsel. It is also essential that any decision be made in writing, and that copies are provided promptly to Mr. Omar and undersigned counsel. As we indicated in the habeas petition, we do not believe that any proceeding short of an Article III criminal proceeding justifies continued detention,

Edward H. White
January 31, 2006
Page 2

Please notify us immediately with details of who should be contacted to arrange for our attendance at the February 3, 2006, proceeding.

Sincerely,

Susan L. Burke



3527 lancaster avenue        philadelphia, pa 19104        tel: 215.387.4705        fax: 215.387.4713

February 1, 2006

**By facsimile, email and regular mail**

Dr. Zalmay Khalilzad, Ambassador
Embassy of the United States
APO AE 09316
Baghdad, Iraq

   *Re:* *U.S. Prisoner Shawqi Ahmad Omar, Detainee No. 200165*
      *Omar v. Harvey, 05-2374*

Dear Ambassador Khalilzad:

   I am part of a legal team representing Mr. Shawqi Omar, a United States citizen who has been imprisoned by United States military forces in Iraq since October 29, 2004. After being retained by Mr. Omar's wife and oldest son, we filed a petition for writ of habeas corpus on Mr. Omar's behalf in the United States District Court for the District of Columbia on December 12, 2005, asking for his immediate release. That Court has ordered the United States to explain why the petition should not be granted. The United States' response is due on February 9, 2006.

   Yesterday, we learned that Mr. Omar will be subject to an unknown type of hearing at Abu Ghraib on Friday, February 3, 2006. Mr. Omar has been imprisoned without charge for over a year, but we understand that he may have recently been or may very soon be formally charged. We have not yet received any copy of any charges against him.

   We are asking for your immediate assistance in securing the right to counsel for this American citizen at what appears to be a crucial proceeding. We understand Abu Ghraib has videolink facilities, so it should not be a problem for us to participate in the proceeding from the United States. In addition, we would like to send our full-time employee in Baghdad to Abu

Ghraib to be physically present during the proceeding to provide additional support for Mr. Omar. Although he is not an attorney, he is our agent and representative and is best able to further our representation of Mr. Omar.

We very much appreciate any assistance you are able to provide. If you learn any information, please contact me at the above numbers or at sburke@burkepyle.com.

Sincerely,

Susan L. Burke

cc via email:    Edward H. White, Esq., U.S. Department of Justice
Greg Mueller, International Committee of the Red Cross



3527 lancaster avenue          philadelphia, pa 19104          tel: 215.387.4705          fax: 215.387.4713

February 1, 2006

**By facsimile, email and regular mail**

Richard C. Hermann, U.S. Consul General
Embassy of the United States
APO AE 09316
Baghdad, Iraq

      *Re:*   *U.S. Prisoner Shawqi Ahmad Omar, Detainee No. 200165*
            *Omar v. Harvey, 05-2374*

Dear Mr. Hermann:

      I am part of a legal team representing Mr. Shawqi Omar, a United States citizen who has been imprisoned by United States military forces in Iraq since October 29, 2004. After being retained by Mr. Omar's wife and oldest son, we filed a petition for writ of habeas corpus on Mr. Omar's behalf in the United States District Court for the District of Columbia on December 12, 2005, asking for his immediate release. That Court has ordered the United States to explain why the petition should not be granted. The United States' response is due on February 9, 2006.

      Yesterday, we learned that Mr. Omar will be subject to an unknown type of hearing at Abu Ghraib on Friday, February 3, 2006. Mr. Omar has been imprisoned without charge for over a year, but we understand that he may have recently been or very soon about to be formally charged. We have not yet received any copy of any charges against him.

      We are asking for your immediate assistance in securing protection of the right to counsel for this American citizen at what appears to be a crucial proceeding. We understand Abu Ghraib has videolink facilities, so it should not be a problem for us to participate in the proceeding from the United States. In addition, we would like to send our full-time employee in Baghdad to Abu

Richard C. Hermann, U.S. Consul General
February 1, 2006
Page 2

Ghraib to be physically present during the proceeding to provide additional support for Mr. Omar.  Although he is not an attorney, he is our agent and representative and is best able to further our representation of Mr. Omar.

