## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SANDRA K. OMAR,** *et. al.*,         ) <br>          **Petitioners,**   ) <br>      ) <br> **v.**    ) <br>   ) <br> **FRANCIS J. HARVEY,** *et. al.*,   ) <br>          **Respondents.**   ) <br>   ) <br>   ) | **CIVIL ACTION NO. 05-2374 (RMU)** |

### SUPPLEMENTAL BRIEFING IN SUPPORT OF PETITIONERS' MOTION
### FOR A TEMPORARY RESTRAINING ORDER

Petitioner Shawqi Omar ("Mr. Omar") and his wife and son as next friends hereby submit supplemental briefing requested by the Court in support of the request for a Temporary Restraining Order ("TRO") preventing the United States government from transferring Mr. Omar, a United States citizen, to Iraqi authorities. This request for temporary relief that will preserve the *status quo* is particularly urgent because Mr. Omar faces a heightened and well-documented risk of torture and indefinite detention in Iraqi custody.

Mr. Omar has been held by the United States since October 29, 2004. He has not been charged or received an adequate hearing. *See* Habeas Pet. ¶ 3. More than fifteen months later – and only days before the U.S. government's response to Mr. Omar's habeas petition was due – undersigned counsel learned that Mr. Omar was to be transferred for "a hearing" of unknown pedigree, to be held under the auspices of the Iraqi criminal courts.

Petitioners seek to prevent respondents from evading the Court's jurisdiction, and also to forestall imminent and irreparable harm to Mr. Omar. To that end, Petitioners seek an extension

of the Court's Order so that the parties can take discovery and the Court can hold an evidentiary hearing to determine whether the United States can lawfully transfer Mr. Omar to Iraqi custody.

The temporary relief sought in this motion, like the grant of the habeas writ itself, is fully consistent with the Constitution's Separation of Powers. As explained below, federal courts have long exercised jurisdiction over persons overseas in U.S. military custody. The Supreme Court recently reaffirmed this long-standing rule-of-law principle in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). There, eight Justices made clear that a United States citizen, even one captured while bearing arms against the United States on a foreign battlefield, may seek habeas relief in a federal district court. The Court expressly rejected the Government's argument that the Separation of Powers circumscribed the judicial role. Petitioners now ask this Court to apply that binding precedent to an individual not captured on a "battlefield" *and* who faces a real risk of torture or death absent this Court's intervention. Extension of the TRO to ensure that the U.S. government is required to act lawfully is not merely warranted. It is demanded by the Separation of Powers, which guarantees a government subject to the rule of law as determined by the federal courts.

## STATEMENT OF FACTS

*i. Detention of Mr. Omar.* As set forth in the Declaration of Susan L. Burke, attached as Exhibit A (hereinafter "Burke Decl."), the U.S. government has complete and unfettered control over Mr. Omar. Since arresting him at his Baghdad home on October 29, 2004, the U.S. government has repeatedly moved Mr. Omar among different U.S.-controlled prisons. *Burke Decl.* ¶¶ 4, 7, 8, 11, 19, 27. To date, Mr. Omar and his counsel have not been told why he was arrested or why he has been imprisoned for more than fifteen months without charge or access to counsel. *Id.* ¶ 5. On December 22, 2004, the U.S. government, responding to entreaties for

information from Mr. Omar's American wife, Sandra Omar, told Ms. Omar that Mr. Omar was imprisoned "under United States military care, custody and control."[1]  *Id.* ¶ 6.

So far as counsel can reconstruct, Mr. Omar was held initially at "Camp Cropper," a prison near the Baghdad International Airport.  *Id.* ¶ 7.  He then was brought to the prison known as "Camp Bucca," where he remained for almost one year.  *Id.*  On October 27, 2005, he was moved to the Abu Ghraib prison for a consular visit.  *Id.* ¶ 8.  One week later, on November 2, 2005, Nermeen Omar (a relative who resides in Baghdad) tried to see Mr. Omar at Abu Ghraib; the U.S. government refused her permission to see him.  *Id.* ¶ 10.  U.S. prison officials confirmed that said Mr. Omar was at the prison, but said he was not allowed visits.  *Id.*  They advised Nermeen to return Monday, November 7, 2005.  *Id.*  But when Nermeen went back to Abu Ghraib on the designated date, the U.S. government prison officials told her that they had already transferred Mr. Omar back to Camp Bucca.  *Id.* ¶ 11.  The U.S. government prison officials let Nermeen make an appointment to see him at the Bucca prison on December 10, 2005.  *Id.*

On December 10, 2005, Nermeen drove eight hours to visit Mr. Omar at Camp Bucca prison.  *Id.* ¶ 12.  The U.S. government prison officials there acknowledged that Mr. Omar was imprisoned at Camp Bucca but denied Nermeen the right to visit him, claiming some problem with her identification.  *Id.*  Two days later, undersigned counsel filed the petition for habeas corpus relief on Mr. Omar's behalf.  *Id.* ¶ 13.  That petition was shown to Mr. Omar and to the U.S. government officials by the ICRC when its representatives visited Mr. Omar on or about January 23, 2006.  *Id.* ¶ 17.

