EXHIBIT

B

1:05 – CV – 02374 – RMU

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDRA K. OMAR, *et. al.*,<br>Petitioners,<br><br>v.<br><br>FRANCIS J. HARVEY, *et. al.*,<br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO. 05-2374 (RMU)

### DECLARATION OF CURT GOERING

I declare under penalty of perjury that the following is true and correct:

1.    My name is Curt Goering.  I am the Deputy Executive Director of Amnesty International, USA.  Amnesty International is regarded as the leading human rights watchdog organization.  Amnesty International received the Nobel Peace Prize in 1977.  Amnesty's work is considered by experts around the globe to be authoritative and reliable.

2.    I have served as Deputy Director for the past 20 years.  In that position, I am personally responsible for overseeing and supervising teams of researchers who observe and monitor adherence to the rule of law on human rights norms.  In addition, I have been a researcher in the Middle East Department at Amnesty International's headquarters in London and have traveled to Iraq to investigate allegations of torture and abuse and interview survivors of torture.

3.    At present, Iraqi government forces do not adhere to the rule of law.  Instead, they regularly and systematically engage in acts of torture.

4.    According to Amnesty International's research, the acts that have been perpetrated by Iraqi government forces include use of electric shocks on different parts of the body,

strangulation, breaking of limbs, sexual abuse, using cigarettes to burn body parts, use of electric drills on arms and legs, and suffocation.

5.    The Iraqi government forces have not established a functioning judicial system. The United Nations mission in Iraq recently called for the release of hundreds of individuals in prison, who were being kept imprisoned despite judicial order for their release.

6.    There is evidence that the Iraqi criminal courts proceedings for those charged with "terrorist activities" include the introduction of evidence (such as confessions) that has been procured by torture and abuse.

7.    At present, the Iraqi criminal courts proceedings fall far short of international standards for fair trials.

8.    We understand that the United States government is contemplating turning United States citizen Shawki Omar over to the Iraqi criminal authorities. Based on Amnesty International's extensive research and investigations, we conclude that Shawki Omar would be at grave and serious risk of being tortured if he were turned over to the Iraqi criminal authorities.

9.    Based on Amnesty International's extensive research and investigation, we conclude that Shawki Omar is not likely to receive a trial in conformity with international standards for fair trials if he were to be tried by the Iraqi criminal authorities.

Date:    5 February 2006

Curt Goering

- 2 -

EXHIBIT

C

1:05 – CV – 02374 – RMU

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDRA K. OMAR, *et. al.*, <br> Petitioners, | ) <br> ) <br> ) |
| | ) |
| v. | ) <br> ) |
| | ) |
| FRANCIS J. HARVEY, *et. al.*, <br> Respondents. | ) <br> ) <br> ) <br> ) |

CIVIL ACTION NO. 05-2374 (RMU)

### DECLARATION OF HANIA MUFTI

I declare under penalty of perjury of the laws of the United States that the following is true and correct:

1.  My name is Hania Mufti. I am employed by Human Rights Watch as a researcher. I am an expert in human rights in Iraq because I have been following and observing Iraqi governmental conduct for many years.

2.  I have first-hand knowledge of the present state of affairs in Iraq. I travel to Iraq on a regular basis to observe whether the Iraqi governmental authorities adhere to the rule of law. The information I gather is provided to my employer, Human Rights Watch, which publicizes the state of affairs in Human Rights Watch statements and publications. The information contained in the Iraq chapter of the Human Rights Watch 2006 World Report remains valid to date.

3.  In the course of my research I have learned that certain Iraqi governmental authorities and their agents torture and otherwise mistreat persons in their custody and control.

Date: _____          _____
                                                Hania Mufti


*Counsel for petitioners have been in contact with Ms. Mufti via email.  Ms. Mufti is in Jordan and therefore unable to physically deliver the signed original to counsel for petitioners in time for the filing deadline.  Counsel for petitioners will file the original available as soon as it is received from Ms. Mufti.*

EXHIBIT

D

1:05 – CV – 02374 – RMU

## IRAQ

The human rights situation in Iraq deteriorated significantly in 2005, with a continuing rise in the number of armed attacks by insurgent groups, including the deliberate targeting of civilians and violent attacks such as suicide bombings. The level of abductions of Iraqis, in many cases for ransom, has remained high, while those of foreign nationals has decreased – reflecting in part the departure of foreign personnel working with humanitarian agencies, media outlets and others as a result of deteriorating security conditions.

Counterinsurgency attacks by U.S.-led international and Iraqi forces further aggravated the human rights situation, resulting in the killing of civilians in violation of the laws of armed conflict. There was also continuing concern about the absence of basic precautions by the U.S. military to protect civilians, including at checkpoints, brought to the fore by the killing of an Italian intelligence officer in March 2005. The subsequent U.S. military investigation exonerated all U.S. military personnel involved in the shooting, but showed that the army had failed to implement lessons learned during two years of manning checkpoints.

Evidence of the torture and other mistreatment of detainees held in the custody of U.S. forces in 2003 and 2004 has continued to emerge in the wake of the Abu Ghraib revelations in April 2004. Some of the evidence is based on accounts by U.S. military personnel, who have described routine and severe beatings of detainees, including subjecting them to forced stress positions, sleep deprivation, extremes of hot and cold, denial of food and water, and the application of chemical substances to detainees' skin and eyes. The accounts show that abuses have resulted from civilian and military failures of leadership and confusion about interrogation standards and the application of the Geneva Conventions. They contradict claims by the Bush administration that detainee abuses by U.S. forces abroad have been infrequent, exceptional and unrelated to policy.

Efforts to boost economic reconstruction and the rebuilding of Iraq's devastated infrastructure continue to be hampered by general instability in the country and the level of violence caused by insurgency and counterinsur-



gency attacks. This is despite progress made in the political process, including the holding of general elections in January 2005, the convening of the Transitional National Assembly in March, the formation of the Iraqi Transitional Government in April and the holding of a referendum on a draft constitution in October.

### The Governing Authority and the Political Process

Elections were held on January 30, 2005 for twenty government bodies, including a Transitional National Assembly. The U.N.-assisted elections took place amid conditions of extreme insecurity and political turmoil, limiting the ability of all eligible voters to participate. Following prolonged delays, the successor Transitional Government, headed by prime minister Ibrahim al-Ja'fari, was formed on April 28.

On October 15, a draft constitution was adopted by national referendum. According to official results, 63 per cent of eligible voters participated, with over 78 percent voting in favor. The drafting process was fraught with difficulties amid efforts to secure the participation of Sunni political groups that had boycotted the January elections and to achieve consensus on key issues including the role of religion and federalism. The constitution contained key fundamental principles and individual rights, but left many of them subject to implementing legislation. A mechanism was established for further review of the constitution following parliamentary elections, scheduled for December 15, 2005.

### Attacks against Civilians by Insurgent Groups

Insurgent groups perpetrated widespread attacks against civilians throughout 2005, claiming the lives of hundreds of Iraqis and other nationals. Among the groups responsible for these abuses are al-Qaeda in Iraq, Ansar al-Sunna and the Islamic Army in Iraq, which have all targeted civilians for abductions and executions. The first two groups have repeatedly boasted about massive car bombs and suicide bombs in mosques, markets, bus stations and other civilian areas.



IRAQ

## A Face and a Name

Civilian Victims of Insurgent Groups in Iraq

HUMAN
RIGHTS
WATCH

These abuses took place in the context of the U.S.-led invasion of Iraq and the ensuing military occupation that resulted in tens of thousands of civilian deaths and sparked the emergence of insurgent groups. Chief among the justifications insurgent groups use is that the U.S. illegally invaded Iraq and killed thousands of Iraqi civilians since March 2003.

The victims of targeted assassination by insurgent groups include government officials, politicians, judges, journalists, humanitarian aid workers, doctors, professors and those deemed to be collaborating with the foreign forces in Iraq, including translators, cleaners and others who perform civilian jobs for the U.S.-led Multi-National Force in Iraq (MNF - I). Insurgents have directed suicide and car bomb attacks at Shi`a mosques, Christian churches and Kurdish political parties with the purpose of killing civilians. Claims that these communities are legitimate targets because they may support the foreign forces in Iraq have no basis in international law, which requires the protection of any civilian who is not actively participating in the hostilities.

