IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SANDRA K. OMAR, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2374 (RMU) |
| | ) | |
| FRANCIS J. HARVEY, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

**RESPONDENTS' OPPOSITION TO PETITIONERS'
*EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER**

On Thursday, February 2, 2006, late in the evening, and without any effort to confirm

with respondents' counsel the accuracy of the facts and assumptions upon which they were

acting, counsel for petitioner Shawqi Omar ("Mr. Omar") and his purported next friend

petitioners filed an *ex parte* motion for a temporary restraining order seeking to prevent

respondents from transferring Mr. Omar out of United States custody until this Court could

consider and determine the merits of petitioners' underlying petition for writ of habeas corpus.

See Memorandum in Support of *Ex Parte* Motion for Temporary Restraining Order at 12 (dkt.

no. 7).  The next day, on Friday afternoon at approximately 3:00 p. m., this Court granted the *ex*

*parte* motion and entered a temporary restraining order ("TRO") prohibiting respondents from

removing Mr. Omar from United States custody and set forth an expedited briefing schedule

regarding the TRO.  See Order at 2-3 (Feb. 3, 2006) (dkt. no. 9).  The TRO was entered without

affording government counsel prior notice and an opportunity to be heard.[1]

_____

[1] Respondents submit that, not only was there no basis in law or fact for the temporary
restraining order (as set forth more fully herein), it was inappropriate for the temporary
restraining order to have been sought and granted on an *ex parte* basis without the government

Respondents object to the TRO and oppose petitioners' motion because they rest on several faulty assumptions and mischaracterizations, including the incorrect premise that Mr. Omar is in the custody of the United States.  See Memorandum in Support of *Ex Parte* Motion for Temporary Restraining Order at 1.  In reality, Mr. Omar has been and currently is in the custody of the Multinational Force – Iraq ("MNF-I"), which is a coalition of forces from nations around the world that, at the request of the sovereign government of Iraq, is assisting that government's efforts to maintain security and stability in Iraq pursuant to United Nations Security Council resolutions.  Mr. Omar is in MNF-I custody, as part of the U.N. mandate, during the pendency of his case before the Central Criminal Court of Iraq ("CCCI") – a national court of Iraq that operates under Iraqi law.

Petitioners' motion is also factually flawed because it wrongly and irresponsibly speculates that the decision to designate Mr. Omar for processing under the rules of the CCCI was made after the habeas petition was filed or after this Court issued its show cause order and

_____

having been notified and given an opportunity to be heard.  Counsel for petitioner had been in communication with respondents' counsel prior to seeking the temporary restraing order but then never advised respondents' counsel that the temporary restraining order was sought and did not serve respondents with their filing.  Given that the motion for the temporary restraining order was filed on the night of February 2, 2006, see Order at 1 (Feb. 3, 2006) (dkt. no. 9), but was not granted until the afternoon of February 3, 2006, moreover, there was ample time for the government to have been advised by petitioners' counsel of the motion and afforded an opportunity to be heard (either telephonically or in person).  The government strongly disagrees with any suggestion that, if it had been advised of the motion, it would have taken action somehow to seek to evade Court review before an order could have been entered preserving the status quo, see Memorandum in Support of *Ex Parte* Motion for Temporary Restraining Order at 1 (Feb. 2, 2006) (dkt. no. 7).  This course of action was all the more inappropriate, furthermore, given that the *ex parte* temporary restraining order was sought and granted to enjoin the respondents from carrying out their military duties as part of the Executive's efforts in support of the activities of the Multinational Force – Iraq during a time of ongoing hostilities on foreign soil.

with the intention to preclude this Court from exercising jurisdiction over this matter.  See id. at

2.  The motion also inaccurately presumes that the decision to refer Mr. Omar's case to the CCCI

imminently subjects Mr. Omar to Iraqi custody and incarceration in an Iraqi prison.  See id. at 1-

2.  To the contrary, as set forth below and in the accompanying declaration of Major General

John D. Gardner ("Gardener Decl.") (attached as Exhibit 1), the determination that Mr. Omar's

case would be appropriate for the CCCI was made before his habeas petition was filed in this

Court.  Mr. Omar has remained in MNF-I's physical custody since that determination was made

and will remain in MNF-I's physical custody throughout the pending CCCI proceedings.  Only if

Mr. Omar is convicted and sentenced by the CCCI would he then be transferred to the physical

custody of Iraqi authorities.  The theories underlying petitioners' motion, therefore, are simply

wrong and misguided.

 Moreover, petitioners cannot demonstrate a likelihood of success on the merits of their

underlying habeas petition.  The petition requests extraordinary and unprecedented relief by

effectively asking a United States court to interfere with the criminal justice proceedings of a

foreign government and to order an international coalition force, acting on behalf and at the

request of a foreign government, either to release or produce for a hearing before a United States

court an individual who will be subject to a foreign sovereign's criminal justice system.  Because

the Supreme Court long ago held that habeas jurisdiction does not lie with respect to detentions

by multinational forces abroad, the petitioners are not likely to succeed on their claims.  In

addition, the relief sought by petitioners would require the Court to violate fundamental

principles of separation of powers by entangling itself in the nation's foreign affairs and national

security matters during a period of ongoing hostilities abroad.  Petitioners also have failed to

provide any legitimate legal basis that would demonstrate any likelihood of success for the relief they seek.

Nor can Mr. Omar adequately demonstrate that he will be irreparably harmed unless the TRO remains in effect. Because Mr. Omar has consistently been in the custody of the MNF-I (and not the United States) since his arrest in Iraq, he has never been subject to this Court's habeas jurisdiction. Accordingly, he cannot claim to be at risk of losing an opportunity for legal redress that he never had to begin with. Moreover, Mr. Omar's assertion that he faces an imminent risk of being subject to torture in an Iraqi prison is based on the false assumption that his designation to be processed through the CCCI will result in his impending transfer from MNF-I custody to an Iraqi prison. Mr. Omar is detained by MNF-I in coalition-run facilities and not in an Iraqi prison, and will remain in MNF-I custody until he is convicted in the CCCI proceedings. Furthermore, Mr. Omar's alleged fear of torture is similarly based on unfounded speculation that he would be transferred to an Iraqi prison where detainees are alleged to have been abused. For all of these reasons, petitioners' motion for a temporary restraining order should be denied and the provisional TRO already in place should be vacated.

## BACKGROUND

### A.     The Multinational Force – Iraq and the Sovereign Government of Iraq

MNF-I is a coalition authority consisting of forces from approximately twenty-seven different nations, including the United States.[2] Gardner Decl. ¶ 2. While the United States is a

---

[2] In addition to forces from the United States, military forces from the following countries are participants in the MNF-I: Albania, Armenia, Australia, Azerbaijan, Bosnia and Herzegovina, Bulgaria, Czech Republic, Denmark, El Salvador, Estonia, Georgia, Italy, Japan, Kazakhstan, South Korea, Latvia, Lithuania, Macedonia, Mongolia, Netherlands, Norway, Poland, Romania, Slovakia, United Kingdom, and Ukraine.

leading participant in the MNF-I, the MNF-I is legally distinct from the United States, and obtains its authority to act from United Nations Security Council Resolutions at the request of the sovereign government of Iraq.  Id.  In particular, U.N. Resolution 1546 provides, in part, that "the multinational force shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq in accordance with the letters annexed to this resolution expressing, inter alia, the *Iraqi request* for the continued presence of the multinational force and setting out its tasks, including by preventing and deterring terrorism . . . ."  U.N. Resolution 1546 ¶ 10 (June 8, 2004) (attached as Exhibit 2) (emphasis added).  Included among the MNF-I tasks identified in the letters annexed to Resolution 1546 are combat operations against members of groups posing security threats to Iraq and internment of such members where necessary.  See June 5, 2004 Letter from U.S. Secretary of State Colin Powell to President of the Security Council Lauro Baja, Jr. attached to U.N. Resolution 1546.  On November 11, 2005, U.N. Resolution 1546 was extended and reaffirmed by a subsequent resolution of the United Nations.  See U.N. Resolution 1637 ¶ 1 (November 11, 2005) (attached as Exhibit 3) (noting that "the presence of the multinational force in Iraq is at the request of the Government of Iraq and, having regard to the letters annexed to this resolution, *reaffirms* the authorization for the multinational force as set forth in resolution 1546 (2004) and *decides* to extend the mandate of the multinational force as set forth in that resolution until 31 December 2006") (emphasis in original).

