**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **SANDRA K. OMAR,** *et. al.*, ) | |
| Petitioners, ) | **CIVIL ACTION NO. 05-2374** |
| ) | **(RMU)** |
| v. ) | |
| ) | |
| **FRANCIS J. HARVEY,** *et. al.*, ) | |
| Respondents. ) | |

*REPLY BRIEF IN SUPPORT OF PETITIONERS'
MOTION FOR A TEMPORARY RESTRAINING ORDER*

In its lengthy opposition, what the respondents include says little, but what they omit speaks volumes. The crux of their argument is that, despite all appearances to the contrary, Mr. Omar is not really in U.S. custody. But the Great Writ is coequal to, and an extension of, the power of this Court. Quite simply, if Mr. Omar's custodians will answer to this Court, then jurisdiction will lie. We do not understand respondents to say they will ignore this Court's order. At least, in their 36-page response, respondents do not advance that admittedly breathtaking claim. This alone resolves any jurisdictional squabble.

Even if the respondents' factual assertion were legally relevant, it is mistaken. As we demonstrate below, responsible Executive Branch officials have long maintained that Mr. Omar is in the actual or constructive custody of the United States. At minimum, there is a factual dispute that cannot be resolved without further inquiry by the Court aided by jurisdictional discovery.

The respondents also maintain, albeit meekly, that the likelihood Mr. Omar will be tortured is speculative and the risk he will be transferred remote. But it was not

petitioners who promised the American public two months ago that *no prisoner* would be transferred to *any* Iraqi facility for fear that he would be tortured: It was the respondents' own declarant in this case. And as for the imminence of the risk to Mr. Omar, respondents declined to foreswear any intent to transfer an American citizen without notice to the Court and counsel, but have it in their power to eliminate this risk tomorrow. Conspicuously, respondents declined to say that they will not transfer Mr. Omar in this way. So long as the respondents are silent, the Court must speak. Such is the nature of divided government.

## ARGUMENT

It is long settled that a federal court has power to grant the Great Writ *whenever a custodian has the will to obey the court's order*. To evade this Court's power, respondents' key contention is that the multinational aspect of Coalition operations places Mr. Omar beyond judicial protection and allows U.S. forces to imprison an American citizen for fifteen months without lawful process. *See* Respondents' Opposition to Petitioners' Ex Parte Motion for a Temporary Restraining Order ("Opp."), at 16-20 (dkt. 12).

Not so. The respondents rely on two cases that reaffirm the unexceptional – and here irrelevant – proposition that a U.S. court will not exercise collateral review of a final criminal judgment issued by a non-U.S. court. Opp. at 17-18. Indeed, the very Court of Appeals case on which respondents rely disproves their sweeping resistance to jurisdiction. The D.C. Circuit there held that "whether the District Court erred in refusing to issue a writ of habeas corpus . . . depends on whether [petitioner] is held *in actual or constructive custody by the respondents named in the petition, or by any other*

*person or persons subject to the jurisdiction of the District Court.*"  *United States ex rel. Keefe v. Dulles*, 222 F.2d 390, 392 (D.C. Cir. 1955) (emphasis added).  As the government's own authorities suggest, a federal court necessarily has habeas jurisdiction whenever a petitioner is held in a respondent's "actual or constructive" custody.

I.  **THE U.S GOVERNMENT HAS ACTUAL OR CONSTRUCTIVE CUSTODY OVER MR. OMAR.**

Here, Mr. Omar was initially detained and continues to be held in the "actual or constructive" custody of the United States.  The Government's own words – both in its own Declaration and in other documents – evidence that the U.S. maintains discretionary authority to release Mr. Omar or keep him imprisoned.

*(1)  Mr. Omar Is in the Actual Custody of the United States.*  The respondents assert that Mr. Omar is not in the control of United States custodians, but instead in the custody of a multilateral force (termed MNF-I).  That supposition cannot be sustained.

Petitioner Sandra Omar, in response to her repeated entreaties for information about her husband, received correspondence from the United States Department of State.  On December 22, 2004, a State Department official advised Ms. Omar that her husband "is under *U.S. military care, custody and control*."  *Email from Marie Damour to Sandra Omar, attached hereto as Exhibit 1 (emphasis added)*.  This, of course, is consistent with the position taken by the Secretary of Defense, who, in sworn testimony, has described the prisoners such as Mr. Omar held at Abu Ghraib as "in U.S. custody."[1]  More recently, another State Department official suggested that the U.S. shared joint custody of Mr.

