# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SANDRA K. OMAR *et al.*,                :
                                        :
      Petitioners,        :        Civil Action No.:        05-2374 (RMU)
                                        :
      v.                  :        Document No.:        10
                                        :
FRANCIS J. HARVEY *et al.*,             :
                                        :
      Respondents.        :

## <u>MEMORANDUM OPINION</u>

### Granting the Petitioner's[1] Motion for a Preliminary Injunction[2]

## I.  INTRODUCTION

This matter is before the court on the petitioner's motion for a preliminary injunction. The petitioner is an American citizen seeking to enjoin his transfer from Camp Cropper, a detainee camp operated by the Multinational Force – Iraq, to the custody of the Central Criminal Court of Iraq ("CCCI").  Because this controversy presents serious, substantial and difficult questions that give rise to the petitioner's right to present proof to support his claims, because the likelihood the petitioner will suffer irreparable injury is high, and because the public interest strongly favors vigorous application of the writ of habeas corpus on behalf of United States citizens, the court grants the petitioner's motion for a preliminary injunction.

---

[1]      There are three petitioners in this case, two of whom are acting as next friends of Shawqi Ahmad Omar.  Because Shawqi Ahmad Omar is the only petitioner allegedly subject to transfer to the Iraqi authorities, the court refers to the petitioners in the singular.

[2]      The petitioner filed a motion for a temporary restraining order.  Because the motion has been fully briefed on an expedited schedule, the court treats it as a motion for a preliminary injunction. *See, e.g.., Planned Parenthood Fed'n of Am., Inc. v. Nat'l Park Serv.*, 1989 WL 39374, at *4 (D.D.C. 1989).

## II. BACKGROUND

The petitioner is an American citizen held by the Multinational Force – Iraq ("MNF-I") since October 29, 2004.  Pet. for Writ of Habeas Corpus ("Pet.") ¶ 2.  The petitioner has not been charged with any crime.[3]  *Id.*  On January 24, 2006, United States officials allegedly moved the petitioner from Camp Bucca to Abu Ghraib.  Pet'r's Supplemental Br. in Supp. of Mot. for a TRO ("Pet'r's Mot. for Prelim. Inj.") at 3.  The petitioner is currently at Camp Cropper.  *Id.* at 5.  On February 2, 2006, the petitioner's attorneys received an e-mail from the respondents, United States military officials, stating that "a determination was previously made to refer his case to the Central Criminal Court of Iraq."[4]  *Id.* at 4.

Fearing the consequences of the petitioner's impending transfer to the custody of the CCCI, the petitioner's attorneys filed a motion for an *ex parte* temporary restraining order late in the evening of February 2, 2006.  On February 3, 2006, the court granted that motion and issued a temporary restraining order valid until Monday, February 13, 2006.  Pursuant to the court's order, the petitioner and the respondents submitted briefs addressing the factors for injunctive relief and the constitutional implications arising out of the exercise of judicial authority over the matter.  Order Granting *Ex Parte* TRO (Feb. 3, 2006).  The court now turns to the petitioner's motion for a preliminary injunction.

---

[3]	The petitioner asserts that he was in Iraq seeking reconstruction work.  Pet. for Writ of Habeas Corpus ("Pet.") ¶ 18.  The respondents allege, however, that the petitioner is an associate of Abu Musab al Zarqawi, "the recognized leader of Al-Qaeda in Iraq," and that he was harboring foreign fighters intent on engaging in jihad.  Resp'ts' Opp'n to Pet'r's' Mot. for TRO ("Resp'ts' Opp'n") at 6.  The foreign fighters allegedly stated that the petitioner "made comments about his fluency in English which allowed him to visit Baghdad hotels in order to entice foreigners to return to Mr. Omar's home for the purpose of their kidnap and ransom."  *Id.*

[4]	The petitioner alleges that the respondents decided to refer him to the Central Criminal Court of Iraq in an attempt to evade judicial review.  Pet'r's Mot. for *Ex Parte* TRO at 1.

