**PRIVACY ACT STATEMENT**

| | |
|---|---|
| AUTHORITY: | Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 (SSN). |
| PRINCIPAL PURPOSE: | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE (YYYYMMDD) | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| ARMY G2 PENTAGON, WASHINGTON DC | 2004/05/18 | 12:30 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| [redacted] | [redacted] | SGT |

**8. ORGANIZATION OR ADDRESS**
B/CO 470TH MILITARY INTELLIGENCE GROUP, CAMP BULLIS, TX 78254

9. [redacted], WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

I arrived at Abu Ghraib as an Individual Augmentee from the 470th MI Group on or about 16 October 2003. I was assigned to the Detainee Assessment Board (DAB). My DAB Supervisor was [redacted]. When I first arrived, we didn't receive any training for working in the DAB. We received the IROEs and I believe I signed them. The IROEs I would say were only vaguely understood due to the speed at which operations had to be conducted. Since the focus of the initial groups was on maintaining a steady stream of intelligence reports answering PIR's, methodology took second stage to volume of output. The IROE's were clarified three months later when we received updated IROEs which we signed again. We were shown the Geneva Conventions and told to adhere to them. They were on the wall along with the IROEs and other memorandums from various commanders within theater for the perusal of anyone who wished to review them. There was some controversy in relation to what the school taught and the environment we were in. The school is an environment where you have some overwatch and where the ambience wherein interrogations are being conducted in a safe place with no additional stresses involved, but at Abu Ghraib, we were so busy there was no oversight on most of the interrogations being conducted as everyone was busy trying to hold up their part of the process. Most individuals arrived one day and were conducting operations the following day. Additionally, because of the additional stresses and due to the detainee's cultural and religious upbringing, many of the things taught at the school house were nearly useless or even irrelevant, which is why experienced or flexible interrogators were so absolutely necessary. Many of the interrogators should not have been conducting interrogations on their own. Most were young, inexperienced, and reservists who did not have the sufficient training nor the experience needed to achieve the necessary mindset of an interrogator in a combat zone. They did not know what to do so they reverted to screaming and throwing things, in other words, harsh approaches. After they didn't get what they wanted, they could send the detainee to isolation for thirty days or more as long as they wrote the right memo. The focus was on intelligence, and the fast tempo dictated that oftentimes the individual interrogator or direct line supervisor had to be trusted to make the right judgment, but unfortunately not everyone was equipped to make the right decisions. The memos were being approved by COL PAPPAS or whatever individual had the authority at the time. No one was checking to ensure the recommendations were sound with any sort of regularity. At the beginning even a memo was not required as far as I knew but as I was not there during the first few weeks of the reorganization of Abu Ghraib into an interrogation facility, I cannot speak with any certainty. We were standing up the JIDC, being mortared daily, and the gate guards were being attacked. The DAB was not part of the Interrogation Control Element (ICE) and there was no SOP in place on how to run one. We began developing one based on the GTMO concept, but the environment was different than GTMO. We were in a combat environment and the numbers of detainees requiring processing were higher so we had to make a lot of changes to the SOP. We were responsible for debriefing all detainees interrogated by the ICE. When a detainee arrived, he was screened and was either identified as being of intelligence value or not. Those with intelligence value were placed in CAMP VIGILANT. Eventually, CAMP VIGILANT became overcrowded some detainees having intelligence value were sent to one of the GANCI camps. A lot would go into isolation to prevent them from corruption of intelligence. I would say that the DAB identified about 85% to 90% of detainees were of either no intelligence value or were of value but innocent and therefore should be not have remained in captivity. We debriefed all the detainees considered to having some intelligence value to ensure intelligence was not getting lost and determined if detainees required to be held longer or recommend release of detainee. At the beginning, the initial group at Abu Ghraib became overwhelmed with the number of detainee being delivered by lower echelon units. The prison went from 200 one day to thousands during the following days. We did not have enough personnel to conduct the screenings and interrogations and determine the value of each detainee on a timely manner. When a detainee was able to answer a Priority Intelligence Requirement (PIR), he would get interrogated numerous times and therefore, others would go without being interrogated for months. The DAB would identify those who had not been interrogated and question the JIDC why it hadn't been done. An interrogation would then be conducted but this didn't always occur because of the shortage of interrogators and due to their focus on detainees of intelligence value. This of course changed for the better after the JIDC was more established and more direct oversight began to be conducted by higher echelon commanders. We would then get the detainee once the interrogator finished with the detainee. We would conduct a thorough debriefing of the detainee. The

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF ___ PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE BE INDICATED.

