UNCLASS
1 Apr 05 (Amended 9 Jun 05)

## Army Regulation 15-6:  Final Report

## Investigation into FBI Allegations of Detainee Abuse at Guantanamo Bay, Cuba Detention Facility

### EXECUTIVE SUMMARY

**Detention and interrogation operations at Joint Task Force Guantanamo (JTF-GTMO) cover a three-year period and over 24,000 interrogations. This AR 15-6 investigation found only three interrogation acts in violation of interrogation techniques authorized by Army Field Manual 34-52 and DoD guidance.  The AR 15-6 also found that the Commander of JTF-GTMO failed to monitor the interrogation of one high value detainee in late 2002.  The AR 15-6 found that the interrogation of this same high value detainee resulted in degrading and abusive treatment but did not rise to the level of being inhumane treatment.  Finally, the AR 15-6 found that the communication of a threat to another high value detainee was in violation of SECDEF guidance and the UCMJ.  The AR 15-6 found no evidence of torture or inhumane treatment at JTF-GTMO.**

### INTRODUCTION

In June 2004, the Federal Bureau of Investigation (FBI) began an internal investigation to determine if any of its personnel had observed mistreatment or aggressive behavior towards detainees at Guantanamo Bay, Cuba (GTMO).  On 9 Jul 04, the FBI – Inspection Division (INSD), sent an e-mail message to all FBI personnel who had served in any capacity at GTMO.  The e-mail stated in relevant part:

"You have been identified as having conducted an assignment at GTMO, Cuba since 9/11/2001.  The Inspection Division has been tasked with contacting those employees who have served in any capacity at GTMO and obtain information regarding the treatment of detainees.  Employees should immediately respond to the following:

  1)  Employees who observed aggressive treatment, which was not consistent with Bureau interview policy guidelines, should respond via e-mail for purposes of a follow-up interview.

  2)  Employees who worked at GTMO and observed no aggressive treatment of detainees should respond via an EC documenting a negative response…"

The above e-mail message was sent by INSD to 493 FBI personnel who had served in GTMO between 9 Sep 01 and 9 Jul 04.  INSD received 434 total

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

responses, and 26 agents stated that they had observed aggressive treatment of detainees at GTMO.

In response to FBI agent allegations of aggressive interrogation techniques at Joint Task Force Guantanamo Bay (JTF-GTMO) Cuba, that were disclosed in Dec 04 as a result of FOIA releases, General (GEN) Bantz J. Craddock, Commander United States Southern Command (USSOUTHCOM), ordered an AR 15-6 investigation and appointed Brigadier General (BG) John T. Furlow, United States Army South Deputy Commander for Support, as the investigating officer. BG Furlow was directed to address the following allegations:

    a. That military interrogators improperly used military working dogs during interrogation sessions to threaten detainees, or for some other purpose;

    b. That military interrogators improperly used duct tape to cover a detainee's mouth and head;

    c. That DoD interrogators improperly impersonated FBI agents and Department of State officers during the interrogation of detainees;

    d. That, on several occasions, DoD interrogators improperly played loud music and yelled loudly at detainees;

    e. That military personnel improperly interfered with FBI interrogators in the performance of their FBI duties;

    f. That military interrogators improperly used sleep deprivation against detainees;

    g. That military interrogators improperly chained detainees and placed them in a fetal position on the floor, and denied them food and water for long periods of time;

    h. That military interrogators improperly used extremes of heat and cold during their interrogation of detainees.

Subsequent to the initial appointment, GEN Craddock directed BG Furlow to investigate two additional allegations concerning a female military interrogator performing a "lap dance" on a detainee and the use of faux "menstrual blood" during an interrogation. Finally, the appointment letter directed BG Furlow to not limit himself to the listed allegations.

On 28 Feb 05, after two months of investigation, BG Furlow advised GEN Craddock that he needed to interview officers senior in grade to himself. On 28 Feb 05 GEN Craddock appointed Lieutenant General (Lt Gen) Randall M. Schmidt, United States Southern Command Air Forces Commander, Davis-

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

Monthan AFB, AZ, as the senior investigating officer.  This report reflects the combined findings and conclusions of the initial investigative efforts and the combined investigative efforts of both BG Furlow and Lt Gen Schmidt.

After submission of the AR15-6 Report of Investigation on 1 Apr 05, CDR USSOUTHCOM directed on 5 May 2005 that the investigation be reopened to consider memos dated 11 Dec 04 and 24 Dec 04, that had recently been discovered, regarding the subject of the second Special Interrogation Plan. Prior to completion of the follow-up, CDR USSOUTHCOM directed on 2 Jun 05 that the investigation should also address new allegations made by the subject of the first Special Interrogation Plan.

## SCOPE OF REVIEW

This investigation was directed and accomplished under the "informal procedures" provisions of Army Regulation 15-6, Procedures for Investigating Officers and Boards of Officers, dated 30 Sep 96, (AR 15-6).  This AR 15-6 investigation centered on alleged abuses occurring during interrogation operations. This AR 15-6 found incidents of abuse during detention operations; all of which were appropriately addressed by the command.  The investigation team conducted a comprehensive review of thousands of documents and statements pertaining to any allegations of abuse occurring at GTMO, to include the complete medical records of the subjects of the first and second Special Interrogation Plan.  The team interviewed 30 FBI agents, conducted interviews of over 100 personnel from 6 Jan 05 to 24 Mar 05 and had access to hundreds of interviews conducted by several recent investigations.  These interviews included personnel assigned to GTMO, USSOUTHCOM, and OSD during the tenure of JTFs 160, 170, and GTMO.  It included nine DIA personnel, including every Joint Intelligence Group Chief and every Intelligence Control Element Chief.  It included 76 DoD personnel, to include every General Officer who commanded Joint Task Force 160, Joint Task Force 170 and Joint Task Force GTMO.  DoD personnel interviewed also included personnel who served as interrogators at GTMO and instructors at the US Army Intelligence School and Center.  During the course of the investigation, the team visited Birmingham, AL; Chicago, IL; Ft Bragg, NC; Ft Devens, MA; Ft Huachuca, AZ; GTMO (twice); Los Angeles, CA; Miami, FL; and Washington D.C. (five times).

The investigation team attempted to determine if the allegations alleged by the FBI, in fact, occurred.  During the course of the follow up investigation the AR15-6 also considered allegations raised specifically by detainees the subject of the first and second Special Interrogation Plans. The investigating team applied a preponderance standard of proof consistent with the guidance contained in AR15-6. The team also applied guidance contained in FM 34-52, CDR USSOUTHCOM, and SECDEF memorandums authorizing special interrogation techniques in deciding if a particular interrogation approach fell properly within an authorized technique. In those cases in which the team concluded that the

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

allegation had in fact occurred, the team then considered whether the incident was in compliance with interrogation techniques that were approved either at the time of the incident or subsequent to the incident. In those cases where it was determined the allegation occurred and to have not been an authorized technique, the team then reviewed whether disciplinary action had already been taken and the propriety of that action. On 28 Mar 05, GEN Craddock, as the investigation appointing authority, asked Lt Gen Schmidt to determine accountability for those substantiated violations that had no command action taken.

The team did not review the legal validity of the various interrogation techniques outlined in Army Field Manual 34-52, or those approved by the Secretary of Defense.

## **BACKGROUND**

On 7 Mar 05 Vice Admiral A.T. Church, III submitted his final report of detention operations and detainee interrogation techniques in the Global War on Terror to the Secretary of Defense. (hereinafter "Church Report") That report included a thorough background discussion of detainee operations at GTMO. Our investigation independently researched the genesis and adjustments to policy and interrogation techniques from the origination of GTMO to the present. Our independently derived findings regarding the development and adjustments to policy and interrogation techniques are identical to the Church report. Therefore, I have adopted relevant portions of the Church report to show the development of permissible interrogation techniques.