We very much appreciate any assistance you are able to provide.  If you learn any information, please contact me at the above numbers or at sburke@burkepyle.com.

Sincerely,

Susan L. Burke

cc via email:  Edward H. White, Esq., U.S. Department of Justice
Greg Mueller, International Committee of the Red Cross

EXHIBIT
2
1:05 – CV – 02374 – RMU

**Heather Allred**

| | |
|---|---|
| **From:** | Ned.White@usdoj.gov |
| **Sent:** | Thursday, February 02, 2006 9:28 AM |
| **To:** | sburke@burkepyle.com (Receipt Notification Requested) (IPM Return Requested); halred@burkepyle.com (Receipt Notification Requested) (IPM Return Requested) |
| **Subject:** | RE: Omar v. Harvey |

Susan,

I write in response to your letter dated January 31, 2006 and our subsequent email communications with respect to this matter.  Mr. Omar is currently in the custody of Multinational Force-Iraq, and a determination was previously made to refer his case to the Central Criminal Court of Iraq (CCCI).  We are informed that no hearing in his case is scheduled for Friday, February 3, 2006.  We understand that when Mr. Omar appears for any hearing in the CCCI, he is afforded counsel (either retained by him/his family, or appointed by the Court).  If Mr. Omar decides to use retained local counsel rather than Court-appointed counsel, we are informed that he/his family can provide to the CCCI the contact information for his retained local counsel before the hearing begins and that Court personnel will notify the retained local counsel at that time.  Please be advised that, whenever scheduled, we would not be able to disclose to you the date of any hearing for security reasons (including the safety of Mr. Omar).  I trust that this information satisfactorily resolves the concerns that prompted your inquiry.

Best regards,

Ned White
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
Tel: (202) 514-5108
Fax: (202) 318-4268

-----Original Message-----
From: hallred@burkepyle.com [mailto:hallred@burkepyle.com]
Sent: Wednesday, February 01, 2006 6:29 PM
To: usconsulbaghdad@state.gov
Cc: White, Ned (CIV); iraq.iqs@icrc.org; sburke@burkepyle.com
Subject: U.S. Citizen detained at Abu Ghraib
Importance: High

Please see attached urgent letter to Ambassador Khalilzad.

---

Heather L. Allred

Burke Pyle LLC

3527 Lancaster Avenue

Philadelphia, PA 19104

215.382.2383

267.679.2674 (cell)

215.387.4713 (fax)

hallred@burkepyle.com

This message may contain privileged and confidential information.  If you are not the intended recipient, please alert me and delete the message.
Thank you.

EXHIBIT

B

1:05 – CV – 02374 – RMU

1 of 1 DOCUMENT

Copyright 2005 The New York Times Company
The New York Times

December 25, 2005 Sunday
Late Edition - Final

**SECTION:** Section 1; Column 6; Foreign Desk; Pg. 1

**LENGTH:** 1305 words

**HEADLINE:** U.S., Citing Abuse In Iraqi Prisons, Holds Detainees

**BYLINE:** By ERIC SCHMITT and THOM SHANKER

**DATELINE:** WASHINGTON, Dec. 24

**BODY:**

The commander of American-run prisons in Iraq says the military will not turn over any detainees or detention centers to Iraqi jailers until American officials are satisfied that the Iraqis are meeting United States standards for the care and custody of detainees.

"Bottom line, we will not pass on facilities or detainees until they meet the standards we define and that we are using today," the commander, Maj. Gen. John D. Gardner of the Army, said in a telephone interview this week from Iraq.

The comments by General Gardner come in the aftermath of two recent raids of Iraqi government detention centers that uncovered scores of abused prisoners. They also follow calls by American officials for the Iraqi government to bar militias from dominating the security forces. American military experts have joined Iraqi officials in inspecting Iraqi detention centers.

The general's remarks also come at a time when three of the main American-operated prisons in Iraq remain severely overcrowded despite a $50 million expansion that is nearly finished and when Americans are training Iraqis to take over detention duties.