Immediately thereafter, on January 24, 2006, the U.S. officials, who did not allow Mr. Omar keep a copy of the Petition, moved Mr. Omar back to Abu Ghraib.  *Id.* ¶ 19.  At the same time, counsel for Petitioners received a telephone call from Edward H. White, an attorney with

---

[1] Some of this information has been previously provided in the Petition, but is repeated for clarity of the narrative.

the Department of Justice, who stated he had been assigned this matter.  *Id.* ¶ 18.  Mr. White

asked for an extension of time to respond to the petition; undersigned counsel did not object and

the Government's request was granted.  *Id.*; *see Minute Order (Jan. 25, 2006).*

　　　Three days later, on January 27, 2006, undersigned counsel learned that the U.S. officials

might be in the process of convening some type of court proceedings at Abu Ghraib prison on or

after February 3, 2006.  *Burke Decl.* ¶ 20.  Soon thereafter, counsel contacted the U.S.

government (Department of Justice, the United States Ambassador to Iraq, the Consul in

Baghdad) to remind them that counsel is entitled to take part in any legal proceeding and needed

to be included to represent Mr. Omar's interests.  *Id.* ¶ 22.  Participating in a proceeding held at

Abu Ghraib appears possible because there are functional video-link facilities.  *Id.*  In addition,

Mr. Omar's attorneys in the United States have an agent in Baghdad who can attend any

proceedings with retained local counsel.  *Id.*

　　　That same day, January 30, 2006, Nermeen Omar finally was able to visit Mr. Omar at

Abu Ghraib.  *Id.* ¶ 21.  On February 2, 2006, the U.S. government informed counsel that the U.S.

intended to hand Mr. Omar over to Iraqi criminal authorities without notice to Court or counsel.

*Id.* ¶ 23.  In an email to one of Mr. Omar's attorneys, Mr. White said:

> Mr. Omar is currently in the custody of Multinational Force-Iraq,
> and *a determination was previously made to refer his case to the
> Central Criminal Court of Iraq (CCCI).*  We are informed that no
> hearing in his case is scheduled for Friday, February 3, 2006.  We
> understand that when Mr. Omar appears for any hearing in the
> CCCI, he is afforded counsel (either retained by him/his family, or
> appointed by the Court).  If Mr. Omar decides to use retained local
> counsel rather than Court-appointed counsel, we are informed that
> he/his family can provide to the CCCI the contact information for
> his retained local counsel before the hearing begins and that Court
> personnel will notify the retained local counsel at that time.  Please
> be advised that, whenever scheduled, we would not be able to
> disclose to you the date of any hearing for security reasons

(including the safety of Mr. Omar).

*Id.* (emphasis added).

Counsel immediately filed an *ex parte* emergency motion for TRO to prevent the U.S. from turning Mr. Omar over to the Iraqis, who, as set forth below, systematically torture and abuse prisoners. *Id.* ¶ 26. During the pendency of the *ex parte* emergency motion, undersigned counsel learned, and advised this Court, that the U.S. government had moved Mr. Omar from Abu Ghraib back to Camp Cropper. *Id.* ¶ 27. The Court granted the TRO and ordered the parties to submit supplemental briefs. *See Order (Feb. 4, 2006).*

*ii. Iraqi Authorities' Systematic Use of Torture.* Absent Court intervention, it would appear the U.S. government is prepared to transfer Mr. Omar to the custody of Iraqi criminal authorities. Amnesty International and Human Rights Watch have provided declarations attesting to ongoing torture by these authorities. Curt Goering, Deputy Executive Director of Amnesty International, USA, explains that he has traveled to Iraq to investigate allegations of torture and abuse and interview survivors of torture. *See Declaration of Curt Goering (hereinafter "Goering Decl.")*, attached as Exhibit B. He and other Amnesty researchers have confirmed that Iraqi government forces regularly and systematically engage in torture, including the use of electric shocks on different parts of the body, strangulation, breaking of limbs, sexual abuse, using cigarettes to burn body parts, use of electric drills on arms and legs, and suffocation. *Goering Decl.* ¶¶ 3-4.

Mr. Goering further reports that the Iraqi government forces have not established a functioning judicial system and that the United Nations mission in Iraq recently called for the release of hundreds of prisoners, who remained confined despite court orders for their release. *Id.* ¶ 5. As Mr. Goering reports, Iraqi criminal procedures fall far short of international standards

for fair trials. *Id.* ¶ 7. Court proceedings for those charged with "terrorist activities" include the

use of evidence, such as confessions, secured by torture or abuse. *Id.* ¶ 6. Mr. Goering

concludes:

> Based on Amnesty International's extensive research and
> investigations, we conclude that Shawki Omar would be at grave
> and serious risk of being tortured if he were turned over to the Iraqi
> criminal authorities. Based on Amnesty International's extensive
> research and investigation, we conclude that Shawki Omar is not
> likely to receive a trial in conformity with international standards
> for fair trials if he were to be tried by the Iraqi criminal authorities.

*Id.* ¶¶ 8-9.