### Torture and Killings by Iraqi forces

The torture and ill-treatment of detainees in Iraqi custody remains a serious concern, with the level of reported incidents rising. The vast majority of allegations concern forces of the Iraqi Ministry of Interior, as well as members of the Iraqi armed forces under Ministry of Defense authority. Detainees in pretrial detention on security-related offenses, in particular, are subjected to various forms of torture or ill-treatment, including routine beatings, sleep deprivation, electric shocks to sensitive parts of the body, prolonged suspension from the wrists with the hands tied behind the back, deprivation of food and water for prolonged periods, and severely overcrowded cells. Former detainees held by Ministry of Interior forces in connection with alleged terrorist offenses linked to insurgent activity report other forms of torture, including having weights attacked to their testicles, or having a string tied tightly round their penis and then being forced to drink large amounts of water.

Iraqi government officials have publicly committed to investigating the abuse of detainees and to holding criminally responsible those found guilty of the

torture of detainees and the killing of civilians. At this writing, neither the Ministry of Interior nor the Ministry of Defense had established an effective mechanism for the monitoring of abuses by law enforcement personnel or the armed forces, nor set up a system for bringing those accused of such offenses to justice. In addition to assistance provided by MNF-I personnel, other training programs through the European Union and NATO to train personnel from the Iraqi police, armed forces, the judiciary and penitentiary personnel were ongoing during 2005, but with little focus on issues related to monitoring and accountability.

### *Accountability for Past Crimes*

The Statute of the Iraqi Special Tribunal, established in December 2003 to try members of the former Iraqi government for genocide, crimes against humanity and war crimes, was amended and adopted by Iraq's Transitional National Assembly in October 2005, one week before the first trial was scheduled to begin on October 19. The Assembly renamed the tribunal the "Supreme Iraqi Criminal Tribunal" (SICT).

Serious doubts remain about the capacity of the Tribunal, as constituted, to conduct fair trials that meet international human rights standards for the prosecution of the crimes in its Statute. Reliance on Iraqi criminal law, which does not adequately ensure protection of the rights of accused, could further undermine the legitimacy of the Tribunal. There remain inadequate protections against self-incrimination, an inappropriate standard of proof, and inadequate procedural and substantive measures to ensure an adequate defense, including the right to confront and examine witnesses. Defense counsel for some of the accused claim that their ability to mount an effective defense has been hampered by lack of adequate access to the accused and to the court's evidence against them. Additionally, prejudicial comments by senior public officials, the politicization of control of the Tribunal and the susceptibility of judges to dismissal seriously undermine the court's appearance of independence and impartiality. After the opening of the first SICT trial on October 19, two defense counsel were assassinated, highlighting the grave risks faced

IRAQ

'Ali Hasan Al-Majid and
the Basra Massacre of 1999

HUMAN
RIGHTS
WATCH

by all who participate in the trials. The defense counsel killings intensify concerns about the accused's right to a competent and effective defense.

As of October 2005, the MNF retained physical custody of over 90 "high value detainees", most of whom remained held at Camp Cropper near Baghdad International Airport, and include members of the former Iraqi government awaiting trial before the Iraqi Criminal Tribunal. U.S. forces began granting these detainees family visits starting in July 2005, in some cases more than two years after arresting them. It is unclear how many continue to be held without access to defense counsel.

### Key International Actors

As of July 2005, the United States retained approximately 140,000 military personnel deployed in Iraq as part of the United Nations Security Council-authorized MNF-I. The mandate of the MNF-I, under Security Council resolution 1546, adopted in June 2004, was scheduled for review in December 2005. The United Kingdom remains the key military and political partner to the United States in the MNF-I, retaining approximately 8,300 troops in Iraq, deployed primarily in the south-eastern governorates. Other countries with a military presence in Iraq include Poland, Italy, Ukraine, Denmark, Romania and Japan, totaling some 12,700 troops.

In a report to the U.S. Secretary-General in September 2005, the United Nations Assistance Mission in Iraq (UNAMI) said the human rights situation in Iraq continued to give rise to serious concern. The report cited "ongoing insurgent attacks and acts of terrorism, including kidnapping and torture", as well as 'continuing concern about military operations conducted by the Multinational Force in the north and north-west of Iraq, resulting in civilian deaths, injury and displacement from excessive or apparently indiscriminate use of force."


EXHIBIT
E
1:05 – CV – 02374 – RMU



# U.S. DEPARTMENT of STATE

## Iraq*

### Country Reports on Human Rights Practices - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

Coalition-led forces overthrew the Ba'athist regime of Saddam Hussein in April 2003. As recognized in U.N. Security Council Resolutions (UNSCR) 1483, 1511, and 1546, an Interim Administration--the Coalition Provisional Authority (CPA)--administered the country until an internationally recognized, representative government was established. The Iraqi Governing Council (IGC), recognized by UNSCR 1500 as the principal body of the Iraqi interim administration during the period of the CPA, adopted the Law for the Administration of the State of Iraq for the Transitional Period--the Transitional Administrative Law (TAL)--on March 8, and the new Iraqi Interim Government (IIG), consistent with UNSCR 1546, assumed full governmental authority on June 28. The TAL set forth a transitional period, to end upon the formation of an elected government pursuant to a permanent constitution. On August 15-18, the National Conference convened and elected a 100-member Interim National Council. Elections for the Transitional National Assembly, the country's legislative authority and the first step in the formation of the Iraqi Transitional Government, were scheduled to take place on January 30, 2005.

The TAL established a republican, federal, democratic, and pluralistic system with powers shared among the federal and regional governments, including 18 governorates, as well as municipalities and local administrations. The Kurdistan Regional Government was recognized in the TAL as the official government of those territories that were administered by the Kurdish Regional Government on March 19, 2003 in the governorates of Dohuk, Arbil, Sulaimaniya, Kirkuk, Diyala, and Ninewah. Islam is the official religion of the State and, according to the TAL, is to be considered a source of legislation. The TAL also mandates the separation and independence of the legislative, executive, and judicial branches of the Government. Some aspects of the judicial system were dysfunctional and, at times, subject to external influence.

Domestic security responsibilities are shared within the IIG between the Ministry of Interior (MOI) and the Ministry of Defense. As set forth in the TAL, certain elements of the Iraqi Armed Forces are under the operational control of the Multi-National Coalition Force (MNF-I) operating in the country under unified command pursuant to UNSCR 1546, and some also have domestic security responsibilities. MOI forces also partner with MNF-I to ensure a coordinated approach to security within the country. The MOI's responsibilities extend only to internal security. The MOI commands a number of uniformed forces, including the Iraqi Police Service, the Department of Border Enforcement, and the Bureau of Dignitary Protection, as well as the MOI Intelligence Service. Among its other responsibilities, the MOI also regulates private domestic and foreign security companies. While civilian authorities generally maintained effective control of security forces under their authority, there were instances in which security force elements acted without government authority. There were reports that members of the MOI's security forces committed numerous, serious human rights abuses.

The country has an estimated population of 25 million, although no reliable census has been undertaken for several years. The former regime owned all major industries and controlled most of the highly centralized economy. The economy is likely to remain heavily dependent on revenues from oil exports and international assistance for the foreseeable future. Reforms under the CPA introduced many market concepts; however, state-owned enterprises still played a significant role in the economy. The Iran-Iraq and Gulf wars, combined with gross mismanagement and corruption, damaged the economy, and the country was subject to U.N. sanctions from its 1990 invasion of Kuwait until the suspension of sanctions following the fall of the Ba'ath regime. Serious security problems significantly slowed reconstruction activities. During the year, official estimates of unemployment ranged between 20 and 30 percent. Government officials estimated that the rate of underemployment was roughly equivalent to joblessness. Anecdotal reports suggested that approximately half the working-age population was unemployed.