**B.    The Circumstances Leading to the Capture and Detention of Mr. Omar**

Shawqi Omar, a dual American-Jordanian citizen, was born in Kuwait and has been living in Iraq at different intervals since 2002.  Gardner Decl. ¶ 3.  He has been under

investigation by many foreign intelligence agencies, including Iraqi agencies.  Id.  He was

captured by Multinational Forces-Iraq (MNF-I) at his home in Baghdad on October 30, 2004, in

a raid targeting associates of Abu Musab al Zarqawi, the recognized leader of Al-Qaeda in Iraq

who has committed numerous acts of terrorism and violence in Iraq, including killing civilians

and taking hostages.  Id.  Specifically, Mr. Omar was captured harboring an Iraqi insurgent and

four Jordanian foreign fighters who illegally entered Iraq.  Id.   In their sworn statements, the

four Jordanians captured with Mr. Omar stated that they traveled illegally to Iraq from Jordan for

the express purpose of committing militant Jihad against American and Coalition Forces.  Id.

The Iraqi insurgent captured with Mr. Omar also admits in his sworn statement to joining the

insurgency for the purpose of militant Jihad and to attack Coalition Forces.  Each of the five

detainees captured with Mr. Omar admitted that while living in his home, they conducted

surveillance of potential kidnap victims within Baghdad and they conducted weapons training in

Fallujah.  Id.  The four Jordanians stated that Mr. Omar directed and participated in the insurgent

cell activities of selection and surveillance of potential kidnap victims.  Id.  All five insurgents

admit that Mr. Omar made comments about his fluency in English which allowed him to visit

Baghdad hotels in order to entice foreigners to return to Mr. Omar's home for the purpose of

their kidnap and ransom.  Id.  At the time of his capture, Mr. Omar had several weapons and

Improvised Explosive Device (IED) making materials in his home.[3]  Id. ¶ 4.

---

[3] Certain additional factual circumstances surrounding Mr. Omar's capture are classified. Should the Court think it essential and request it, respondents could file an ex parte submission under seal with the Court detailing the additional relevant facts.  As explained herein, however, the motion for a TRO should be denied as a matter of law based on the facts set forth in this opposition.

Mr. Omar has multiple ties to the Zarqawi terrorist network in Iraq and is believed to have acted as al Zarqawi's personal emissary to insurgent groups in several cities in Iraq. Id. There is evidence that indicates Mr. Omar provided aid to the Zarqawi network in Iraq, including such actions as: facilitating the Zarqawi network's connection to other terrorist groups, aiding the movement of foreign fighters into Iraq, and aiding in the planning and execution of kidnappings in Iraq. Id. There is also testimonial evidence of Mr. Omar's numerous private meetings with al Zarqawi.[4] Id. ¶ 3. Moreover, Mr. Omar is named on the same Jordanian indictment as al Zarqawi for plotting an unsuccessful chemical weapons attack in Jordan. Id.; see also Rana Husseini, Jordan Indicts Zarqawi, 12 Others In Terror Plot, Jordan Times, Oct. 18, 2004, available at http://www.jordanembassyus.org/10182004001.htm.

## C.    The MNF-I Tribunal and the Central Criminal Court of Iraq

Following his capture, in December of 2004 Mr. Omar appeared before a three-member panel of the MNF-I consistent with the principles of Article 5 of the Geneva Convention to determine his enemy prisoner of war status. Gardner Decl. ¶ 5 The panel reviewed the facts and circumstances surrounding Mr. Omar's capture, interviewed witnesses, and considered available intelligence information. Id. Mr. Omar was present at the hearing and had the opportunity to hear the basis for his detention, to make a statement, and to call witnesses who were immediately available. Id. The panel concluded that Mr. Omar did not satisfy the criteria for prisoner of war status under the Third Geneva Convention, but did meet the criteria for status as a security

---

[4] Mr. Omar is personally related to al Zarqawi by marriage. His second wife and al-Zarqawi's first wife are sisters. Mr. Omar's son, Ahmad, is married to the daughter of Abu Muhammad al Maqdesi, who is al Zarqawi's spiritual advisor. Maqdesi has been imprisoned multiple times in Jordan for crimes against the Jordanian government. Gardner Decl. ¶ 3.

internee under the Fourth Geneva Convention and should be detained for imperative reasons of security.  Id.  Subsequently, in August, 2005, it was determined that Mr. Omar's case would be appropriately handled in the Central Criminal Court of Iraq ("CCCI").  Id. ¶ 6.  As mentioned, the CCCI is an independent national court of the sovereign government of Iraq that operates under Iraqi law.  Id. ¶ 2.  The CCCI is based in the city of Baghdad and is comprised of Iraqi judges.  Id. ¶ 7.  The CCCI consists of two chambers: an investigative court and a trial court.  Id. ¶ 8.  In the investigative court a judge presides over an investigative hearing to determine if there is a sufficient basis to refer the accused for trial.  Id.  The accused is entitled to counsel at the investigative hearing and if he has not retained counsel himself the court will provide counsel. Id.  If the investigative judge concludes that there is not a sufficient basis to refer the accused for trial, the judge issues an order of release and the accused is released.  Id.  If, however, the investigative judge concludes that there is a sufficient basis to refer the accused for trial, the judge writes a report which includes formal charges against the accused and forwards the report to a panel of trial judges.  Id.  It may be weeks following the conclusion of the investigative hearing for the investigative judge to issue his report to the trial court.  The trial court consists of panels of three judges with a presiding judge who conducts the trial proceedings.  Id.  The accused is also entitled to counsel at the trial.  Id. ¶ 9.

Mr. Omar is currently in MNF-I custody and is awaiting his appearance at a CCCI investigative hearing.  Id. ¶¶ 2, 6.  MNF-I maintains physical custody of its detainees for the duration of all CCCI proceedings.  Id. ¶ 10.  Detainees are transferred from MNF-I custody to the physical custody of Iraqi authorities only after the detainee is convicted and sentenced,

assuming that his case proceeds to trial following the completion of the investigative hearing in the first place.  <u>Id.</u>