---

[1] *See* Transcript of testimony by Secretary of Defense Donald H. Rumsfeld, House Armed Services Committee, Friday, May 7, 2004 (available at http://www.defenselink.mil/speeches/2004/sp20040507-secdef0421.html) ("I feel terrible about what happened to these Iraqi detainees.  They're human beings.  *They were in U.S. custody*.  Our country had an obligation to treat them right, to treat them as human beings.  We didn't do that.  That was wrong.") (emphasis added).

- 3 -

Omar, so he "remains under control of Coalition Forces (U.S. and MNF)." *Email from Richard C. Hermann to Sandra Omar, attached hereto as Exhibit 2.*

*(2) Mr. Omar Is in the Constructive Custody of the United States.* Even apart from evidence of actual custody, respondents' own filing makes it undeniably clear that Mr. Omar is, at the very least, in their *constructive* custody, making them appropriate respondents against whom the writ will run. The Declaration filed in support of the Opposition by Major General Gardner states, in paragraph 6: "In August 2005, *after consultation with U.S. authorities*, as appropriate in the case of a U.S. national such as Mr. Omar, MNF-I ascertained that the Iraqi Judiciary would proceed with charging Mr. Omar in the Central Criminal Court of Iraq (CCCI). In November 2005, *U.S. authorities indicated no objection* to Iraqi plans to prosecute Mr. Omar in the CCCI." Gardner Decl. ¶ 6 (emphases added). Despite its carefully finessed terminology, Major General Gardner's language reveals *de facto* control by the United States: It is clear that if the "U.S. authorities" referred to in paragraph 6 had objected to Iraqi plans, Mr. Omar would not and could not be turned over to the Iraqis. Thus, the very Declaration submitted by the Department of Justice to establish lack of custody appears to establish actual, or at least constructive, custody. And the respondents' filing carefully avoids making any statement as to changes in Mr. Omar's legal custody, leaving petitioners uncertain as to whether any change in that regard may occur. At a minimum, then, it raises a question of disputed fact that warrants the jurisdictional discovery that petitioners have already sought.[2]

---

[2] Petitioners' counsel also have learned from reliable sources based in Iraq that the U.S. Government has some type of agreement with the Iraqis to the effect that, if the Iraqi criminal authorities find Mr. Omar (or any other prisoners) not guilty of any crime and order him released, the U.S. Government may nonetheless continue to imprison Mr. Omar without interference from the Iraqis.

The light sprinkling of foreign troops and the thin veneer of U.N. authorization cannot alter the fact that U.S. personnel make the controlling determinations about Mr. Omar's liberty. As Major General Gardner's Declaration discloses, the United States calls the shots on Mr. Omar's detention. *See supra.* And, as the respondents tacitly concede, the MNF-I is dominated by the United States military. Indeed, about 140,000 of the 160,000 personnel – or 87.5 per cent – are American. Dexter Filkins et al., *Iraqi Official Says Foreign Forces Could Fall Below 100,000 This Year*, N.Y. Times, Jan. 31, 2006, at A12.

The U.S. Government cannot evade the Constitution by merely inviting foreign soldiers to fight alongside American military forces. American soldiers who serve in multinational forces in Afghanistan and Iraq do not lose access to the federal courts if they are subject to a court-martial while serving in a joint force. Of course, respondents do not suggest otherwise. Still less do U.S. civilians lose their longstanding right of access to the federal courts if they are swept up in U.S. military operations. On the contrary, the federal courts have always shown *heightened* solicitude for civilians facing military justice. *See, e.g.*, *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246-48 (1960); *cf.* Memorandum in Support of Ex Parte Motion for Temporary Restraining Order at 12-13 (dkt. no. 7).

*(3) Respondents' Reliance on Cases Barring Collateral Attacks on Final Foreign Judgments Is Unavailing.* As the Supreme Court has long observed, the habeas writ "is directed to, and served upon, not the person confined, but his jailer . . . . The officer or person who serves it does not unbar the prison doors, and set the prisoner free, but the court relieves him by compelling the oppressor to release his constraint. The whole force