### III.  ANALYSIS

### A.  Legal Standard for Injunctive Relief

This court may issue interim injunctive relief only when the movant demonstrates:

> (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *see also World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 64 (D.D.C. 2000).  It is particularly important for the movant to demonstrate a substantial likelihood of success on the merits.  *Cf. Benten v. Kessler*, 505 U.S. 1084, 1085 (1992) (per curiam).  Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review."  *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (internal quotation omitted).  In cases that raise questions "going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground . . . for more deliberative investigation," however, courts should eschew an "exaggeratedly refined analysis of the merits at an early stage in the litigation."  *Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 844 (D.C. Cir. 1977).  This is particularly true when the moving party seeks to maintain the status quo pending a final determination of the merits.  *Id.*; *see also Carabillo v. ULLICO Inc. Pension Plan and Trust*, 355 F. Supp. 2d 49, 53 (D.D.C. 2004).

The four factors should be balanced on a sliding scale, and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor.  *CSX Transp.,*

*Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005) (citing *CityFed Fin. Corp.*, 58 F.3d at 747). "An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 747.

Moreover, the other salient factor in the injunctive relief analysis is irreparable injury. A movant must "demonstrate at least 'some injury'" to warrant the granting of an injunction. *CityFed Fin. Corp.*, 58 F.3d at 747 (quotation omitted). Indeed, if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors. *Id.*

Because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). As the Supreme Court has said, "[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Id.* (citation omitted). Therefore, although the trial court has the discretion to issue or deny a preliminary injunction, it is not a form of relief granted lightly. In addition, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown. *Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990) (citation omitted).

### B. The Court Grants the Petitioner's Motion for Injunctive Relief

As a legal matter, resolution of the petitioner's motion for a preliminary injunction and his underlying habeas petition centers on whether the petitioner is held in either physical or constructive custody of the respondents. The parties dispute whether the MNF-I, the entity that is technically holding the petitioner in its custody, is an entity that is synonymous with, or a part

4

of, the respondents, such that the petitioner is in the respondents' constructive custody. Concluding that the matter presents serious and difficult questions and that the risk of irreparable injury is high, the court rules that the petitioner meets the requirements for a preliminary injunction. The preliminary injunction factors are analyzed in turn below.

### (1) Substantial Likelihood of Success on the Merits

The petitioner argues that he is likely to succeed on his underlying habeas petition because it is "well-established that prisoners held by the United States cannot be imprisoned without legal process." Pet'r's Mot. for Prelim. Inj. at 16 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004)). The respondents, on the other hand, argue that the petitioner cannot succeed on his underlying habeas petition because the court does not have jurisdiction to hear a habeas case when the respondents do not have custody of the petitioner. Resp'ts' Opp'n to Pet'r's Mot. for TRO ("Resp'ts' Opp'n") at 12. The respondents further argue that the court's involvement in this case violates the separation of powers[5] between the judicial and executive branches of government. *Id.* at 21. The court addresses each of these arguments in turn.

### a. Jurisdiction

The respondents describe the MNF-I as "an international coalition force, acting on behalf and at the request of a foreign government," and argue that they do not have custody of the petitioner. *Id.* at 3, 4. The petitioner, on the other hand, argues that, at the very least, he is in the

---

[5]    "Under this constitutional doctrine of 'separation of powers,' one branch is not permitted to encroach on the domain or exercise the powers of another branch." BLACK'S LAW DICTIONARY 1365 (6th ed. 1990). The related doctrine of "political question" "holds that certain issues should not be decided by the courts because their resolution is committed to another branch of government." *Id.* at 1158. In the international context, the "act of state" doctrine "precludes the courts of this country from inquiring into the validity of governmental acts of a recognized sovereign committed within its own territory." *Id.* at 34.

constructive custody of the respondents.  Pet'r's Reply at 4.  Without resolving the factual

dispute between the parties, the court determines that the case at bar "raise[s] questions going to

the merits so serious, substantial, difficult and doubtful, as to make them fair ground for

litigation and thus for more deliberative investigation."[6]  *Holiday Tours, Inc.*, 559 F.2d at 844.