DA FORM 2823, DEC 1998      DA FORM 2823, JUL 72, IS OBSOLETE      USAPA V1.00

| STATEMENT OF ▮▮▮ | TAKEN AT Army G2, Pentagon | DATED 2005/05/18 |
|---|---|---|

**9. STATEMENT** *(Continued)*

In November, we also began to ask all detainees we debriefed if they had ever been mistreated while in the custody of the U.S. Several individuals stated they had. One general stated that while at Abu Ghraib, some drunk MPs had gathered the him and five other generals from the General Population and taken them in to the Hard Site. They were tied up, blind folded and placed in a circle and were punched by the MPs. After the MPs were finished beating them, they were placed back into the general population. I wrote this on my DAB report and reported it to my ▮▮▮ 66th MI. She told ▮▮▮ and it was reported to a warrant officer (do not know his name. He is part of the unit who is there now). He received a copy of the report and thanked us for reporting it. Another detainee stated he was stripped naked, made to stand on a box with his arms spread out and bag over his head while he was hit on his legs by the MPs. There were also two other instances where detainees reported being abused before they arrived to Abu Ghraib. One reported being electrocuted by an Egyptian interpreter who was working for a civilian agency. This had occurred four to five months prior to us speaking to him. Another detainee stated the capturing MPs threw him to the ground and pour dirt all over him. He said he was diabetic and was trying to tell the MPs and he went into diabetic shock. More prevalent than any abuse while in U.S. Custody were the reports that the detainee's had been abused by the Iraqi police and the BADR Corp. I never witnessed any detainee abuse except when I saw a naked detainee walking in the Hard Site. But that is all I saw. I was pretty far away and could not tell who it was and do not know the circumstances. I do know that when criminals were placed in isolation they were often stripped. I was in the hard site at that time picking up a detainee to debrief. IN reference to humiliation, I know that some interrogators would insult the detainee's religion and family. They did not physically abuse them, but humiliated them with words. The use of words was kind of questionable. We didn't know how far they could go with words. In reference to dogs, One of my friends, I do not remember who, said someone used the dog for an interrogation. That is all I know about dogs. We did not know what the MPs could do with the dogs or maybe the MPs did not know what we could do with the dogs, some things appeared to be in gray areas and often the individual interrogator or MP may have thought they had to make the decision themselves. In reference to OGA detainees, all I know was that some were not processed and we could not talk to them. They (OGA) came and went as they pleased for the most part though some coordination was required. The operations section of the JIDC would know more as they were the POC for these agencies. I never saw or knew of any photos or videos of detainees until after the CID investigation began. ▮▮▮ a fellow DAB member, stated that ▮▮▮ CACI employee pushed a detainee against the wall once. This was reported in the written report and reported up the chain. ▮▮▮ spoke to ▮▮▮ and told him that was not acceptable. We told ▮▮▮ spoke to ▮▮▮ then became my partner. I was not pleased with his work. He made comments which were unnecessary. I did not allow the interpreter to translate the comments. He would insult their religion and would state that this was the time for them to show their loyalty to the U.S. I reported to my supervisor that I did not want to work with ▮▮▮ He left a few days later to go work as an escort. I wrote about the incidents on a memorandum that I believe was submitted by my supervisors to ▮▮▮ I believe ▮▮▮ the CACI supervisor on the ground in Abu Ghraib, was very leery about doing anything to his guys. Another incident I was made aware of (I believe it may have been ▮▮▮ who told me but cannot say with any degree of certainty) was of a female linguist or interrogator (If linguist I believe it to be the female on the photo shown in photo #11 on file named ▮▮▮ who was asked to humiliate male detainees by making comments as to their manhood by talking about the size of their genitals. My personal opinion is that of all the female linguists, she was the only one that would have agreed to something of that nature. I believe I heard this right before the CID investigation, but cannot say for sure. She was a bit more open than the other female linguists. I personally know of one female linguist and a male linguist that quit because they did not agree with the way interrogators spoke to detainees. My assumption on the CACI personnel is that a lot of them were being hired on the basis of their experience in law enforcement and other such areas but that no true determination of their abilities as interrogators/screeners, etc. was done by the civilian company that hired them. Most of them were not properly trained on questioning and interrogation methodology but due to the fact that a lot of them were as much as twice as old as the interrogators leading Tiger Teams, they were not willing to listen. The focus on numbers (i.e. output) was so great that non-qualified individuals, both military and civilian, were allowed to have positions that gave them what seemed at times full powers over another persons life, namely detainees. Because these individuals (U.S. Personnel) were not screened or trained properly and not properly supervised, detainee's suffered incarceration and varied other discomforts, from mild to major, which were completely unnecessary in my estimation. Various reports of interrogators, linguists, and civilians treading the gray line between harsh interrogation and violation of the Geneva Conventions/IROE, but as far as was apparent no particular importance was placed upon them until the advent of the CID investigation. Some of the civilians thought that they were exempted from the rules of conduct which governed the soldiers and some of the interrogators seemed to feel the same. This, I believe, led to some of the misconduct that occurred, since the civilians didn't fear negative action and the soldiers could honestly say they were not personally involved in the actual misconduct. These statements are conjecture based upon my personal observations and conversations with other individuals and do not reflect any but my own opinions. I also think that U.S. personnel, especially civilian contractors, allowed their personal biases to color their reports, leading to detainee's being placed in isolation and being incarcerated for a longer period of time though no proof of wrongdoing was apparent. Often enough, the conclusion at the end of a report which determined a detainee's future disposition (release/further incarceration), was more a matter of personal opinion than actual analysis of information given. People were afraid to take personal responsibility of recommending release of detainee's, even when obviously innocent, and often this would lead to condemning statements such as "the detainee told the same story seven times but is lying because he should know such and such information and was therefore uncooperative. Recommend detainee be held in U.S. custody for the duration of the conflict." ▮▮▮