Interrogation operations at GTMO began in January 2002. Initially interrogators relied upon the interrogation techniques contained in FM 34-52. These techniques were ineffective against detainees who had received interrogation resistance training. On 11 Oct 2002, Major General Michael E. Dunlavey, the Commander of Joint Task Force (JTF) 170, the intelligence task force at GTMO, requested that the CDR USSOUTHCOM, GEN James T. Hill, approve 19 counter resistance techniques that were not specifically listed in FM 34-52. The techniques were broken down into Categories I, II, and III, with the third category containing the most aggressive techniques. On 25 Oct 02 CDR USSOUTHCOM forwarded the request to the Chairman of the Joint Chiefs of Staff, General Richard B. Myers. On 2 Dec 02, the Secretary of Defense approved the use of all Category I and II techniques, but only one of the Category III techniques (which authorized mild, non-injurious physical contact such as grabbing, poking in the chest with a finger, and light pushing). In the approval memorandum, the SECDEF approved the techniques for use by CDR USSOUTHCOM, who subsequently verbally delegated the authority to approve and apply these techniques to CDR JTF-GTMO.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

On 15 Jan 03, SECDEF rescinded his approval of all Category II techniques and the one Category III technique leaving only Category I techniques in effect. The SECDEF memo permitted use of Category II and III techniques only with SECDEF approval. No approval was requested or granted.

On 16 Apr 03, the Secretary of Defense issued a new policy accepting 24 techniques, most of which were taken directly from or closely resembled those in FM 34-52. The Secretary's guidance remains in effect today. This policy memorandum placed several requirements on CDR USSOUTHCOM. First, it required all detainees to continue to be treated humanely. Second, it required SECDEF notification prior to the implementation of any of the following aggressive Interrogation techniques: Incentive/Removal of Incentive; Pride and Ego Down; Mutt and Jeff; and Isolation. Third, it specifically limited the use of these aggressive techniques to circumstances required by "military necessity." The memorandum did not attempt to define the parameters of "humane treatment" or "military necessity."

The CDR USSOUTHCOM issued a memorandum on 2 Jun 03 providing further guidance on the implementation of the 16 Apr 03 SECDEF approved techniques. This guidance provided that prior to the use of any of the specified aggressive techniques, the JTF Commander would submit the request in writing to CDR USSOUTHCOM for submission to SECDEF. The guidance also stated that "specific implementation guidance with respect to techniques A-Q is provided in Army Field Manual 34-52. Further implementation guidance with respect to techniques R-X will need to be developed by the appropriate authority." GTMO standard operating procedure on interrogations provides guidance for interrogations.

In addition, the CDR USSOUTHCOM guidance provided the following clarification to the SECDEF's 16 Apr 03 memorandum: **(quoting)**

>   (a)  Reference Technique B, the Working Group was most concerned about removal of the Koran from a detainee—something we no longer do. Because providing incentives (e.g., McDonald's Fish Sandwiches or cigarettes) is an integral part of interrogations, you will notify me in writing when the provided incentive would exceed that contemplated by interrogation doctrine contained in Army FM 34-52, or when the interrogators intend to remove an incentive from a detainee;

>   (b)  Reference Techniques I and O, you will notify me in writing when use of these standard interrogation techniques goes beyond the doctrinal application described in Army FM 34-52. When use of the technique is consistent with FM 34-52, you do not need to notify me;

>   (c)  I define "sleep deprivation", referenced in Technique V, as keeping a detainee awake for more that 16 hrs, or allowing a detainee to rest

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

briefly and then repeatedly awakening him, not to exceed four days in succession;

(d) Reference Technique X, I do not consider the use of maximum-security units as isolation.  A detainee placed in a maximum-security unit is segregated, but not truly isolated;

(e) I define the "least intrusive method" as the technique that has the least impact on a detainee's standard of treatment, while evoking the desired response from the detainee during interrogations;

(f) Except in the case of Techniques B, I, O, and X, I have determined that the first 0-6/GG-15 in the chain of command or supervision, is the "appropriate specified senior approval authority," unless approval authority is withheld from that individual by higher authority.

Lastly, I have told the Secretary of Defense his 16 April guidance applies to all interagency elements assigned or attached to JTF GTMO. **(end quote)**

There have been over 24,000 interrogation sessions at GTMO since the beginning of interrogation operations.

# FINDINGS

## GENERAL DETAINEE POPULATION

**Allegation:  That DoD interrogators improperly impersonated FBI agents or Department of State officers during the interrogation of detainees.**

**Finding #1:**  On several occasions in 2003 various DoD interrogators impersonated agents of the FBI and the Department of State.

**Technique:  Authorized:** FM 34-52 (p. 3-13); Category I technique approved by SECDEF  – Deceiving interrogator identity

**Discussion:**  The Chief of the Special Interrogation Team directed two interrogators to pose as US State Department representatives during an interrogation.  In addition another interrogator posed as an FBI agent on one occasion. This impersonation came to the attention of the Senior Supervisory Agent (SSA) of the FBI at Guantanamo Bay when several other agents advised him that detainees were complaining during interviews that the FBI had already asked them the same questions.  The SSA approached the Joint Interrogation Group (JIG) Chief, with his agents' concerns.  According to the SSA, the JIG Chief did not contest the FBI agents' accusations.  In fact, the JIG Chief knew of at least one military interrogator who had impersonated an FBI agent.  After the

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

meeting, the JIG Chief agreed to stop the practice of DoD interrogators impersonating FBI agents without prior FBI approval. The SSA made it clear to the investigation team that he did not believe the impersonation interfered with FBI operations and was pleased with the JIG Chief's rapid and thorough response to the situation.

**Organizational response:**  Immediately stopped the practice.

***Recommendation #1:  The allegation should be closed.  The technique, while authorized, was undermining the inter-agency working relationship. No additional corrective action is necessary or appropriate.***

**Allegation:  That a female military interrogator performed a "lap dance" on a detainee during an interrogation.  I have expanded this allegation to "That female military interrogators performed acts designed to take advantage of their gender in relation to Muslim males."**

**Finding #2a:**  On one occasion between October 2002 and January 2003, a female interrogator put perfume on a detainee by touching the detainee on his arm with her hand;

**Technique:  Authorized:**  FM 34-52 (p. 3-11); Category III technique approved by SECDEF  – Mild, non-injurious physical touching

**Discussion:  a.**  On at least one occasion in late 2002, a female interrogator rubbed perfume on a detainee. The Interrogation Control Element (ICE) Chief stated that he specifically directed the interrogator to go to the PX and purchase rose oil with the intent of rubbing a portion of the perfume on the detainee's arm to distract the detainee. The interrogator admitted to using this approach with a detainee. At the time of the event the detainee responded by attempting to bite the interrogator and lost his balance, fell out of his chair, and chipped his tooth. He received immediate and appropriate medical attention and did not suffer permanent injury.

**Organizational response:  a.**  The interrogator was not disciplined for rubbing perfume on a detainee since this was an authorized technique.

**Finding #2b:**  During the month of March 2003, a female interrogator approached a detainee from behind, rubbed against his back, leaned over the detainee touching him on his knee and shoulder and whispered in his ear that his situation was futile, and ran her fingers through his hair.