Pentagon and military officials say that Gen. George W. Casey Jr., the senior American commander in Iraq, has expressed frustrations over the heavy burden of guarding and caring for a detainee population that is growing far faster than inmates can be processed and turned over to Iraqi authorities.

The number of violent detainees has grown to more than 14,000 from about 8,000 in January. The crowding has been compounded by a growing backlog of prisoners, now about 3,100 people, who are waiting for Iraq's fledgling judicial system to hear their cases.

General Gardner, who took command on Nov. 30, expressed optimism that the inspections of Iraqi detention sites would not unduly delay the American goal of delivering Iraqi detainees to the Iraqi government. Military officials said they had a tentative target of turning over American-run prisons to the Iraqis by the end of 2006, although no exact timetable has been approved. But other senior military officials said turning over all Iraqi prisoners to the Iraqis could stretch into 2007.

One Pentagon official described the Iraqi detainee population as a "millstone" that sapped personnel who otherwise could be assigned to other pressing missions. About 3,700 American personnel are assigned to detention operations, the equivalent of one full brigade out of the 17 American brigades now in Iraq, a figure that is scheduled to drop to 15 early next year.

U.S., Citing Abuse In Iraqi Prisons, Holds Detainees  The New York Times

Pentagon and military officials say the huge number of prisoners under American control is a constant source of tension with ordinary Iraqis two years after the Abu Ghraib prisoner-abuse scandal came to light.

General Gardner said that he was painfully aware of the legacy of Abu Ghraib, but insisted that conditions at the American-run prisons in Iraq had improved strikingly. "Abu Ghraib was criminal and I was appalled," he said. "We've come a long way since then."

The issue of Iraqi detainees raises complex legal and diplomatic questions. The United States has pledged to conduct itself in keeping with international conventions, including one regarding torture that precludes handing prisoners to any country where they would face the likelihood of torture. Iraq is not a signatory to that treaty, and it is hard for the United States at this point to certify that some of these prisoners would not be tortured if put under the control of Iraqi jailkeepers.

The influx of detainees has swelled the population at the major American-run prisons to 119 percent of their ideal capacity, General Gardner said. As of this week, the military is holding 14,055 detainees in four prisons, a military spokesman, Lt. Aaron J. Henninger, said. In addition, 535 are being held at the brigade or division level around the country.

At Abu Ghraib, where crowding contributed to the worst of the prisoner abuses that occurred in late 2003, there are 4,924 detainees, nearly 40 percent over what the military considers ideal capacity.

At the largest center, Camp Bucca, in the south, the prison has been divided into compounds of about 150 people instead of 600 or more, to allow guards to maintain better control. There are 7,795 detainees there.

Camp Cropper, at the Baghdad airport, holds 140 prisoners, including dozens of so-called high-value detainees. Fort Suse, a 1980's Russian barracks in northern Iraq, was turned into a prison in October and holds 1,196 detainees.

The increase in the number of imprisoned foreign fighters -- to 465 from 391 in June -- underscores the shifting profile of insurgents taken into custody recently. These fighters come mainly from Syria, Egypt, Saudi Arabia, Sudan and Jordan, the command said. In a survey taken in October, of the more than 3,500 new detainees in American-operated prisons in Iraq since January, about 87 percent were deemed to pose a "high risk" or "extremely high risk" to American personnel, about twice the percentage from late last year, military officials said. American officials this week were reclassifying all detainees as either low, medium or high-risk prisoners.

Many of the new prisoners are considered so dangerous that two review boards, each staffed by six Iraqi and three allied officials, are now ordering them released in only 35 to 40 percent of the cases, General Gardner said, down from 60 percent last year. Each panel reviews about 400 cases a week, he said.

Under rules put in place in June 2004, the United States must release detainees held in American custody after 18 months unless the Iraqi prime minister and General Casey agree to continue to hold them for a specified period, said Lt. Col. Guy Rudisill, another military spokesman. About 130 detainees face hearings under this process in January and a similar number in February, he said in an e-mail message.

The transfer of the American-run detention centers will require training and equipping Iraqis to operate the prisons.

Lt. Col. Barry Johnson, director of the Coalition Press Information Center in Baghdad, said via an e-mail message that the transition plan had four basic steps.