Similarly, Hania Mufti, the Iraqi expert with Human Rights Watch, reports that the

findings of systemic and widespread torture documented in the Human Rights Watch 2006

World Report remain valid to date. *See Declaration of Hania Mufti (hereinafter "Mufti Decl").,*

attached as Exhibit C, *at* ¶ 2. Specifically, the Report found:

> The torture and ill-treatment of detainees in Iraqi custody
> remains a serious concern, with the level of reported incidents
> rising. The vast majority of allegations concern forces of the Iraqi
> Ministry of Interior, as well as members of the Iraqi armed forces
> under Ministry of Defense authority. *Detainees in pre-trial*
> *detention on security-related offenses, in particular, are subjected*
> *to various forms of torture or ill-treatment, including routine*
> *beatings, sleep deprivation, electric shocks to sensitive parts of the*
> *body, prolonged suspension from the wrists with the hands tied*
> *behind the back, deprivation of food and water for prolonged*
> *periods, and severely overcrowded cells.* Former detainees held by
> Ministry of Interior forces in connection with alleged terrorist
> offenses linked to insurgent activity report other forms of torture,
> including having weights attacked to their testicles, or having a
> string tied tightly round their penis and then being forced to drink
> large amounts of water.
>
> > . . . .
>
> Iraqi government officials have publicly committed to
> investigating the abuse of detainees and to holding criminally
> responsible those found guilty of the torture of detainees and the
> killing of civilians. At this writing, neither the Ministry of Interior
> nor the Ministry of Defense had established an effective

mechanism for the monitoring of abuses by law enforcement personnel or the armed forces, nor set up a system for bringing those accused of such offenses to justice.  In addition to assistance provided by MNF-I personnel, other training programs through the European Union and NATO to train personnel from the Iraqi police, armed forces, the judiciary and penitentiary personnel were ongoing during 2005, but with little focus on issues related to monitoring and accountability.

Human Rights Watch, *World Report 2006* 446-53 (2006), attached as Exhibit D.

Although somewhat more dated than these two authoritative Declarations, the U.S. government's own official reports confirm that the Iraqi criminal authorities more than likely would torture Mr. Omar.  On February 28, 2005, the United States Department of State reported "numerous, serious human rights abuses" and "[c]orruption at all levels of the Government," including "dysfunctional" aspects of the judicial system.  United States Department of State, Country Reports on Human Rights Practices for 2004 (Feb. 28, 2005), attached as exhibit E. Reported torture includes instances of beatings with cables and hosepipes; electric shocks to [prisoners'] earlobes and genitals; and food and water deprivation, and overcrowding in standing room only cells."  *Id.*  The State Department also reported that "coerced confessions and interrogation continued to be the favored method of investigation by police."  *Id.*  Further problems in the criminal justice system uncovered by the U.S. government include "arbitrary arrest and detention practices," "lengthy pretrial detention," and ignoring court orders requiring proof of the lawfulness of an arrest.  *Id.*[2]

---

[2] As stated in the Emergency Ex Parte Motion for a Temporary Restraining Order, after the recent public revelations that the Iraqi authorities were torturing persons in their custody, the United States has recognized that the risk of torture and abuse in Iraqi custody is great.  Moreover, several United States officials have spoken on the record stating that prisoners in U.S. custody would not be transferred into Iraqi hands.  United States envoy to Baghdad Zalmay Khalilzad stated just last month that "U.S. officials believe that . . . the Interior Ministry has condoned torture of Sunni prisoners and increasingly used the police to settle sectarian scores."  David Ignatius, *America's Message to Iraq*, Wash. Post, Jan. 25, 2006, at A19.  United States' officials reported they found the Iraqi authorities had engaged in the "breaking of bones, torture with electric shock, extraction of fingernails, and cigarette burns to the neck and back" in a Baghdad detention center.  Ellen Knickmeyer, *Abuse Cited In 2nd Jail Operated by Iraqi Ministry; Official Says 12 Prisoners Subjected to 'Severe Torture'*, Wash. Post, Dec. 12, 2005, at A1.  The

**ARGUMENT**

By granting a Temporary Restraining Order to prevent the imminent transfer of Mr. Omar, the Court preserved the *status quo* for ten days. The Court alluded to "the tension created by the constitutional implications arising out of judicial versus executive branch authority," and asked the parties to "address this issue head on and through referenced authority in their submissions." *Omar v. Harvey*, No. 05-2347 (RMU) (Feb. 3, 2006), 2 n.2. Part I of this Supplemental Submission explains why this Court has the power and the obligation to protect the constitutional and statutory rights of a United States citizen imprisoned by the United States government. Part II explains that the Court's Temporary Restraining Order is well-supported by legal authority and should be extended so that the parties can take discovery and the Court can hold an evidentiary hearing to determine whether the United States can lawfully transfer Mr. Omar to Iraqi custody.