The Interim Government, reversing a long legacy of serious human rights abuses under the previous regime, generally respected human rights, but serious problems remained. During the period of the report, the Government's human rights performance was handicapped by a serious insurgency in which a terrorist campaign of violence impacted every aspect of life with executions, kidnappings, torture, and intimidation waged against civilians, the Government and Coalition Forces. Although this insurgency may have had popular support in some areas, its core was former regime elements, foreign and domestic terrorists, and organized criminal gangs. On November 7, Prime Minister Iyad Allawi declared a 60-day state of emergency limited to Ramadi and Fallujah, in accordance with the July 6 IIG "Order of Safeguarding National Security." The state of emergency provides broad powers to impose curfews, close off entire towns and cities, take command of intelligence and security forces, and restrict assembly and movement. It remained in effect at year's end.

With the ongoing insurgency limiting access to information, a number of instances in the Report have been difficult to verify. However, there were reports of arbitrary deprivation of life, torture, impunity, poor prison conditions--particularly in pretrial detention facilities--and arbitrary arrest and detention. There remained unresolved problems relating to the large number of Internally Displaced Persons (IDPs). Corruption at all levels of the Government remained a problem. Some aspects of the judicial system were dysfunctional, and there were reports that the judiciary was subject to external influence. The exercise of labor rights remained limited, largely due to violence, unemployment, and maladapted organizational structures and laws; however, with international assistance, some progress was underway at year's end.

Civic life and the social fabric remained under intense strain from the insurgency, as well as from a continuing shortage of basic services and staples. Despite this pressure, the IIG in 6 months set and kept to a legal and electoral course based on respect for political rights. This included most importantly the right of citizens to change peacefully their government through nationwide, free, and fair elections. The development of a Human Rights Ministry, the ongoing empowerment of women, and the explosive growth of nongovernmental organizations (NGOs) and civic associations reflected a governmental commitment to human rights. The Government's success in building an accommodating structure for the exercise of civil liberties, although burdened by the heritage of dictatorship and disregard for law, was shown clearly in the citizens' embrace of freedoms of speech and press, peaceful assembly, and association and religion. While major problems still remained, they were of a far different magnitude and nature than previously.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

With the ongoing insurgency, there was a climate of extreme violence in which persons were killed for political and other reasons. There were occasional reports of killings particularly at the local level by the Government or its agents, which may have been politically motivated. In early December, Basrah police reported that officers in the Internal Affairs Unit were involved in the killings of 10 members of the Ba'ath Party. Basrah police also reported that the same Internal Affairs Unit officers were involved in the killings of a mother and daughter accused of engaging in prostitution. The Basrah Chief of Intelligence was removed from his position as a result of the accusations; however, he retained command of the Internal Affairs Unit. An MOI investigation into the Basrah allegations was ongoing at year's end. Other instances reflected arbitrary actions by government agents. For example, on October 16, Baghdad police arrested, interrogated, and killed 12 kidnappers of 3 police officers.

Insurgents killed thousands of citizens (see Section 1.g.). In a terrorist campaign of violence and intimidation, they targeted, kidnapped and killed foreigners, government officials and workers, security forces, members of the armed forces, and civilians suspected of collaborating with the Coalition.

Insurgent and terrorist groups also claimed responsibility for the bombings of churches, government facilities, public gathering spots, and businesses. These actions resulted in a massive loss of life and grave injuries. There were no indications of government involvement in these acts.

Until its fall in 2003, the former regime was responsible for the disappearance, murder, and torture of persons suspected of or related to persons suspected of oppositionist politics, economic crimes, military desertion, and a variety of other activities. The discovery of mass graves (considered to be unmarked sites containing at least six bodies) provided evidence of the vast dimension of these practices. Immediately following the fall of the regime and throughout the remainder of 2003, mass graves were reported from sources throughout the country. During this reporting period, 189 mass graves were confirmed, and investigators continued to review evidence on additional mass graves.

Grid coordinates were obtained on at least 10 mass graves in Al-Hatra in Ninewah Province. On September 1, authorities began to dig a site near Al-Hatra. Two gravesites were excavated; one site contained the remains of women and children and the other contained remains of men. Approximately 275 bodies--thought to be Kurds who were killed by the former regime--were found in each site.

Sites were discovered in all regions and contained remains of members of every major religious and ethnic group in the country, as well as of foreign citizens. Graves contained forensic evidence of atrocities, including signs of torture, decapitated or mutilated corpses, or evidence that some victims were shot in the head at close range.

During the year, the Ministry of Human Rights strengthened efforts to help relatives learn the fate of their family members under the regime, including those found in mass graves, and created its national bureau of missing persons, the National Center for Missing and Disappeared Persons.

b. Disappearance

There were no reports of politically motivated disappearances associated with the Government.

Due to the ongoing insurgency and the opportunities for common crime, as well as politically motivated kidnapping (see Section 1.g.), kidnapping and disappearances remained an ongoing problem. Many hundreds, if not thousands, of individuals disappeared without a trace. The widespread and ongoing nature of these disappearances precluded the availability of reliable statistics.

There were many reports of disappearances dating from the former regime of a large number of citizens. In 2003, human rights organizations widely believed that the former regime had executed as many as 300,000 civilians and probably more. Several of these organizations held the view that as many as 1.3 million persons were missing from the country as a result of wars, executions, and defection.

To date, the authorities, assisted by various Coalition officials, have identified through DNA analysis the remains of 322 missing Kuwaitis whose corpses were found in mass graves.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The TAL expressly prohibits torture in all its forms under all circumstances, as well as cruel, inhuman, or degrading treatment.

According to Human Rights Watch (HRW), during this reporting period, torture and ill treatment of detainees by police was commonplace. In interviews with 90 prisoners conducted from August to October, 72 claimed that they had been tortured or mistreated. The reported abuses included some instances of beatings with cables and hosepipes, electric shocks to their earlobes and genitals, food and water deprivation, and overcrowding in standing room only cells.

Additionally, HRW reported that specialized agencies, including the Major Crimes Unit, Criminal Intelligence, Internal Affairs and possibly the Intelligence Service, were responsible for pretrial irregularities, such as arrest without warrant, lengthy periods of detention before referral to an investigative judge, and the denial of contact with family and legal counsel. Although detainees were primarily criminal suspects, they also included others, such as members of the Mahdi Militia and juveniles, who sometimes were caught in arrest sweeps.

There were instances of illegal treatment of detainees. For example, on November 1, Baghdad police arrested two Coalition Force citizen interpreters on charges involving the illegal use of small arms. After their arrest, police bound the detainees' arms behind them, pulling them upward with a rope and cutting off their circulation. This treatment was followed by beatings over a 48-hour period with a steel cable, in an effort to make the detainees confess. Both interpreters required medical treatment after their release to Coalition Forces. No further information on the incident was available at year's end. In another case, the Commission on Public Integrity (CPI) gathered enough evidence to prosecute police officers in Baghdad who were systematically raping and torturing female detainees. Two of the officers received prison sentences; four others were demoted and reassigned.

There were also allegations that local police sometimes used excessive force against both citizens and foreigners. On November 28, a foreign national reported that police beat him at a police station in Kufa. According to the victim, he witnessed police beating detainees at a police station while he was filing a claim on another matter. When he questioned the treatment of the detainees, he was beaten and detained for 4 hours.

A number of complaints about Iraqi National Guard (ING) abuses surfaced during the year. For example, in November, the ING raided a house in southern Baghdad and arrested four alleged insurgents. The family was evicted and the ING burnt the house. In another incident, a doctor at the al-Kindi hospital in Baghdad said that the ING had tried to force him to treat one of their colleagues before other more serious cases. When he refused, they beat him. There also were many reported instances of ING looting and burning houses in Fallujah in November.

According to an ING official, disciplinary procedures were in place to deal with the mistreatment of citizens and a number of members of the ING were fired during the year for violations.

There were numerous reports and direct evidence that insurgents employed multiple forms of torture and inhumane treatment against their victims (see Section 1.g.).

Although there was significant improvement in Iraqi Corrections Service (ICS) prison conditions following the fall of the former regime, in many instances the facilities did not meet international penal standards. According to the Government, it generally permitted visits by independent human rights observers. In August, the International Committee of the Red Cross (ICRC) visited ICS facilities. The Ministry of Human Rights established a permanent office at the Abu Ghraib prison. HRW visited some ICS facilities.