**D.    Petitioner's Habeas Petition, Motion For TRO, and Related Proceedings**

On December 12, 2005, after the decision had been made to refer Mr. Omar's case to the CCCI, Mr. Omar's American-born wife and his eldest son filed a Petition for Writ of Habeas Corpus on behalf of Mr. Omar as his purported next friends in this Court.  <u>See</u> Petition for Writ of Habeas Corpus ("Petition") (dkt. no. 1) (Dec. 12, 2005).  The Petition asserts that Mr. Omar is held in United States military custody in violation of various provisions of the United States Constitution, the laws of the United States, and obligations of international law.  <u>See</u> Petition ¶¶ 4, 12, 20.  Petitioners allege that this Court has federal habeas jurisdiction to consider this case under the Supreme Court's decision in <u>Rasul v. Bush</u>, 543 U.S. 466 (2004).  <u>Id.</u> at ¶ 6.  For relief, petitioners ask the Court, among other things, to issue a writ of habeas corpus requiring respondents either to release Mr. Omar or produce him for a hearing before a United States court to justify his continued detention.  <u>Id.</u> at 17, Prayer for Relief ¶ (f).  On January 20, 2006, this Court ordered respondents to show cause why the writ should not be issued.  On January 31, 2006, petitioners' counsel informed respondents' counsel that she had been told by Mr. Omar's wife that Mr. Omar was scheduled for some type of hearing at Abu Ghraib prison on February 3, 2006.  <u>See</u> January 31, 2006 Letter from S. Burke to E. White (attached as Exhibit 4).[5]  After

---

[5]  In their supplemental briefing, petitioners' counsel misled the Court by indicating that they were concerned and had inquired of respondents about the possibility of "some type of court proceedings at Abu Ghraib prison on <u>or after</u> February 3, 2006."  Petitioners' Supplemental Brief at 4 (emphasis added).  In reality, petitioners' counsel never expressed any concern about a hearing after February 3, 2006, and merely inquired of respondents about a proceeding rumored to be set to occur specifically on February 3, 2006.  <u>See</u> January 31, 2006 Letter from S. Burke to E. White.  Respondents' counsel investigated and determined that no

investigation, on the morning of February 2, 2006, respondents' counsel informed petitioners' counsel by e-mail that Mr. Omar was in the custody of Multinational Force-Iraq; that his case was previously referred to the CCCI; and that, contrary to what petitioner's counsel had been told, no hearing in his case was scheduled for February 3, 2006. See February 2, 2006 E-mail from N. White to S. Burke (attached as Exhibit 5). Despite having this information, and without notifying respondents' counsel or seeking to further clarify the accuracy of certain assumptions, petitioners' counsel abruptly proceeded to file their *ex parte* motion for a TRO on the ground that Mr. Omar was presently in U.S. custody and faced imminent transfer to Iraqi authorities. The Court granted the motion without first providing respondents an opportunity to be heard and established an expedited briefing schedule regarding the propriety of the TRO.

## ARGUMENT

## I.    A TEMPORARY RESTRAINING ORDER IS EXTRAORDINARY RELIEF.

It is well-established that a request for temporary restraining order "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004). As discussed further below, this is particularly true where, as here, the relief sought intrudes into core functions of the Executive – namely, the conduct of the Nation's foreign relations and military affairs. To prevail in a request for a temporary restraining order, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an

---

hearing was scheduled for February 3, 2006. See February 2, 2006 E-mail from N. White to S. Burke (attached as Exhibit 5).

injunction would not substantially injure other interested parties, and 4) that the public interest

would be furthered by the injunction.'"[6]  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88

(D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738,

746 (D.C. Cir. 1995)).

    In particular, the irreparable harm that must be shown to justify temporary injunctive

relief "must be both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co.

v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against

something merely feared as liable to occur at some indefinite time; the party seeking injunctive

relief must show that the injury complained of is of such imminence that there is a clear and

present need for equitable relief to prevent irreparable harm."  Id. (citations and internal

quotation marks omitted; emphasis in original).  Accordingly, the power to issue such

exceptional relief should be used sparingly.  See Dorfmann v. Boozer, 414 F.2d 1168, 1173

(D.C. Cir. 1969); Guam Indus. Services, Inc. v. Rumsfeld, 383 F. Supp. 2d 112, 116 (D.D.C.

2005).

    Petitioners' motion does not satisfy the requirements for a temporary restraining order,

and therefore should be denied.

## II.    PETITIONERS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THIS CASE.

    "'Likelihood of success is the main bearing wall of the four-factor framework'" applicable

to motions for preliminary relief.  Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir.

---

    [6] It is well-established that the same legal standards apply for issuance of a temporary
restraining order and a preliminary injunction.  See Vencor Nursing Centers, L.P. v. Shalala, 63
F. Supp. 2d 1, 7 n.5 (D.D.C. 1999).

2001) (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir.1996)).

Here, petitioners' efforts to establish that they are likely to succeed in this case can bear no

weight whatsoever.

>    **A.    The Motion for a TRO Should be Denied because it is Based on Incorrect Factual Predicates.**

Petitioners' motion for a TRO rests on several unfounded assumptions and unsupported

conclusions and, as a result, lacks any compelling factual basis to warrant the extraordinary relief

requested. Chief among their inaccurate assertions is the statement that "Mr. Omar [is] in the

custody and control of the United States" and that a TRO is required to maintain this purported

status quo situation. Memorandum in Support of *Ex Parte* Motion for Temporary Restraining

Order at 4 (Feb. 2, 2006) (dkt. no. 7). From this postulate, petitioners jump to yet another false

assumption that the decision to refer Mr. Omar's case to the CCCI subjects Mr. Omar to

imminent transfer from his present physical custody by MNF-I forces to Iraqi physical custody

for incarceration in an Iraqi prison, where they allege he would likely be subject to torture. See

id. at 2 (claiming that "petitioners learned from the government that they intend to relinquish

custody of Mr. Omar by transferring him to the jurisdiction of Iraq."); see also id. at 3

(contending that "the government . . . intends to transfer him to Iraqi custody despite having

vowed publicly it would not transfer *any* prisoners . . . to the jurisdiction of Iraq because Iraqi

authorities are torturing prisoners."). Petitioners then assume, without any factual basis

whatsoever, that the decision to designate Mr. Omar for processing under the rules of the CCCI

was made after the habeas petition was filed or after this Court issued its show cause order, and

that it was made for the purpose of avoiding this Court's purported jurisdiction over Mr. Omar's

habeas petition. See id. at 2, 4 (asserting that "[t]he government cannot be permitted to evade

judicial scrutiny by handing Mr. Omar over to the jurisdiction of Iraq as soon as Petitioner challenges the basis of his detention in this Court.").  Each of petitioners' statements underlying the motion is unsubstantiated and false, thus the motion should be denied.  See Al-Anazi v. Bush, 370 F. Supp. 2d 188, 194-95 (D.D.C. 2005) (Bates, J.); Almurbati v. Bush, 366 F. Supp. 2d 72, 78 (D.D.C. 2005) (unsubstantiated and speculative evidence is not a proper basis upon which preliminary injunctive relief can be granted).

### 1. Mr. Omar is Not in United States Custody.

As explained previously, Mr. Omar is not in the custody of the United States.  Rather, he was arrested by MNF-I forces and has been in MNF-I custody ever since.  Gardner Decl. ¶¶ 2, 6. MNF-I consists of a coalition of forces from nations around the world, including the United States.  Id. ¶ 2.  U.S. armed forces participate in MNF-I along with armed forces of many other nations, see infra note 2, but MNF-I is not the U.S. armed forces.  See id.  And while U.S. Armed Forces participate in MNF-I's custody over Mr. Omar, they do so as part of MNF-I and not qua the United States.  MNF-I operates with the consent of the sovereign government of Iraq to maintain security and stability in Iraq, and receives its authority pursuant to United Nations Security Council resolutions.  See U.N. Resolution 1546 ¶ 10 (June 8, 2004) (attached as Exhibit 2); U.N. Resolution 1637 ¶ 1 (November 8, 2005) (attached as Exhibit 3).  Petitioners fail to offer any support for their assertion that Mr. Omar is in United States custody.