of the writ is spent upon the respondent." *Ex parte Endo*, 323 U.S. 283, 306 (1944) (quoting *In re Jackson*, 15 Mich. 417, 439, 440 (1867)); *see also United States v. Davis*, 25 F. Cas. 775, 775, 5 Cranch. C.C. 622 (C.C.D.C. 1839) (a custodian, if within the court's jurisdiction, "is *bound* to produce the bodies of the [petitioner]," and is subject to contempt sanctions for failing to do so) (emphasis added); *see also Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 495 (1973) ("Read literally, the language of § 2241(a) requires nothing more than that the court issuing the writ have jurisdiction over the custodian."). That is why, as the D.C. Circuit has held, the critical question is "whether [petitioner] is held in the *actual or constructive custody* by the respondents named in the petition, or by any other person or persons subject to the jurisdiction of the District Court." *Keefe*, 222 F.2d at 392 (emphasis added). We do not understand respondents to argue that they, Mr. Omar's custodians, would not obey the Court's order. Jurisdiction, therefore, is complete.

The respondents rely principally on two cases in which a habeas petitioner was detained by a foreign custodian as a consequence of a final criminal judgment issued by a foreign court. *See* Respondents' Opposition to Petitioners' Ex Parte Motion for a Temporary Restraining Order, at 16-20 (dkt. 12). These cases are factually distinct and cannot support jurisdictional ouster here.

In *Hirota v. General of the Army MacArthur*, 338 U.S. 197 (1949) (per curiam), the Supreme Court declined to issue habeas writs to Japanese citizens "held in custody pursuant to the judgments of a military tribunal in Japan." *Id.* at 198. The Court explicitly limited its holding in *Hirota*, in language respondents fail to quote, to those facts of foreign citizenship and conviction pursuant to a foreign court's final criminal

- 6 -

judgment: "[T]he courts of the United States have no power or authority to review, to affirm, set aside or annual *the judgments and sentences* imposed on these petitioners." *Id.* (emphasis added). Petitioners in *Hirota* sought, in effect, a collateral attack in U.S. federal court on a judgment issued in another jurisdiction. While the Court declined to exercise such collateral review, it did not consider itself powerless to do so.[3]

Although respondents quote Justice Douglas's concurrence, they fail to mention his express warning that the case would stand in a quite different posture were American citizens and their rights implicated. Justice Douglas thus cautioned:

> Today Japanese war lords appeal to the Court for application of American standards of justice. Tomorrow or next year an American citizen may stand condemned in Germany or Japan by a military court or commission. If no United States court can inquire into the lawfulness of his detention, the military have acquired, contrary to our traditions . . . a new and alarming hold on us.

*Hirota*, 338 U.S. at 201-02 (Douglas, J., concurring) (citations omitted). Justice Douglas explained that "[t]he fact that the tribunal has been set up by the Allied Powers should not of itself preclude our inquiry," else a "dangerous" precedent of granting such bodies "absolute" power be set. *Id.* at 203-04. "We should not allow that inquiry to be thwarted merely because the jailer acts not only for the United States but for other nations as well." *Id* at 204. Moreover, his concurrence expressly noted his view that even foreign citizen petitioners could properly refile petitions in this District Court, rather than in the Supreme Court. *Id.* at 200.

---

[3] *Hirota*, which concerned a foreign citizen held overseas, is similar in some factual respects to *Johnson v. Eisentrager*, 339 U.S. 763 (1950). But the Supreme Court in 2004 cast grave doubt on *Johnson*'s continuing vitality. *Cf. Rasul v. Bush*, 542 U.S. 466, 497 (2004) (Scalia, J., dissenting) ("The reality is this: Today's opinion, and today's opinion alone, overrules *Eisentrager*."). It is thus far from clear that *Hirota*'s limited ruling, which itself rested on the singular facts of a foreign national petitioner in effect appealing a final foreign judgment from a criminal proceeding, remains good law.

The respondents also rely on *United States ex rel Keefe v. Dulles*. Unlike *Hirota*, *Keefe* concerned a United States citizen. 222 F.2d at 391. But like *Hirota*, the petitioner was detained pursuant to a foreign court's final judgment in a criminal proceeding (there, a French court). The Court denied the writ because Keefe's "petition shows on its face that Keefe [was] not in the custody of the respondents . . . [and] a court will not issue th[e] writ unless the person who has custody of the petitioner is within reach of its process." *Id.* at 392.[4] It is striking how the *Keefe* Court, presented with a citizen's habeas petition conceding a foreign power had actual and constructive custody over him, nonetheless engaged in a far more detailed inquiry than the summary disposal of the *Hirota* Court. The Circuit Court carefully examined the question whether "a mandatory order requiring the Secretary of State to obtain Keefe's release through diplomatic negotiations with France" should issue. *Id.* In any case, unless the respondents are prepared to say they will not comply with the Court's orders in any fashion in this matter, *Keefe* is irrelevant.