A court's jurisdiction over a habeas petition rests on its jurisdiction over the petitioner's

custodian.  *Rumsfeld v. Padilla*, 542 U.S. 426, 442 (2004); *Rasul v. Bush*, 542 U.S. 466, 478-79

(2004).  Where a court does not have actual jurisdiction over a habeas petitioner's custodian, a

court may nonetheless have jurisdiction if the petitioner is held in the constructive custody of a

respondent within the court's jurisdiction.  28 U.S.C. § 2241(c)(1) (stating that the writ of habeas

corpus extends to an individual "in custody under *or by color of the authority of the United*

*States*" (emphasis added)); *see also United States ex rel. Keefe v. Dulles*, 222 F.2d 390, 392

(D.C. Cir. 1955) (analyzing whether the respondents had constructive custody of a habeas

petitioner when the petitioner was detained by French authorities); *Abu Ali v. Ashcroft*, 350 F.

Supp. 2d 28, 47 (D.D.C. 2004) (explaining that the language of the habeas statute provides for

habeas jurisdiction when the custodian possesses constructive custody of the petitioner).

In the instant case, the respondents argue that the petitioner cannot succeed on the merits

of his underlying habeas petition because the court does not have jurisdiction over the entity that

officially serves as the petitioner's custodian, the MNF-I.  Resp'ts' Opp'n at 16.  The

respondents further assert that the "MNF-I operates with the consent of the sovereign

government of Iraq to maintain security and stability in Iraq, and receives its authority pursuant

---

[6]        As the D.C. Circuit has explained, a preliminary injunction is appropriate for preserving
the status quo in cases raising difficult issues.  *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841, 844 (D.C. Cir. 1977).

to United Nations Security Council resolutions." *Id.* at 13. The respondents rely primarily on *Hirota v. MacArthur*, a case in which the Supreme Court declined to exercise jurisdiction over habeas petitions filed by Japanese citizens seeking review of convictions of a military tribunal in Japan even though the military tribunal was set up by a United States military officer, General Douglas MacArthur. *Hirota v. MacArthur*, 338 U.S. 197, 198 (1948) (per curiam). The Court reasoned that the tribunal sentencing these petitioners was not a United States tribunal because General MacArthur was acting as the head of the Allied forces. *Id.*

Three important distinguishing factors lead the court to the conclusion that *Hirota* is inapplicable in the present situation. First, *Hirota* involved habeas petitions filed by residents and citizens of Japan. *Id.* at 198. Shawqi Omar is an American citizen, and Supreme Court case law after the *Hirota* decision indicates that citizens are entitled to the highest level of protection from detention at the hands of the executive. *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950) (describing an "ascending scale of rights" with "citizenship as the head of jurisdiction"). Indeed, Justice Douglas, in his concurring opinion in *Hirota*, expressed alarm at the potential implications of denying an American citizen access to the habeas writ simply because the citizen stood condemned by an multinational military tribunal.[7] *Hirota*, 338 U.S. at 201-202.

Second, the petitioner in this case presents evidence showing that he is in the constructive

---

[7]    With perhaps prescient insight, Justice Douglas wrote:

> Today Japanese war lords appeal to the Court for application of American standards of justice. Tomorrow or next year an American citizen may stand condemned in Germany or Japan by a military court or commission. If no United States court can inquire into the lawfulness of his detention, the military have acquired, contrary to our traditions . . . a new and alarming hold on us.