| INITIALS OF PERSON MAKING STATEMENT ▮▮▮ | PAGE 2 OF 4 PAGES |
|---|---|

Statements such as these were insufficient of themselves to commit detainee's to longer incarceration but couple that with supervisors fear of releasing anybody, and what came out was detainee's being held for months on nothing but an interrogators personal opinion for which no substantiate information was given. The biggest issues that lead to the inefficiency in the collection process, I believe arose from the actions of lower echelon interrogation facilities and the capturing units themselves. The capturing units themselves were often not accompanied by appropriately trained individuals, namely members of THT or interrogators, able to make quick determinations of the value of a detainee and the appropriateness of detaining an innocent individual even if he did have information of intelligence value. Since the detainees were not properly screened on the spot and the capturing units were often not even qualified to conduct those types of operations, anyone who was in the area or looked out of place was detained regardless of culpability. When these individuals were taken to a brigade or division level facility, they were screened by civilians or military personnel who were not sufficiently or properly trained, or even sufficiently staffed, to render intelligent judgments as to the detainee's suitability to the information exploitation process. This resulted in the glutting of Abu Ghraib, a facility, which should have been housing only individuals necessary to the interrogation process, and not innocent individuals who should have never been taken from their homes, much less gone through two or three different interrogations facilities. Reports from lower echelon facilities were often not available and even when available, spotty at best. This led to a lot of duplication of effort at Abu Ghraib, which in turn meant an unnecessary delay in the detainee exploitation process. This was also true however of interrogators in Abu Ghraib, as stated above, who were also often not qualified or experienced enough for the job they were doing. The failure to ID those that could help us out in the communities instead of holding them in detention is a major cause, as far as I'm concerned, for the political instability/anti-U.S. sentiment existent in Iraq at the moment. I personal interviewed several individuals who were influential in their communities, military, religions, etc. but who had done nothing wrong or had previously voluntarily cooperated with U.S. agencies but were detained anyways. Some had letters from U.S. officials detailing the extent of ▓▓▓▓