**Technique:  Authorized:**  FM 34-52 technique – Futility – Act used to highlight futility of the detainee's situation.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

**Discussion: b.** On 17 Apr 03, An interrogation supervisor supervised a female interrogator as she interrogated a detainee with her BDU top off[1], and subsequently the interrogator ran her fingers through the detainee's hair.  The interrogator also approached the detainee from behind, touched him on his knee and shoulder, leaned over him, and placed her face near the side of his in an effort to create stress and break his concentration during interrogation.

**Organizational response: b.** The interrogation supervisor was given a written letter of admonishment for failure to document the techniques to be implemented by the interrogator prior to the interrogation. There is no evidence that either activity ever occurred again.

***Recommendation #2:  Command action was effective and sufficient with respect to the individual interrogators.  AR 15-6 recommends that the approval authority for the use of gender coercion as futility technique be withheld to the JTF GTMO-CG.***

**<u>Allegation</u>:  That a female military interrogator wiped "menstrual blood" on a detainee during an interrogation.**

**Finding #3:**  In March 2003, a female interrogator told a detainee that red ink on her hand was menstrual blood and then wiped her hand on the detainee's arm.

**Technique:  Authorized:**  FM 34-52 technique – Futility – act used to highlight futility of the detainee's situation

**Discussion:**  The female interrogator is no longer in military service and has declined to be interviewed.  According to a former ICE Deputy the incident occurred when a detainee spat in the interrogator's face.  According to the former ICE Deputy, the interrogator left the interrogation room and was crying outside the booth.  She developed a plan to psychologically get back at him.  She touched the detainee on his shoulder, showed him the red ink on her hand and said; by the way, I am menstruating. The detainee threw himself on the floor and started banging his head.  This technique was not in an approved interrogation plan.

**Organizational response:**  The ICE Deputy verbally reprimanded the interrogator for this incident.  No formal disciplinary action was taken.  There is no evidence that this happened again.

***Recommendation #3:  Command action was inadequate with respect to the individual interrogator.  The interrogator should have been formally admonished or reprimanded for using a technique that was not approved in advance.  Advance approval ensures that retaliatory techniques are not***

---

[1] It was common practice at GTMO to conduct interrogations in a t-shirt with the BDU top removed because of the heat and humidity.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

*employed on impulse.    Considering the lapse in time, recommend this allegation be closed.*

**Allegation:  That DoD interrogators improperly played loud music and yelled loudly at detainees.**

**Finding #4:**  On numerous occasions between July 2002 and October 2004, detainees were yelled at or subjected to loud music during interrogation.

**Technique:  Authorized**:  FM 34-52 technique – Incentive and Futility – acts used as reward for cooperating or to create futility if not cooperating.

**Discussion:**  Almost every interviewee stated that yelling and the use of loud music were used for interrogations at GTMO.  On a few occasions, detainees were left alone in the interrogation booth for an indefinite period of time while loud music played and strobe lights flashed.  The vast majority of yelling and music was accomplished with interrogators in the room.  The volume of the music was never loud enough to cause any physical injury. Interrogators stated that cultural music would be played as an incentive. Futility technique included the playing of Metallica, Britney Spears, and Rap music.

**Organizational response:**  None.

*Recommendation #4:  The allegation should be closed.  Recommend JTF-GTMO develop specific guidance on the length of time that a detainee may be subjected to futility music.  Placement of a detainee in the interrogation booth and subjecting him to loud music and strobe lights should be limited and conducted within clearly prescribed limits.*

**Allegation:  That military interrogators improperly used extremes of heat and cold during their interrogation of detainees.**

**Finding #5:**  On several occasions during 2002 and 2003, interrogators would adjust the air conditioner to make the detainee uncomfortable.

**Technique:  Unauthorized prior to 16 Apr 03**:  SECDEF did not approve exposure to cold in his 2 Dec 02 list of approved techniques

**Technique:  Authorized after 16 Apr 03**: SECDEF approved technique.  This technique was officially permitted under 16 Apr 03 SECDEF Memorandum – Environmental Manipulation

**Discussion:**  Two FBI agents indicated that they were aware of DoD interrogators using temperature adjustment as an interrogation technique. Many interviewees, FBI agents and military interrogators, believed the hot climate at GTMO and the detainee's comfort in a hot climate caused a differing in opinions

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

regarding the use of the air conditioning units in the interrogation booths.  There were several individuals who were interviewed who acknowledged that certain military interrogators would adjust the air conditioning down (cool) in an attempt to make the detainee uncomfortable for the interrogation. Several witnesses indicated that the practice of adjusting the temperature ceased when CDR JTF-GTMO directed that the practice no longer be employed.  The current GTMO SOP still permits interrogators to adjust the temperature.  In addition, one interrogator supervisor stated that detainees were interrogated at Camp X-Ray, where the "booths" were not air-conditioned, to make the detainees uncomfortable.

**Organizational response:**  No disciplinary action required.

***Recommendation #5:  The allegation should be closed.***

**Allegation:  That military interrogators improperly used sleep deprivation against detainees.**

**Finding #6:**  During 2003 and 2004 some detainees were subjected to cell moves every few hours to disrupt sleep patterns and lower the ability to resist interrogation.  Each case differed as to length and frequency of the cell moves.

**Technique:  Unauthorized prior to 2 Dec 02 and between 15 Jan 03 and 16 Apr 03**: Neither sleep disruption or deprivation is an authorized FM 34-52 technique

**Technique:  Authorized between 2 Dec 02 and 15 Jan 03 and after 16 Apr 03:**  The exact parameters of this technique remained undefined until 2 Jun 03 when CDR USSOUTHCOM established clear guidance on the use of sleep adjustment.  His guidance prohibited the practice of keeping a detainee awake for "more than 16 hours or allowing a detainee to rest briefly and then repeatedly awakening him, not to exceed four days in succession."

**Discussion:**  Only one FBI agent alleged sleep deprivation; his complaint was that an individual was subjected to 16 hours of interrogation followed by four-hour breaks.  He says he was told about these sessions by DoD interrogators and they implied that these 16 hour interrogations were repeated on a 20 hour cycle, but he did not know for certain what in fact occurred. The FBI agent was at GTMO from 2 Jun 03 to 17 Jul 03.  Under CDR USSOUTHCOM's 2 Jun 03 guidance, 16 hour interrogations were permitted and do not constitute sleep deprivation if done on a 24 hour cycle. During the course of the investigation of the FBI allegation, the AR 15-6 did conduct a review of the interrogation records to see if there was any evidence that corroborated this allegation.  While not directly supporting the FBI's allegation, records indicated that some interrogators recommended detainees for the "frequent flyer program."  A current GTMO interrogation analyst indicated that this was a program in effect throughout 2003

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

and until March 2004 to move detainees every few hours from one cell to another to disrupt their sleep. Documentation on one detainee indicated that he was subjected to this practice as recently as March 2004.

**Organizational response:** None. Current JTF-GTMO Commander terminated the frequent flyer cell movement program upon his arrival in March 04.