First is instruction on the basics of how to be a prison guard, a course taught by visiting American Justice Department instructors. So far, about 300 guards designated to work side by side with American jailers at internment centers run by American forces have completed the program, Colonel Johnson said. Another 450 guards are currently in the course, and the next session is expected to include approximately 150 Iraqi guards.

The second step involves Iraqi guards actually working alongside guards at detention centers under American control. The 300 guards who completed the classroom instruction in October are now working at the Fort Suse center with American guards, Colonel Johnson said.

Camp Bucca is scheduled to receive 150 Iraqi guards this month, and Fort Suse will receive another 150 Iraqi guards before the New Year, bringing the total to 450. Early next year, Camp Bucca will receive an additional 300 Iraqi guards, also bringing the total there to 450, Colonel Johnson said.

U.S., Citing Abuse In Iraqi Prisons, Holds Detainees  The New York Times

Step three, he said, involves Iraqi guards taking the lead of detention operations under the supervision of the American forces.

"This will allow us to work continually with them to ensure all standards of humane treatment and quality of care are maintained," Colonel Johnson said. "This process mirrors what we are doing for security transition across the country."

In the final stage, he said, "oversight will be reduced until the Iraqis are ready to completely assume control."

No specific timetable for the final transition has been set. "The transition will be based on meeting standards, not on a timeline," he said.

**URL:** http://www.nytimes.com

**GRAPHIC:** Chart: "Detaining More"Iraqi detainees in American custody.Fort Suse*JUNE 2005: 0DEC. 2005 (through 12/20): 1,196Camp CropperJUNE 2005: 121DEC. 2005 (through 12/20): 140Abu GhraibJUNE 2005: 3,563DEC. 2005 (through 12/20): 4,924Camp BuccaJUNE 2005: 6,451DEC. 2005 (through 12/20): 7,795*Operational on Oct. 24.Main centersJUNE 2005: 10,135DEC. 2005 (through 12/20): 14,055Division and Brigade centersJUNE 2005: 1,695DEC. 2005 (through 12/20): 535TOTALJUNE 2005: 11,830DEC. 2005 (through 12/20): 14,590(Source by U.S. Military, Task Force-134)(pg. 18)

**LOAD-DATE:** December 25, 2005

1 of 27 DOCUMENTS

Copyright 2006 The Washington Post
The Washington Post

January 25, 2006 Wednesday
Final Edition

**SECTION:** Editorial; A19

**LENGTH:** 798 words

**HEADLINE:** America's Message To Iraq

**BYLINE:** David Ignatius

**BODY:**

America's agile envoy in Baghdad, Zalmay Khalilzad, is working these days to cajole Iraqi political leaders to put aside narrow interests in favor of a government of national unity. But behind the political dickering lies a stark message: If the Iraqis can't agree on a broad-based government of reconciliation, the United States may have to reduce its military and economic support. America won't bankroll one side in a civil war.

I spoke with Khalilzad by telephone this week about his efforts to coax a compromise from the Iraqis. By most accounts, the Afghan-born diplomat has been a brilliant ringmaster of the Baghdad political circus. But even he can't soften the dilemma facing the Iraqis: They must find a way to work together or the fragile Iraqi state will unravel.

The American envoy is deploying a weapon the United States hasn't used much in Iraq -- the word "no." He said he is arguing that the new government must give the two security ministries -- Interior and Defense -- to people who have broad national support and aren't linked to sectarian militias. Otherwise, America may have to adjust its massive effort to train and equip the Iraqi security forces.

"The security ministries have to be run by people who are not associated with militias and who are not regarded as sectarian," Khalilzad told me. "The issue is how forces that we're investing a huge amount of money in are perceived by the Iraqis. If they are perceived as sectarian, their effectiveness will not be there. We have insisted on this, stated it clearly. These two ministries need people who are acceptable to all parties of a national unity government. . . . We are saying: If you choose the wrong candidates, that will affect U.S. aid."