I.      **THE SEPARATION OF POWERS DEMANDS JUDICIAL OVERSIGHT OF EXECUTIVE DETENTION.**

      A.      **Federal Courts Have Authority, Consistent With the Separation of Powers, To Grant Habeas Writs and Provide Appropriate Relief on Behalf of Citizens Held by the U.S. Military Overseas.**

The Court asked the parties to address the "constitutional implications arising out of judicial versus executive branch authority" in this matter. *Omar v. Harvey*, No. 05-2347 (RMU), at 2 n.2 (Feb. 3, 2006). Because "the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions," the greatest threat to the principle of divided government comes not when the Court speaks, but when it is silent. *Sterling*

---

Government's own freely expressed concerns about the conduct of Iraqi authorities suggest that the risk of torture for a Sunni Muslim, such as Mr. Omar, in Iraqi hands is substantial. Indeed, as recently as December 25, 2005, Major General John D. Gardner of the Army stated in an interview that the military was not going to turn over prisoners to the Iraqis. *See* Eric Schmitt and Thom Shanker, *U.S., Citing Abuse In Iraqi Prisons, Holds Detainees*, N.Y. Times, Dec. 25, 2005, at A1.

*v. Constantin*, 287 U.S. 378, 401 (1932). Recently, the Supreme Court rejected a Separation of

Powers challenge to the exercise of habeas jurisdiction over a U.S. citizen detained overseas in

the course of military operations:

> [I]t does not infringe on the core role of the military for the courts
> to exercise their own time-honored and constitutionally mandated
> roles of reviewing and resolving claims like those presented
> here . . . . "[L]ike other claims conflicting with the asserted
> constitutional rights of the individual, the military claim must
> subject itself to the judicial process of having its reasonableness
> determined and its conflicts with other interests reconciled" . . . .
> *We have long since made clear that a state of war is not a blank
> check for the President when it comes to the rights of the Nation's
> citizens.*

*Hamdi*, 542 U.S. at 535-36 (plurality op.) (quoting *Korematsu v. United States*, 323 U.S. 214,

233-34 (1944) (Murphy, J., dissenting)) (internal citations omitted) (emphasis added). As the

Supreme Court held, "unless Congress acts to suspend it, the Great Writ of habeas corpus allows

the Judicial Branch to play a necessary role in maintaining th[e] delicate balance of governance,

serving as an important judicial check on the Executive's discretion in the realm of detentions."

*Id*. at 536. Eight Justices in *Hamdi*, in accord with long-standing judicial practice, agreed that a

federal court could exercise supervision over military captures of American citizens abroad

pursuant to its habeas jurisdiction. *Id.* at 536-37; *id.* at 553 (Souter, J., concurring in part,

dissenting in part, and concurring in the judgment); *id.* at 554 (Scalia, J., dissenting); *see also Ex

parte Milligan*, 71 U.S. (4 Wall.) 2, 120-21 (1866).

**B.    Federal Courts Have Jurisdiction To Grant Habeas Relief.**

Mr. Omar is a U.S. citizen imprisoned by the executive without any lawful process. That

alonewarrants this Court's intervention. From the Nation's founding, habeas corpus has

protected *all* citizens, wherever they are, from unlawful executive detention. *See, e.g.*, *Ex parte

Bollman*, 8 U.S. (4 Cranch) 75, 135 (1807) (Marshall, C.J.) (discharging prisoners charged with

treason based upon insufficient evidence).  "The historic purpose of the writ has been to relieve

detention by executive authorities without judicial trial."  *Brown v. Allen*, 344 U.S. 443,

533 (1953) (Jackson, J., concurring in the result), *abrogated on other grounds*, 28 U.S.C.

§ 2254(d); *see also Hamdi*, 542 U.S. at 525 (plurality op.); *INS v. St. Cyr*, 533 U.S. 289, 301

(2001) ("At its historical core, the writ of habeas corpus has served as a means of reviewing the

legality of Executive detention, and it is in that context that its protections have been

strongest."); *Ex parte McCardle,* 73 U.S. (6 Wall.) 318, 325 (1867) (affirming that the habeas

statute is "of the most comprehensive character").

> U.S. citizenship alone suffices to sustain this Court's habeas jurisdiction:

>> Citizenship as a head of jurisdiction and a ground of protection
>> was old when Paul invoked it in his appeal to Caesar.  The years
>> have not destroyed nor diminished the importance of citizenship
>> nor have they sapped the vitality of a citizen's claims upon his
>> government for protection.

*Johnson v. Eisentrager*, 339 U.S. 763, 769 (1950).  This principle remains at the bedrock of our

constitutional order, especially in today's globalized world.

> Federal court jurisdiction is also plain on the face of the habeas statute.  Since 1789,

federal courts have exercised habeas jurisdiction over claims brought by individuals, such as Mr.

Omar, "in custody, under or by colour of the authority of the United States, or . . . committed for

trial before some court of the same."  Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 82 (codified at

28 U.S.C. § 2241(c)(1)).  In 1867, Congress extended the Great Writ's protections to "all cases

where any person may be restrained of his or her liberty in violation of the constitution, or of any

treaty or law of the United States."  Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385 (codified at 28

U.S.C. § 2241(c)(3)).  Mr. Omar has properly invoked both these statutory bases, and this Court

has the jurisdiction and the power to grant relief under 28 U.S.C. §§ 2241(c)(1) and (c)(3).  The

habeas remedy here is as old as the Republic itself.

Neither Mr. Omar's overseas *situs* nor the military nature of his detention – nor some

alchemic combination of the two – robs this Court of authority to exercise jurisdiction and to

grant interim and final relief to petitioners.  On the contrary, federal courts have long exercised

jurisdiction on receipt of a habeas petition from prisoners held overseas.  Jurisdiction is proper,

and relief may be granted, even if the prisoner is in overseas military custody.