After the fall of the former regime, prison functions were consolidated into the Ministry of Justice, and the ICS was transferred from the Ministry of Labor and Social Affairs to the Ministry of Justice. According to the Government, ICS confined civilians under the rule of law, and a valid confinement order from a judge was required. Confinement was not connected with military intelligence operations nor was there any contact with military confinement functions.

Allegations of inmate abuse by ICS Officers continued, although fewer than in the previous year. The ICS Internal Affairs Division claimed it conducted investigations of all detected or reported cases and that appropriate corrective action was taken if an allegation was verified. Although fewer than 10 cases were investigated between July and December, an individual with access to human rights complaints alleged that hundreds of cases were pending accusing ICS officers of abuse and torture of detainees and prisoners, including women. No further information was available at year's end.

At year's end, ICS was investigating eight cases in which inmates alleged police predetention abuse and torture.

Overcrowding was a problem. Inmate disturbances and riots reduced available prison beds by approximately one-third, and pretrial detention facilities were often overcrowded. The insurrections in Sadr City and later in Najaf created additional overcrowding in detention facilities.

ICS operated 17 facilities, totaling 8,500 beds. Renovation and construction on an additional 6 facilities, totaling 6,000 beds, was underway at year's end. No inmates died during the period under review due to poor conditions of confinement or lack of medical care, although the quality of care was low.

ICS operated both pretrial detention facilities and post-trial prisons across the country. The law provides that police, may detain prisoners for 24 hours during which time a magistrate must review the case. If the magistrate orders continued confinement, the prisoner is transported to an ICS detention facility to await trial.

The law provides that women and juveniles be held separately from men; according to HRW interviews, juveniles were confined with adults in some cases.

All of the ICS personnel were required to undergo training. An 8-week course including instruction in basic human rights, rights of women and children, trafficking in persons, prohibition against torture, international corrections standards, integrity issues, professional ethics, and code of conduct was mandatory for the 4,000 ICS correctional officers.

d. Arbitrary Arrest or Detention

Under the 1971 Code of Criminal Procedure, as amended by the CPA, an individual suspected of a crime may be arrested only on a judicial warrant, except when the police observe a crime taking place or have reasonable grounds to suspect such acts. The law provides that, in any case, detainees must see an investigating judge within 24 hours.

Detainees were generally retained in custody pending the outcome of a criminal investigation. Individuals were generally arrested openly and warrants were issued only with sufficient evidence, although, there were numerous reports of arbitrary arrest and detention

There were no publicized cases of criminal proceedings brought against members of the security forces in connection with alleged violations of these rights, nor were there publicly known measures adopted to prevent recurrence.

Due to the insurgency, high-crime rates, and limited police training, innocent persons were sometimes arrested and detained erroneously

The MOI's responsibilities extended only to internal security. MOI commands a number of uniformed forces, including the Iraqi Police Service (IPS) and Department of Border Enforcement. The MOI also has criminal and domestic intelligence capabilities and regulates all domestic and foreign private security companies operating in the country. The MOI also has authority over the Civil Defense Directorate, the firefighters and emergency response organization, and the Facilities Protection Service shielding strategic infrastructure, government buildings, and cultural and educational assets.

In the aftermath of the fall of the former regime, a police presence temporarily vanished, except in the Kurdish North. Police equipment was stolen. After April 2003, a large recruitment and training program was established, including hiring former police officers.

During the year, various specialized units were created, including an Emergency Response Unit (with capabilities similar to a SWAT team) and Public Order Battalions that perform riot control functions, as well as specialized counterinsurgency units.

More than any other group, the police have been a target of terrorist attacks. Over 1,500 IPS personnel have been killed between April 2003 and year's end. Additionally, pervasive lawlessness has led to an increase in violent and organized crime, particularly related to kidnappings (see Section 1.g.).

Detainees generally were informed of the charges against them, although sometimes with delay.

There was a widespread perception that police made false arrests to extort money. Some police officers did not present defendants to magistrates and held them in detention cells until their families paid bribes for their release. In the Central Criminal Court in Baghdad, the time between arrest and arraignment was often in excess of 30 days, despite the 24-hour requirement.

There were organized police abuses. For example, on September 4, approximately 150 police, none of whom had uniforms or badges, surrounded the Iraqi Institute of Peace (IIP), which is associated with the International Center for Reconciliation of the Coventry Cathedral, in response to an alert that a prominent former regime figure might be inside the Cathedral. Four individuals identified themselves as MOI officials, but did not show badges. Armed men, some with heavy weapons, broke down the doors and ransacked the IIP building, stealing phones and money. The incident ended with no serious injuries but without judicial follow-up.

On August 16, a ministry, reportedly wishing to occupy the real property used by a political party, caused party members to be arrested and detained for almost 60 days without charges. During their detention, a habeas corpus writ from the Chief Investigative Judge of the Central Criminal Court was ignored. The minister involved also refused to appear before the judge to explain his ministry's actions. The political party members were eventually released; however, the property involved remained under the control of the ministry at year's end.

Reportedly, coerced confessions and interrogation continued to be the favored method of investigation by police. According to one government official, hundreds of cases were pending at year's end alleging torture. There have been several arrests, and both criminal and administrative punishments were handed out to police in cases where allegations of torture were substantiated.

Additionally, corruption continued to be a problem with the police. The CPI was investigating cases of police abuse involving unlawful arrests, beatings, and the theft of valuables from the homes of persons who were detained; however, the police often continued to use the methods employed by the previous regime. In addition to the CPI, several other mechanisms were put into place to address this problem, including an internal affairs capability, mentoring, and training programs that focus on accountability.

Efforts to increase the capacity and effectiveness of the police were ongoing; however, there was little

indication that the IIG took sufficient steps to address this problem adequately or to reinforce publicly the message that there will be no climate of impunity.

Because of arbitrary arrest and detention practices, some prisoners were held in incommunicado detention.

Pursuant to the Code of Criminal Procedure, the judge who issues an arrest warrant sets the bond conditions. If no conditions of release are specified, the accused is detained. The most common bond condition is that an accused is released into the custody of a responsible individual (such as family member or tribal leader), who will vouch that the individual will appear at a future court hearing.

Judges are authorized to appoint counsel for those who cannot pay, and did so, according to observers of proceedings in the Central Criminal Court in Baghdad. Attorneys were provided with private accommodations during official visits to their clients.

Lengthy pretrial detention continued to be a significant problem due to backlogs in the judiciary and slow processing of criminal investigations. Approximately 3,000 inmates were in pretrial detention, and 1,000 were held post-trial.

In August, the IIG issued a national amnesty for insurgents who had not committed any major crime, including murder, rape, robbery, or abduction. Local amnesties continued to be offered in the context of specific local security arrangements.

e. Denial of Fair Public Trial

The TAL provides for an independent judiciary; however, there has not been sufficient experience to determine in practice its independence. Senior levels of the Government expressed commitment to this provision.

According to the TAL, all persons are equal before the courts and no individual may be deprived of life or liberty except in accordance with legal procedures. No one may be unlawfully arrested or detained, and no one may be detained by reason of political or religious beliefs.

The TAL provides for the right to a fair trial and the judiciary generally sought to enforce this right. The accused is innocent until proven guilty pursuant to the law, and has the right to engage independent and competent counsel, remain silent in response to questions, and to summon and examine witnesses or ask that a judge do so.

The criminal justice system is based on the French or civil system. It was modified under the Ottoman Turks and greatly influenced by Egypt. The system is inquisitorial; cases are controlled and investigated by the judiciary. Judges, not lawyers, direct the progress of a case. After the fall of the former regime, parallel court systems were abolished and all criminal and civil judicial functions were consolidated into the Ministry of Justice-controlled courts. Thereafter, the Ministry underwent numerous changes, banning judges and administrators linked to the former regime's judicial practices in an effort to strengthen the rule of law. The laws continued to be reviewed to ensure that they meet international human rights standards. Tribal leaders routinely applied Shari'a law in settling disputes.

The courts are geographically organized into 17 appellate districts. There are two types of criminal courts-- misdemeanor and felony. Cases are presented to the court in the district where the crime took place. Under the law, a criminal defendant must be presented to an investigative judge within 24 hours of arrest. The investigative judge controls the investigation and recommends charges if sufficient evidence has been discovered. A trial and sentencing is generally a very short process. Witnesses who are not present have their statements read into the record.