**2.     Directing Mr. Omar's Case to be Presented to the CCCI does not Result in His Imminent Transfer to an Iraqi Prison.**

Petitioners are also mistaken to presume that the decision to designate Mr. Omar's case as appropriate for the CCCI will imminently result in a transfer of Mr. Omar to an Iraqi prison. At present, Mr. Omar has been designated to proceed before the CCCI; CCCI proceedings have not yet been initiated for Mr. Omar's case and he awaits his initial appearance at an investigative hearing.  Gardner Decl. ¶ 6.  Even after that investigative hearing, Mr. Omar will remain in MNF-I's physical custody throughout the pending CCCI proceedings.  Id. ¶ 10.  Mr. Omar will be transferred to the physical custody of Iraqi authorities only if he is convicted after trial (and Mr. Omar will proceed to trial only if the investigative judge believes his case merits a trial).  Id. It is possible that the investigative judge could dismiss Mr. Omar's case and order him to be released or that he would not be convicted at trial and be set free.  Additionally, the CCCI proceedings take time.  Even if an investigative judge believed Mr. Omar's case warranted a trial, it typically takes a number of weeks for an investigative judge to submit a report to the trial court.  And trials do not occur until some time after the submission of the investigative judge's report.  Accordingly, petitioners' assertion that Mr. Omar faces an imminent transfer to an Iraqi prison under the physical custody of Iraqi authorities based merely on his designation to proceed before the CCCI is baseless.

**3.     Mr. Omar's Assumption that He Will Likely be Tortured if Transferred to an Iraqi Prison is Unfounded.**

Petitioners' further supposition that Mr. Omar will likely be tortured if he is transferred to the physical custody of Iraqi authorities and placed in an Iraqi prison is also unfounded. Petitioners primarily rely on reports of abuse in detention facilities operated by the Iraqi Ministry

of the Interior.  As explicitly noted in petitioners' supplemental briefing, "[t]he vast majority of allegations concern forces of the Iraqi Ministry of the Interior, as well as members of the Iraqi armed forces under Ministry of Defense authority."  Petitioners' Supplemental Brief at 6 (quoting Human Rights Watch, World Report 2006, 446-53 (2006)).  The Iraqi Ministry of Justice, however, is the only entity of the Iraqi government that is currently authorized to operate detention facilities.  Accordingly, MNF-I transfers detainees to the custody of Ministry of Justice officials.  Gardner Decl. ¶ 10.  As a result, Mr. Omar's fears of being subject to torture if transferred to an Iraqi prison are entirely speculative and unwarranted and do not merit the relief requested.

### 4.     The Determination to Refer Mr. Omar's Case to the CCCI was Made Well Before Petitioners' Habeas Petition was Filed.

Finally, petitioners' assertion that the decision to refer Mr. Omar's case to the CCCI was made after the habeas petition was filed in order to circumvent this Court's alleged authority is utterly false and baseless.  Petitioners' only support for such conjecture is an email from one of Mr. Omar's wives reporting merely that Mr. Omar was transferred from Camp Bucca to Abu Ghraib on or around January 24, 2006 and speculating that he would be subjected to some type of hearing on or about February 3, 2006.  See Memorandum in Support of *Ex Parte* Motion for TRO at 2.  Counsel for respondents, however, informed petitioners' counsel that no hearing for Mr. Omar was scheduled for February 3.  See February 2, 2006 E-mail from N. White to S. Burke (Exhibit 5).  In any event, the determination that Mr. Omar's case would be appropriate for the CCCI was made by August, 2005-- well before his habeas petition was filed and the show cause order was issued.  Gardner Decl. ¶ 6.  Accordingly, any implication that respondents acted to designate Mr. Omar to proceed before the CCCI as a result of the filing of the habeas petition

or in any sort of effort to affect this litigation is not only entirely unsupported by the record, but controverted by the factual evidence presented by respondents.

> **B.    Federal Courts Lack Jurisdiction to Entertain a Petition for Habeas Corpus Brought by a Petitioner in the Custody of a Multinational Military Force in a Foreign Country.**

This Court's habeas power extends only to the extent that a detainee is in the custody of a properly named respondent over which the Court has jurisdiction.  <u>See</u> 28 U.S.C. § 2242.  As the uncontroverted evidence demonstrates, Mr. Omar is not in the custody of the United States but is in the custody of MNF-I.  Gardner Decl. ¶¶ 2, 6.  This Court's habeas jurisdiction, therefore, does not extend to Mr. Omar's custodians.

The Supreme Court has spoken directly to the situation faced here.  In <u>Hirota v. General of the Army MacArthur</u>, 338 U.S. 197 (1948) (per curiam), the Court considered, and rejected, a habeas petition filed on behalf of several individuals who were in the custody of the Allied Powers in Japan under the direct command of a General of the United States Armed Forces, and who had been convicted by an international military tribunal there that obtained its authority under the Allied Powers.  The Court noted that:

> The United States and other allied countries conquered and now occupy and control Japan.  General Douglas MacArthur [the respondent named in the petition] has been selected and is acting as the Supreme Commander for the Allied Powers.  The military tribunal sentencing these petitioners has been set up by General MacArthur as the agent of the Allied Powers.

<u>Id.</u> at 198.  The Court concluded that because "the tribunal sentencing these petitioners is not a tribunal of the United States," the "courts of the United States have no power" to grant the requested relief.  <u>Id.</u>  Thus, notwithstanding that the tribunal at issue was established by an American general, who was also named as a respondent to the petition, and that an American

general maintained custody of these individuals, the Court held that habeas relief was

unavailable because the petitioners were not in the custody of the United States acting as the

United States. Instead, the American general who maintained custody of these individuals was

detaining them as part of his participation in the Allied war effort and under the authority of the

Allied Powers, not the United States. See id. at 199 (Douglas, J., concurring) (indicating that

petitioners were "under the custody of respondent Walker, Commanding General of the United

States Eighth Army who held them pursuant to the orders of respondent MacArthur, Supreme

Commander for the Allied Powers."). Here, as in Hirota, to the extent that U.S. military

authorities are involved in the detention of Mr. Omar, they are maintaining custody of him

pursuant to their role in and under the authority of the MNF-I, not the United States qua United

States. As such, this Court lacks jurisdiction to grant the relief requested by petitioners.

    The decision in Hirota is consistent with the conclusions of other courts that have

addressed the analogous situation of American citizens who are detained abroad by sovereign

nations and are subject to those countries' criminal justice systems, but nevertheless seek habeas

relief in U.S. courts. Courts routinely deny requests for habeas relief under such circumstances.

In Keefe v. Dulles, 222 F.2d 390 (D.C. Cir. 1954), an American soldier stationed overseas was

held by French authorities on charges brought by the French. The habeas petitioner (the soldier's

wife) claimed that the Secretaries of State, Defense, and the Army had conspired to deprive the

soldier of his rights in connection with his incarceration in a French prison. Id. at 391. Despite

these allegations, the court rejected out of hand the theory that it had jurisdiction to grant habeas

relief. Id. at 392 (concluding that "[t]he petition shows on its face that Keefe is not in the

custody of the respondents" but rather is detained by French civil authorities). Other courts have

similarly concluded that it is inappropriate for United States courts to issue writs of habeas corpus in cases involving persons in the custody of foreign sovereign nations abroad.  See, e.g., Duchow v. United States, 1995 WL 425037, *1, *3 (E.D. La. 1995) (concluding that a U.S. citizen detained in Bolivia by the Bolivian government was not entitled to habeas relief because "it is the Bolivian government who has custody over plaintiff and would be required to produce the body.").