Respondents' position is also in tension with *Johnson v. Eisentrager*, 339 U.S. 763 (1950), which concerned German nationals held overseas pursuant to a final criminal judgment. Even though the *Johnson* petitioners were in the custody of an American officer operating under a joint European and American command, Justice Jackson stated that, had they been U.S. citizens and not conceded enemy aliens, the case would have been very different. *Id.* at 769. His statement would make scant sense if the mere

---

[4] Respondents also cite a case in which petitioners were held pursuant to a final foreign criminal judgment, *see Holmes v. Laird*, 459 F.2d 1211, 1214 (D.C. Cir. 1972), and an unpublished district court opinion in which the petitioner was in the midst of Bolivian criminal proceedings, and had even been granted habeas relief by a Bolivian court, *see Duchow v. United States*, No. 95-2121, 1995 WL 425037, at *1 (E.D. La. 1995). *See* Respondents' Opposition to Petitioners' Ex Parte Motion for a Temporary Restraining Order, at 18, 22). These cases, which implicate quite different equities from the one at bar, are no more persuasive than *Hirota* and *Keefe*.

expedient of transfer to shared custody with another nation robbed federal courts of jurisdiction over the matter.

Finally, respondents omit any mention of the case from this District most directly on point. In December 2004, the District Court (Judge Bates) held that the federal courts retain habeas jurisdiction even when a United States citizen is undisputably held by a foreign sovereign and "the United States is correctly deemed to be operating through a foreign ally as an intermediary." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 41 (D.D.C. Sept. 16, 2004).[5]

Judge Bates thus reaffirmed the bedrock judicial role of habeas courts when the executive engineers the lock-up of its own citizens by examining and rejecting the Government's proposed exception for foreign custody:

> This position is as striking as it is sweeping. The full contours of the position would permit the United States, at its discretion and without judicial review, to arrest a citizen of the United States and transfer her to the custody of allies overseas in order to avoid constitutional scrutiny; to arrest a citizen of the United States through the intermediary of a foreign ally and ask the ally to hold the citizen at a foreign location indefinitely at the direction of the United States; or even to deliver American citizens to foreign governments to obtain information through the use of torture . . . . This Court simply cannot agree that under our constitutional system of government the executive retains such power free

---

[5] Judge Bates also considered and rejected the collateral arguments pressed by the Government in this case. There will be time enough to address these matters in full when the Court turns to the underlying merits. For now, it is sufficient to observe that the Government's arguments have neither changed nor improved since they were rejected by Judge Bates:

> Unable to find support for the rule they propose in either the text of the habeas statute or controlling precedent, the United States appeals to three weighty principles: the act of state, separation of powers, and political question doctrines. Each is an important consideration in this case. None, however, extinguishes the fundamental right of a citizen to challenge his detention colorably alleged to be at the behest of the executive.

*Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 57 (D.D.C. Sept. 16, 2004).

>  from judicial scrutiny when the fundamental rights of
>  citizens have allegedly been violated.

*Id.* at 40 (emphasis added).  It is the constitutionally committed role of the Judicial Branch to ensure Due Process of Law whenever any U.S. citizen is faced with the prospect of transfer to another sovereign by our Government.  *See Valenzuela v. United States*, 286 F.3d 1223, 1229 (11th Cir. 2002) ("Despite our limited role in extradition proceedings, the judiciary must ensure that the constitutional rights of individuals subject to extradition are observed.  We turn therefore to consider petitioners' claims of error."); *Berenguer v. Vance*, 473 F. Supp. 1195, 1196 (D.D.C. 1979) ("Under the due process clause, a defendant is entitled to a hearing before extradition.").  And the Government cannot evade the obligations of the Due Process Clause, as enforced through the habeas statute, through formalistic camouflage.[6]