*Hirota v. MacArthur*, 338 U.S. 197, 201-202 (1949) (Douglas, J., concurring) (internal citations omitted).

custody of the respondents.  Specifically, the petitioner submits two e-mails from the State

Department to the petitioner's wife, stating that the petitioner is "under U.S. military care,

custody and control," and that the petitioner is "under control of Coalition Forces (U.S. and

MNF)."  Pet'r's Reply, Exs. 1 & 2.  These e-mails cast doubt on the respondents' claim that the

petitioner has been under MNF-I custody[8] since his original detention.  Resp'ts' Opp'n at 6.  In

short, whereas the *Hirota* decision indicates that the Japanese detainees were held by an entity

other than the United States, the petitioner here has presented strong evidence that he is in the

constructive custody of the United States military.[9]

Third, the *Hirota* case was decided prior to significant evolution of the Supreme Court's

habeas jurisprudence.  In the time between the *Hirota* decision and the Supreme Court's most

recent habeas decisions, the Supreme Court has expanded and clarified the application of the

"Great Writ" to better fulfill its ultimate purpose of allowing an individual to present "a simple

challenge to physical custody imposed by the Executive."  *Padilla*, 542 U.S. at 441 (discussing

the historical development of habeas jurisprudence).  For example, in 1953, the Court expanded

jurisdiction over habeas cases to include petitions brought by individuals convicted in military

tribunals who alleged that their court martials denied them of basic rights.  *Burns v. Wilson*, 346

U.S. 137 (1953); 95 A.L.R. Fed. 472 §2(a) (discussing the importance of *Burns v. Wilson*).  In

the concurring opinion, Justice Frankfurter explained that "[t]he right to invoke habeas corpus to

---

[8]    It is worth noting the well-established principle in the analogous criminal law context that constructive possession may happen through another person or by one or more persons at the same time. CRIMINAL JURY INSTRUCTIONS: DISTRICT OF COLUMBIA, Instruction No. 3.08 (4th ed. 2004); *see also United States v. Harrison*, 931 F.2d 65 (D.C. Cir. 1991), *cert. denied*, 502 U.S. 953 (1991).

[9]    Stated differently, *Hirota* analyzed the matter of custody in a different stage of the litigation.  Here, the question remains whether the coalition force that holds the petitioner is an entity controlled by the United States.  *Holiday Tours, Inc.*, 559 F.2d at 844 (explaining that a preliminary injunction is appropriate for preserving the status quo in cases raising difficult issues).

secure freedom is not to be confined by any a priori or technical notions of 'jurisdiction.'" *Id.* at

148 (Frankfurter, J., concurring). By 1973, the majority of the Supreme Court, embracing the

sentiments first expressed by Justice Frankfurter twenty years earlier, "rejected interpretations of

the habeas corpus statute that would suffocate the writ in stifling formalisms or hobble its

effectiveness with the manacles of arcane and scholastic procedural requirements," and

expanded the relief addressable by the writ to include restraints other than physical confinement.

*Hensley v. Mun. Court, San Jose Milpitas Judicial Dist., Santa Clara County*, 411 U.S. 345, 350

(1973).

The Supreme Court has recently further clarified the scope of the traditional habeas to

respond to new situations, illuminating this court's present path. *See, e.g., Rasul*, 542 U.S. at

483 (extending the reach of habeas to nonresident aliens detained in Guantanamo Bay, Cuba and

reasoning that "[a]s Lord Mansfield wrote in 1759, even if a territory was 'no part of the realm,'

there was 'no doubt' as to the court's power to issue writs of habeas corpus if the territory was

'under the subjection of the Crown.'" (citing *King v. Crowle*, 2 Burr. 834, 854-55, 97 Eng. Rep.

587, 598-99 (K.B.)). The Court's expansions and clarifications of habeas have served the

ultimate purpose of preserving the writ's status as the "stable bulwark of our liberties."[10] *Hamdi*

*v. Rumsfeld*, 542 U.S. 507, 557 (2004) (Scalia, J., dissenting) (quoting WILLIAM BLACKSTONE, 1

COMMENTARIES *153). *Hirota* is therefore distinguishable from the case at bar in a fashion

---

[10]    As the Supreme Court recognized when deciding whether a citizen's physical location
made a "determinative constitutional difference" for purposes of habeas:

> This creates a perverse incentive. Military authorities faced with the stark choice of
> submitting to the full-blown criminal process [in the United States] or releasing a suspected
> enemy combatant captured on the battlefield will simply keep citizen-detainees abroad.