Initals of Person making Statement        Page 3 of page 4

9. STATEMENT (Continued)

their participation and a request to not arrest these particular individuals. These papers were ignored and the detainee's held for months without any particular care paid to these documents. These detainees's, who had the potential to be great friends to the U.S./Coalition efforts in Iraq, would have very little reason to stay their hand, and every reason to become implacable enemies of the U.S. once released. The detainee assessment branch functioned as a checks and balances for the JIDC interrogators who were constantly being pressured to produce and thus had no real opportunity to check their work or pay attention to the detainee's themselves. Individuals within the ICE attempted to do away with the DAB, stating that the interrogators themselves were qualified to make final decisions as to a detainee's final disposition, but as evinced in the statements I made above and in the actual reports present in Abu Ghraib, oversight from a section not directly involved in the Interrogation Collection Element was necessary to avoid not only missing information of possible intelligence value, but also to prevent the needless incarceration of innocent people who may have never even talked to an interrogator before their fate was decided upon. A comprehensive report was necessary to ensure that the proper disposition of detainee's was being enacted and that interrogators did not recommend further incarceration of detainee's who had done no wrong but had been unlucky enough to be present at the scene of a raid. Beyond that, I believe a system of checks and balances was sadly lacking at the lower echelon interrogation facilities, and someone should have been given the task of spot-checking every facility occasionally to ensure the proper implementation of the IROES as well as adherence to the Geneva Conventions. We received a training class by a linguist who taught us what type of words to use to humiliate the detainees. His name was ███████████ was also requested by those interrogators who used more aggressive techniques. Although this does not necessarily entail any wrongdoing on his part or on the part of those interrogators who used him, the fact that the class occurred at all was indicative I believe of the notion that it was OK to humiliate detainees, to curse their mothers and daughters, to deride their religious practices, all unnecessary to a truly professional interrogator. I was shown some photos and was able to identify some of the military intelligence personnel. Photo #6 and #7 in file named Mark 5 show ███████████ observing some detainees on the floor. Photo #23 show an analyst in PT uniform and ███████████ is leaning against the wall to the left. Photo #11 in file named ███████████ shows a female interpreter (name unknown) and a CACI interrogator who I believe was a member of a special interrogation team. Though this is probably of little relevancy, I would also like to comment that I was personally present at the general population camps in Abu Ghuraib at one of the riots that occurred in November and which resulted in the deaths of some detainee's(number unknown) and the injury of several. The riots were a constant threat to the MP's during that time period due to the Muslim religious holiday of Ramadan. Many of the detainee's, especially the innocent ones with families, and who had been there a long time, felt like it was extremely unfair to them and were easy prey to the leaders amongst them who called for riots and such forms of violent expression.
Q. Do you have anything else to add to this statement? ███
A. No ███
//////////////////////////////////////End of Statement//////////////////////////////////////

*Nothing Follows JDG*

AFFIDAVIT

███████████, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE 4. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

(Signature of Person Making Statement)

WITNESSES:

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 18th day of MAY, 2004 at ARMY PENTAGON, WASHINGTON DC

ORGANIZATION OR ADDRESS

(Signature of Person Administering Oath)

(Typed Name of Person Administering Oath)

UCMJ, ARTICLE 136

ORGANIZATION OR ADDRESS

(Authority To Administer Oaths)

INITIALS OF PERSON MAKING STATEMENT ███

PAGE 4 OF 4 PAGES

PAGE 3, DA FORM 2823, DEC 1998

USAPA V1.00

| AGENT'S INVESTIGATIVE REPORT<br>CID Regulation 195-1 | ROI NUMBER 0085-04-CID519- |
|---|---|
| | PAGE 1 OF 2 PAGES |

**DETAILS**

BASIS FOR INVESTIGATION: About 1000, 19 Jun 04, this office was notified by CPT [redacted], Magistrate/Command Advocate, 160th MP Battalion, Camp Bucca, Iraq, of an Aggravated Assault, Forcible Sodomy and Cruelty and Maltreatment of a detainee.

Agent's Comment: Review of emails and statements this office received revealed the following: two unknown individuals detained Mr. [redacted], Internment Facility (IF), Camp Bucca, Iraq, and began to interrogate him about his involvement with attacks on Coalition Forces in Iraq. During the interrogation Mr. [redacted] was beaten with wooden sticks, punched, electrocuted, forcibly sodomized, and made to drink urine.