***Recommendation #6: The allegation should be closed. Recommend USSOUTHCOM clarify policy on sleep deprivation.***

<u>Allegation</u>:  **That military interrogators improperly used duct tape to cover a detainee's mouth and head.**

**Finding #7:** Sometime in October 2002 duct tape was used to "quiet" a detainee.

**Technique:  Unauthorized**

**Discussion:** In his testimony, the ICE Chief testified that he had a situation in which a detainee was screaming resistance messages and potentially provoking a riot. At the time of the incident there were 10 detainees in the interrogation section and the ICE Chief was concerned about losing control of the situation. He directed the MPs to quiet the detainee down. The MP mentioned that he had duct tape. The ICE Chief says he ultimately approved the use of duct tape to quiet the detainee. The MP then placed a single strand of duct tape around the detainee's mouth. The single strand proved ineffective because the detainee was soon yelling again. This time the MPs wrapped a single strand of duct tape around the mouth and head of the detainee. The detainee removed the duct tape again. Fed up and concerned that the detainee's yelling might cause a riot in the interrogation trailer, The ICE Chief ordered the MPs to wrap the duct tape twice around the head and mouth and three times under the chin and around the top of the detainee's head. According to an FBI agent, he and another FBI agent were approached by the ICE Chief who was laughing and told the agents that they needed to see something. When the first agent went to the interrogation room he saw that the detainee's head had been wrapped in duct tape over his beard and his hair. An interrogator testified that another interrogator admitted to him that he had duct taped the head of a detainee. According to the first agent, the ICE Chief said the interrogator wrapped the detainee's head with duct tape because the detainee refused to stop "chanting" passages from the Koran.

**Organizational response:** The JTF-170 JAG testified that she became aware of the incident and personally counseled the ICE Chief. The counseling session consisted of a verbal admonishment.[2] The ICE Chief did not receive any formal

---

[2] While the ICE Chief testified that he was counseled by the JTF-GTMO Commander this is not possible. The Commander in question did not arrive until the month following the event. The previous Commander has no recollection of the event.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

discipline action.  We have no evidence that duct tape was ever used again on a detainee.

***Recommendation #7:  Command action was inadequate with respect to the ICE Chief.  He should be formally admonished or reprimanded for directing an inappropriate restraint to be used on a detainee.***

**Allegation:  That military interrogators improperly chained detainees and placed them in a fetal position on the floor**

**Finding #8:**  On at least two occasions between February 2002 and February 2003, two detainees were "short shackled" to the eye-bolt on the floor in the interrogation room.

**Technique:  Unauthorized.**

**Discussion:**  Two FBI agents each stated that they witnessed a detainee in an interrogation room that had been "short shackled" to the floor. Short shackling is the process by which the detainee's hand restraints are connected directly to an eyebolt in the floor requiring the detainee to either crouch very low or lay in a fetal position on the floor.  The FBI agents indicated that each of the detainees was clothed.  Another FBI agent stated she witnessed a detainee short shackled and lying in his own excrement.  The AR 15-6 was unable to find any documentation, testimony, or other evidence corroborating the third agent's recollection, to this allegation or her email allegation that one of the detainees had pulled his hair out while short shackled.  We also found that 'short shackling' was initially authorized as a force protection measure during the in processing of detainees.[3]

**Organizational response:**  None.  JTF-GTMO has implemented SOPs that prohibit short shackling.

***Recommendation #8: The allegation should be closed.  The AR 15-6 was not able to find any evidence to adequately assign responsibility for these actions.  This practice is now specifically prohibited by current GTMO interrogation policy.***

**Allegation:  That military personnel improperly interfered with FBI interrogators in the performance of their FBI duties.**

**Finding #9:**  We discovered no evidence to support this allegation.

---

[3] During the course of a site visit to GTMO several detention operations personnel indicated that they understood that short shackling was permitted in the early days of GTMO as a force protection measure. They all stated that it was no longer authorized as either a detention measure or during interrogations.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

**Discussion:**  This allegation stems from an FBI agent objections to a proposed Special Interrogation Plan.  The dispute resulted in a DoD official being rude to the FBI agent.  The team did not find any evidence of "interference" with FBI interrogations that extended beyond the dispute over which techniques worked best in interrogation.  During the infancy of interrogation operations at GTMO, it was obvious that the different investigative agencies had different interrogation objectives.  Law enforcement agencies were primarily interested in interviews that would produce voluntary confessions that would be admissible in U.S. Federal District Courts.  Conversely, DoD interrogators were interested in actionable intelligence and thus had greater latitude on the techniques used during the interrogations.  These different goals created friction.

*Recommendation #9:  The allegation should be closed.*

<u>Allegation</u>:  **That military interrogators denied detainees food and water for long periods of time.**

**Finding #10:**  We discovered no evidence to support the allegation that the detainees were denied food and water.

**Discussion:**  This allegation stems from the statement of an FBI Agent.  She reports two incidents of observing two detainees in "the fetal position and lying on the floor of interview rooms."  And that there was no "evidence of any food or water."  The Agent admits in her statement that she made an assumption that the detainees were denied food and water based solely upon their appearance.  The Agent was unable to provide any specific information as to the day she made these observations to permit additional proof or assignment of responsibility.

*Recommendation #10:  The allegation should be closed.*

## SPECIAL INTERROGATION PLANS

**During the course of interrogations certain detainees exhibited refined resistance techniques to interrogations.  These detainees were suspected to possess significant current intelligence regarding planned future terrorist attacks against the United States.  For these reasons Special Interrogation Plans were proposed and approved for the detainees.  A total of two Special Interrogation Plans were carried out.  They are referred to herein as the "First Special Interrogation Plan" and the "Second Special Interrogation Plan".**

## THE FIRST SPECIAL INTERROGATION PLAN

On 23 Nov 02 interrogators initiated the first Special Interrogation Plan.  The interrogation plan was designed to counter resistance techniques of the subject

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

of the first Special Interrogation Plan. The memo authorizing the techniques for this interrogation was signed by SECDEF on 2 Dec 02. These techniques supplemented techniques already permitted under the provisions of FM 34-52.

**Allegation:  That military interrogators improperly used military working dogs (MWD) during interrogation sessions to threaten detainees, or for some other purpose.**

**Finding #11a:**  On one occasion in October 2002 a military working dog was brought into the interrogation room and directed to growl, bark, and show his teeth at the subject of the first Special Interrogation Plan.

**Technique:  Unauthorized prior to 12 Nov 02.**

**Discussion:  a.  October 2002 incident**: GTMO records indicate that on 01 Oct 02, the Commander of JTF-170 requested Joint Detention Operations Group (JDOG) support for interrogation operations to interrogate the subject of the first Special Interrogation Plan.  The dog was requested to assist in the movement of the subject of the first Special Interrogation Plan between Camp X-ray and the GTMO Naval Brig to "discourage the detainee from attempting to escape." The interrogation plan (IP) indicates that the interrogation would begin on the 2nd or 3rd of October 2002. One FBI agent in his statement recalls the MWD being used on or about 05 Oct 02.  He indicated that the events were notable for several reasons.  He had recently purchased a German Shepard and wanted to get some "tips" from the dog handlers.  The FBI agent noticed that there were two working dog teams (one Navy and one Army) present for the interrogation of the subject of the first Special Interrogation Plan.  Finally, the FBI agent recalled that he and his partner left the observation room when the MWD was introduced into the interrogation room. The FBI agent's partner corroborates this statement.

In addition an interrogator indicated that she recalled a MWD being brought into the interrogation room during interrogation of the subject of the first Special Interrogation Plan at Camp X-ray, between 02-10 Oct 02.  She stated that the dogs were used only "briefly." She stated that the use of the dog was documented on the IP and approved by the ICE Chief and CDR, JTF-GTMO

**Finding #11b:**  In November 2002 a military working dog was brought into the interrogation room and directed to growl, bark, and show his teeth at the subject of the first Special Interrogation Plan.