Khalilzad's message is aimed largely at Abdul Aziz Hakim, the leader of the Shiite religious coalition that won the largest number of votes in December's election. The current interior minister is a close ally of Hakim's and a former leader of the Shiite militia known as the Badr Brigade. U.S. officials believe that under his control, the Interior Ministry has condoned torture of Sunni prisoners and increasingly used the police to settle sectarian scores. That must stop, the Americans argue.

U.S. officials see Iraq at a decisive turning point following December's election to choose a permanent government. They had hoped the balloting would open the way for a secular coalition that might bridge the bitter divisions among Shiites, Sunnis and Kurds. Instead, the balloting reinforced those sectarian tendencies. Iraqis voted their fears and the us-or-them logic of sectarian conflict. Religious and ethnic parties that maintain strong militias did well; secular parties that support national institutions did poorly.

"We've reached a point of no return now," argues Raad Alkadiri, an Anglo-Iraqi who advised the British government in Baghdad during the first year of occupation and who is now a consultant with PFC Energy in Washington. "Are Iraqis willing to put aside their narrow interests? Is there a real Iraqi state? You can't fudge this. This is the edge of the precipice."

America's Message To Iraq The Washington Post January 25, 2006 Wedn

Khalilzad is telling Shiite and Kurdish leaders that they have a golden opportunity to stabilize the country because of a sharp split that is emerging within the Sunni insurgency. Sunni tribal and political leaders who had been backing the insurgency are increasingly angry at the terrorist tactics of al Qaeda's leader in Iraq, Abu Musab Zarqawi. That opens the way for a deal -- if the Shiites and Kurds want one. "The tectonics are shifting in the Sunni heartland," Khalilzad told me. "A fault line is developing that is going to expand, between Zarqawi and his allies and elements of the insurgency."

If the Iraqis can reach across the sectarian chasm, it could mark the beginning of a virtuous cycle in Iraq that could finally bring a measure of stability and prosperity. Khalilzad has been talking with Iraqi leaders about a "First 100 Days" program that would get the new government off to a fast start. He has discussed creating a National Security Council that would hammer out consensus within a small leadership group. He is talking with Iraqi leaders about a national Bill of Assurances that would address the anxieties of each sect. But all these good steps require the basic willingness to compromise, bury the hatchets and bring in the Sunnis.

Khalilzad's message is that America's money and patience aren't unlimited. If the Iraqis can come together to build a framework for cooperation, America stands with them. If they can't pull together, they will eventually have to face the nightmare of a shattered Iraq on their own. Ironically, that's America's hidden leverage in Iraq -- the power to walk away.

davidignatius@washpost.com

**LOAD-DATE:** January 25, 2006

washingtonpost.com

# Abuse Cited In 2nd Jail Operated by Iraqi Ministry

Official Says 12 Prisoners Subjected to 'Severe Torture'

By Ellen Knickmeyer
Washington Post Foreign Service
Monday, December 12, 2005; A01

Advertisement

VONAGE
THE BROADBAND PHONE COMPANY

USE YOUR BROADBAND
CONNECTION TO SAVE
ON ALL YOUR CALLS.

Unlimited calls
to all 50 states
and Canada.

$24.99/month

GET A FREE MONTH ▸

VONAGE
THE BROADBAND PHONE COMPANY

BAGHDAD, Dec. 11 -- An Iraqi government search of a detention center in Baghdad operated by Interior Ministry special commandos found 13 prisoners who had suffered abuse serious enough to require medical treatment, U.S. and Iraqi officials said Sunday night.

An Iraqi official with firsthand knowledge of the search said that at least 12 of the 13 prisoners had been subjected to "severe torture," including sessions of electric shock and episodes that left them with broken bones.

"Two of them showed me their nails, and they were gone," the official said on condition of anonymity because of security concerns.

A government spokesman, Laith Kubba, said Sunday night that any findings at the prison would be "subject to an investigation," but he declined to comment on the allegations.

The site, which was searched Thursday, is the second Interior Ministry detention center where cases of prisoner abuse have been confirmed by U.S. and Iraqi officials.

U.S. troops found the first site last month when they entered an Interior Ministry building in central Baghdad to look for a Sunni Arab teenager they believed had been detained, officers said at the time. Several prisoners at that site appeared to have suffered beatings, and many were emaciated, U.S. and Iraqi officials and witnesses said.