*i. Extraterritorial Detention.*  The writ of habeas corpus has long extended to individuals

held in executive detention outside United States territory.  In *Braden v. 30th Judicial Circuit*

*Court of Kentucky*, the Supreme Court held that "[w]here American citizens confined overseas

(and thus outside the territory of any district court) have sought relief in habeas corpus, we have

held, if only implicitly, that the petitioners' absence from the district does not present a

jurisdictional obstacle to the consideration of the claim."  410 U.S. 484, 498 (1973) (overruling

*Ahrens v. Clark*, 335 U.S. 188 (1948)).[3]  The *Braden* Court cited three then-recent cases

involving the exercise of habeas jurisdiction on behalf of persons detained overseas.  *See Burns*

*v. Wilson*, 346 U.S. 137 (1953); *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955); *Hirota*

*v. General of the Army Douglas MacArthur*, 338 U.S. 197 (1949).  Writing for the Court in 2004,

Chief Justice Rehnquist confirmed the continuing validity of this rule from *Braden*.  *See*

*Rumsfeld v. Padilla*, 542 U.S. 426, 447 n.16 (2004); *accord Rasul v. Bush*, 542 U.S. 466, 478-79

---

[3] *Braden* is in accord with the common law exercise of extraterritorial habeas jurisdiction.  At common law, whether a court could issue a writ of habeas corpus turned *not* on the status or location of the particular territory but, rather, on whether the crown exercised sufficient power and control to secure obedience to the writ's command.  *See, e.g.*, *King v. Cowle*, 97 Eng. Rep. 587, 599 (K.B. 1759) (there is "*no doubt* as to the power [of the court]" to issue writs of habeas corpus "where the place is under the subjection of the Crown of England").  Thus, as long as the executive exercised sufficient power and control over the detention, a habeas court was obliged to "judge of the cause" and "give relief upon it" where warranted.  *Id.* at 600; *see also* 3 William Blackstone, *Commentaries* *131 ("high prerogative writ" of habeas corpus ensures "an account, why the liberty of any of [the king's] subjects is restrained, *wherever that restraint may be inflicted*") (emphasis added).

(2004). Also in 2004, Judge Bates of this District rebuffed an effort by the United States to carve

a new, atextual, and "implicit territorial limitation" on the Great Writ. *Abu Ali v. Ashcroft*, 350

F. Supp. 2d 28, 42-43 (D.D.C. 2004).

 The habeas writ is not a hollow vessel for citizens detained by our government overseas.

The path-marking case of *Reid v. Covert* confirmed that habeas jurisdiction protects the

substantive constitutional rights of citizens who venture beyond American shores. Writing in

*Reid*, Justice Black explained that "Art. III, s 2 manifests that constitutional protections for the

individual were designed to restrict the United States Government when it acts outside of this

country, as well as here at home." *Reid v. Covert*, 354 U.S. 1, 7 (1957) (plurality op.).

Certainly, "the United States may not avoid the habeas jurisdiction of the federal courts by

enlisting a foreign ally as an intermediary to detain the citizen." *Abu Ali*, 350 F. Supp. 2d at 41.

 *ii. Overseas Military Custody.* Federal courts have unstintingly granted the writ to

persons held in military custody even when they have been arrested or held overseas, or detained

in occupied zones. *See, e.g., Grisham v. Hagan*, 361 U.S. 278 (1960) (writ granted to prisoner

tried by court-martial in France); *McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281

(1960) (prisoner filed writ challenging court-martial jurisdiction from Morocco); *Kinsella v.*

*United States ex rel. Singleton*, 361 U.S. 234 (1960) (writ granted to prisoner arrested and tried

in Germany); *Reid*, 354 U.S. at 1 (writ granted when petitioners arrested and tried by court

martial in England and Japan).

 Habeas jurisdiction has been exercised even when the individual is in an occupied zone.

*See Madsen v. Kinsella*, 343 U.S. 341, 343-44 (1952) (habeas jurisdiction exercised to ascertain

that a person tried by United States Court of the Allied High Commission for Germany had

proper jurisdiction, after petitioner had been transferred to West Virginia). Indeed, in one

- 12 -

instance – recently cited approvingly by the Supreme Court – a Circuit Court of Appeals considered the habeas petition of a U.S. citizen POW captured "in Italy upon the field of battle." *In re Territo*, 156 F.2d 142, 142 (9th Cir. 1946); *accord Hamdi*, 542 U.S. at 518-19 (plurality op.). The fact that the respondents have chosen to keep Mr. Omar in Iraq makes no difference to this Court's exercise of its habeas jurisdiction. *Cf. Abu Ali*, 350 F. Supp. 2d at 40 (rejecting any argument that would enable the United States to avoid jurisdiction by transferring a detainee).