There is no jury in the criminal justice system. A three-judge panel decides if a defendant is guilty. Defendants who are found guilty are sentenced immediately after the verdict. Prosecutors and defense counsel are permitted to question witnesses during the proceeding. In practice, they often asked few, if any, questions due to the questioning that has already occurred by the investigative or trial judges. The prosecutors and defense counsel routinely gave initial and final statements to the court. Cases can be appealed to the appellate court and then to the Court of Cassation.

The Council of Judges (COJ) is responsible for all matters relating to the courts. The chief appellate judge of each district, along with several judges from the Court of Cassation, comprises the COJ. The COJ is responsible for the administration of the judiciary, and the Chief Judge manages the day-to-day administrative

responsibilities of the COJ, specifically, court facilities, staff, and security. In the event of misconduct involving judges, the COJ convenes a disciplinary hearing to determine the merits of the allegations. During this reporting period, the COJ convened a disciplinary hearing concerning the allegation that a Baghdad judge dismissed criminal cases due to external influence. Pending resolution of this allegation, the judge was removed from office and an investigation was ongoing at year's end. The COJ was very powerful and there were allegations that the Executive Branch influenced the COJ.

The law provides for civilian judges to be designated to sit as a separate military court for members of the military. Although 20 judges were so designated, no military trials occurred during this reporting period.

Corruption remained a problem in the criminal justice system. In the fall, the MOI referred allegations of misconduct involving a judge to the COJ. The allegations concerned professional misconduct, including bribery. At year's end, this case was still pending (see Section 3).

In 2003, the IGC created the Iraqi Special Tribunal (IST) to try persons accused of committing certain specified crimes during the time period from July 17, 1968 through May 1, 2003. The IST's jurisdiction includes war crimes, genocide, crimes against humanity, and specified offenses under the country's law. The IST will try those accused of these crimes. Investigative hearings were ongoing at year's end against multiple defendants, however, indictments had not been issued, and trials had not begun.

The Iraq Property Claims Commission (IPCC) was established on January 14 as an independent governmental commission designed to resolve claims for real property that was confiscated or otherwise taken for less than fair value between July 17, 1968, and April 9, 2003. This included land and buildings (not personal property) seized because the policies of the former regime did not include land reform or lawfully applied eminent domain. The statute establishing the IPCC was amended in June to extend the time limits for the filing of claims until June 30, 2005, thus allowing claims from "Arabization Arabs" and Kurdish peoples whose property was forcibly taken between March 18, 2003, and June 30, 2005 (see Section 2.d.).

The IPCC comprised approximately 700 employees in offices located in all 18 governorates. Regional commissions consider claims on the basis of the documentation made available either by the claimant or through the relevant government offices.

The IPCC accepted over 37,000 claims during this reporting period more than 600 cases had been adjudicated and over 150 appeals filed as of year's end.

There were no reports of political prisoners.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The TAL prohibits such actions, and the Government generally respected these prohibitions in practice, although in some instances, the security forces reportedly did not. The law provides for the right to privacy, and police, investigators, or other governmental authorities may not violate the sanctity of private residences without a search warrant issued in accordance with the applicable law unless reasonable suspicion exists that criminal activity is in progress or, which rarely occurs, when such an action is deemed critical to national security. Generally, police complied with legal warrant requirements; however, there were reports that these rights were sometimes not respected.

g. Use of Excessive Force and Violations of Humanitarian Law in Internal and External Conflicts

During the period of the report, insurgents and foreign terrorists continued their attacks. The core of the insurgency, although it may have had some popular support in some areas fueled by fears deriving from political grievances and ethnic and religious tensions, was composed of former regime elements, foreign and domestic terrorists, and organized criminal gangs. Their actions resulted in killings, kidnappings, violence, torture, and a campaign of intimidation. On November 7, Prime Minister Allawi declared a 60-day state of emergency limited to Ramadi and Fallujah. The state of emergency provided broad powers to impose curfews, close off entire towns and cities, take command of intelligence and security forces, and restrict assembly and movement. It remained in effect at year's end.

The insurgents targeted anyone whose death or disappearance would profit their cause and, particularly, anyone suspected of being connected to Coalition Forces.

Bombings, executions, killings of government officials, kidnappings, shootings, and intimidation were a daily

occurrence throughout all regions and sectors of society. An illustrative list of these attacks, even a highly selective one, scarcely could reflect the broad dimension of the violence.

On September 30, an Islamist website, linked to the Unification and Jihad Group, posted a message claiming responsibility for three suicide attacks, one of which resulted in the deaths of dozens of civilians--most of them children--attending the opening of a sewage plant in Baghdad. On October 25, ING recruits, returning home on a bus after completing their training at the Kirkush military camp northeast of Baghdad, were killed. Abu Musab al-Zarqawi claimed responsibility for the killings. Thirty-seven bodies were found on the ground with their hands behind their backs, killed execution-style. Another 12 bodies were found in a burned bus. On November 1, unknown assailants gunned down Hatem Kamel Abdul Fatah, the deputy governor of Baghdad, as he was driving to work. The following day, a car bomb exploded near the Ministry of Education, killing at least six persons and wounding eight others. On November 20, women's rights activist Dr. Amal Ma'amalchi and four of her colleagues were shot and killed in their way to work at the Ministry of Municipalities and Public Works. On December 19, violence in 2 Shi'a holy cities killed at least 60 and wounded more than 120. A suicide bomber set off a blast at Karbala's main bus station, which was followed by a car bomb during a funeral procession in Najaf an hour later.

According to the Ministry of Human Rights, at least 80 professors and 50 physicians were assassinated during the year. Reporters Without Borders noted that 31 journalists and media assistants were killed during the year (see Section 2.a.). Universities also suffered from a wave of kidnappings. Researchers, professors, administrators, and students were all victims, including some who disappeared without a trace. Since the beginning of the insurgency, more than 150 foreigners have been kidnapped, and many were killed. In addition to the more publicized cases, ordinary civilians were also wounded and killed.

Terrorists systematically damaged and destroyed the infrastructure--oil, electricity, and transportation lines-- reducing the movement and availability of key services and goods to the population. They attacked a Baghdad hospital on November 8, killing 7 and wounding 30.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and the Press

The TAL protects the freedoms of speech and the press, and the Government generally respected these rights in practice. There are transparent licensing procedures for broadcast media, and the written press does not require a license to operate.

There were over 130 daily and weekly publications, and private local television stations broadcast in Arabic, Kurdish, and Syriac. The media represented a very wide range of viewpoints from across the political spectrum. Foreign journalists generally operated without legal or bureaucratic hindrance. However, on August 7, the IIG banned the Qatar-based Al-Jazeera news channel from working in the country for 30 days. Prime Minister Allawi, citing an Iraqi Communication and Media Commission report as a basis for the ban, accused the station of inciting violence and hatred. Nonetheless, during this unenforced suspension, ministers and the Vice President appeared, on the station, which continued to function in the country by using free-lance journalists. They also bought reports and footage from other satellite networks. The IIG extended the temporary suspension indefinitely on September 7.

According to Reporters Without Borders, 31 journalists and media assistants were killed during the year as a result of the ongoing insurgency. The Al-Arabiya television network reported on November 1 that five of its citizen employees had been killed after a car bomb exploded near its offices.

Canadian, French, British, American, and Iraqi journalists were kidnapped and released during the period of the report. The Islamic Army in Iraq and Muqtada al-Sadr's group were among the identified kidnappers.

On August 15, police ordered all unembedded journalists to leave the city of Najaf, where Coalition and Iraqi forces had been fighting supporters of Muqtada al-Sadr. The police cited concerns about the journalists' safety for the order, but many journalists ignored it. Police rounded up 60 foreign and Arab journalists at gunpoint on August 25 and brought them to police headquarters, where they were later released.

Foreign news broadcasts, including Al-Jazeera, were not jammed. There were no restrictions on content or access to books, periodicals, mass media of any sort, satellite dishes, computers, modems, faxes, and Internet services. The authorities formally respected academic freedom.

b. Freedom of Peaceful Assembly and Association

The TAL provides for freedom of assembly and association, and the Government generally respected these rights in practice.