Petitioners mistakenly rely on a number of habeas cases that they assert support the exercise of jurisdiction over Mr. Omar's habeas petition.  See Petrs Supp. Mem. at 9-13.  These cases are distinguishable for the simple reason that the petitioners in these cases were unquestionably in the custody of the United States or within the jurisdiction of a United States court.  Here, by contrast, Mr. Omar is being detained by MNF-I, a distinct entity from the United States government, inside the sovereign nation of Iraq.  The Supreme Court's decision in Rasul v. Bush, 542 U.S. 466 (2004), is unavailing to petitioners in this case, for example, because the Rasul petitioners were unquestionably in the sole custody of U.S. armed forces at the U.S. Naval Base at Guantanamo Bay, Cuba – an area over which the Court concluded the United States historically has exercised "complete jurisdiction and control."  See id. at 480.  The United States military forces at Guantanamo Bay are not functioning as part of an international coalition. Petitioners' reliance on Hamdi v. Rumsfeld, 542 U.S. 507 (2004), is similarly misplaced because the petitioner in that case unquestionably was detained by United States forces in the United States.  Id. at 510.  Mr. Omar, however, is not in the custody of the United States but rather is in the custody of MNF-I forces in Iraq.  Accordingly, Rasul and Hamdi are inapplicable to Mr.

-18-

Omar's custodial situation. Indeed, the most analogous case to Mr. Omar's custodial situation is Hirota – a case petitioners cite but tellingly fail to discuss.

Petitioners' reliance on Johnson v. Eisentrager, 339 U.S. 763 (1950), is equally misplaced. In Eisentrager, the Supreme Court held that aliens held overseas by the United States Army had no right to habeas review. Id. at 790-91. Whatever implications one might draw from Eisentrager's holding regarding the availability of habeas review for U.S. citizens held by United States authorities overseas, Eisentrager certainly does not stand for, or even support, the proposition that U.S. courts have habeas jurisdiction when, as here, the petitioner is in the custody of a multinational coalition force acting at the request of a foreign sovereign.

Similarly, United States ex rel. Toth v. Quarles, 350 U.S. 11 (1955), and Burnes v. Wilson, 346 U.S. 137 (1953), upon which petitioners rely, involved habeas petitioners in the exclusive custody of the United States Armed Forces, qua United States, and are thus inapposite to the jurisdictional question before the Court. Petitioners' case also is not helped by Reid v. Covert, 354 U.S. 1 (1957), which involved criminal proceedings brought by United States military authorities and, like Rasul, Hamdi, Eisentrager, and Toth, therefore involved prisoners held by United States authorities. Moreover, neither Toth nor Reid actually analyzed the proper scope of habeas jurisdiction, but rather assumed such jurisdiction. For these reasons, and because "the unexplained silences of [the Supreme Court's] decisions lack precedential weight," Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 232 (1995), neither Toth nor Reid can be viewed as precedent in petitioners' favor. See also Lewis v. Casey, 518 U.S. 343, 353 (1996) ("the existence of unaddressed jurisdictional defects has no precedential effect").

Additionally, petitioners rely on Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484 (1973), and its progeny for the unremarkable proposition that the petitioner's physical absence from the jurisdiction of a federal district court does not present a jurisdictional obstacle to the consideration of the petition so long as the petition names as respondent a supervisory custodial official and files the petition in the district where that respondent resides.  See also Rumsfeld v. Padilla, 542 U.S. 426, 436 n.9, 447 n.16 (2004).  This line of cases, which merely addresses the identity of the proper respondent in habeas cases, is inapposite to the present situation because Mr. Omar is not within the custody of the United States government.  Hence, there is no respondent over whom the Court could exercise jurisdiction in this situation.

While U.S. courts may arguably have jurisdiction in some circumstance to hear habeas petitions of U.S. citizens held abroad by the exclusive authority of the United States government, qua the United States, they do not have jurisdiction to hear such petitions when the petitioner is in the custody of a multinational coalition acting during a time of war or a foreign power. Hirota, Keefe, and Duchow all stand for this common-sense proposition, and petitioners have not cited a single case to the contrary.  Accordingly, petitioners' request for injunctive relief should be denied.

### C.     The Court Should Refrain from Interfering with the Criminal Justice Proceedings of a Foreign Government.

Even if the Court were to reach the remarkable conclusion that Mr. Omar is in United States custody and that the Court has habeas jurisdiction in this case, the Court should not exercise such jurisdiction because it would interfere with the workings of the sovereign government of Iraq's criminal justice system.  As discussed, Mr. Omar has previously been designated to be processed through the CCCI.  As a result, if the Court were to grant petitioners

the habeas relief they seek, it would  intrude on a pending criminal investigation and potential

prosecution by the Iraqi government.  Just as principles of federal comity direct federal courts to

abstain from interfering with pending state criminal proceedings, see Younger v. Harris, 401

U.S. 37 (1971) (indicating that notion of comity requires federal courts to have proper respect for

state functions), similar principles of international comity instruct federal courts to avoid

inserting themselves in the middle of pending foreign criminal proceedings.  Cf. Hilton v. Guyot,

159 U.S. 113, 163 (1895) (discussing international comity); Holmes v. Laird, 459 F.2d 1211

(D.C. Cir. 1972) (rejecting U.S. citizen service members' requests to examine the fairness of

their treatment by the West German courts and declining to prevent the U.S. government from

surrendering them to West German authorities to serve sentences for convictions by West

German courts on criminal charges relating to their conduct while stationed in West Germany).

> **D.    The Temporary Restraining Order Would Violate Fundamental Principles Of Separation of Powers**.

Separation of powers principles foreclose Court intervention in this matter.. "[I]t is

beyond the judicial function for a court to review foreign policy decisions of the Executive

Branch." People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999) (citing

Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103 (1948)); see

also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he

controlling considerations are the interacting interests of the United States and of foreign

countries, and in assessing them [the courts] must move with the circumspection appropriate

when [a court] is adjudicating issues inevitably entangled in the conduct of our international

relations.'") (quoting Romero v. International Terminal Operating Co., 358 U.S. 354, 383

(1959)).[7]  Indeed, deference by the Judiciary to military determinations during a time of war is a

hallmark of the separation of powers principle, as "courts traditionally have been reluctant to

intrude upon the authority of the Executive in military and national security affairs."  Dep't of

the Navy v. Egan, 484 U.S. 518, 530 (1988); see Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2647

(plurality opinion) ("Without doubt, our Constitution recognizes that core strategic matters of

warmaking belong in the hands of those who are best positioned and most politically accountable

for making them"); Franklin v. Massachusetts, 505 U.S. at 818 (stating that the principle of

judicial deference "pervades the area of national security"); Haig v. Agee, 453 U.S. 280, 292

(1981) (recognizing that "[m]atters intimately related to foreign policy and national security are

rarely proper subjects for judicial intervention").

 If the Court were to entertain petitioners' claims in this case, it would have to inject itself

into an exclusive Executive function: the United States military's role in MNF-I, a multinational

coalition force dispatched at the request of the Iraqi government pursuant to United Nations

Security Counsel Resolution 1546 to assist Iraq with its wartime security and rebuilding efforts.

Such judicial review would involve scrutiny of United States officials' judgments and

assessments regarding the military's participation in MNF-I as well as the scope of that

participation vis a vis its coalition partners and United Nations authorities.  This type of inquiry

---

 [7] In Holmes, U.S. citizen servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court." 459 F.2d at 1225.

would intrude on the Executive's participation in and prosecution of the ongoing war in Iraq and its prerogative to conduct military affairs and foreign policy with other nations, including the United Nations, involved in MNF-I's legitimate activities.