---

[6] Respondents raise a flurry of irrelevant doctrinal objections hinging on matters far removed from the instant case, such as the division of foreign affairs authority between States and the federal government or the proper allocation of federally appropriated funds.  *See* Respondents' Opposition to Petitioners' Ex Parte Motion for a Temporary Restraining Order, at 24-25 (dkt. 12) (citing, *e.g.*, *Crosby v. National Foreign Trade Council*, 520 U.S. 363 (2000), and *United States-South West Africa/Namibia Trade and Cultural Council v. United States*, 90 F.R.D. 695, 698 (D.D.C. 1981)).  That respondents must reach so far afield from the matter at hand – violation of the constitutional rights of a U.S. citizen – is a good indication of how weak their position is in fact.  Respondents also mistakenly rely on a case in which this Court exercised habeas jurisdiction to consider constitutional claims, but rejected petitioner's argument that it could assess whether the president had properly obtained Congress's permission for troop deployment – a question of constitutional structure quite distinct from the issues of Due Process and core individual liberty presented here.  *See United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80 (D.D.C. 2004); Respondents' Opposition to Petitioners' Ex Parte Motion for a Temporary Restraining Order, at 25 (dkt. 12).

   But the irreducible role of the federal courts, in peace and in war, when matters of citizens' liberty are at stake, has long been beyond doubting.  As the Supreme Court said in *Ex Parte Endo*:

>  [T]he Constitution when it committed to the Executive and to Congress
>  the exercise of the war power necessarily gave them wide scope for the
>  exercise of judgment and discretion so that war might be waged
>  effectively and successfully.  At the same time, however, the
>  Constitution is as specific in its enumeration of many of the civil rights
>  of the individual as it is in its enumeration of the powers of his
>  government . . . .  [A]s a further safeguard against invasion of the basic
>  civil rights of the individual it is provided in Art. I, Sec. 9 of the
>  Constitution that 'The Privilege of the Writ of Habeas Corpus shall not

**II.    MR. OMAR FACES AN IMMINENT RISK OF IRREPARABLE HARM.**

Respondents deny that Mr. Omar would face a risk of irreparable harm if transferred to Iraq and assert that no transfer is imminent. They are wrong on both counts.

*First*, respondents have not rebutted petitioners' evidence that Mr. Omar would very likely be tortured if handed over to Iraqi authorities. Instead, respondents suggest, without a scintilla of evidentiary support, that Mr. Omar will not be tortured because he would be transferred to the Iraqi Ministry of Justice rather than the Iraqi Ministry of the Interior. *See* Opp. at 14-15. But respondents provide the Court with no assurance or evidence that the Ministry of Justice would not simply turn Mr. Omar over to the Ministry of the Interior.

More importantly, respondents give no reason to believe the distinction between two Iraqi ministries in the same government has any relevance at all. They cannot refute the petitioners' evidence that torture in Iraqi detention is both systematic and pervasive, regardless of how that detention is labeled. Pet'rs Supp. Br. at 5-7 & n.2. They ignore not only the detailed accounts of torture in Iraq by the U.S. Department of State and other human rights experts, *id.* at 5-7 & Exs. B, C & E, but also the statements of their own declarant, Major General John D. Gardner. Less than two months ago, Major General Gardner announced to the public that the United States would not turn over *any* detainee, to *any organ* of the new Iraq Government, because Iraqi prisons failed to meet required

---

> be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.'

*Ex parte Endo*, 323 U.S. 283, 298-99 (1944). It is telling that the unequivocally foreign nature of the threat at issue in *Endo* from Japan after Pearl Harbor did not warrant judicial capitulation, just as the multinational aspect of U.S. military operations in Korea did not defeat citizens' constitutional rights claims in the landmark case of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

- 11 -

standards of care for *foreign* detainees.  *See* Eric Schmitt and Thom Shanker, *U.S., Citing Abuse in Iraqi Prisons, Holds Detainees*, N.Y. Times, Dec. 25, 2005, at A1.[7]

*Second*, respondents argues, *see* Opp. at 4, 8-9, that injunctive relief is unnecessary because it will not transfer Mr. Omar to Iraqi custody until he is convicted in an Iraqi criminal proceeding.  The respondents do not – and cannot – explain how the Iraqi criminal authorities can convict Mr. Omar if he is not *present*, in an Iraqi courtroom in at least shared Iraqi custody, to defend himself.  Even assuming *arguendo* the respondents could avoid this bind, the respondents have categorically refused to provide Mr. Omar's counsel – or this Court – with *any* notice before intentionally transferring him to the Iraqis.  Thus, Mr. Omar's transfer may occur at any time, without notice to the Court or counsel.[8]  For all intents and purposes, the respondents' silence means that Mr. Omar's transfer is imminent.  Presumably, the Court and parties would wake one morning to an entry in the Court's electronic court filing system marking a motion by the Government to dismiss the case because Mr. Omar has been transferred to Iraqi custody, having been convicted by some unknown process based on unseen evidence of uncertain progeny without the assistance of undersigned counsel.