*Hamdi v. Rumsfeld*, 542 U.S. 507, 524 (2004).

rendering it inapplicable to the present situation.[11]

The lack of precedent directly on point requires this court to examine the fundamental concepts underlying habeas jurisprudence. Courts analyzing whether a respondent has custody of a habeas petitioner "must avoid 'legalistic' and 'formalistic' distinctions and honor the 'breadth and flexibility' of the Great Writ." *Abu Ali*, 350 F. Supp. 2d at 46. To this end, "federal courts have long disregarded legalistic requirements in examining applications for the writ and judged the papers by the simple statutory test of whether facts are alleged that entitle the applicant to relief." *United States v. Morgan*, 346 U.S. 502, 506 n.3 (1954). And, as stated *supra*, "[t]he right to invoke habeas corpus to secure freedom is not to be confined by any a priori or technical notions of 'jurisdiction.'" *Burns*, 346 U.S. at 148 (Frankfurter, J., concurring). Thus, contrary to the respondents' argument that this court should avoid ruling on the issues presented in either the underlying habeas petition or the motion for injunctive relief because it is allegedly devoid of jurisdiction, Resp'ts' Opp'n at 3, the court's analysis must focus on whether

_____

[11]     In addition to *Hirota*, the respondents cite a few other cases for the well-established proposition that United States courts cannot review decisions taken by the tribunals of other sovereign nations. Resp'ts' Opp'n at 17 (citing *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972), *Keefe v. Dulles*, 222 F.2d 390 (D.C. Cir. 1954), *Duchow v. Elmore*, 1995 WL 425037 (E.D. La. July 19, 1995) (unpublished opinion)). Although the respondents do not explicitly state it, they are arguing that the MNF-I has the status of a sovereign nation. *Id.* In contrast to the cases cited by the respondents, the petitioner here has not been convicted by a foreign tribunal and is not contesting a decision taken by another sovereign nation. The petitioner here alleges that United State officials, through a multinational military force made up mostly of American troops, holds him in violation of American laws. Pet. ¶ 2. The petitioner, in other words, is not challenging a decision taken by another sovereign nation; he merely challenges the role that American officials, through a multinational force, have in his detention. Where a habeas petitioner challenges actions taken allegedly at the behest of the United States, the court engages in a constructive custody analysis. *See, e.g.*, *Abu-Ali*, 350 F. Supp. 2d, 28 47 (D.D.C. 2004) (stating that habeas jurisdiction exists where United States officials possess either actual or constructive custody of a petitioner) (citing *Keefe*, 222 F.2d at 392).

the petitioner has alleged any facts that entitle him to relief.[12]

The petitioner alleges that the respondents, through a multinational military force comprised largely of American troops and commanded by American officials, Pet'r's Reply at 5 (stating that 87.5 percent of the foreign forces in Iraq are from the United States), are holding him in violation of his due process, *see generally* Pet.  These facts alone allow the court to entertain the petitioner's habeas petition.  *Hirota*, 338 U.S. at 204 (Douglas, J., concurring) (explaining that the writ of habeas corpus runs not to an official of an international coalition, but to the American officials in such a coalition).  As Justice Douglas stated:

> If an American General holds a prisoner, our process can reach him wherever he is. To that extent at least the Constitution follows the flag. It is no defense for him to say that he acts for the Allied Powers. He is an American citizen who is performing functions for our government.  It is our Constitution which he supports and defends. If there is evasion or violation of its obligations, it is no defense that he acts for another nation. There is at present no group or confederation to which an official of this Nation owes a higher obligation than he owes to us.