About 1000, 19 Jun 04, SA [redacted] this office interviewed COL [redacted], Physician, [redacted], 160th MP Battalion, Camp Bucca, Iraq, who related that during his examination of Mr. [redacted] he observed the following; Mr. [redacted] did have a scar on his right wrist which was indicative of him being pulled by his handcuffs or being hung by handcuffs. Further COL [redacted] stated that Mr. [redacted] was bleeding from his anus and this injury could of occurred when Mr. [redacted] was forcibly sodomized. (See Sworn Statement for details)

Agent' Comment: COL [redacted] stated that they were unable to conduct any x-rays of Mr. [redacted] person due to the equipment and personnel located at Camp Bucca, Iraq. COL [redacted] further stated the exam showed no signs that Mr. [redacted] had any broken bones at the time or the exam.

About 1410, 19 Jun 04, SA [redacted] interviewed SSG [redacted], 160th MP Battalion, Camp Bucca, Iraq, who stated he interviewed Mr. [redacted] on 16 Jun 04, and prepared an investigator's statement to document the interview and the facts which Mr. [redacted] stated occurred after he was captured in Baghdad, Iraq. (See Investigator's Statement for details)

About 1505, 19 Jun 04, SA [redacted] interviewed Mr. [redacted] who stated that he was captured on 05 May 04, by two males wearing green t-shirts, cargo pants and tan vest, who stated they worked for the "Criminal Investigations". The two males then placed a hood over his head and transported him to their headquarters in Baghdad, Iraq, where he was interrogated. During interrogation Mr. [redacted] stated he was punched numerous times and struck with large wooden sticks all over his body, forcibly sodomized and made to drink urine. Mr. [redacted] stated this abuse occurred over a period of 4 days and he was transported to Abu Grihab, Iraq/ Mr. [redacted] stated a week later he was transported to Camp Bucca, Iraq where he is currently located. (See Sworn Statement for details)

Agent's Comment: During the interview of Mr. [redacted] he stated that he was beaten badly and when SA [redacted] introduced himself Mr. to [redacted] was very stiff and moved like he was in pain.

| TYPED AGENT'S NAME AND SEQUENCE NUMBER<br>SA [redacted] | ORGANIZATION<br>78th Military Police Detachment (CID), (FWD)<br>Camp Arifjan, Kuwait APO AE 09366 |
|---|---|
| SIGNATURE [redacted] | DATE 19 Jan 04 | EXHIBIT |

CID FORM 94
1 FEB 77

FOR OFFICIAL USE ONLY

DODDOACID-005096

5

| AGENT'S INVESTIGATIVE REPORT<br>CID Regulation 195-1 | ROI NUMBER 0085-04-CID519- |
|---|---|
| | PAGE 2 OF 2 PAGES |

**DETAILS**

About 1530, 19 Jun 04, SA ████ [7C1.b6d] coordinated with COL ████ [7C3.b63] who provided the patient screening record in reference to Mr. ████ [7C1.b6e] (See records for details)

About 1520, 19 Jun 04, SA ████ [7C1.b6e] photographed Mr. ████ [7C1.b64, /7F 7C.b64] chest, back, legs and face to document any bruises that he may still have on his person. Visual exam of Mr. ████ person showed no bruises or scars except for the small scar on his wrist. (See compact disc for details)

STATUS: This investigation is being terminated within this office and no further investigative activity is anticipated. ///Last Entry///

TYPED AGENT'S NAME AND SEQUENCE NUMBER [7C1.b6d / b2]
SA ████

SIGNATURE ████ [7C1.b6l]

ORGANIZATION
78th Military Police Detachment (CID), (FWD)
Camp Arifjan, Kuwait APO AE 09366

DATE: 19 Jun 04

EXHIBIT:

CID FORM 94
1 FEB 77

FOR OFFICIAL USE ONLY

DODDOACID-005097

# SWORN STATEMENT

For use of this form, see AR 190-45; the proponent agency is Office of The Deputy Chief of Staff for Personnel.