**Technique:  Authorized**:  SECDEF approved the use of Category I and II techniques for the subject of the first Special Interrogation Plan.  Category II technique permits the use of dogs to exploit "individual phobias" during interrogations.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

**Discussion: b.** An interrogator testified that the MWD was in the booth on one occasion for the subject of the first Special Interrogation Plan. He testified that he was approached by another interrogator and discussed the use of a MWD in an interrogation session. Specifically, the first interrogator stated that the second interrogator told him that a MWD was brought into the doorway of the interrogation room and ordered by the dog handler to growl, show teeth and bark at the detainee. In addition a psychologist assigned to the Behavioral Science Consultation Team (BSCT) for JTF-170/JTF-GTMO witnessed the use of a MWD named "Zeus" during a military interrogation of the subject of the first Special Interrogation Plan during the November 2002 time period. In his interview, the ICE Chief acknowledged that an MWD had entered the interrogation room of the subject of the first Special Interrogation Plan under the authority of a "special IP" for the subject of the first Special Interrogation Plan. The unsigned but approved interrogation plan for the subject of the first Special Interrogation Plan is from 12 Nov 02. (Church p. 115) It indicates dogs will only be used in interrogation if approved in writing, in advance. Both JTF-GTMO Commanders who were in charge during the execution of the special interrogation plan deny that they authorized the use of MWDs in the interrogation room.

**Organizational response: a. and b.** None. Current SOPs expressly prohibit the use of MWDs in the interrogation room. There is no evidence that this has ever happened again.

**Recommendation #11: The allegation should be closed. While the ICE Chief was aware of and condoned the first use of the MWD, additional corrective action is not necessary. The event occurred on two occasions and was expressly approved after the first occasion for this detainee. This practice is now specifically prohibited by current GTMO interrogation policy.**

**Allegation: That a female military interrogator performed a "lap dance" on a detainee during an interrogation. I have expanded this allegation to "That female military interrogators performed acts designed to take advantage of their gender in relation to Muslim males."**

**Finding #12a:** On 21 and 23 Dec 02, MPs held down a detainee while a female interrogator straddled the detainee without placing weight on the detainee;

**Technique: Authorized**: FM 34-52 technique – Futility – Act used to highlight futility of the detainee's situation.

**Finding #12b:** On 04 Dec 02, a female interrogator massaged the detainee's back and neck over his clothing;

**Technique: Authorized:** FM 34-52 technique – Futility – Act used to highlight futility of the detainee's situation.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

**Finding #12c:**  On various occasions between October 2002 and January 2003, a female interrogator invaded the private space of a detainee to disrupt his concentration during interrogation;

**Technique:  Authorized:**  FM 34-52 technique – Futility – act used to highlight futility of the detainee's situation.

**Discussion:**  Interrogation logs and MFRs for the subject of the first Special Interrogation Plan document that on both 21 and 23 Dec 02, a female interrogator straddled, without putting any weight on the detainee, the subject of the first Special Interrogation Plan while he was being held down by MPs.  During these incidents a female interrogator would tell the detainee about the deaths of fellow Al-Qaeda members.  During the straddling, the detainee would attempt to raise and bend his legs to prevent the interrogator from straddling him and prayed loudly. Interrogation MFRs also indicate that on 04 Dec 02, a female interrogator began to enter the personal space of the subject of the first Special Interrogation Plan, touch him, and ultimately massage his back while whispering or speaking near his ear.  Throughout this event, the subject of the first Special Interrogation Plan prayed, swore at the interrogator that she was going to Hell, and attempted to get away from her.  The female interrogator admitted in her interview that she personally prepared portions of the MFRs of the the subject of the first Special Interrogation Plan interrogations.  She asserts that she had permission to employ all these techniques. We have found no evidence of a lap dance ever occurring.

**Organizational response:**  No disciplinary action taken.  The ICE Chief approved these techniques at the time.

***Recommendation #12:  The allegation should be closed.  No command action is necessary with respect to the individual interrogators. Their supervisor acknowledged that he approved the approaches at the time of the interrogation.   AR 15-6 recommends that the approval authority for the use of gender coercion as futility technique be withheld to the JTF GTMO-CG.***

<u>**Allegation**</u>:  **That DoD interrogators improperly played loud music and yelled loudly at detainees.**

**Finding #13:**  On numerous occasions between November 2002 and 15 Jan 03, the subject of the first Special Interrogation Plan was yelled at or subjected to loud music during interrogation.

**Technique:  Authorized**: FM 34-52 technique – Incentive and Futility – acts used as reward for cooperating or to create futility in not cooperating.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

**Discussion:  See above discussion for Finding #4.**

**Organizational response:**  No disciplinary action required; technique authorized.

***Recommendation #13:  The allegation should be closed.  Recommend JTF-GTMO develop specific guidance on the length of time that a detainee may be subjected to futility music.  Placement of a detainee in the interrogation booth and subjecting him to loud music and strobe lights should be limited and conducted within clearly prescribed limits.***

<u>Allegation</u>:  **That military interrogators improperly used extremes of heat and cold during their interrogation of detainees.**

**Finding #14:**  On several occasions between November 2002 and January 2003 interrogators would adjust the air conditioner to make the subject of the first Special Interrogation Plan uncomfortable.

**Technique:  Unauthorized prior to 16 Apr 03**:  SECDEF did not approve exposure to cold in his 2 Dec 02 list of approved techniques

**Discussion**.  There are no medical entries indicating the subject of the first Special Interrogation Plan ever experienced medical problems related to low body temperature. The subject of the first Special Interrogation Plan's medical records do indicate that he did have a body temperature between 95 and 97 degrees twice. The subject of the first Special Interrogation Plan's medical records do indicate that from 7-9 Dec 02 he was hospitalized for observation after an episode of bradycardia.  He was released within forty-eight hours, after the bradycardia resolved without intervention and he maintained stable hemodynamics.[4] He experienced a second episode of bradycardia in Feb 03.

**Organizational response:**  None

***Recommendation #14:  The allegation should be closed.***

<u>Allegation</u>:  **That military interrogators improperly used sleep deprivation against detainees.**

**Finding #15:**  From 23 Nov 02 to 16 Jan 03, the subject of the first Special Interrogation Plan was interrogated for 18-20 hours per day for 48 of the 54 days, with the opportunity for a minimum of four hours rest per day.

**Technique:  Authorized:**  SECDEF approved technique.  This technique was officially permitted under 2 Dec 02 SECDEF Memorandum – The use of 20-hour interrogations

---

[4] Bradycardia is a relatively slow heart; hemo dynamics are mechanics of blood circulation.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

**Discussion:**  SECDEF approved 20 hour interrogations for every 24-hour cycle for the subject of the first Special Interrogation Plan on 12 Nov 02. Later, CDR USSOUTHCOM formalized the definition of sleep deprivation in his 02 Jun 03 memorandum "promulgating" SECDEF's interrogation techniques of 16 Apr 03. He defined sleep deprivation as keeping a detainee awake for more than 16 hours, or allowing a detainee to rest briefly and then repeatedly awakening him, not to exceed four days in succession.

**Organizational response:**  None. This was an authorized interrogation technique approved by SECDEF.

***Recommendation #15: The allegation should be closed. Recommend USSOUTHCOM clarify policy on sleep deprivation.***

**Additional Allegations, Re: The subject of the first Special Interrogation Plan:**  In addition to the FBI allegations addressed above, the following additional interrogation techniques (not all inclusive) were used in the interrogation of the subject of the first Special Interrogation Plan. Each act is documented in the interrogation MFRs maintained on the subject of the first Special Interrogation Plan.

**Finding #16a:**  That the subject of the first Special Interrogation Plan was separated from the general population from 8 Aug 02 to 15 Jan 03.

**Technique:  Unauthorized prior to 12 Nov 02**: SECDEF did not approve movement of detainee to an "isolation facility" for interrogation purposes prior to approval of Category II techniques for the subject of the first Special Interrogation Plan on 12 Nov 02.