The abuse alleged at the prison found this week appeared to have been more severe. Asked specifically what types of torture were found in the commandos' prison, the official cited breaking of bones, torture with electric shock, extraction of fingernails and cigarette burns to the neck and back.

International law, including the U.N. Convention Against Torture, bans torture in all cases. U.S. Ambassador Zalmay Khalilzad issued a sharp public rebuke of the Iraqi government after the secret prison was discovered last month, demanding in a statement that all detainees nationwide be treated in accord with human rights.

Prime Minister Ibrahim Jafari, under heavy pressure from Khalilzad and Army Gen. George W. Casey Jr., the top U.S. commander in Iraq, ordered a nationwide investigation of detention centers after that discovery. The prison investigated Thursday was the first center examined as part of the government-ordered inquiry.

explanation.

Sunni political leaders charge that similar incidents of torture are occurring at other Interior Ministry detention facilities and have identified some of the sites by name.

Shiite political leaders say the U.S. military frequently visits the facilities and suggest that American authorities would know about any abuse.

Last week, Defense Secretary Donald H. Rumsfeld ordered military commanders to come up with clear rules for how U.S. forces should respond if they witness detainee abuse. The order followed an exchange between Rumsfeld and Marine Gen. Peter Pace, the Joint Chiefs of Staff chairman, at a news conference Nov. 29.

Pace said then that it was "absolutely the responsibility of every U.S. service member if they see inhumane treatment being conducted to intervene to stop it."

Rumsfeld said, "I don't think you mean they have an obligation to physically stop it; it's to report it."

Pace responded, "If they are physically present when inhumane treatment is taking place, sir, they have an obligation to try to stop it."

U.S. officials have said the FBI and the U.S. military are aiding the prison investigation. Authorities have identified more than 1,000 detention centers across Iraq.

© 2005 The Washington Post Company

**Advertising Links**　　　　　　　　　　　　　　　　　　　　　　　　　　　　What's this?

**2.75% Fixed Student Loan Consolidation**
70% lower monthly student loan payment at NextStudent. Consolidation rate locked as low as 2.75%. No costs. Flexible payment plans. Secure site. Pre-qualify in 60 seconds online.
www.nextstudent.com

**Mortgage Rates Hit Record Lows**
$160,000 loan as low as $633/month. Compare rates - refinance now.
www.lowermybills.com

**Save on All Your Calls with Vonage**
When looking for local regional and long distance calling, use Vonage to make calls to all 50 states and Canada. Get voicemail, great international rates and more. Sign up today.
www.vonage.com

FOCUS - 7 of 72 DOCUMENTS

Copyright 2005 The New York Times Company
The New York Times

November 29, 2005 Tuesday
Late Edition - Final

**SECTION:** Section A; Column 1; Foreign Desk; THE STRUGGLE FOR IRAQ: KILLINGS; Pg. 1

**LENGTH:** 1584 words

**HEADLINE:** Sunnis Accuse Iraqi Military Of Executions

**BYLINE:** By DEXTER FILKINS; John F. Burns and Mona Mahmoud contributed reporting for this article.

**DATELINE:** BAGHDAD, Iraq, Nov. 28

**BODY:**

As the American military pushes the largely Shiite Iraqi security services into a larger role in combating the insurgency, evidence has begun to mount suggesting that the Iraqi forces are carrying out executions in predominantly Sunni neighborhoods.

Hundreds of accounts of killings and abductions have emerged in recent weeks, most of them brought forward by Sunni civilians, who claim that their relatives have been taken away by Iraqi men in uniform without warrant or explanation.

Some Sunni men have been found dead in ditches and fields, with bullet holes in their temples, acid burns on their skin, and holes in their bodies apparently made by electric drills. Many have simply vanished.

Some of the young men have turned up alive in prison. In a secret bunker discovered earlier this month in an Interior Ministry building in Baghdad, American and Iraqi officials acknowledged that some of the mostly Sunni inmates appeared to have been tortured.