Nor does the fact that a person is overseas and in military custody *at the moment he or she files the habeas petition* alter this Court's habeas powers. In *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955), the Court granted relief to a former service man arrested in Pittsburgh and transported to Korea for court-martial. The Court did so even though Toth's habeas petition had been filed *after* he had been transferred to Korea. *Id.* at 13 & n.3; *see also* Joseph W. Bishop, Jr., *Civilian Judges and Military Justice: Collateral Review of Court-Martial Convictions*, 61 Colum. L. Rev. 40, 51 n.60 (1961). Similarly, in *Burns v. Wilson*, the Court considered a pair of habeas petitions filed while petitioners had been confined in Japan. 346 U.S. 137, 139, 146 (1953) (exercising jurisdiction but rejecting petitions on the merits); Bishop, *supra*, at 51, n.60; *see also United States ex rel. Keefe v. Dulles*, 222 F.2d 390, 392-93 (D.C. Cir. 1955) (exercising habeas jurisdiction, but denying the writ, when petitioner, detained by French government, could not show constitutional rights violated by U.S. action).

The Court of Appeals for the District of Columbia Circuit has applied the rule of *Burns* and *Toth* to hold that a citizen apprehended *and* confined overseas by the military has access to a federal court through a petition for habeas in order to vindicate constitutional rights. *See Day v. Wilson*, 247 F.2d 60, 62 (D.C. Cir. 1957), *remanded to* 155 F. Supp. 469 (D.D.C. 1957) (entertaining jurisdiction but declining to issue writ because petition was without merit). *Day*

remains the law in this Circuit.  *Cf.* Charles Fairman, *Some New Problems of the Constitution Following the Flag*, 1 Stan. L. Rev. 587, 643 (1949) ("So far as the convenience of the Government is concerned, the courts for the Districts of Columbia are the normal jurisdiction for the trial of overseas petitions.").

That Mr. Omar remains in Iraq does not diminish the role of the judiciary.  Justice O'Connor, speaking in *Hamdi*, explained in no uncertain terms that the Court's *ratio decidendo* applied with equal vigor to a person detained in some proximity to hostilities, and not removed from the area.  Justice O'Connor specifically rejected the suggestion that the *situs* of captivity might be factor in the habeas analysis, explaining that:

> This creates a perverse incentive.  Military authorities faced with the stark choice of submitting to the full-blown criminal process or releasing a suspected enemy combatant captured on the battlefield will simply keep citizen-detainees abroad.  Indeed, the Government transferred Hamdi from Guantanamo Bay to the United States naval brig only after it learned that he might be an American citizen.  *It is not at all clear why that should make a determinative constitutional difference.*

542 U.S. at 524 (plurality op.) (emphasis added).

In sum, this Court unquestionably has both the constitutional authority and the judicial obligation to prevent the Government from rendering Mr. Omar to the Iraqi authorities.  Indeed, Separation of Powers problems would arise only if this Court were to refuse to exercise its historic habeas jurisdiction over American citizens and fail to do "as law and justice require."  28 U.S.C. § 2243.

II.    **THIS COURT SHOULD EXERCISE ITS POWER TO RESTRAIN THE EXECUTIVE BRANCH FROM DELIVERING A UNITED STATES CITIZEN TO LIKELY TORTURE.**

    A.    **Petitioners Have Carried the Burden Necessary For a Temporary Restraining Order To Preserve the Status Quo.**

Petitioners unquestionably meet the four elements necessary for the issuance of a Temporary Restraining Order to preserve the status quo.  That is: (1) petitioners are likely to succeed on the merits; (2) Mr. Omar will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm anyone; and (4) an injunction would further the public interest by ensuring that the United States does not willingly ignore the Constitution and the rule of law to engage in or participate in torture.  *See, e.g.*, *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005) (citations omitted) (reciting four elements of consideration for issuance of preliminary injunctive relief).

Significantly, Mr. Omar does not seek to change the *status quo*.  He asks only to prevent a unilateral act by one party to the litigation that doubtless will prejudice him directly and radically change the issues before the Court.  It is well-settled that this kind of conservative preliminary relief demands a lesser showing than an effort to change the *status quo*.  *E.g., Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).  As the Court of Appeals for the District of Columbia Circuit has held, where the balance of hardships tips decidedly toward the movant – as it clearly does here – it will "'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'"  *Id.*

**1.     Mr. Omar Is Likely To Be Granted Habeas Relief.**

Petitioners' underlying habeas petition is meritorious and likely to succeed.  It is now well-established that prisoners held by the United States cannot be imprisoned without legal process.  *See generally Hamdi*, 542 U.S. at 507.  Mr. Omar has received no hearing, charge, or court proceeding of any type in the fifteen months that he has been confined.  The government has ferried him from one U.S.-controlled prison to another, while ignoring his repeated requests for counsel and access to family.  Now, the U.S. government risks obviating federal judicial scrutiny through a precipitous transfer to Iraqi custody.

As the U.S. government well knows, Mr. Omar has the same if not greater[4] – right to federal judicial process as Mr. Hamdi, whose habeas claim was determined to be valid and consistent with the Separation of Powers.  *Id.* at 507.  There, the Supreme Court held that "process was due once it became clear that a determination had been made to continue holding the prisoner." *Id.* at 534.  In this case, it is clear beyond cavil that the U.S. government has exercised its authority to continue holding Mr. Omar beyond his initial arrest.  Indeed, the government has been holding him for fifteen months.