Many demonstrations, which often proved to be a cover for insurgent violence, took place countrywide. According to the Government, the MOI did not break up any peaceful violations, except when a curfew was violated.

c. Freedom of Religion

The TAL provides for freedom of thought, conscience, and religious belief and practice. The Government generally respected these rights in practice; however, there was substantial politically and religiously driven violence between Sunni and Shi'a (see Section 1.g.) and against Christians. Despite cases of religious intolerance and terrorism against citizens of different faiths and their places of worship, there were clerics and other religious leaders who called for tolerance. On November 18, the IIG issued a statement condemning violence against religious groups and calling for unity among Christians and Muslims.

An estimated 97 percent of the population is Muslim, predominantly Shi'a (60-65 percent) with a substantial Sunni minority (32-37 percent). The remaining approximately 3 percent consist of Christians--Chaldeans (Roman Catholic), Assyrians (Church of the East), Syriac (Eastern Orthodox), Armenian Orthodox, several denominations of Protestant Christians, Yazidis, and a small number of Sabean Mandaeans and Jews.

Sunni-Shi'a violence was widespread and often fueled by foreign extremists. On December 4, a suicide bomber blew himself up near a Shi'a mosque located in the Sunni Muslim district of Al-Adhamiya in Baghdad, killing 16 people and wounding over a dozen others. Zarqawi's organization, Group of Jihad in the Country of Two Rivers, claimed responsibility for the bombing.

On November 23, masked gunmen assassinated a Sunni cleric north of Baghdad. Sheikh Ghalib Ali al-Zuhairi was a member of the Association of Muslim Scholars, an influential Sunni clerics group. He was shot while leaving a mosque in the town of Muqdadiyah and died in the local hospital.

There were numerous incidents of violence against the Christian community this year, ranging from individual killings to intimidation and assaults on women for not wearing a headscarf (hijab). Most of these incidences of violence were related to religion.

At the university in Mosul, Christian women boycotted classes during Ramadan in response to Islamist pressure for all women to cover their hair. The number of Christians leaving the country rose, after bombings of 14 churches in Baghdad and Mosul and the Chaldean Bishop's Palace in Mosul from August through December. The bombings left 43 dead and 340 injured, as well as damaging the churches. In the immediate aftermath of the August bombings, Grand Ayatollah Sistani condemned the attacks and reaffirmed the rights of Iraqi Christians. Christian leaders blamed foreign terrorists, including al-Qa'ida, for the attacks.

The Government's Christian Endowment Office reported that there were between 750,000 and 1 million Christians in the country, mostly in the North and Baghdad; there were 1.4 million in 1987. The majority of the country's Christians were Chaldeans. Christian religious leaders estimated that approximately 700,000 Christian citizens lived abroad.

According to the Christian Endowment Office, more than 30,000 Christian families fled the country during the year. Many remained in Jordan or Syria, hoping to return when the security situation improved. In November, a leaflet circulated to churches and some individual Christians in Baghdad ordered Christians to leave the country or convert to Islam

After the promulgation of the TAL in February, the former Governing Council addressed the question of whether Jewish expatriates would be allowed to vote in the 2005 elections. It announced that they would be treated like any other expatriate group. The Government also denied unfounded rumors (sometimes spread in flyers distributed by antigovernment extremist groups) that Jewish expatriates were buying up real estate in an attempt to reassert their influence in the country.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The TAL provides for these rights, and the Government generally respected them in practice.

On November 7, the Government announced a 60-day state of emergency starting November 8 in conjunction

with the onset of major military operations in Fallujah.

The state of emergency, which applied to Ramadi and Fallujah, was based on the National Security Order adopted by the IIG on July 7 but not immediately implemented. It could be invoked anywhere in the country if citizens' lives were threatened by a persistent campaign of violence aimed at hindering the political process. Its duration cannot be more than 60 days, but it is renewable every 30 days if the threat continues.
Under the law and subject to judicial review, the prime minister has the power to restrict freedom of movement, assembly (pursuant to a court order), and use of weapons. Suspects can be detained and searched, and their homes and work places searched, but they must appear before a judge within 24 hours of arrest. He can impose a curfew, cordon off and search an area, freeze assets, monitor and seize communications, and take necessary security and military measures (in Kurdish areas, only in coordination with the Kurdish regional government).

The TAL expressly prohibits forced exile, and there were no known government restrictions on emigration, although exit permits were required for citizens leaving the country. Despite current legislation to the contrary, there were reports that some authorities continued to require that women between the ages of 12 and 40 receive approval of their husbands, fathers, or brothers before being issued a passport. Government officials strongly denied that there was a policy to this effect.

In August, the International Organization for Migration (IOM) estimated that there were over 1.4 million IDPs in the country. The former regime was responsible for the displacement of more than one million persons. More than 225,000 persons, mostly Arabs displaced in Diyala and Salah El Din governorates, were estimated to have been displaced after April 2003. In November, the ongoing military conflict related to the insurgency resulted in the displacement of approximately 200,000 persons from Fallujah (see Section 4).

During the Saddam era, the vast majority of IDPs were non-Arabs (Kurds, Chaldo-Assyrians, and Turkmen). In the 1980s and early 90s, these non-Arabs were forcibly relocated as part of the regime's "Arabization" process to make way for incoming Arab families around oil-rich Kirkuk and other northern areas. After the fall of the regime, displaced non-Arabs began returning to their former homes. In some instances, these returns resulted in displacement of Arabs who had been moved there by the regime.

Many Arabs, who were part of this Arabization process, either fled their homes during the war or were forced out or prevented from returning by Kurdish civilians and fighters who had returned to villages from which they had originally been displaced. Many remained in Kirkuk, in extremely poor conditions, to try to resolve their property disputes.

The IPCC accepted more than 37,000 claims property disputes. By year's end, some 600 cases had been adjudicated; however, successful claimants had not received any financial compensation by year's end (see Section 1.e.).

The Ministry for Displacement and Migration is responsible for all issues related to refugees and displaced persons, as well as failed asylum seekers and other irregular migrants. Due to poor security conditions and inadequate social infrastructure, the Ministry did not support the forced return of Iraqi citizens to the country. In addition to the poor security situation, there was a housing shortage estimated at between 1.4 and 2 million units. There were also inadequate education and health care facilities for the current population. The Ministry publicly stated its support to the principles of voluntary repatriation and underscored the importance of safe and dignified returns.

The law does not provide for the granting of asylum or refugee status in accordance with the 1951 U.N. Convention Relating to the Status of Refugees or its 1967 Protocol, and the Government has not established a system for providing protection to refugees. However, the Government recognized a refugee population of an estimated 65,000 persons.

The Government cooperated with U.N. High Commission for Refugees (UNHCR) and other humanitarian organizations in assisting refugees and asylum seekers.

During the year, refugees were targeted for attacks that were allegedly carried out by insurgents. On November 21, UNHCR officials reported that Syrian refugees in Baghdad were singled out for attack and that protection for Palestinian and Syrian refugees had deteriorated after the fall of the former regime. The physical safety of refugees from various groups (Palestinians, Syrian Ba'athists, and Ahwazis) was threatened by groups not affiliated with the Government; they were suspected of having received privileged treatment under the former regime. Landlords forcibly expelled some Palestinian refugees (395 families) who were living in rented apartments. In some instances, the expulsions were carried out with the use of firearms. Syrian Ba'athists living

in Baghdad also received threats, and some were forced to relocate. UNHCR noted cases of Palestinian and Syrian refugees who had been detained and faced severe treatment in prison.

UNHCR provided protection and assistance to both Syrian and Palestinian refugees through rental subsidies, other forms of material assistance, and legal representation.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The TAL provides citizens with the right to change their government peacefully through periodic, free, and fair elections based on universal suffrage. Elections at the national level were scheduled for January 30, 2005, to exercise this right.

The first step towards realizing the 2005 elections took place from August 15 to 18, when the National Conference elected the 100-seat Iraqi Interim National Council (IINC). Representative of the country's ethnic and national diversity, it was comprised of Arabs, Turkmen, Kurds, Assyrians, Chaldeans, and an Armenian, as well as a Mandean, Sunni and Shi'a Muslims, and Christians. The TAL provides for the election of women and minorities to the Transitional National Assembly, with a goal of having no less than one quarter of the representatives be women and of having fair representation of all communities. Some women's leaders, representing a broad spectrum of political views, expressed concern that some women were selected to participate in the political process--at both the local and national level--only to meet this quota and not necessarily based on their qualifications.