For example, any order by the Court directing Executive Branch personnel to take particular acts to effectuate Mr. Omar's release from MNF-I custody may compromise the Executive's substantial interest in maintaining good relations and previous commitments with its MNF-I coalition partners. See Smith v. Reagan, 844 F.2d 195, 198 (4th Cir. 1988) (granting the relief sought by petitioners would "involve courts in matters of the most delicate diplomacy. A charge that a foreign government has 'unjustly deprived' an American citizen of liberty is likely to have far-reaching and unforeseeable effects on the conduct of foreign relations."). Because MNF-I is a distinct legal entity from the government of the United States, and in no sense subject to the jurisdiction of this Court, the injunctive relief suggested by petitioners would needlessly complicate and harm the Executive's relations with its coalition partners during a time of war.

These concerns are even more pronounced where, as here, judicial relief intrudes on decisions about how to provide for the national defense and to deploy military force abroad during a time of war. Such decisions are placed singularly in the Executive Branch. See, e.g., Ludecke v. Watkins, 335 U.S. 160, 170 (1948) (determination of state of war and status of individual as enemy alien are "matters of political judgment for which judges have neither technical competence nor official responsibility"); United States v. The Three Friends, 166 U.S. 1, 63 (1897) ("[I]t belongs to the political department to determine when belligerency shall be recognized, and its action must be accepted according to the terms and intention expressed."); Curran v. Laird, 420 F.2d 122, 130 (D.C. Cir. 1969) (en banc) ("It is – and must – be true that

the Executive should be accorded wide and normally unassailable discretion with respect to the conduct of the national defense and the prosecution of national objectives through military means."). This conclusion is supported by well-established, mutually reinforcing factors inherent in the framework of the Constitution, such as the dangers posed by judicial intervention into and second-guessing of determinations necessary in the conduct of war, the limited institutional capacity of the courts to evaluate such determinations, and the need for the Executive to speak with one voice in the area of foreign affairs. See Crosby v. National Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"); Tozer v. LTV Corp., 792 F.2d 403, 405 (4th Cir. 1986) ("The judicial branch contains no Department of Defense or Armed Services Committee or other ongoing fund of expertise on which its personnel may draw. Nor is it seemly that a democracy's most serious decisions, those providing for common survival and defense, be made by its least accountable branch of government."); Zadvydas v. Davis, 533 U.S. 678, 711 (2001) (recognizing the "obvious necessity" that the Nation speak with one voice" in the area of foreign affairs). These concerns are even more apparent in the present context, given the unconventional nature of the current war and enemy in Iraq, involving individuals of many nationalities fighting without uniform or insignia and often in an unorthodox or covert fashion. Cf. Zadvydas v. Davis, 533 U.S. 678, 696 (2001) (noting that "terrorism or other special circumstances" may counsel "heightened deference to the judgments of the political branches with respect to matters of national security").

Indeed, petitioners' requested relief also raises non-justiciable political questions. <u>See</u> <u>Baker v. Carr</u>, 369 U.S. 186, 210-11, 217 (1962). In particular, the Court lacks judicially cognizable standards by which to make the policy decision that is at the heart of the relief sought by petitioners – whether, and how, the United States Government should interact with MNF-I (and Iraq) regarding Mr. Omar's detention and the pendency of his case before the CCCI. This Court lacks the institutional competence to make the sensitive foreign policy decisions involved in determining whether or not to seek Mr. Omar's release from MNF-I custody, whether to enjoin CCCI proceedings – a national court of Iraq that operates under Iraqi law – to remain silent on the matter, or to take some other course of conduct. These types of decisions should be made based on a wide array of considerations – relating not only to Mr. Omar, but to other matters relevant to the ongoing relations between the MNF-I, the United States, the United Nations, Iraq, and other participating nations – that are unavailable to the Court. For these reasons, courts have recognized that judicial inquiry into the manner in which the Executive interacts with multinational coalitions authorized by the United Nations are non-justiciable political questions. <u>See</u> <u>U.S. ex rel. New v. Rumsfeld</u>, 350 F. Supp. 2d 80, 96-100 (D.D.C. 2004) (holding that legal challenge to the manner in which the Executive deploys military forces pursuant to a multinational United Nations peacekeeping initiative presents non-justiciable political questions); <u>United States-South West Africa/Namibia Trade and Cultural Council v.</u> <u>United States</u>, 90 F.R.D. 695, 698 (D.D.C. 1981) (holding that legal challenge to the United States' appropriation of funds to the United Nations for the purpose of supporting the recognized government of Namibia presents non-justiciable political questions).

Beyond justiciability concerns, petitioners' motion also raises serious questions regarding the act-of-state doctrine and international comity. Petitioners effectively ask that the Court to direct the conduct of the Nation's foreign relations by injecting the Court into the Executive's decisions about its participation in a United Nations program. Further, petitioners' requested relief seeks judicial review and oversight of the Executive's decisions about how it uses its military resources to accomplish a military mission authorized by the United Nations, acting at the request of the sovereign nation of Iraq, in detaining, and criminally charging Mr. Omar with violations of Iraqi law. See Banco Nacional De Cuba v. Sabbatino, 376 U.S. 398, 401 (1964) ("act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory"); Hilton v. Guyot, 159 U.S. 113, 163 (1895) ("The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call 'the comity of nations.'"). Here, the sovereign nation of Iraq has requested United Nations assistance in its security and rebuilding efforts. Acting on this request, the United Nations has authorized a multinational coalition – MNF-I – to carry out these various nation-building functions. While the United States is a leading participant in this effort, it is Iraq that has made a sovereign determination to allow a multinational United Nations force to operate within its boarders. Accordingly, it would be inappropriate for the this Court to interfere in that determination and question Iraq's decision to authorize coalition forces to assist in its security effort, particularly with respect to the manner in which it allocates those resources toward the capture and detention of foreign fighters who are

charged with breaking Iraqi laws like Mr. Omar.  Moreover, adjudication of petitioners' claims would require this Court to pass upon the validity of official Iraqi government actions and its relationship with the various nations participating in the MNF-I effort.  For these reasons, the act of state doctrine bars the relief sought by petitioners.

**E.    Petitioners' Motion Lacks A Legitimate Legal Basis.**

In addition to separation of powers concerns, petitioners also have failed to provide any legitimate legal basis for the relief they seek.  As explained below, petitioners mistakenly rely on several legal bases that do not support the extraordinary relief sought in their motion.

**1.    Convention Against Torture**

Petitioners rely on the Convention Against Torture ("CAT") as the basis for the injunction they seek.  However, petitioners' contention that the transfer they hypothesize would violate the CAT depends on the same fiction that pervades their papers generally: i.e., that transfer of Mr. Omar is part of a scheme to deprive this Court of jurisdiction by transferring him to the custody of the government of Iraq, where he likely will be tortured.  As respondents have explained above, there is no such scheme.

Moreover, it is clear that the CAT, in and of itself, does not confer judicially enforceable rights.  The United States Senate conditioned its advice and consent to the CAT upon a Resolution of Ratification declaring "that the provisions of Articles 1 through 16 of the Convention are not self-executing."  136 Cong. Rec. S17486-01, at S17492 (Oct. 27, 1990); S. Exec. Rep. 101-30, at 31.  The Senate Report regarding the CAT, to which the Resolution of Ratification was appended, included the Executive's analysis that the term "competent authorities" in Article 3 of the CAT "appropriately refers in the United States to the competent

administrative authorities who make the determination whether to extradite, expel, or return. . . .

Because the Convention is not self-executing, the determinations of these authorities will not be

subject to judicial review in domestic courts." S. Exec. Rep. 101-30, at 17-18 (emphasis added).

Consistent with this language, numerous courts have held that the CAT does not give rise to

judicially enforceable rights.[8]  See Khalid v. Bush, 355 F. Supp. 2d 311, 327 (D.D.C. 2005)

(Leon, J.); Auguste v. Ridge, 395 F.3d 123, 132 n.7 (3d Cir. 2005); Hawkins v.