---

[7] The Government also suggests that Mr. Omar, a United States citizen who carries with him the rights embedded in the Constitution, has no right to be free of torture.  That is plainly wrong.  *See* Petr's Supp. Br. at 17-18.  His right to be free of torture is guaranteed not only under the Convention Against Torture and implementing legislation, *see, e.g.*, *St. Fort v. Ashcroft*, 321 F.3d 191, 202 (1st Cir. 2003); *Ogbudimkpa v. Ashcroft*, 342 U.S. 207, 220 (3d Cir. 2003), but also under the Fifth Amendment to the Constitution, which the Government (Br. at 27-32) startlingly neglects even to mention.

[8] The Government's complaint (Opp. at 1-2 n.1) that petitioners should have told the Government beforehand that it was seeking a motion for a temporary restraining order is misplaced.  Petitioners were forced to seek this relief *ex parte* precisely because the Government had already refused to provide petitioners' counsel or the Court with any advance notice of Mr. Omar's transfer, refused even to disclose the date of any hearing before the CCCI, and failed to respond to petitioner's entreaty for further information.  *See* Pet'rs Supp. Br. at 4-5 & Burke Decl. ¶ 23 (citing email of Edward H. White, Esq., of Department of Justice).  Having stonewalled and provided scraps of information, the Government cannot now complain when petitioners' counsel do their best to decipher cryptic and misleading clues as to the fate of their client.

It is of little moment whether respondents deliberately intend to circumvent this Court's jurisdiction, or whether it is merely following bureaucratic protocols. The inevitable – and unacceptable – result of their point-blank refusal to notify counsel or the Court before handing Mr. Omar over to Iraqi authorities means there exists an imminent risk of transfer to torture. Accordingly, the Court should enjoin the respondents from transferring Mr. Omar until his habeas petition is adjudicated or, at a minimum, order the Government to provide counsel and the Court 30 days' advance notice before any transfer to Iraqi custody can occur. This Court and numerous others in this District have issued similar notice orders preventing the transfer of *foreign nationals* detained at Guantánamo Bay, Cuba. *See* Pet'rs Supp. Br. at 17. Certainly, an American citizen is entitled to no less.

## CONCLUSION

This Court has habeas jurisdiction so long as if Mr. Omar's custodians will answer to this Court. By their own admission, respondents are Mr. Omar's "actual or constructive" custodians. They do not indicate their unwillingness to obey this Court's lawful order. Petitioners' request for a Temporary Restraining Order barring transfer and providing counsel and the Court 30 days' advance notice before any transfer, must therefore be granted.

Dated: February 8, 2006                    Respectfully submitted,

                                               /s/ Susan L. Burke
                                      Susan L. Burke (D.C. Bar # 414939)
                                      Heather L. Allred (admitted *pro hac vice*)
                                      BURKE PYLE LLC
                                      3527 Lancaster Avenue
                                      Philadelphia, PA 19104
                                      Telephone:    (215) 387-4705
                                      Facsimile:     (215) 387-4713

Joseph Margulies
MACARTHUR JUSTICE CENTER,
UNIVERSITY OF CHICAGO LAW
SCHOOL
1111 East 60th Street
Chicago, IL  60637
Telephone:    (773) 702-9560
Facsimile:     (773) 702-0771

Aziz Z. Huq (admitted *pro hac vice*)
Jonathan Hafetz (admitted *pro hac vice*)
BRENNAN CENTER FOR JUSTICE,
NEW YORK UNIVERSITY LAW
SCHOOL
161 Avenue of the Americas
12th Floor
New York, NY  10013
Telephone:    (212) 998-6730
Facsimile:     (212) 995-4550

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I, Heather L. Allred, hereby certify that on February 8, 2006, I caused to be served a true and correct copy of the foregoing Reply Brief in Support of Petitioners' Motion For a Temporary Restraining Order via electronic mail and U.S. First Class Mail, postage prepaid, upon the following individual at the address indicated:

Edward H. White, Esq.<br>
U.S. Department of Justice<br>
Civil Division, Federal Programs Branch<br>
20 Massachusetts Avenue, N.W., Room 6110<br>
Washington, DC 20530<br>
ned.white@usdoj.gov

*Heather L. Allred* (signature)
Heather L. Allred