*Id.*  Viewed in conjunction with the need to avoid "an exaggeratedly refined analysis of the merits at an early stage in the litigation," particularly where the requested injunctive relief seeks to maintain the status quo, *Holiday Tours*, 559 F.2d at 844, the possibility that formulaic concepts of habeas may deprive the court of jurisdiction at a later stage of the litigation is not enough for this court to deny the motion for a preliminary injunction.  With a view to ensuring that the petitioner does not become a victim of a lack of precedent and because the facts as alleged entitle the petitioner to relief, the court concludes that the jurisdictional issues in the

---

[12]      In situations where the court's jurisdiction is a contested issue, moreover, district courts routinely order jurisdictional discovery to better analyze their ability to hear a case.  *See, e.g., Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 580 (1999) (explaining that the district court dismissed a case after it permitted jurisdictional discovery).

present case do not pose a fatal obstacle at this stage of the litigation.

### b. Separation of Powers

The respondents argue that the court's consideration of the petitioner's underlying habeas case and the motion for injunctive relief violates fundamental principles of separation of powers. Resp'ts' Opp'n at 21. The respondents posit that the court's consideration of the petitioner's claims requires the court to "inject itself into an exclusive Executive function: the United States military's role in MNF-I, a multinational coalition force dispatched at the request of the Iraqi government pursuant to United Nations Security Council Resolution 1546 to assist Iraq with its wartime security and rebuilding efforts." *Id.* at 22. But doctrines such as act of state, separation of powers and political question, although important considerations, do not "extinguish[] the fundamental right of a citizen to challenge his detention colorably alleged to be at the behest of the executive." *Abu-Ali*, 350 F. Supp. 2d at 57 (denying the government's motion to dismiss a habeas petition filed by an American citizen who was detained by the Saudi government allegedly at the request of the United States). "The competing interests of the executive to manage foreign affairs and the judiciary to protect the due process rights of citizens has never been resolved wholly in the executive's favor." *Id.* at 62.

The court is mindful that this case presents complex questions regarding the Executive's power in enigmatic times, mindful of American citizens' due process rights and humbled by the gravity of the judiciary's role as the arbiter of the two. *Marbury v. Madison*, 5 U.S. 137, 180 (1803). The court's obligations, however, requires inquiry into the legality of American officials holding American citizens. *See Hirota*, 338 U.S. at 204. Therefore, the court concludes that the petitioners have satisfied their burden of persuasion on the first of the four preliminary injunction factors. That is, this case presents questions "going to the merits that are so serious,

substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Holiday Tours*, 559 F.2d at 844.

## (2) Irreparable Injury

The petitioner's original request for *ex parte* injunctive relief alleged that the United States military was set to present him to the CCCI for a hearing on February 3, 2006. The court, concerned that such a transfer would cause irreparable harm to the petitioner, either because it exposed the petitioner to the risk of torture or because it could moot the petitioner's pending habeas petition, granted the motion for an *ex parte* temporary restraining order. Order Granting *Ex Parte* TRO (Feb. 3, 2006). The respondents' opposition asserts, and the court has no reason to doubt, that the alleged February 3, 2006 hearing did not take place.[13] Resp'ts' Opp'n at 10.

The petitioner's supplemental briefing reiterates the general argument that he is likely to suffer irreparable injury if transferred to Iraqi custody. Pet'r's Mot. for Prelim. Inj. at 17. Specifically, the petitioner alleges that a transfer "would expose him to a substantial risk of torture, even death by Iraqi authorities," and that a transfer "would deprive him of his rights to due process." *Id.* at 17, 19. The respondents assert that the petitioner is not in danger of imminent torture because the "MNF-I retains physical custody of [the petitioner] throughout the CCCI proceedings." Resp'ts' Opp'n at 33. That is, the petitioner is not subject to transfer from the MNF-I to the Iraqi authorities unless the CCCI determines that the petitioner's case should be referred to a trial, and the petitioner is subsequently convicted at the trial. *Id.*