| LOCATION | DATE | TIME | FILE NUMBER |
|---|---|---|---|
| BCCF b7C-4 b6-4 | 7 Jul 04 | 0938 | 0099-04-C10789 |

| LAST NAME, FIRST NAME, MIDDLE NAME | SOCIAL SECURITY NUMBER | GRADE/STATUS |
|---|---|---|
| ████████ | IVORS ███ | Detainee |

| ORGANIZATION OR ADDRESS |
|---|
| BCCF   b7C-4 b6-4   b7C-4 b6-4 |

I, ████████, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

Foreign Language

DODDOACID-004952

| EXHIBIT | INITIALS OF PERSON MAKING STATEMENT ███ | PAGE 1 OF 2 PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF ___ TAKEN AT ___ DATED ___ CONTINUED." THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT AND BE INITIALED AS "PAGE ___ OF ___ PAGES." WHEN ADDITIONAL PAGES ARE UTILIZED, THE BACK OF PAGE 1 WILL BE LINED OUT, AND THE STATEMENT WILL BE CONCLUDED ON THE REVERSE SIDE OF ANOTHER COPY OF THIS FORM.

DA FORM 2823, 1 JUL 72

FOR OFFICIAL USE ONLY
Law Enforcement Sensitive

FILE NUMBER: 0099-04-CID789

STATEMENT OF [redacted] TAKEN AT BCCF DATED 7 Jul 04 CONTINUED:

**STATEMENT (Continued)**

[page crossed out diagonally]

**AFFIDAVIT**

I, [redacted], HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1 AND ENDS ON PAGE 2. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

(Signature of Person Making Statement)

WITNESSES:

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 7 day of July, 20 04 at BCCF

ORGANIZATION OR ADDRESS

(Signature of Person Administering Oath)

SA [redacted]
(Typed Name of Person Administering Oath)

ORGANIZATION OR ADDRESS

Art 136 (b)(4) UCMJ
(Authority To Administer Oaths)

INITIALS OF PERSON MAKING STATEMENT

PAGE 2 OF 2 PAGES

DODDOACID-004953

FOR OFFICIAL USE ONLY
Law Enforcement Sensitive

EXHIBIT 9

**TRANSLATION OF STATEMENT PROVIDED BY DETAINEE** ███
#█████ 07 Jul 04/0938

We were 18 persons in Camp Bucca, and there was a fight between the members of the group, and the Americans hit them with tear gases in order to disengage them, and they ordered us to sit down, and I sat down, and there was a person who was talking to me but I did not talk to him, then an American soldier who had an electric gun in his hand, came and slapped me on my face, and I said to him, "why do you hit me?". Then he hit me with the electric gun twice in my arm with two wire needles, and they took me to the doctor who picked up the two wire needles from my arm.
Q: Did they hit you with open hand or with the fist?
A: Open hand.
Q: How was the shape of the gun they hit you with?
A: Black and has a yellow head and it was almost seven inches.
Q: Can you describe to us the American soldier who slapped you and hit you with the electric gun?
A: He was tan and tall, and has a short hair and black eyes, and he was almost 25 years old.
Q: Do you think that the soldier who hit you has his reasons to do that?
A: He has no reasons to hit me.
Q: Why did you tell the interrogators in CID that you have not been assaulted?
A: I told them the same story I told you.
Q: Was there any witness saw what happened?
A: Yes, there was a person called ███████ from ███████
Q: Are you sure that the fight between the detainees was over when the American came and slapped you?
A: The fight was over since three to four minutes.
Q: What was the name of the American soldier who slapped you?
A: His name seems to be ███████
Q: Do you wish to add anything to this statement?
A: No. ///End of Statement///

TRANSLATED BY: ███████  
Mr. ███████  
Translator, Category II  
Titan Corporation

VERIFIED BY: ███████  
Mr. ███████  
Translator, Category II  
Titan Corporation

Assigned to:
Prisoner Interrogation Team (PIT)(CID)
75th Military Police (MP) Det. (CID)(FWD)(-)
Baghdad Central Confinement Facility (BCCF)
Abu Ghraib, Iraq APO AE 09342