**Technique:  Authorized after 12 Nov 02**:

**Discussion:**  The subject of the first Special Interrogation Plan was never isolated from human contact. The subject of the first Special Interrogation Plan was however placed in an "isolation facility" where he was separated from the general detainee population from 8 Aug 02 to 15 Jan 03. The subject of the first Special Interrogation Plan routinely had contact with interrogators and MPs while in the "isolation facility." The SECDEF did not define "isolation facility" when he approved the use of an "isolation facility" for up to 30 days with additional isolation beyond 30 days requiring CDR JTF-GTMO approval on 12 Nov 02. Prior to the SECDEF's approval, placement in an "isolation facility" was not an authorized interrogation technique.

**Organizational response to Additional Allegations, Re:** The subject of the first Special Interrogation Plan:  None taken.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

**Eight Techniques Below:  Authorized**:  FM 34-52 technique – Ego down and Futility.

**Finding #16b:**  On 06 Dec 02, the subject of the first Special Interrogation Plan was forced to wear a woman's bra and had a thong placed on his head during the course of the interrogation.

**Finding #16c:**  On 17 Dec 02, the subject of the first Special Interrogation Plan was told that his mother and sister were whores.

**Finding #16d:**  On 17 Dec 02, the subject of the first Special Interrogation Plan was told that he was a homosexual, had homosexual tendencies, and that other detainees had found out about these tendencies

**Finding #16e:**  On 20 Dec 02, an interrogator tied a leash to the subject of the first Special Interrogation Plan's chains, led him around the room, and forced him to perform a series of dog tricks.

**Finding #16f:**  On 20 Dec 02, an interrogator forced the subject of the first Special Interrogation Plan to dance with a male interrogator.

**Finding #16g:**  On several occasions in Dec 02, the subject of the first Special Interrogation Plan was subject to strip searches.[5] These searches, conducted by the prison guards during interrogation, were done as a control measure on direction of the interrogators.

**Finding #16h:**  On one occasion in Dec 02, the subject of the first Special Interrogation Plan was forced to stand naked for five minutes with females present. This incident occurred during the course of a strip search.

**Finding #16i:**  On three occasions in Nov 02 and Dec 02, the subject of the first Special Interrogation Plan was prevented from praying during interrogation

**Finding #16j:** Once in Nov 02, the subject of the first Special Interrogation Plan became upset when two Korans were put on a TV, as a control measure during interrogation, and in Dec 02 when an interrogator got up on the desk in front of the subject of the first Special Interrogation Plan and squatted down in front of the subject of the first Special Interrogation Plan in an aggressive manner and unintentionally squatted over the detainee's Koran.

**Finding #16k:**  On seventeen occasions, between 13 Dec 02 and 14 Jan 03, interrogators, during interrogations, poured water over the subject of the first Special Interrogation Plan head.

---

[5] The subject of the first Special Interrogation Plan alleges that he was subject to "cavity searches."  During the course of interrogation, the subject of the first Special Interrogation Plan was strip searched.  The AR 15-6 was unable to determine the scope of these strip searches.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

**Discussion:** the subject of the first Special Interrogation Plan was a high value detainee that ultimately provided extremely valuable intelligence. His ability to resist months of standard interrogation in the summer of 2002 was the genesis for the request to have authority to employ additional counter resistance interrogation techniques. The techniques used against the subject of the first Special Interrogation Plan were done in an effort to establish complete control and create the perception of futility and reduce his resistance to interrogation. For example, this included the use of strip searches, the control of prayer, the forced wearing of a woman's bra, and other techniques noted above. It is clear based upon the completeness of the interrogation logs that the interrogation team believed that they were acting within existing guidance. Despite the fact that the AR 15-6 concluded that every technique employed against the subject of the first Special Interrogation Plan was legally permissible under the existing guidance, the AR 15-6 finds that the creative, aggressive, and persistent interrogation of the subject of the first Special Interrogation Plan resulted in the cumulative effect being degrading and abusive treatment. Particularly troubling is the combined impact of the 160 days of segregation from other detainees, 48 of 54 consecutive days of 18 to 20-hour interrogations, and the creative application of authorized interrogation techniques. Requiring the subject of the first Special Interrogation Plan to be led around by a leash tied to his chains, placing a thong on his head, wearing a bra, insulting his mother and sister, being forced to stand naked in front of a female interrogator for five minutes, and using strip searches as an interrogation technique the AR 15-6 found to be abusive and degrading, particularly when done in the context of the 48 days of intense and long interrogations.[6] While this treatment did not rise to the level of prohibited inhumane treatment the JTF-GTMO CDR was responsible for the interrogation of the subject of the first Special Interrogation Plan and had a responsibility to provide strategic guidance to the interrogation team. He failed to monitor the interrogation and exercise commander discretion by placing limits on the application of otherwise authorized techniques and approaches used in that interrogation. The Commander stated he was unaware of the specific details or impacts of the techniques on the detainee for this important interrogation. His failure to supervise the interrogation of the subject of the first Special Interrogation Plan allowed subordinates to make creative decisions in an environment requiring extremely tight controls[7].

***Recommendation #16: The Commander JTF-GTMO should be held accountable for failing to supervise the interrogation of the subject of the first Special Interrogation Plan and should be admonished for that failure.***

---

[6] The AR 15-6 found no evidence that the subject of the first Special Interrogation Plan was ever physically assaulted. His medical records show no evidence of any physical assaults. A medical examination completed on the subject of the first Special Interrogation Plan on 16 Jan 03 found no medical conditions of note.

[7] The JTF-GTMO Commander's testimony that he was unaware of the creative approaches taken in the interrogation is inconsistent with his 21 Jan 03 letter to CDR USSOUTHCOM in which he asserts that the CJTF approved the interrogation plan in place and it was followed "relentlessly by the command."

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

**Allegation**: In addition to the allegations above, the AR 15-6 also considered additional allegations raised specifically by the subject of the first Special Interrogation Plan.

**Finding #17:** The AR 15-6 was unable to corroborate the subject of the first Special Interrogation Plan's allegations to the point of concluding that they had occurred by a preponderance of the evidence. Specific findings include:

The AR 15-6 did find that the subject of the first Special Interrogation Plan was required to stand for periods of time which he may have interpreted as forced positions.

There is evidence that the subject of the first Special Interrogation Plan regularly had water poured on his head. The interrogation logs indicate that this was done as a control measure only.

There is no evidence that the subject of the first Special Interrogation Plan was subjected to humiliation intentionally directed at his religion. It is however possible that the subject of the first Special Interrogation Plan interpreted many of the interrogation techniques employed to be religious humiliation.

The AR 15-6 found no evidence that the subject of the first Special Interrogation Plan was threatened with homosexual rape. He was told on 17 Dec 02 that he was a homosexual but not threatened in any manner.

There is no evidence, to include entries in his medical records, that either occurred regarding the subject of the first Special Interrogation Plan or any other detainee.

**Discussion:** In reaching conclusions on the treatment of the subject of the first Special Interrogation Plan the AR 15-6 relied heavily on the interrogations logs. The level of specificity of the logs strongly supports their credibility regarding the interrogation of the subject of the first Special Interrogation Plan and thus they carried considerable weight on the findings.

*Recommendation #17:  The allegation should be closed*

## THE SECOND SPECIAL INTERROGATION PLAN

In July 03 interrogators initiated a request for approval of a Special Interrogation Plan for a detainee. This plan was approved by SECDEF on 13 Aug 03. Interrogation logs indicate that the techniques were never implemented because the subject of the second special interrogation plan began to cooperate prior to the approval.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

In addition to the interrogation logs, the AR 15-6 also considered allegations of abuse raised by the subject of the second special interrogation, himself. Specifically, after months of cooperation with interrogators, on 11 Dec 04, the subject of the second special interrogation notified his interrogator that he had been "subject to torture" by past interrogators during the months of July to October 2003.[8]

**Allegation:  That military interrogators improperly used extremes of heat and cold during their interrogation of detainees.**

**Finding #18:**  During the summer of 2003, interrogators would adjust the air conditioner to make the subject of the second special interrogation uncomfortable.