Bayan Jabr, the interior minister, and other government officials denied any government involvement, saying the killings were carried out by men driving stolen police cars and wearing police and army uniforms purchased at local markets. "Impossible! Impossible!" Mr. Jabr said. "That is totally wrong; it's only rumors; it is nonsense."

Many of the claims of killings and abductions have been substantiated by at least one human rights organization working here -- which asked not to be identified because of safety concerns -- and documented by Sunni leaders working in their communities.

American officials, who are overseeing the training of the Iraqi Army and the police, acknowledge that police officers and Iraqi soldiers, and the militias with which they are associated, may indeed be carrying out killings and abductions in Sunni communities, without direct American knowledge.

But they also say it is difficult, in an already murky guerrilla war, to determine exactly who is responsible. The American officials insisted on anonymity because they were working closely with the Iraqi government and did not want to criticize it publicly.

The widespread conviction among Sunnis that the Shiite-led government is bent on waging a campaign of terror against them is sending waves of fear through the community, just as Iraqi and American officials are trying to coax the Sunnis to take part in nationwide elections on Dec. 15.

Sunnis believe that the security forces are carrying out sectarian reprisals, in part to combat the insurgency, but also in revenge for years of repression at the hands of Saddam Hussein's government.

Sunnis Accuse Iraqi Military Of Executions The New York Times November 2

Ayad Allawi, a prominent Iraqi politician who is close to the Sunni community, charged in an interview published Sunday in The London Observer that the Iraqi government -- and the Ministry of Interior in particular -- was condoning torture and running death squads.

The allegations raise the possibility of the war being fought here by a set of far messier rules, as the Americans push more responsibility for fighting it onto the Iraqis. One worry, expressed repeatedly by Americans and Iraqis here, is that an abrupt pullout of American troops could clear the way for a sectarian war.

One Sunni group taking testimony from families in Baghdad said it had documented the death or disappearance of 700 Sunni civilians in the past four months.

An investigator for the human rights organization said it had not been able to determine the number of executions carried out by the Iraqi security forces. So far, the investigator said, the evidence was anecdotal, but substantial.

"There is no question that bodies are turning up," said the investigator, who agreed to speak on the condition of anonymity, citing safety concerns. "Quite a few have been handcuffed and shot in the back of the head."

As an example, the human rights investigator said that the group had been able to verify that a number of Sunni men taken from the Baghdad neighborhood of Huriya and shot to death last August. Relatives of the dead told the group that more than 30 men had been taken from their homes by the Iraqi police in what appeared to be a roundup of Sunni males.

In the Iskan neighborhood in Baghdad, the human rights group said it had confirmed that 36 Sunni men had been abducted and killed in the neighborhood in August. Sunni groups say the men were taken from their homes by men who identified themselves as intelligence agents from the Interior Ministry.

"The stories are pretty much consistent across the board, both in the manner that the men are being abducted and in who they say is taking them," the human rights investigator said.

More than 15 Sunni families interviewed for this article gave similar accounts of people identifying themselves as Iraqi security forces taking their relatives away without warrants. The families said that most of those said to have been abducted were later found dead.

On Nov. 12, according to the Samarraie family in Gazalia, a Baghdad neighborhood, a group of masked men identifying themselves as agents of the Interior Ministry broke down the family's door. Outside, the family members said, was a line of white pickup trucks with machine guns mounted on them.

The men in masks said they were looking for Yasir, 36, one of the Samarraie brothers, the family said. They took him away.

"We are intelligence people from the Ministry of the Interior," one of the men said, according to Yasir's wife, Wuroud Sami Younis.

A few days later, the police found Yasir's body in an empty field a couple of neighborhoods away. His skull was broken, and there were two bullet holes in his temple, family members said. Officials at the city morgue confirmed Mr. Yasir's death.

"The government is trying to terrorize and dominate the Sunni people," said Yasir's brother, Shuhaib.

The claims of direct involvement by the Iraqi security services are extremely difficult to verify. In a land where rumor and allegation are commonly used as political weapons, the truth is difficult to distill.

Mr. Jabr, the interior minister, acknowledged that many civilians were being killed in Baghdad and around Iraq, and that some of them were being killed for sectarian reasons. "When we have cases like that, we investigate them, and if we can find the culprits we arrest them," he said.