Mr. Omar's challenge to his continued detention implicates "the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law." *Id.* at 531.  This case concerns whether any meaningful constitutional and statutory safeguard exists against the government's indefinite detention of American citizens held *outside* United States territory.  Given the gravity of the rights and interests at stake, "there is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Holiday Tours, Inc.*, 559 F.2d at 844.

---

[4] Unlike Mr. Hamdi, Mr. Omar was not seized or detained in a zone of active combat – he was arrested at his home in Baghdad with his family.

Indeed, other courts in this district have found a likelihood of success on the merits and preliminarily enjoined the Government from transferring or removing *non-citizens* from the Court's jurisdiction. *See, e.g.*, *Hatim v. Bush,* No. 05-1549 (D.D.C. Aug. 22, 2005) (Urbina, J.); *Al-Hela v. Bush*, No. 05-1048 (D.D.C. June 3, 2005) (Urbina, J.); *Al-Marri v. Bush*, No. 04-2034, 2005 WL 774843 (D.D.C. Apr. 4, 2005) (Kessler, J.); *Al-Joudi v. Bush*, No. 05-301, 2005 WL 774847 (D.D.C. Apr. 4, 2005) (Kessler, J.); *Al-Shiry v. Bush*, No. 04-0490, 2005 WL 1384680 (D.D.C. Apr. 1, 2005) (Friedman, J.); *Al-Oshan v. Bush*, No. 05-0520 (D.D.C. Mar. 31, 2005) (Urbina, J.); *Abdah v. Bush*, No. 04-1254, 2005 WL 589812 (D.D.C. Mar. 12, 2005) (Collyer, J.) & 2005 WL 711814 (Mar. 29, 2005) (Kennedy, J.). For example, in *Abdah v. Bush*, the Court required the government to provide thirty days notice before any transfer of the petitioner from Guantánamo. 2005 WL 711814 at *7. Specifically, the Court held a transfer of the prisoners would effectively extinguish their habeas claims by fiat, and found that this alone clearly satisfied the preliminary injunction standard of irreparable injury. *Id.* at *4. The government "may not act to deprive this court of its jurisdiction over the very corpus of this case, and the federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals." *Id*. at *4 (internal citations and quotations omitted).

### 2. Irreparable Injury Is Almost Certain To Result If Mr. Omar's Custody Status Is Changed.

Mr. Omar's transfer to Iraqi custody would cause him irreparable harm for two reasons. *First*, it would expose him to a substantial risk of torture, even death by Iraqi authorities. It is beyond question that all citizens have a constitutional right to be free from torture. *Chavez v. Martinez*, 538 U.S. 760, 773 (2003) (plurality op.); *Miller v. Fenton*, 474 U.S. 104, 109 (1985) (torture or other abusive interrogation techniques "are so offensive to a civilized system of

justice that they must be condemned under the Due Process Clause"); *Rochin v. California*, 342

U.S. 165, 172 (1952) (describing conduct that "shocks the conscience"); *Abu Ali*, 350 F. Supp.

2d at 40 & n.7 (rejecting government position "arguing for nothing less than the unreviewable

power to separate an American citizen from the most fundamental of his constitutional rights,"

including freedom from torture).

Mr. Omar's right to be free from torture is also protected by the 1984 Convention Against

Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). Article 3 of

CAT states: "No State Party shall expel, return ('refouler') or extradite a person to another State

where there are substantial grounds for believing that he would be in danger of being subjected

to torture." This provision has been incorporated into United States law under the Foreign

Affairs Reform and Restructuring Act of 1998 ("FARRA") of 1998, which provides that "[i]t

shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary

return of any person to a country in which there are substantial grounds for believing the person

would be in danger of being subjected to torture, *regardless of whether the person is physically

present in the United States.*" Pub. L. No. 105-227, Div. G., Title XXII § 2242, 112 Stat. 2681,

2681-822, codified as note to 8 U.S.C. § 1231 (emphasis added); *see also* the Torture Victim

Protection Act of 1991, Pub. L. 102-256, Mar. 12, 1992, 106 Stat. 73 (ensures that United States

citizens are protected from torture); *Rosado v. Civiletti*, 621 F.2d 1179 1195-96 (2d Cir. 1980)

(requiring close scrutiny in extradition proceeding where transfer "would expose [petitioner] to

procedures or punishment 'antithetic to a federal court's sense of decency'").

As set forth in the Statement of Facts, Amnesty International's Deputy Executive

Director Curt Goering concludes that Mr. Omar would be at serious risk of being tortured if the

U.S. government turns him over the Iraqi authorities. Indeed, the U.S. government's own

official reports confirm the substantial, serious and systemic use of torture by Iraqi authorities. *See Exhibit D.* These freely expressed concerns about the conduct of Iraqi authorities from the Government suggest the risk of torture in Iraqi hands is indeed substantial. In fact, on December 25, 2005, Major General John D. Gardner of the Army stated in an interview that the military was not going to turn over prisoners to the Iraqis. *See* Eric Schmitt and Thom Shanker, *U.S., Citing Abuse in Iraqi Prisons, Holds Detainees*, N.Y. Times, Dec. 25, 2005 at A1.