There were 25 women on the Interim National Council and 6 ministers in the Government: The Minister of State for Women's Affairs and the Ministers of Labor and Social Affairs, Agriculture, Displacement and Migration, Environment, and Public Works.

On July 9, in the first elections after the fall of the former regime, the municipal district of Al Zubair outside Basra city peacefully chose members of its municipal council.

The Independent Electoral Commission of Iraq (IECI) was established under CPA Order 92 and had sole responsibility for administering the January 2005 Elections. The IECI's mandate as an independent, autonomous, and nonpartisan government entity was to promulgate, implement, and enforce regulations, rules, and procedures in connection with elections during the transitional period.

During the year, the IECI continued to draft regulations to support the conduct of a free, fair, and transparent electoral process.

As election preparations began, regional IECI staff faced intimidation by rejectionists in areas of insurgent activity. IECI representatives and food agents delivering voter registration forms in Ninewah Province received death threats, many refused to participate in election-related activity, and provincial IECI offices were closed. In Anbar Province, violence and threats against election workers prevented establishment of voter registration centers and distribution of registration forms. The provincial IECI office in Diyala moved to a new location following threats and violence. Intimidation forced the temporary closure of seven registration centers in Baghdad. On December 19, three IECI workers were shot and killed on Baghdad's Haifa Street.

Political parties and candidates had the right freely to propose themselves or be nominated by other groups. The Government did not restrict political opponents nor did it interfere with their right to organize, seek votes, or publicize their views.

Political parties, both secular and nonsecular, that were active during the year included the Supreme Council for Islamic Revolution in Iraq, D'awa, the Iraqi Islamic Party, the Iraqi National Congress, the Iraqi National Accord, the Iraqi Independent Democrats, Patriotic Union of Kurdistan (PUK), Kurdistan Democratic Party (KDP), and the Iraqi Turkmen Front.

Large-scale corruption, systemic under the former regime, continued in a lesser degree and kind (see Section 1.c.).

Many high-level government officials, including some heads of ministries and regional units, continued to exercise the autocratic authority permissible under the Ba'athist regime. Thus, officials at MOI made arrests without first obtaining arrest warrants issued by a judge (see Section 1.d.). Court orders requesting proof that an arrest was lawful were sometimes ignored. Several heads of ministries attempted to remove their inspectors general (IG) in violation of the law that established those offices and which provided that IG may only be

removed for specified causes.

The CPI was formed on January 28 and was dedicated to preventing and investigating cases of corruption in all ministries and other units of the Government nationwide. CPI is an independent body headed by a single Commissioner who reports publicly at least annually on the CPI's activities to the country's Chief Executive and Legislature. CPI is responsible for investigating allegations of corruption within the Government and referring appropriate cases for criminal prosecution, promoting standards of transparency and accountability in government activities; and conducting community education and outreach programs to stimulate public demand for open, honest, and accountable government.

Among other initiatives, CPI conducted ethics training for selected ministry officials designed to instill respect for the rule of law and curb abuses of power. CPI also investigated a number of cases involving human rights violations. No results were public at year's end.

The CPA established a system of IGs for the various ministries in January. A number of ministers failed to provide sufficient support for the program and attempted to remove IGs without justification. Consequently, the Prime Minister approved a plan that would transfer oversight and financial responsibility for the IG program to CPI on a de facto basis.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A number of domestic and international human rights groups generally operated without government restriction other than security constraints, investigating and publishing their findings on human rights cases. While NGO advocacy is still in its infancy, government officials were generally cooperative and responsive to their views. The Ministry of Human Rights met regularly with NGO leaders.

By CPA Order 45, the Ministry of Planning and Development (MoPD) was accorded responsibility for the registration of foreign and domestic NGOs. On October 24, the Office of the Prime Minister issued a statement that the IIG had approved the transfer of the NGO Assistance Office from MoPD to the Ministry for Civil Society Affairs. The Minister of State for Civil Society has taken an active approach to developing relations with, and assisting, human rights and elections-related NGOs.

On May 16, MOI issued a letter instructing governorates to notify MOI of NGO funding and to get approval for such funding. In order to qualify, organizations had to sign an affidavit stating that their group was nonpolitical, nonreligious, financially responsible, and would work to build a democratic society. On August 24, although this edict was not generally enforced, a National Democratic Institute (NDI) employee in Nasiriya was arrested for failing to seek governorate approval for conducting NDI activities. The employee was subsequently released.

Terrorists throughout the country have systematically killed NGO and civic leaders.

NGOs had serious security concerns that impaired their ability to work in the country. On August 3, four citizen aid workers employed by the Agency for Technical Cooperation and Development were stabbed to death near Najaf. On September 7, unknown assailants kidnapped two Italian aid workers. Subsequently, a group claiming loyalty to al-Qa'ida and calling itself Al-Zawahiri Loyalists took responsibility for the kidnappings. The women were held for 3 weeks before being released. On October 19, the charity group Care International confirmed that its head of operations had been kidnapped in Baghdad. After her presumed death, Care International suspended its operations in the country (see Section 1.g.).

The Ministry of Human Rights is responsible for the development and implementation of a human rights policy. The Ministry employed 250 people and, in addition to its office in Baghdad, had an office in Basra and planed to open offices in 5 other cities. There were also independent ministers of human rights in Arbil and Sulaimaniya.

During the year, the Ministry focused on raising awareness and knowledge of human rights throughout the country, building a viable civil society, working with other ministries to ensure that human rights were a mainstream priority within the Government, and assisting with humanitarian exhumations. The Ministry attempted to draw the Government's attention to human rights and abuses, pointing to the recent past when the former regime tortured thousands of persons perceived to be oppositionist.

In a July 13 online political publication (PolitInfo.com), the Human Rights Minister Bakhtiar Amin, expressed public concern that the new security forces, as well as the public at large, were not adequately educated regarding human rights. He noted that the battle against human-rights abuses was difficult because these abuses were "learned behavior," adding that the security forces were still not well-educated in the principles of

human rights, international humanitarian law, conventions against torture, and the investigative methodologies of countries that have well-ingrained democratic values and rules. He has returned publicly to that theme, acknowledging that abuses had occurred and that the legacy of the former regime would take time to alter.

On November 18, the Ministry announced that it had earmarked $45 million (67.5 billion dinars) in aid for the city of Fallujah. Ministry teams used the money to provide emergency aid to an estimated 200,000 Fallujans displaced due to insurgent and subsequent military operations.

Security was a key issue for the Ministry of Human Rights during the year. The Minister and members of his staff received death threats. Additionally, experts judged the security situation too difficult to provide in-country training.

The Ministry established relationships with the international human rights and humanitarian communities in an effort to align the country's institutions and practices with international standards: The ICRC, the U.N. Development Fund for Women, as well as relationships with the United Nations Educational, Scientific and Cultural Organization, the U.N. Office for Project Services, Office of the High Commissioner for Human Rights, the U.N. Development Program, and the World Health Organization.

Section 5 Discrimination, Societal Abuses and Trafficking in Persons

The TAL provides that all citizens are equal without regard to gender, sect, opinion, belief, nationality, religion, or origin, and the Government generally enforced these rights.

Women

The Ministry of State for Women's Affairs, with a professional staff of 10 and 13 security personnel, functioned primarily as a policy office.

The Ministry of Labor and Social Affairs' (MOLSA) Social Care Directorate administers a variety of social care institutions, among them for orphans and the elderly. No substantive assistance was currently offered for victims of domestic violence, although women who were heads of single-parent households did receive a minimal cash stipend from the Ministry.

Domestic violence against women occurred, but little was known about its extent. Such abuse was customarily addressed within the tightly knit family structure. There was no public discussion of the subject, and no statistics were published. There were some reports that honor killings occurred, but no further information was available.

A safe house located within the International Zone in Baghdad provided shelter to victims of domestic abuse or those threatened with honor killings. The safe house relied on nongovernmental support and had an uncertain future because of government space needs in the International Zone.