Comparet-Cassani, 33 F. Supp. 2d 1244, 1257 (C.D. Cal. 1999), other orders rev'd, 251 F.3d

1230 (9th Cir. 2001); White v. Paulsen, 997 F. Supp. 1380, 1386-87 (W.D. Wash. 1998); Matter

of Extradition of Cheung, 968 F. Supp. 791, 802-03 & n.17 (D. Conn. 1997).  Therefore, the

Court does not have jurisdiction to grant an injunction based on any perceived risk of a violation

of the CAT.

Petitioners also cannot salvage their CAT argument by pointing to the Foreign Affairs

Reform and Restructuring Act of 1998 ("FARR Act"), Pub. L. No. 105-277, § 2242, 112 Stat.

2681 (codified at 8 U.S.C. § 1231 note).  The FARR Act directs the appropriate agencies to

prescribe regulations to implement the obligations of the United States under the CAT.  See

FARR Act § 2242(b).  However, the FARR Act expressly provides that "nothing in this section

---

[8] A treaty "is primarily a compact between independent nations."  Head Money Cases,
112 U.S. 580, 597 (1884).  Consequently, international treaties do not provide private litigants
with enforceable rights unless their terms are implemented by appropriate legislation or intended
to be self-executing.  See, e.g., Whitney v. Robinson, 124 U.S. 190, 194 (1888) ("When the
stipulations [of a treaty] are not self-executing, they can only be enforced pursuant to legislation
to carry them into effect."); Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 968 (4th Cir.
1992) (en banc).  Absent a clear contrary intent, a treaty "depends for the enforcement of its
provisions on the interest and the honor of the governments which are parties to it." Heat Money
Cases, 112 at 597; see also Committee of United States Citizens Living in Nicaragua v. Reagan,
859 F.2d 929, 937 (D.C. Cir. 1988) (refusing to adjudicate the claim that U.S. policy and actions
concerning Nicaragua violated the U.N. Charter).

shall be construed as providing any court jurisdiction to consider or review claims raised under

the Convention or this section, or any other determination made with respect to the application of

the policy set forth in subsection (a) [prohibiting the return of persons when there are substantial

grounds for believing they will be tortured], except as part of the review of a final order of

removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. § 1252)." See

FARR Act § 2242(d); Soliman v. United States ex rel. INS, 296 F.3d 1237, 1241 n.1 (11th Cir.

2002) (noting lack of jurisdiction over FARR Act claims in the absence of a petition to review a

final order of removal, and denial of emergency stay on that basis).  It is undisputed that this case

does not involve a final order of removal under section 242 of the Immigration and Nationality

Act, and thus the FARR Act does not create jurisdiction to review petitioners' CAT claim in this

situation.  See Al-Anazi v. Bush, 370 F. Supp. 2d 188, 194 (D.D.C. 2005) (Bates, J.) (rejecting

petitioners' argument that FARR Act could serve as legal basis for prohibiting or limiting

transfer of wartime detainees to other countries); O.K. v. Bush, 377 F. Supp. 2d at 118 n.17

(same); Khalid, 355 F. Supp. 2d at 327 n.21 (same).

2.    Federal Rule Of Appellate Procedure 23(a)

Petitioners also incorrectly contend that Federal Rule of Appellate Procedure 23(a)

empowers the Court to enjoin any action that would deprive the Court of jurisdiction over this

case.[9]  As a threshold matter, Rule 23(a) is clearly not applicable to this situation because

_____

[9] Rule 23(a) provides:

Pending review of a decision in a habeas corpus proceeding commenced before a
court, justice, or judge of the United States for the release of a prisoner, the person
having custody of the prisoner must not transfer custody to another unless a
transfer is directed in accordance with this rule. When, upon application, a
custodian shows the need for a transfer, the court, justice, or judge rendering the

petitioners' habeas petition is not presently on appeal.  Rule 23(a) is a rule of appellate

procedure, not a substantive basis for relief in district court litigation.  See Al Anazi, 370 F.

Supp. 2d at 199 n.11.  In any event, Rule 23(a) is merely designed to ensure that, in situations

where a prisoner is transferred from one custodian subject to federal habeas jurisdiction to

another custodian subject to federal habeas jurisdiction, but remains in the custody of the United

States (or relevant state thereof), the court is able to appropriately substitute the successor

custodian as the respondent.  See Fed. R. App. Proc. 23(a) ("the court, justice, or judge rendering

the decision under review may authorize the transfer and substitute the successor custodian as a

party"); O.K. v. Bush, 377 F. Supp. 2d 102, 116-118 (D.D.C. 2005).  As explained above, such a

situation is not implicated in the present case.  Mr. Omar has been and currently is in the custody

of MNF-I, thus no transfer of custody from a United States custodian to another United States

custodian is at issue here.[10]

    3.    All Writs Act, 28 U.S.C. § 1651(a).

    Lacking any other relevant legal authority for their motion, petitioners fall back on the

All Writs Act, 28 U.S.C. § 1651(a), which provides that federal courts "may issue all writs

necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and

---

decision under review may authorize the transfer and substitute the successor
custodian as a party.

[10]  Neither Rule 23(a), nor any other provision of law, would operate to restrict the United
States from relinquishing custody of him, which, after all, is the ultimate object of a habeas
corpus case.  See O.K., 377 F. Supp. 2d at 116-118; Al Anazi, 370 F. Supp. at 189-99; Almurbati
v. Bush, 366 F. Supp. 2d 72, 72-83 (D.D.C. 2005).  Petitioners' citation to cases involving
Guantanamo Bay detainees who have sought advance notice of their potential transfers from
United States custody is distinguishable because the United States does not have custody of Mr.
Omar and is not proposing to transfer him to a United States custodian.

principles of law." Although the All Writs Act empowers district courts to issue injunctions to protect their jurisdiction, the proposed injunction in this case would effectively protect jurisdiction the district court does not have. See S.E.C. v. Vision Communications, Inc., 74 F.3d 287, 291 (D.C. Cir. 1996); Almurbati v. Bush, 366 F. Supp. 2d 72, 80 (D.D.C. 2005) (concluding that the All Writs Act is inapplicable once the petitioner is no longer held in United States custody). Because Mr. Omar is in the custody of MNF-I – as distinct from the custody of the United States government – the Court was never seized of jurisdiction over his petition ab initio. Consequently, the Court lacks legal authority to issue injunctive relief pursuant to the All Writs Act.

    4.    International Extradition Procedures.

    Finally, petitioners incorrectly argue that Mr. Omar's transfer to Iraqi custody would violate the law governing foreign extradition procedures of United States citizens. See 18 U.S.C. §§ 3184. This argument is misplaced because petitioners fundamentally misunderstand the facts of Mr. Omar's custody. As explained above, Mr. Omar is in MNF-I custody and thus it is not the United States that would be transferring Mr. Omar to the custody of the government of Iraq. Nor is the government of Iraq seeking extradition of Mr. Omar from the government of the United States. Instead, Mr. Omar is currently in the custody of MNF-I and will remain in MNF-I custody during the pendency of his case before the CCCI. For these reasons, the extradition procedures found in 18 U.S.C. § 3184 are inapplicable to this case.