Without assessing the statistical probability that the petitioner may be tortured in the near future, the respondents' assertions have not allayed the court's original concern that any physical

---

[13]    Indeed, the respondents state that no hearing was scheduled for February 3, 2006. Resp'ts' Opp'n at 9 n.5.

transfer of the petitioner may prematurely moot the case or undo this court's jurisdiction. *See* 28

U.S.C. § 1651. Divesting the court of jurisdiction, either as a matter of law or *de facto*, would

abuse the process now put in place for the purpose of adjudicating matters on their merits. *See*

*Rasul*, 542 U.S. at 465; *see also Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936) (observing that

courts "must guard against depriving the processes of justice of their suppleness of adaptation to

varying conditions"). Accepting the respondents' contention that the petitioner's appearance

before the CCCI does not constitute an immediate transfer to the Iraqi authorities does little to

ease the court's apprehension of irreparable injury. Specifically, the respondents assert that

much time may pass before the petitioner's initial appearance at the CCCI and his ultimate

conviction and corresponding transfer in that same forum. Resp'ts' Opp'n at 14 (stating that the

decision to refer the petitioner's case to the CCCI will not imminently result in a transfer and

explaining that the petitioner "will be transferred to the physical custody of the Iraqi authorities

only if he is convicted after trial (and [the petitioner] will proceed to trial only if the

investigative judge believes his case merits a trial)"). The respondents, however, do not address

the possibility that the petitioner may be presented to the CCCI and in that same day, be tried,

convicted and transferred to the CCCI's jurisdiction and beyond the jurisdiction of this court.

The court's own unfamiliarity with the functioning of the CCCI increases, rather than decreases,

its concern about the risk of injury to the petitioner. *Avramidis v. Arco Petroleum Prods. Co.*,

748 F.2d 12, 15 n.8 (1st Cir. 1986) (affirming a district court's decision to issue a preliminary

injunction when the district court based its decision on a lack of information).

### (3) Harm to the Respondents & Public Interest Considerations

Although the direct harm to the respondents in this case is difficult to ascertain, the court

does not take lightly the harm that may result from a possible encroachment into executive

14

authority.  Balancing executive and judicial authority is a "delicate exercise."  *Baker v. Carr*, 369 U.S. 186, 211 (1962) (stating that "deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation").  The respondents argue that for the court to exercise jurisdiction would be to interfere with the workings of MNF-I as well as the Iraqi government.  Resp'ts' Opp'n at 20-21.  According to the respondents, federal courts must "avoid inserting themselves in the middle of pending foreign criminal proceedings."  *Id.* at 21.  Indeed, "federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy."  *Hwang Geum Joo v. Japan*, 413 F.3d 45, 49 (D.C. Cir. 2005) (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 (2004)); *see also Hamdi*, 542 U.S. at 531 (explaining that "[w]ithout doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them"); *see also INS v. Chadha*, 462 U.S. 919, 960 (1983) (Powell, J., concurring) (noting that "[t]he Framers perceived that '[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny'") (citing THE FEDERALIST NO. 47, at 324  (J. Madison) (J. Cooke ed., 1961)).

In balancing the hardships to the parties, however, the court must conclude that the threat of tangible harm to the petitioner resulting from the court's failure to act outweighs any potential harm to the Executive's exercise of its war powers.  The court, moreover, notes that it is in the public's interest to have a judiciary that does not shirk its obligations, *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986) (explaining that "one of the Judiciary's characteristic

15

roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones"), particularly where the Great Writ is concerned, *Hamdi*, 542 U.S. at 536 (reasoning that the "Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining this delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions").

## IV.  CONCLUSION

For the foregoing reasons, the court grants the petitioner's motion for a preliminary injunction.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 13th day of February, 2006.

RICARDO M. URBINA
United States District Judge