DODDOACID-004954

For Official Use Only - Law Enforcement Use Only     Exhibit 10

# AGENT'S INVESTIGATION REPORT
CID Regulation 195-1

ROI NUMBER: 0099-04-CID789

PAGE 1 OF 2 PAGES

**DETAILS**

**BASIS FOR INVESTIGATION:** On 11 Jul 04, this office received a supplemental Request for Assistance (RFA) from the 78th Military Police (MP) Det. (BN), Camp Arifjan, Iraq, to re-interview Detainee ███████, National Detainee Reporting System (NDRS) # ███████, in reference to the incident in which SFC ███████████████████, 160th MP BN, Camp Bucca, Iraq, was accused of slapping ███████ in the head, while detained at Camp Bucca, Iraq.

**AGENT'S COMMENT:** This office received this request after being provided additional documentation.

About 0820, 12 Jul 04, SA ███████, with the assistance of Linguist ███████, this office, re-interviewed ███████ stated that on the day of the alleged incident, a black, male soldier, called "███████ slapped him in the face and tazzed him in the right arm, as stated in his previous statement. ███████ clarified that a fight between several detainees had just occurred. After the fight, ███████ was squatting on the ground with his elbows on his knees with his back to another detainee, who was sitting on the ground with his hands tied behind his back. He explained that he and the other detainee were talking, when ███████ walked up from behind him and slapped him in the right cheek with the back of "███████ hand, but not hard. ███████ then started to get up because it made him angry. When he started to stand up, ███████ jumped back and shot him with the tazer from about eight feet. When asked if he thought the slapped in the face was abuse or to get him to quit talking, he stated that it was not abuse, but it was to stop him from talking. ███████ stated that no one yelled, "What are you looking at?" at him. ███████ stated he did not see any other detainee get slapped by a white, male soldier.

**AGENT'S COMMENT:** ███████ could not read or write Arabic. ███████ demonstrated on this Agent how the incident occurred, to include slapping this Agent with same amount of force. The amount of force was consistent with that of getting someone's attention by slapping him or her on the shoulder.

**AGENT'S COMMENT:** ███████ is very temperamental. During this interview, he became very belligerent at this Agent and Mr. ███████.

About 0855, 12 Jul 04, SA ███████ exposed Photographs of ███████ alleged tazer marks using a Vivitar Digital Camera. (See Photographs)

**AGENT'S COMMENT:** This Agent has been tazzed before as part of Police Training and determined the marks depicted in the photographs were consistent with a tazer.

About 0910, 12 Jul 04, SA ███████ coordinated with SGT ███████, 391st Military Police (MP) Battalion (BN), Detainee Aid Station (DAS), BCCF, AGI, who estimated the scar above ███████ right elbow was approximately four weeks old.

DODDOACID-004955

| TYPE AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION |
|---|---|
| SA ███████ | PRISONER INTERROGATION TEAM (PIT)(CID)<br>Baghdad Central Confinement Facility, Abu Ghraib 09342 |

| SIGNATURE | DATE | EXHIBIT |
|---|---|---|
| ███████ | 12 Jul 04 | |

CID FORM 94    FOR OFFICIAL USE ONLY-LAW ENFORCEMENT SENSITIVE

# AGENT'S INVESTIGATION REPORT
CID Regulation 195-1

ROI NUMBER
**0099-04-CID789**

PAGE 2 OF 2 PAGES

**DETAILS**

AGENT'S COMMENT: No medical doctor was available. SGT [redacted b7c-3, b6-3] evaluates detainees on a daily basis as part of her duty.

About 1300, 12 Jul 04, SA [redacted b7c-1, b6-1] coordinated with SGT [redacted b7c-3, b6-3], 301st MP Co, BCCF, AGI, Certified Tazer Instructor, who stated the marks in the photographs could be consistent with a tazer, but was not sure. He further stated that to employ a tazer, it must be used from a distance of 7-15 feet.