**Technique:  Authorized:**  SECDEF approved technique.  This technique was officially permitted under 16 Apr 03 SECDEF Memorandum – Environmental Manipulation.

**Discussion:**  The interrogation logs of the subject of the second Special Interrogation Plan indicate that on at least two occasions on 10 and 11 Jul 03 the air conditioner was turned off to heat up the room. In addition the subject of the second special interrogation alleges that on repeated occasions from Jul 03 to Oct 03, he was subjected to placement in a room referred to as the "freezer."

**Organizational response:**  No disciplinary action required.  Environmental manipulation was expressly permitted in the 16 Apr 03 SECDEF Memorandum. There is no evidence in the medical records of the subject of the second special interrogation being treated for hypothermia or any other condition related to extreme exposure.

***Recommendation #18:  The allegation should be closed.***

**Allegation: The subject of the second special interrogation alleges that female military interrogators removed their BDU tops and rubbed themselves against the detainee, fondled his genitalia, and made lewd sexual comments, noises, and gestures.**

---

[8] He reported these allegations to an interrogator. The interrogator was a member of the interrogation team at the time of the report. The interrogator reported the allegations to her supervisor.  Shortly after being advised of the alleged abuse, the supervisor interviewed the subject of the second special interrogation, with the interrogator present, regarding the allegations.  Based upon this interview, and notes taken by the interrogator, the supervisor prepared an 11 Dec 04 MFR addressed to JTF – GTMO JIG & ICE.  The supervisor forwarded his MFR to the JTF – GTMO JIG.  The JIG then forwarded the complaint to the JAG for processing IAW normal GTMO procedures for investigating allegations of abuse.  The JAG by email on 22 Dec 04 tasked the JDOG, the JIG, and the JMG with a review of the complaint summarized in the 11 Dec 04 MFR and directed them to provide any relevant information.  The internal GTMO investigation was never completed.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

**Finding #19:** The AR 15-6 was unable to corroborate the allegations to the point of concluding that they had occurred by a preponderance of the evidence.

**Discussion:** The interrogation logs for the subject of the second special interrogation indicate that on a number of occasions female interrogators used their status as females to distract the subject of the second special interrogation during the interrogation but there is nothing to corroborate the allegation of the subject of the second special interrogation.

**Organizational response:** No disciplinary action taken.

***Recommendation #19:  The allegation should be closed.***

**Allegation: The subject of the second Special Interrogation Plan alleges that in late summer of 2003 he was hit by guards and an interrogator "very hard" and "with all their strength" he was hit "all over."**

**Finding #20:** The AR 15-6 was unable to corroborate the allegations to the point of concluding that they had occurred by a preponderance of the evidence.

**Discussion:**  The interrogation logs contain no reference to any physical violence against the subject of the second Special Interrogation Plan.  His medical records indicate that in August 2003 the subject of the second special interrogation reported "rib contusions" from an altercation with MPs when moved between camps.  During this examination the physician also noted an "edema of the lower lip" and a "small laceration" on his head.  There are no other medical entries of any other physical injuries.  There are no indications of swelling or contusions to support a conclusion that the subject of the second special interrogation was hit "very hard all over."

**Organizational response:** No disciplinary action taken.  The allegation was not substantiated.

***Recommendation #20:  The allegation should be closed.   There is no evidence to support the subject of the second special interrogation's allegation of physical abuse.***

**Allegation:  A DoD interrogator improperly impersonated a Navy Captain assigned to the White House.**

**Finding #21:** The Special Team Chief impersonated a USN Captain assigned to the White House during interrogation of the subject of the second special interrogation.

**Technique:  Authorized:** This technique is permitted under FM 34-52 – Deception.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

**Discussion:**  On 2 Aug 03 the Special Team Chief presented himself to the subject of the second special interrogation dressed as a Captain in the USN and indicated he was from the White House in an effort to convince the subject of the second special interrogation that he needed to cooperate with his interrogators. The Special Team Chief presented a letter to the subject of the second special interrogation, which indicated that because of the subject of the second special interrogation's lack of cooperation, U.S. authorities in conjunction with authorities from the country of origin of the subject of the second Special Interrogation Plan would interrogate the mother of the subject of the second Special Interrogation Plan. The letter further indicated that if his mother was uncooperative she would be detained and transferred to U.S. custody at GTMO for long term detention. While the JTF-GTMO Commander acknowledges that he was aware of the intent by the interrogator to wear Captain's rank and purport to be from the White House, he stated that he was not aware of the intention to convey a threat or the plan to use a fictitious letter.

**Organizational response:**  None taken.

***Recommendation #21:  The allegation should be closed.   No further action necessary.***

**Allegation:**  **That Military interrogators threatened the subject of the second special interrogation and his family.**

**Finding #22:**  The Special Team Chief threatened the subject of the second special interrogation and his family in July, August and September 2003.

**Technique:  Unauthorized:**  This technique was rejected by SECDEF on     2 Dec 2002

**Discussion:**  During the interrogation of the subject of the second special interrogation, a masked interrogator was used to interrogate the subject of the second special interrogation [9].  On 17 Jul 03 the masked interrogator told that he had a dream about the subject of the second special interrogation dying. Specifically he told the subject of the second special interrogation that in the dream he "saw four detainees that were chained together at the feet.  They dug a hole that was six-feet long, six-feet deep, and four-feet wide.  Then he observed the detainees throw a plain, pine casket with the detainee's identification number painted in orange lowered into the ground."  The masked interrogator told the detainee that his dream meant that he was never going to leave GTMO unless he started to talk, that he would indeed die here from old age and be buried on "Christian… sovereign American soil." On 20 Jul 03 the masked interrogator, "Mr.

---

[9] The interrogator was a DoD interrogator who was masked so as to preserve the identity of the interrogator.   This was done in case the interrogation team wanted to use that interrogator later in another role.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

X", told the subject of the second Special Interrogation Plan that his family was "incarcerated." On 2 Aug 03, the Special Team Chief, while impersonating a USN Captain from the White House, told the subject of the second special interrogation that he had a letter indicating that the subject of the second special interrogation's family had been captured by the United States and that they were in danger.[10]  He went on to tell the subject of the second special interrogation that if he wanted to help his family he should tell them everything they wanted to know.  The MFR dated 02 Aug 03 indicates that the subject of the second special interrogation had a messenger that day there to "deliver a message to him".  The MFR goes on to state:

 "That message was simple:   Interrogator's colleagues are sick of hearing the same lies over and over and are seriously considering washing their hands of him.  Once they do so, he will disappear and never be heard from again.  Interrogator assured detainee again to use his imagination to think of the worst possible scenario he could end up in.  He told Detainee that beatings and physical pain are not the worst thing in the world.  After all, after being beaten for a while, humans tend to disconnect the mind from the body and make it through.  However, there are worse things than physical pain.  Interrogator assured Detainee that, eventually, he will talk, because everyone does.  But until then, he will very soon disappear down a very dark hole.  His very existence will become erased.  His electronic files will be deleted from the computer, his paper files will be packed up and filed away, and his existence will be forgotten by all.  No one will know what happened to him and, eventually, no one will care."