The chief suspects, according to Sunni leaders, human rights workers and a well-connected American official here, are current and former members of the Badr Brigade, the Iranian-backed militia controlled by the Supreme Council for the Islamic Revolution in Iraq, a principal part of the current government. Since the fall of the Hussein government in April 2003, Badr gunmen are suspected of having assassinated dozens of its former officials, as well as suspected insurgents.

Sunnis Accuse Iraqi Military Of Executions The New York Times November 2

Since April, when the Shiite-led government came to power, Badr fighters have joined the security services, like the police and commando units under the control of the interior minister, Mr. Jabr, who is also a senior member of the Supreme Council.

With Badr gunmen operating inside and outside the government, the militia can act with what appears to be official backing. It is not clear who is directing the security services, the government officials or the heads of the militias.

"The difference between the Ministry of the Interior and the Badr Brigade has become very blurry," the human rights investigator said.

"You have these people in the security services, and they have different masters," said the American official in Baghdad. "There isn't a clear understanding of who is in charge."

The alarm in the Sunni community is so great the Um al-Qura Mosque, one of the largest temples in Baghdad, has begun documenting cases of allegations of executions and abductions. Mazan Taha, who is overseeing the project, said he has compiled the names of some 700 Sunni men who have disappeared or been killed in the past four months.

In one Sunni neighborhood, Sababkar, residents said the Iraqi Army surrounded the neighborhood and took away 11 of its Sunni men in July. Most of the bodies were found the next day; television stations here showed pictures of bodies that had been burned with acid and drilled with holes by electric drills. Most of the men had been shot in their temples.

"How did these killers get police uniforms?" Mr. Taha asked of the details surrounding many of the killings. "How was it that they were operating freely after curfew? That they had police cars?"

Each day, Sunni families with little faith that the Shiite-led government will help them line up at Mr. Taha's office instead, to tell of family members who have been killed and disappeared.

"They took three of my sons!" wailed Naima Ibrahim, waving three government-issued identification cards, as Mr. Taha quietly wrote the information down. "They took three of my sons!"

The grief in Baghdad's Sunni neighborhoods has begun to spill onto the streets.

On Friday, hundreds of Iraqi Sunnis marched through the Amriya neighborhood to protest the killing of a prominent Sunni leader and three of his sons last Wednesday. Witnesses said the killers were wearing Iraqi army uniforms and came in the middle of the night, when the curfew has been strictly enforced. The Sunni leader, Kadhim Surhid, was buried, but much was unclear.

"They killed them in their beds," said Jama Hussein, a friend who attended the funeral. He jutted his palms out from his body. "I myself carried them from their beds."

**URL:** http://www.nytimes.com

**GRAPHIC:** Photo: At a large Sunni mosque in Baghdad, Mazan Taha, left, logs allegations of attacks by Shiites. Sadia Abbas reported a nephew's arrest in Basra. (Photo by Joao Silva for The New York Times)(pg. A16)

**LOAD-DATE:** November 29, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SANDRA K. OMAR, *et. al.*,        )
        Petitioners,      )
        )      CIVIL ACTION NO. 05-2374 (RMU)
        )
v.        )
        )
FRANCIS J. HARVEY, *et. al.*,    )
        Respondents.    )
        )
        )

### *[PROPOSED] TEMPORARY RESTRAINING ORDER*

**IT IS HEREBY ORDERED THAT**, Respondents, their agents, servants, employees, confederates, and any person acting in concert or participation with them, or having knowledge of this Order by personal service or otherwise, are **HEREBY IMMEDIATELY AND TEMPORARILY RESTRAINED** from removing Shawqi Omar from United States custody until this matter can be determined at a hearing for a preliminary injunction or for ten days, whichever is greater.

**IT IS FURTHER ORDERED THAT** Petitioners shall file briefs within __ days showing why Mr. Omar should not be transferred. Counsel for the United States shall file a response within __ days after service of Petitioners brief.

Date: _____          _____
                                   United States District Judge

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2006 FEB -2  PM 10: 34

NANCY M.
MAYER-WHITTINGTON
CLERK