In short, the United States Congress and the federal judiciary have declared unambiguously that the United States will not subject its citizens even to the *possibility* of torture. Moreover, "federal courts have jurisdiction under § 2241 to consider claims arising under CAT, as implemented by FARRA." *Wang v. Ashcroft*, 320 F.3d 130, 142 (2d Cir. 2003); s*ee also Ogbudimpka v. Ashcroft*, 342 F. 3d 207, 220 (3rd Cir. 2003) ("[T]hose individuals whose detention violates FARRA may challenge their detention under 28 U.S.C. § 2241."). The irreparable injury in this instance, therefore, is one that federal courts are uniquely placed to prevent.

*Second*, Mr. Omar's transfer to Iraqi custody would deprive him of his rights to due process under the Fifth Amendment and Article I, section 9, clause 2 of the United States Constitution. These rights were reaffirmed in *Hamdi*, where the Supreme Court set clear constitutional limits on the government's ability to imprison citizens found on the battlefield. The Court concluded such detention was proper only "for the duration of the conflict" and also that detainees must receive "a fair opportunity to rebut the Government's factual assertions before a neutral decision maker." 542 U.S. at 601 (plurality op.). As set forth more fully in the Statement of Facts above, it is unlikely that Mr. Omar would receive a trial in accord with international standards if he were to be turned over to the Iraqi criminal system, but would

instead be subject to indefinite imprisonment without due process.  Accordingly, he faces

irreparable harm for that reason as well.

### 3.    Maintaining the Status Quo Does Not Harm the Government.

In contrast to the actual bodily harm and loss of opportunity for legal redress that Mr.

Omar confronts, the government will not be harmed at all by being prohibited from acting

unlawfully by transferring a United States citizen to Iraq.  The government held Mr. Omar for

fifteen months without transferring him to other hands.  Whatever initial basis might have

existed for the arrest of Mr. Omar – which remains wholly unknown to Mr. Omar or his

counsel – it does not outweigh the rights Mr. Omar enjoys under the Constitution and established

laws of the United States.

### 4.    Protecting an American Citizen from Torture Is in the Public Interest.

The public interest is clearly benefited by ensuring that American citizens can preserve

their rights under the Constitution and various statutes in a federal judicial proceeding.  Because

the government has the unfettered discretion to move prisoners, as demonstrated by its repeated

transfer of Mr. Omar across Iraq, only an order from the Court can guarantee that he will not be

surrendered to Iraqi authorities.

### B.    Further Proceedings Are Appropriate and Necessary Absent Agreement by the Government Not To Transfer Mr. Omar in Violation of His Constitutional and Statutory Rights.

Unless the U.S. government is willing to agree not to transfer Mr. Omar to the custody of

the Iraqi authorities, this Court should permit discovery and a hearing to enable Petitioners to

demonstrate with admissible evidence that such transfer would subject Mr. Omar to the risk of

torture.  *See, e.g.*, *Abu Ali*, 350 F. Supp. 2d at 68-69 (granting expeditious discovery to resolve

factual disputes where American citizen detained overseas).  Indeed, it is "the inescapable

obligation" of this Court to authorize appropriate discovery so that the necessary facts may be determined.  *See Harris v. Nelson*, 394 U.S. 286, 299 (1969).  The habeas writ must be "administered with the initiative and flexibility essential to insure that miscarriages of justice . . . are surfaced and corrected."  *Id.* at 291; s*ee also Townsend v. Sain*, 372 U.S. 293, 312 (1963) ("[T]he power of inquiry on federal habeas corpus is plenary."), *overruled on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court extend the Temporary Restraining Order enjoining the U.S. government, their agents, servants, employees, confederates, or any person acting in concert or participation with them, from transferring Shawqi Omar out of the United States' physical and/or legal custody until discovery can be conducted and this Court can hold a hearing on the Petitioner's motion for a preliminary injunction.


Dated: February 6, 2006                    Respectfully submitted,


                                    _____/s/ Susan L. Burke_____
                                    Susan L. Burke (D.C. Bar # 414939)
                                    Heather L. Allred
                                    BURKE PYLE LLC
                                    3527 Lancaster Avenue
                                    Philadelphia, PA 19104
                                    Telephone:     (215) 387-4705
                                    Facsimile:      (215) 387-4713

                                    Joseph Margulies
                                    MACARTHUR JUSTICE CENTER,
                                    UNIVERSITY OF CHICAGO LAW SCHOOL
                                    1111 East 60th Street
                                    Chicago, IL  60637
                                    Telephone:     (773) 702-9560
                                    Facsimile:      (773) 702-0771

Aziz Z. Huq
Jonathan Hafetz
BRENNAN CENTER FOR JUSTICE, NEW
YORK UNIVERSITY LAW SCHOOL
161 Avenue of the Americas
12th Floor
New York, NY  10013
Telephone:      (212) 998-6730
Facsimile:      (212) 995-4550

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I, Heather L. Allred, hereby certify that on February 6, 2006, I caused to be served a true

and correct copy of the foregoing Supplemental Briefing in Support of Petitioners' Motion For a

Temporary Restraining Order via electronic mail and U.S. First Class Mail, postage prepaid,

upon the following individual at the address indicated:

Edward H. White, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 6110
Washington, DC 20530
ned.white@usdoj.gov

Heather L. Allred