Women's leaders claimed that some extremist groups targeted women by kidnapping, killing, and terrorizing them in an effort to force them to refrain from working in public, to remain at home, wear veils, and adhere to a very conservative interpretation of Islam. According to an Amnesty International (AI) report, the lack of security remained a serious threat, and women and girls feared abduction, rape, and murder.

Islamic extremists reportedly targeted female university students in a number of cities and demanded that they cease wearing western style clothing and cover their heads while in public. Additionally, these extremists allegedly demanded that some universities separate male and female students. According to the Ministry of Higher Education, approximately 3,000 women indicated that they wanted to postpone their university studies because of the current security situation.

The law prohibits rape, and prostitution is illegal.

Children

According to UNICEF, almost one-half of the country's total population was under the age of 18.

Primary education, which is free and universal, is compulsory through age 11. Attendance in the sixth grade fell to about 50 percent of first grade levels due, in part, to the pervasiveness of child labor.

According to UNICEF, nearly 1 in 4 children (31.2 percent of girls and 17.5 percent of boys) between the ages of 6 and 12 did not attend school. According to authorities, literacy dropped from 80 percent in the late 1980s to approximately 50 percent during the year. Although 75 percent of teachers are women, women and girls represented approximately 70 percent of the increase in illiteracy.

Ministry of Health clinics provide health care, which was generally free of charge to all citizens. There was no systemic distinction in the care provided to boys and girls.

During the August National Conference that chose the Interim National Council, a Human Rights Sub-Committee was established. It noted as one of its priorities the need to stop the exploitation of children, especially their employment in military militias.

The Child Welfare Commission, in coordination with UNICEF, held its first conference on children's rights on November 30. The Commission includes the Ministries of Labor and Social Affairs, Foreign Affairs, Education, Health, Culture, Planning, Youth, Justice, Environment, Interior, Women's Affairs, and Human Rights.

Trafficking in Persons

Detection of trafficking was extremely difficult due to lack of information because of the security situation, existing societal controls of women, and the closed-tribal culture. Some reports suggested that the country might be a country of origin for women trafficked for the purpose of sexual exploitation to other countries within the region and to India. For example, there were reports indicating that some citizen women and girls were trafficked to the Arabian Peninsula for sexual exploitation. Some of these victims cited threats against their families as a means of coercion; others may be victims of debt bondage. To a lesser extent, there were reports of girls and women trafficked within the country for sexual exploitation. The Ministry of Interior has responsibility for trafficking-related issues.

Persons with Disabilities

The Ministry of Labor and Social Affairs operated several institutions for the education of disabled children and young adults. These institutions offered basic educational services; however, they did not have access to appropriate pedagogical technology due to the absence of training and funding.

National/Racial/Ethnic Minorities

Ethnically and linguistically, the country's population includes Arabs, Kurds, Turkmen, Chaldeans, Assyrians, and Armenians. The religious mix likewise is varied and consists of Shi'a and Sunni Muslims (both Arab and Kurdish), Christians (including Chaldeans and Assyrians), Kurdish Yazidis, and a small number of Sabean Mandaeans, Baha'is, and Jews.

Historic tensions between Turkmen and Kurds reportedly reached their peak at the end of 2003 and continued during this reporting period.

Assyrian and Chaldean were considered by many to be a distinct ethnic group. These communities spoke a different language (Syriac), preserved traditions of Christianity, and did not define themselves as Arabs.

The TAL identifies Arabic and Kurdish as the two official languages of the State. It also guarantees the right of citizens to educate their children in their mother tongue, such as Turcoman, Syriac, or Armenian, in government educational institutions in accordance with educational guidelines, or in any other language in private educational institutions.

Christians in the region reported that they experienced problems, which they attributed to the affiliation of some Sunnis with foreign Sunni extremist groups; however, relations with their Shi'a neighbors remained cordial. Many Christians have reportedly left their businesses because of threats. Some Christian professionals complained that corruption in the Government excluded them from jobs for which they qualified.

The country's Jewish population reportedly dwindled at year's end to only 22 persons in the Baghdad area, from 33 in April 2003. Soon after the fall of the Ba'ath Regime, the IGC signed a memorandum with the Baghdad Jewish community that would protect Jewish assets should all members of the community depart the country. These assets would be transferred to three external organizations.

Section 6 Worker Rights

The exercise of labor rights remained limited, largely due to societal violence, high unemployment, and maladapted labor organizational structures and laws; however, with international assistance, some progress was underway at year's end.

MOLSA's Labor Directorate has jurisdiction over the labor code, child labor, wages, the Occupational Safety and Health Administration (OSHA), and labor relations. Most elements of this department were not staffed and no funds were available from the budget.

At year's end work was in progress to draft a new labor code. The TAL incorporated the 1987 labor code and the CPA Order Number 89 that amended it.

a. The Right of Association

The TAL guarantees the right of free, peaceable assembly and the right to join associations freely, as well as the right to form and join unions and political parties freely.

Despite the formation of dozens of trade union groups since 1991, MOLSA continued to recognize and deal with the Iraqi Federal Federation of Trade Unions. This was the only labor federation recognized by the government, in spite of the existence of three other labor federations.

Throughout the year, the International Labor Organization (ILO) provided technical assistance outside the country to help rebuild the capacity of MOLSA, establish emergency employment services, and put in place training and skills programs. In June, a national delegation composed of representatives of workers, employers, and the Government attended the 92nd session of the ILO Conference in Geneva. The Conference accepted an arrangement proposed by the Government for the settlement of its arrears of contributions for the period 1988-2003, thereby restoring the country to full voting rights in the Conference.

b. The Right to Organize and Bargain Collectively

The TAL states that every citizen has the right to demonstrate and strike peaceably in accordance with the law. The labor law of the former regime still in force prohibits collective bargaining in the public sector.

In February, a delegation of the Brussels-based International Confederation of Free Trade Unions (ICFTU) visited the country on a 10-day fact-finding mission. Composed of members of ICFTU affiliates in Tunisia, the United Kingdom, and the U.S., as well as representatives of the Global Union Federations in the education and transport sectors, the delegation met with workers and trade union leaders, members of the Iraqi Federation of Industries, and officials of the IGC and the CPA. The ICFTU reported that workers were organizing unions in workplaces where they had been forbidden under the laws of the former regime and revitalizing union structures previously dominated by the Ba'athists. Later in the year, the ICFTU provided a number of training seminars in core labor standards for trade unionists.

There are no export processing zones.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced or compulsory labor, including by children, and there were no reports that such practices occurred.

d. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the worst forms of child labor. The Government had limited capacity to enforce the law due to the effects of the ongoing insurgency. The minimum age for employment is 15 years.

The Child Labor Unit at MOLSA was established in January with a staff of four. The Unit is responsible for coordinating child labor projects designed to eliminate the worst forms of child labor, raising awareness of the hazards of the worst forms of child labor, and conducting inspections of work places to enforce child labor laws. No inspectors were hired or trained, and no further budget allocations were made to support the unit by year's end.

Despite the various laws and regulations in place, children were routinely tapped as an additional source of labor or income for the family unit. This often took the form of seasonal manual labor in rural areas, while in cities; it often meant begging or peddling a variety of products

According to a report of the Islamic Institution for Women and Children, many children under the age of 16 worked to help support their unemployed parents. The report cited poverty as the main reason for child labor. In Baghdad's industrial zone (Kusra and Attach areas), children worked in various industrial crafts industries and constituted approximately 30 percent of the workers. Children earned, 66 cents to $2 (1000 to 3000 dinars) per day.

e. Acceptable Conditions of Work

The national minimum wage for a skilled worker was less than $7.00 per day (10,000 dinars) and for an unskilled worker less than $3.50 per day (5,000 dinars). The standard workday is 8 hours. The average salary was approximately $1,250 per year (1,785 million dinars). Unskilled workers must work 357 days per year to achieve this average. These earnings were barely above poverty level.

The OSHA component of MOLSA was inherited from the Ministry of Health and comprises approximately 129 staff located throughout the country. Salary disputes and a lack of funding effectively curbed any work by this unit.

---------------
* The 2004 report covers the human rights record of the Interim Government from June 28 to December 31, 2004.