    Even assuming that federal extradition procedures apply to Mr. Omar, the circumstances of his capture and detention are not covered by the treaty cited by petitioners between the United States and Iraq, see 49 Stat. 3380 (1936), or the federal extradition statute. The treaty cited by

petitioners between the United States and Iraq, if it applies at all, applies only to persons charged with or convicted of crimes committed in the jurisdiction of one country "and who shall be found within the territories of the <u>other</u> High Contracting Party." <u>Id.</u>, art. I (emphasis added). This treaty is facially inapplicable to Mr. Omar because his belligerent actions took place inside the territorial jurisdiction of Iraq and he also was found within the jurisdiction of Iraq.  In light of the fact that Mr. Omar was not "found within the territory" of the United States, the treaty cannot serve as a basis for injunctive relief. <u>See</u> <u>Haitian Refugee Center, Inc. v. Gracey</u>, 600 F. Supp. 1396 (D.D.C. 1985) (concluding that similar language in an extradition treaty between United States and Haiti could not provide the basis for injunctive relief because interdiction of persons on high seas is not the same as being "found" in the territory of one of the contracting parties).

Further, the federal extradition statute relied upon by petitioners applies only to "any person found within" the jurisdiction of a court of the United States. 18 U.S.C. § 3184.  Mr. Omar was "found" in Iraq, which is unquestionably outside the jurisdiction of a United States district court.  Moreover, as discussed above, the Court lacks jurisdiction over this case because Mr. Omar is being held in the custody of MNF-I.  For these reasons, the federal extradition statute is not a proper basis for relief.

## III.    PETITIONERS HAVE NOT ESTABLISHED THAT MR. OMAR FACES CERTAIN AND IMPENDING IRREPARABLE HARM.

As indicated previously, the irreparable harm that must be shown to justify temporary injunctive relief "must be both certain and great; it must be actual and not theoretical." <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such <u>imminence</u> that there

is a clear and present need for equitable relief to prevent irreparable harm." Id. (citations and internal quotation marks omitted; emphasis in original).

Petitioners assert that without the temporary injunctive relief they seek, Mr. Omar will be irreparably harmed by losing his purported ability to challenge his detention in federal court and by being subjected to physical torture. See Memorandum in Support of *Ex Parte* Motion for Temporary Restraining Order at 4. As explained above, however, because Mr. Omar consistently has been in the custody of the MNF-I, not the United States, since his arrest in Iraq, he has never been subject to this Court's habeas jurisdiction. See Hirota v. General of the Army MacArthur, 338 U.S. 197 (1948) (per curiam).[11] Accordingly, he cannot claim to be at risk of losing an opportunity for habeas relief that he never had to begin with.

In addition, contrary to petitioners' contentions, Mr. Omar's risk of being tortured in an Iraqi prison is not certain, great, or imminent to justify the relief sought; rather, his assertions in this regard are entirely speculative, unfounded, and merely feared to occur. First, the mere fact that Mr. Omar's case has been referred to the CCCI does not establish that he soon will be transferred from MNF-I custody to an Iraqi prison. As discussed, MNF-I retains physical custody of Mr. Omar throughout the CCCI proceedings. Gardner Decl. ¶ 10. Only if Mr. Omar's case is referred to trial after the investigative hearing and only if he is convicted at trial would he be transferred to an Iraqi detention facility. Id. Neither of these events will occur imminently, if at all. Moreover, even if Mr. Omar is eventually transferred to an Iraqi prison, the

_____

[11] The same is true notwithstanding that U.S. Armed Forces participate in Mr. Omar's custody because they do so as part of their participating role in MNF-I and not qua the United States.

-33-

possibility that he will be tortured in such a prison is entirely speculative.[12]  As explained

previously, concerns about the treatment of prisoners in Iraqi jails pertain to detention centers

operated by the Iraqi Ministry of the Interior.  See Petitioners' Supplemental Brief at 6.  MNF-I

forces transfer detainees to detention facilities operated by Iraq's Ministry of Justice, see

Gardner Decl ¶ 10, making the possibility that Mr. Omar will be tortured even more unlikely to

occur.  Accordingly, petitioners have failed to demonstrate that Mr. Omar will be irreparably

harmed in the absence of injunctive relief.

## IV.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST.

The public interest favors allowing the Executive Branch, which is constitutionally

vested with the authority both to conduct military functions and to engage in foreign affairs, to

act without undue intrusion within its constitutional sphere of responsibility.  As one Judge of

this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon
> the foreign policy and war powers of the Executive on a deficient factual record.

---

[12]  Petitioners attempt to bolster their claim of irreparable harm with speculative opinion testimony from a self-styled expert who does not purport to have any personal knowledge or involvement with the particular situation or circumstances facing the petitioner in this case.  See Declaration of Curt Goering.  Despite this tenuous basis, Mr. Goering not only makes sweeping assertions –  "Iraqi government forces do not adhere to the rule of law"– but factually incorrect assertions as well – "Iraqi government forces have not established a functioning judicial system." See Goering Decl. ¶¶ 3, 5.  Petitioners are not clear about whether the Goering Declaration is intended as fact testimony or as expert testimony, but either way it is improper and cannot provide a basis for injunctive relief in this case.  Moreover, the declaration candidly provides a roadmap of where petitioners apparently envision this litigation going: a full-scale judicial inquiry into the state of due process standards, conditions of confinement, and the fairness of the Iraqi judicial system.  The very notion of a trier of fact engaging in such an inquiry collides head-on with basic separation of powers principles, including the Rule of Non-Inquiry, providing yet another independent reason for denying petitioners' motion.  See, e.g., United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (forbidding judicial inquiry into the fairness a foreign nation's justice system and its procedures or treatment).

> Where the conduct of the Executive conforms to law, there is simply no benefit –
> and quite a bit of detriment – to the public interest from the Court nonetheless
> assuming for itself the role of a guardian ad litem for the disposition of these
> detainees. See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the
> judicial function for a court to review foreign policy decisions of the Executive
> Branch.").

Al-Anazi, 370 F. Supp. 2d at 199. Contrary to petitioners' allegations, the United States is not

attempting to evade scrutiny by transferring Mr. Omar outside the jurisdiction of this Court,

particularly when there was no jurisdiction in this Court ab initio.  The so-called "facts"

presented in petitioners' motion are little more than unfounded allegations that lack foundation.

The public interest is not well-served when military functions during a time of war are

needlessly interrupted and overly burdened due to baseless allegations.  Accordingly, the public

interest would best be served if the Court denied petitioners' request for injunctive relief.[13]

## **CONCLUSION**

For the reasons stated above, respondents respectfully oppose petitioner's *ex parte* motion

for a temporary restraining order and request that it be denied in all respects and that the current

temporary restraining order be dissolved.

---

[13] Petitioners' request for discovery also is not warranted. As an initial matter, because
this Court lacks jurisdiction to entertain petitioners' request for relief, discovery, if ever
appropriate, is premature at this time. Indeed, the norm in habeas cases is that discovery is not
permitted. See, e.g., Harris v. Nelson, 394 U.S. 286 (1969). Moreover, the type of discovery
petitioners' apparently contemplate is wholly improper because it inserts the Judiciary further
into the province of the Executive than is constitutionally permissible and thereby violates core
separation-of-powers principles. See supra Section II. C.

Dated: February 7, 2006                    Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           KENNETH L. WAINSTEIN
                                           United States Attorney

                                           /s/ Edward H. White & Andrew I. Warden
                                           JOSEPH H. HUNT (D.C. Bar No. 431134)
                                           VINCENT M. GARVEY (D.C. Bar No. 127191)
                                           EDWARD  H. WHITE (D.C. Bar No. 468531)
                                           ANDREW I. WARDEN
                                           Attorneys
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Avenue, N.W.  Room 6110
                                           Washington, D.C. 20530
                                           Tel: (202) 514-5108
                                           Fax: (202) 318-4268
                                           email: ned.white@usdoj.gov

                                           Attorneys for Respondents