Status: Your RFA has been completed in the attached enclosures. No further investigative activity was anticipated by this office.
//////////////////////////////////////////////////LAST ENTRY///////////////////////////////////////////////////////

DODDOACID-004956

| TYPE AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION |
|---|---|
| SA [redacted b7c-1, b6-1, b2] | PRISONER INTERROGATION TEAM (PIT)(CID)<br>Baghdad Central Confinement Facility, Abu Ghraib 09342 |

| SIGNATURE | DATE | EXHIBIT |
|---|---|---|
| [redacted] | 12 Jul 04 | 32 |

CID FORM 94    FOR OFFICIAL USE ONLY-LAW ENFORCEMENT SENSITIVE

Encl

# AGENT'S INVESTIGATION REPORT
CID Regulation 195-1

ROI NUMBER: 0099-04-CID789

PAGE 1 OF 1 PAGES

**DETAILS**

**BASIS FOR INVESTIGATION:** On 13 Jul 04, this office received a supplemental Request for Assistance (RFA) from the 78th Military Police (MP) Det. (BN), Camp Arifjan, Iraq, to re-interview MSG ███████, 418th MP Det, 391st MP BN, Baghdad Central Confinement Facility (BCCF), AGI, in reference to the incident in which SFC ███████, 160th MP BN, Camp Bucca, Iraq, was accused of slapping ███ in the head, while detained at Camp Bucca, Iraq.

**AGENT'S COMMENT:** This office received this request after determining that MSG ███ had been transferred to BCCF.

About 1440, 14 Jul 04, SA ███ re-interviewed MSG ███ who confirmed the facts given in his previous statement. He also provided a sketch of the area where the incident was alleged to have happened. In addition, he viewed a photograph of ███ could not positively identify ███ as the detainee he saw get slapped, although he was fairly sure. (See Sworn Statement, Sketch, and Agent Created Sketch)

**AGENT'S COMMENT:** This Agent created the additional sketch to clarify details in the sketch drawn by MSG ███.

Status: Your RFA has been completed in the attached enclosures. No further investigative activity was anticipated by this office.

////////////////////////////////////////////////LAST ENTRY////////////////////////////////////////////////

DODDOACID-004957

TYPE AGENT'S NAME AND SEQUENCE NUMBER
SA ███

ORGANIZATION
PRISONER INTERROGATION TEAM (PIT)(CID)
Baghdad Central Confinement Facility, Abu Ghraib 09342

SIGNATURE: ███

DATE: 14 Jul 04

EXHIBIT: 12-33

CID FORM 94

# AGENT'S INVESTIGATION REPORT
*CID Regulation 195-1*

**ROI NUMBER:** 0099-04-CID789

**PAGE 1 OF 1 PAGES**

## DETAILS

**BASIS FOR INVESTIGATION:** On 6 Jul 04, this office received a Request for Assistance (RFA) from the Operations Officer, 22nd Military Police (MP) Battalion (BN), Camp Victory, Baghdad, Iraq, to re-interview Detainee ▬▬▬▬, National Detainee Reporting System (NDRS) # ▬▬▬▬ in reference to the incident in which SFC ▬▬▬▬, 160th MP BN, Camp Bucca, Iraq, was accused of slapping ▬▬▬▬ in the head, while detained at Camp Bucca, Iraq.

**AGENT'S COMMENT:** No medical records exist for ▬▬▬▬ at Baghdad Central Confinement Facility (BCCF).

About 0938, 7 Jul 04, SA ▬▬▬▬ with the assistance of Linguist ▬▬▬▬, this office, interviewed ▬▬▬▬ who provided a verbal sworn statement, which was recorded in Arabic by Linguist ▬▬▬▬ and verified by ▬▬▬▬ describing being slapped in the right cheek and shocked with a "tazer" on his right arm by a dark skinned, male soldier, called "▬▬▬▬". (See Sworn Statement)

**Status:** Your RFA has been completed in the attached enclosures. No further investigative activity was anticipated by this office.
//////////////////////////////////////////////LAST ENTRY//////////////////////////////////////////////

DODDOACID-004951

| TYPE AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION |
|---|---|
| SA ▬▬▬▬ | PRISONER INTERROGATION TEAM (PIT)(CID) Baghdad Central Confinement Facility, Abu Ghraib 09342 |
| SIGNATURE ▬▬▬▬ | DATE 7 Jul 04 | EXHIBIT 8 |

FORM 94　　FOR OFFICIAL USE ONLY-LAW ENFORCEMENT SENSITIVE　　27