Finally, interrogator MFRs dated 08 Sep 03 indicate that the subject of the second special interrogation wanted to see "Captain Collins" and that they "understood that detainee had made an important decision and that the interrogator was anxious to hear what Detainee had to say.  Detainee stated he understood and will wait for interrogator's [Captain Collins] return and that the subject of the second Special Interrogation Plan "…was not willing to continue to protect others to the detriment of himself and his family."

In investigating the actions above, the AR 15-6 focused on the threat made by the Special Team Chief.[11]  When questioned about the threats to the subject of the second special interrogation, the Special Team Chief indicated that prior to the "threat" to detainee the subject of the second special interrogation he cleared the proposal and the letter with the senior judge advocate who approved the technique as a "deception."  As written the letter does contain a threat to detain the subject of the second special interrogation's mother but does not contain any threat on her life or that of her family.  The SJA indicated in his initial interview

---

[10] The actual content of the letter simply indicates that his mother will be taken into custody and questioned.
[11] Mr. X's dream story does not rise to the level of a threat.  It appears to be a staged prelude to the direct threat made by the Special Team Chief.

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

that he did not recall the letter. He subsequently elected to exercise his Article 31 rights and declined to answer direct questions about the letter and the threats. The Special Team Chief also indicated that both JIG Chiefs in charge during the promulgation of the Special Interrogation Plan[12] were also aware of the threat letter. The first JIG Chief has retired and was unwilling to cooperate with this investigation. The second JIG Chief indicated under oath that he was unaware of the interrogation events discussed above. He recognizes, that read in conjunction with each other, they indicate a threat. He believes that the Commander of JTF-GTMO was not aware of the threat since the second JIG Chief was not aware of the threat. The second JIG Chief stated that they had weekly meetings with the Commander to discuss interrogations but they would not have covered this level of detail in that meeting. Neither he nor the Commander read interrogation MFRs on a regular basis. Finally, the Commander denies any knowledge of the existence of the threat or the letter. He does not recall ever discussing the issue of threats with the interrogators. He is aware that this is a prohibited practice and would not have permitted it if he had been aware of the plan.

Taken as a whole, it appears that the decision to threaten the subject of the second Special Interrogation Plan was made by the Special Team Chief. He claims that he cleared the plan with the senior judge advocate but not with his supervisors. Considering the actual content of the letter, it is reasonable to conclude that the JAG advised that the letter was a proper deception and therefore additional approval was not required. The Special Team Chief knew that under FM 34-52 deception did not require additional approval.

Despite the fact that the letter may be a proper deception technique under FM 34-52, the interrogation logs clearly indicate that the interrogation went well beyond the "threat to detain" made in the letter, and in fact was a threat to the subject of the second special interrogation and his family that violated the UCMJ, Article 134 Communicating a threat.

**Organizational Response:** None taken.

***Recommendation #22: While the threats do not rise to the level of torture as defined under U.S. law, the facts support a conclusion that the Special Team Chief violated the UCMJ, Article 134, by communicating a threat. Recommend his current commander discipline the Special Team Chief.***

---

[12] The first JIG Chief was in charge during the approval process for the second Special Interrogation Plan and then rotated out of JTF-GTMO. The second JIG Chief was in charge during the execution of the second Special Interrogation Plan

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

## SUMMARY OF FINDINGS

The findings above fall into three categories: Techniques that were authorized throughout the interrogation periods; techniques that were never authorized and finally, techniques that were originally unauthorized, and then subsequently authorized. The summary below only outlines the latter two categories of techniques to address whether the findings violated the UCMJ, international law, U.S. Law, regulations or directives.

**Techniques that were never authorized:** AR 15-6 determined the following acts were NEVER authorized under any interrogation guidance:

   a) On at least two occasions between February 2002 and February 2003, two detainees were "short shackled" to the eye-bolt on the floor in the interrogation room;

   b) Sometime in October 2002 duct tape was used to "quiet" a detainee.

   c) Military interrogators threatened the subject of the second special interrogation and his family;

**Techniques that became authorized after the fact:** AR 15-6 determined the following acts were initially not authorized under existing interrogation guidance but later authorized as an approved technique.

   a) On several occasions during 2002 and 2003, interrogators would adjust the air conditioner to make the detainees, to include the subject of the first Special Interrogation Plan, uncomfortable. This technique is now permitted under the SECDEF 16 Apr 03 guidance.

   b) On several occasions prior to 2 Dec 02 and between 15 Jan 03 and 16 Apr 03 interrogators had detainees moved from one cell to another every few hours to disrupt sleep patterns and lower the ability to resist interrogation. This technique is now permitted under the SECDEF 16 Apr 03 guidance.

   c) In October 2002 a Military Working Dog was brought into the interrogation room during the course of interrogation of the subject of the first Special Interrogation Plan and directed to growl, bark, and show his teeth at the detainee. This technique is subsequently approved for the interrogation of the subject of the first Special Interrogation Plan by SECDEF on 12 Nov 02.

   d) The subject of the first Special Interrogation Plan was separated from other detainees in an isolation facility away from the general population from 8 Aug 02 to 12 Nov 02. This technique was subsequently approved

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

for the interrogation of the subject of the first Special Interrogation Plan by SECDEF on 12 Nov 02.

In each of the incidents above the violations can best be characterized as violations of policy. The SECDEF's subsequent approval of each of the techniques clearly establishes the ultimate legitimacy of that technique and thus additional corrective action is not necessary.

**Additional Matters:**  In addition to findings outlined above it is important to document some additional findings:

a) The team found no evidence that any detainee at GTMO was improperly documented or unaccounted for at any time.  Every agency interviewee clearly indicated that they never knew of any "ghost detainees" at GTMO;

b) Several past interrogators at GTMO declined to be interviewed.  In the case of personnel who are currently in a civilian status we had extremely limited authority to compel the individuals to cooperate with this investigation; of particular note was former SGT Erik Saar who has written a book into "activities" at GTMO.  Despite repeated requests he declined to be interviewed;

c) During the course of this investigation, JTF-GTMO CG investigated and took action for personal misconduct of senior DoD personnel on GTMO.  These allegations were reviewed and it was determined that they were not relevant to this investigation, and did not rise to a level to suggest a leadership environment with any impact on interrogation or detainee operations.

## ADDITIONAL RECOMMENDATIONS

This AR15-6 recommends consideration of the following:

a) ***Recommendation #23*** Recommend a policy-level review and determination of the status and treatment of all detainees, when not classified as EPWs.  This review needs to particularly focus on the definitions of humane treatment, military necessity, and proper employment of interrogation techniques.  (e.g. boundaries or extremes);

b) ***Recommendation #24*** Recommend study of the DoD authorized interrogation techniques to establish a framework for evaluating their cumulative impact in relation to the obligation to treat detainees humanely;

UNCLASS
1 Apr 05 (Amended 9 Jun 05)

c) ***Recommendation #25*** Recommend a reevaluation of the DoD and Inter-agency interrogation training consistent with the new realities of the requirements of the global war on terror;

d) ***Recommendation #26*** Recommend a policy-level determination on role of Military Police in "setting the conditions" for intelligence gathering and interrogation of detainees at both the tactical level and strategic level facilities;

e) ***Recommendation #27*** Recommend an Inter-Agency policy review to establish "standards" for interrogations when multiple agencies and interrogation objectives are involved.  Particular emphasis should be placed on setting policy for who has priority as the lead agency, the specific boundaries for the authorized techniques in cases with multiple agencies involved, a central "data-base" for all intelligence gathered at a detention facility, and procedures for record keeping to include historical, litigation support, lessons learned, and successful/unsuccessful intelligence gathering techniques.