**No.**

# In the Supreme Court of the United States

PETE GEREN, SECRETARY OF THE ARMY, ET AL.,
PETITIONERS

*v.*

SANDRA K. OMAR, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI**

PAUL D. CLEMENT
  *Solicitor General*
    *Counsel of Record*
PETER D. KEISLER
  *Assistant Attorney General*
GREGORY G. GARRE
  *Deputy Solicitor General*
DARYL JOSEFFER
  *Assistant to the Solicitor
    General*
DOUGLAS N. LETTER
JONATHAN H. LEVY
LEWIS S. YELIN
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  (202) 514-2217*

**QUESTIONS PRESENTED**

Respondent, a dual American-Jordanian citizen, voluntarily traveled to Iraq, allegedly committed serious crimes there, was captured in an active combat zone by members of an international military force (the Multinational Force-Iraq), and is being held under international authority by United States military personnel acting as part of that international military coalition and at the request of the Iraqi government. The questions presented are as follows:

1. Whether the United States courts have jurisdiction to entertain a habeas corpus petition filed on behalf of an individual such as respondent challenging his detention by the multinational force.

2. Whether, if such jurisdiction exists, the district court had the power to enjoin the multinational force from releasing respondent to Iraqi custody or allowing respondent to be tried before the Iraqi courts.

(I)

### PARTIES TO THE PROCEEDINGS

The petitioners are Pete Geren, Secretary of the United States Army; William H. Brandenburg, Major General-Deputy Commanding General (Detainee Operations); and Timothy Houser, Lieutenant Colonel.

The respondents are Sandra K. Omar and Ahmed S. Omar, acting as next friends of Shawqi Ahmad Omar.

(II)

## TABLE OF CONTENTS

Page

Opinions below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Constitutional and statutory provisions involved . . . . . . . . . . . 2
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Reasons for granting the petition . . . . . . . . . . . . . . . . . . . . . . . . 8
   A.  The court of appeals' jurisdictional ruling
      warrants this Court's review . . . . . . . . . . . . . . . . . . . . 11
   B.  The court of appeals' ruling upholding the
      district court's injunction warrants this Court's
      review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   C.  The Court should grant the petition in this case
      and hold the petition in *Munaf* . . . . . . . . . . . . . . . . . 26
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Appendix A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1a
Appendix B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40a
Appendix C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59a
Appendix D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61a
Appendix E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63a
Appendix F . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65a
Appendix G . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68a
Appendix H . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100a

## TABLE OF AUTHORITIES

Cases:

*Abu Ali* v. *Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004) . . . . 5
*Al-Bandar* v. *Bush*, 127 S. Ct. 854 (2007) . . . . . . . . . . . . . 15
*Flick* v. *Johnson*, 174 F.2d 983 (D.C. Cir.), cert.
   denied, 338 U.S. 879 (1949) . . . . . . . . . . . . . . . . . . . . . . . 13
*Floyd* v. *Henderson*, 456 F.2d 1117 (5th Cir. 1972) . . . . . . 22

(III)

IV

Cases—Continued:                                               Page

   *Hirota* v. *MacArthur*:

      335 U.S. 876 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      338 U.S. 197 (1948) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

   *Holmes* v. *Laird*, 459 F.2d 1211 (D.C. Cir.), cert.
      denied, 409 U.S. 869 (1972) . . . . . . . . . . . . . . . . . . . . 19, 20

   *Lopez-Smith* v. *Hood*, 121 F.3d 1322 (9th Cir. 1997) . . . . . 21

   *Munaf* v. *Geren*, 482 F.3d 582 (D.C. Cir.), petition
      for cert. pending, No. 06-1666 (filed June 13,
      2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20, 26

   *Munaf* v. *Harvey*, 456 F. Supp. 2d 115 (D.D.C. 2006),
      aff'd, 482 F.3d 582 (D.C. Cir.), petition for cert.
      pending, No. 06-1666 (filed June 13, 2007) . . . . . . . . . . 9

   *Neely* v. *Henkel*, 180 U.S. 109 (1901) . . . . . . . . . . . . 13, 21, 23

   *Ramadan* v. *Bush*, 127 S. Ct. 1512 (2007) . . . . . . . . . . . . . 14

   *Reid* v. *Covert*, 354 U.S. 1 (1957) . . . . . . . . . . . . . . . . . . . . 18

   *Republic of the Philippines* v. *Westinghouse Elec.
      Corp.*, 43 F.3d 65 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . 23

   *Schooner Exch.* v. *M'Fadden*, 11 U.S. (7 Cranch) 116
      (1812) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   *Spencer* v. *Kemna*, 523 U.S. 1 (1998) . . . . . . . . . . . . . . . . . 16

   *United States* v. *Kin-Hong*, 110 F.3d 103 (1st Cir.
      1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

   *Wilson* v. *Girard*, 354 U.S. 524 (1957) . . . . . . . . 11, 18, 20, 24

Treaty, resolutions and statute:

   Geneva Convention Relative to the Treatment of
      Prisoners of War, Aug. 12, 1949, Art. 5, 6 U.S.T.
      3322, 75 U.N.T.S. 140 . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V

Resolutions and statute—Continued:                    Page

Res. 1546, U.N. SCOR, U.N. Doc. S/Res. 1546
   (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20, 68a
Res. 1637, U.N. SCOR, U.N. Doc. S/Res. 1637
   (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20, 89a
Res. 1723, U.N. SCOR, U.N. Doc. S/Res. 1723 (2006) . 2, 20
Authorization for Use of Military Force Against Iraq
   Resolution of 2002, Pub. L. No. 107-243, 116 Stat.
   1498 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 65a

# In the Supreme Court of the United States

———

No.

PETE GEREN, SECRETARY OF THE ARMY, ET AL.,
PETITIONERS

*v.*

SANDRA K. OMAR, ET AL.

———

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

———

**PETITION FOR A WRIT OF CERTIORARI**

———

The Solicitor General, on behalf of the Secretary of the Army and the other federal petitioners, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the District of Columbia Circuit in this case.

## OPINIONS BELOW

The opinion of the court of appeals (App., *infra*, 1a-39a) is reported at 479 F.3d 1.  The opinion of the district court (App., *infra*, 40a-58a) is reported at 416 F. Supp. 2d 19.

## JURISDICTION

The judgment of the court of appeals was entered on February 9, 2007.  A petition for rehearing was denied on May 24, 2007 (App., *infra*, 61a-62a).  On August 15,

(1)

2

2007, the Chief Justice extended the time within which to file a petition for a writ of certiorari to and including September 21, 2007. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Pertinent provisions are reprinted in the appendix to this petition (App., *infra*, 65a-67a).

## STATEMENT

1. a. The Multinational Force-Iraq (MNF-I) is an internationally authorized entity consisting of forces from approximately 27 nations, including the United States. App., *infra*, 100a-101a. It operates in Iraq at the request of the Iraqi government and under a United Nations (U.N.) Security Council resolution authorizing it "to take all necessary measures to contribute to the maintenance of security and stability in Iraq." Res. 1546, U.N. SCOR, at 4, U.N. Doc. S/Res. 1546 (2004).[1] The MNF-I is charged with, among other tasks, deterring and preventing terrorism and detaining individuals where necessary for imperative reasons of security. App., *infra*, 85a. Pursuant to its U.N. mandate, the MNF-I operates under the "unified command" of United States military officers, *id*. at 74a, but the multinational force is legally distinct from the United States, has its own insignia, and includes high-ranking officers from other nations (for example, the second in command is a British officer).

_____

[1] That authority is subject to periodic review and reconsideration by the U.N. Security Council. The Security Council extended the MNF-I's mandate through December 2006, see Res. 1637, U.N. SCOR, U.N. Doc. S/Res. 1637 (2005), and again through December 2007, see Res. 1723, U.N. SCOR, U.N. Doc. S/Res. 1723 (2006).

3

b.  The Central Criminal Court of Iraq (CCCI) is an Iraqi court under Iraqi governance, staffed by Iraqi judges who apply Iraqi law.  App., *infra*, 104a.  The CCCI is divided into two chambers:  an investigative court and a felony trial court.  *Ibid*.  The investigative court conducts an investigative hearing, during which witnesses present sworn testimony, to determine whether there is sufficient evidence to warrant a criminal trial.  *Ibid*.  If the investigative court determines that there is sufficient evidence to proceed, it forwards a report to the trial court and recommends charges.  *Id*. at 105a. The trial court sits in panels of three judges, who review the evidence submitted by the investigative court and may take additional evidence in formal proceedings. *Ibid.*  In both investigative and trial proceedings, a defendant is entitled to be represented by court-appointed counsel or counsel of his choosing.  *Id.* at 105a-106a.

Under the authority of the U.N. Security Council resolutions, the Government of Iraq and the MNF-I have determined that the MNF-I should maintain physical custody of many individuals suspected of criminal activity in Iraq pending investigation and prosecution in Iraqi courts, because, *inter alia*, many Iraqi prison facilities have been damaged or destroyed in connection with the hostilities in Iraq.  See App., *infra*, 106a.

2.  Respondent is an American-Jordanian citizen who voluntarily traveled to Iraq.  See App., *infra*, 2a, 103a-104a.  In October 2004, he was captured by MNF-I forces in a raid of his Baghdad home targeting associates of Abu Musab al-Zarqawi, the former Al-Qaeda leader in Iraq.  See *ibid.*  When he was captured, respondent was harboring an Iraqi insurgent and four Jordanian Jihadist fighters in his home.  *Id.* at 101a-102a. Upon their capture, the individuals seized with respon-

4

dent stated that, while living in his home in Baghdad, they surveilled potential kidnap victims, conducted weapons training, and engaged in other insurgent cell activities. *Id.* at 102a. Those individuals, as well as respondent, also explained that respondent planned to use his fluency in English to entice foreigners to return to his home where they could be kidnapped and ransomed. *Ibid.* At the time of his capture, respondent had several weapons and explosive-making materials in his home. *Id.* at 103a.

Since his capture, respondent has remained in the custody of members of the United States armed forces operating as part of the MNF-I. See App., *infra*, 1a. A three-member MNF-I tribunal held a hearing at which respondent was present and had the opportunity to hear the charges against him, make a statement, and call witnesses who were immediately available. *Id.* at 3a. The tribunal found that respondent was a security internee under the authority of the U.N. resolutions, *i.e.*, that he posed a threat to the security of Iraq, and that he was also an enemy combatant in the war on terrorism. See *ibid.*; *id.* at 103a. The MNF-I determined to refer respondent to the CCCI for investigation and prosecution for offenses committed in Iraq. That referral is consistent with the manner in which the MNF-I has treated other security internees being held by the MNF-I under international authority. *Id.* at 3a-4a.

3. Before the MNF-I referred respondent to the CCCI, this next-friend habeas corpus petition was filed on his behalf. The district court issued a preliminary injunction directing that "the respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order by personal ser-

5

vice or otherwise, shall not remove the petitioner from United States or MNF-I custody." App., *infra*, 59a.

The district court rejected the government's contention that *Hirota* v. *MacArthur*, 338 U.S. 197 (1948) (per curiam), controls the jurisdictional question here. App., *infra*, 47a-49a. In that decision, this Court held that federal courts lacked habeas jurisdiction over petitions filed by Japanese nationals convicted by a multinational military court established by General Douglas MacArthur acting "as the agent of the Allied Powers" and detained in the custody of General MacArthur's subordinate in the United States Army. 338 U.S. at 198. Because General MacArthur and his military subordinates were acting pursuant to international authority as part of a multinational force, this Court determined that "the courts of the United States ha[d] no power" to grant the petitioners any habeas relief. *Ibid.*

The district court also rejected the government's contention that constitutional separation-of-powers considerations preclude the courts from adjudicating this case. App., *infra*, 53a-54a. In the district court's view, regardless of the merits of those arguments, "doctrines such as act of state, separation of powers and political question, although important considerations, do not 'extinguish[] the fundamental right of a citizen to challenge his detention colorably alleged to be at the behest of the executive.'" *Ibid.* (quoting *Abu Ali* v. *Ashcroft*, 350 F. Supp. 2d 28, 57 (D.D.C. 2004)).

Having concluded that it had authority to entertain this habeas action, the district court entered an order barring respondent's release from MNF-I custody on the ground that "any physical transfer of [respondent] may prematurely moot the case or undo this court's jurisdiction." App., *infra*, 55a. Although the court recog-

6

nized that respondent's "appearance before the CCCI
does not constitute an immediate transfer to the Iraqi
authorities," the court nevertheless also barred the
MNF-I from presenting respondent for any proceedings
before the CCCI on the theory that respondent might be
"presented to the CCCI and in that same day, be tried,
convicted, and transferred to the CCCI's jurisdiction."
*Id.* at 56a; see *id.* at 59a-60a (order granting relief).

4. The court of appeals affirmed as to both the exis-
tence of jurisdiction and the propriety of the district
court's injunction. App., *infra*, 1a-39a.

a. The court of appeals held that the district court
had jurisdiction over this habeas action. App., *infra*, 7a-
14a. It recognized that this case is like *Hirota* in that
respondent is being held "overseas" by a "multinational
force," but it held that the basic jurisdictional limitation
established in *Hirota* for individuals held by multina-
tional forces acting under international authority does
not govern this case because respondent has not yet
been convicted by the Iraqi courts based on the criminal
offenses for which he is being held. *Id.* at 11a, 12a-13a.

The court of appeals likewise rejected the govern-
ment's arguments that respondent's challenge to his
detention and effort to block his transfer to Iraqi au-
thorities were not justiciable. App., *infra*, 15a-19a. The
court recognized that "the 'rule of non-inquiry' * * *
bars courts from investigating the fairness of a request-
ing nation's justice system," such as Iraq's. *Id.* at 19a
(citation omitted). But the court asserted that "since the
only question before us at this stage of the litigation
relates to the district court's jurisdiction," the rule of
non-inquiry "has no relevance" here. *Ibid.*

A panel majority also upheld the district court's in-
junction. App., *infra*, 19a-26a. Although the majority

7

recognized that the district court lacked the authority to enjoin respondent's outright release, *id.* at 20a, the majority nonetheless concluded that the district court properly enjoined respondent's transfer to Iraqi custody, his release accompanied by information sharing with the Iraqi government that would enable Iraq to arrest respondent upon his release, and his prosecution by the Iraqi courts. *Id.* at 20a, 23a, 25a. The court reasoned that such steps were warranted to preserve the district court's jurisdiction to consider the legality of any transfer of respondent to Iraqi custody. *Id.* at 23a.

b. Judge Brown dissented. App., *infra*, 27a-39a. She joined the panel's threshold ruling on jurisdiction, but "disagree[d] with the majority's view that, while the district court cannot enjoin [respondent's] release outright, it may indeed dictate the *terms* of his release." *Id.* at 27a. Because "[r]elease would provide [respondent] with all the relief to which he might be entitled by way of his habeas petition," Judge Brown would have vacated the injunction in its entirety. *Id.* at 30a, 39a.

Judge Brown explained that "to make an injunction against transfer to Iraqi authorities a viable form of preliminary relief, [respondent] would need to show some likelihood of obtaining permanent relief protecting him from Iraqi custody." App., *infra*, 35a. Respondent could not make that showing, however, because "'transfer' here means simply allowing Iraqi officials to arrest and take custody of a person who was captured in Iraq and has remained there continuously—something they undeniably have a right to do." *Id.* at 35a-36a.

Judge Brown reasoned that, especially because Iraq has the "exclusive jurisdiction to punish offenses against its laws committed within its borders," a United States court cannot "enjoin the United States military from

8

sharing information with an allied foreign sovereign in a war zone * * * with the deliberate purpose of foiling the efforts of the foreign sovereign to make an arrest on its own soil, in effect secreting a fugitive to prevent his capture." App., *infra*, 34a, 36a. "Any judicial order barring this sort of information sharing in a military zone," Judge Brown explained, "would clearly constitute judicial interference in a matter left solely to Executive discretion and would hence be improper under the political question doctrine." *Id.* at 33a.

Judge Brown concluded that the injunction upheld by the panel majority constitutes an "unprecedented" interference "in the decisions of sovereigns acting jointly within the same territory," amounts to a clear "trespass" on Executive authority, and imposes a "substantial impairment to the Executive's ability to prosecute the war efficiently and to make good on its commitments to our allies." App., *infra*, 34a, 36a-37a, 38a.

c. The court of appeals denied petitioners' petition for rehearing en banc. App., *infra*, 63a-64a. Two judges would have granted the petition. *Ibid.*

### REASONS FOR GRANTING THE PETITION

This case raises questions of exceptional importance concerning the separation of powers, the Nation's conduct of foreign and military affairs, and the sovereign prerogative of foreign nations to try individuals for the commission of criminal offenses within their own borders. The court of appeals upheld the exercise of jurisdiction over a habeas petition filed on behalf of an individual being held by a multinational force operating overseas in a theater of active hostilities pursuant to a U.N. mandate and at the request of the local foreign sovereign. By a split decision, the court of appeals also

9

held that the existence of such jurisdiction empowers the United States courts to enjoin the multinational force from releasing the individual to the custody of the local foreign sovereign and even to prevent the foreign sovereign from prosecuting the individual for criminal offenses committed within its own borders. As far as the government is aware, no court has previously sanctioned such a far-reaching and internationally unsettling exercise of American judicial power.[2]

In reaching that unprecedented result, the court of appeals misconstrued this Court's decision in *Hirota* v. *MacArthur*, 338 U.S. 197 (1948) (per curiam). *Hirota* establishes that United States courts lack jurisdiction to review the detention of individuals held abroad pursuant to international authority, including individuals held by United States forces acting under American command as part of a multinational force. The court of appeals confined *Hirota*'s jurisdictional rule to situations in which an individual has already been criminally convicted by a foreign tribunal. But that "criminal conviction" limitation does not square with the rationale of *Hirota* and, as the injunction at issue underscores, creates a perverse incentive for United States courts to interfere with the exercise of criminal jurisdiction by foreign sovereigns earlier rather than later in order to "preserve[]" (App., *infra*, 27a) the jurisdiction of the United States courts.

---

[2] See *Munaf* v. *Harvey*, 456 F. Supp. 2d 115, 130 (D.D.C. 2006), aff'd, 482 F.3d 582, 584 (D.C. Cir. 2007) ("[N]o court in our country's history, other than [in the *Omar* case], has ever found habeas jurisdiction over a multinational force comprised of the United States acting jointly with its allies overseas."), petition for cert. pending, No. 06-1666 (filed June 13, 2007).

10

Although respondent is a citizen, it bears emphasis that the court of appeals fashioned a "criminal conviction" limitation on *Hirota*, rather than relying on respondent's citizenship in finding jurisdiction over this action. Although (as Justice Douglas recognized in his concurring opinion) the rationale of *Hirota* does not lend itself to a citizenship exception, see 338 U.S. at 202-203, 205, limiting *Hirota* to non-citizens would produce a less dramatic result than that reached by the court of appeals. The court of appeals' "criminal conviction" rule is not tied to citizenship and thus could have significant consequences as to the detention of aliens held abroad by multinational forces operating under international authority.  That prospect magnifies the importance of the threshold jurisdictional question.

Furthermore, even if jurisdiction exists, a writ of certiorari is warranted to review the legitimacy of the district court's *exercise* of that jurisdiction by granting its unprecedented injunction against respondent's transfer to Iraqi authorities to answer for criminal conduct within Iraq's own borders.  That injunction overrides the determinations of a multinational force acting pursuant to authority derived from the United Nations at the request of Iraq; interferes with the United States' international commitments to the United Nations, the other countries comprising the multinational force, and the Government of Iraq; intrudes on Iraq's sovereign interest in prosecuting serious criminal offenses committed within its own territory; and impedes the fundamental mission of the multinational force to help secure Iraq and establish the legitimacy of vital governmental institutions in Iraq, including its courts.

As Judge Brown observed, under the decision in this case, "a single unelected district court judge can enjoin

11

the United States military from sharing information with an allied foreign sovereign in a war zone and may do so with the deliberate purpose of foiling the efforts of the foreign sovereign to make an arrest on its own soil." App., *infra*, 34a. "Such interference by a court in the decisions of sovereigns acting jointly within the same territory" not only is "unprecedented," *id.* at 36a-37a, but constitutes a "substantial impairment to the Executive's ability to prosecute the war efficiently and to make good on its commitments to our allies," *id.* at 38a, contravenes this Court's precedent, *e.g.*, *Wilson* v. *Girard*, 354 U.S. 524, 529 (1957), and warrants this Court's review.

### A. The Court Of Appeals' Jurisdictional Ruling Warrants This Court's Review

1. The threshold jurisdictional question presented by this habeas action is governed by *Hirota*. That decision addressed petitions for writs of habeas corpus filed by Japanese citizens convicted by a multinational military court established by General Douglas MacArthur acting "as the agent of the Allied Powers," and detained in the custody of General MacArthur's subordinate in the United States Army. *Hirota*, 338 U.S. at 198; see *id.* at 199 (Douglas, J., concurring). Because this Court was "satisfied that the tribunal sentencing these petitioners [was] not a tribunal of the United States," it held that "the courts of the United States ha[d] no power" to adjudicate the habeas petitions. *Id.* at 198.

The Court recognized that although General MacArthur was a United States military officer, *Hirota*, 338 U.S. at 207 (Douglas, J., concurring), he was "acting as the Supreme Commander for the Allied Powers" and the military tribunal at issue was "set up by General MacAr-

12

thur as the agent of the Allied Powers." *Id.* at 198. General MacArthur's authorization to establish the tribunal came from the Far Eastern Commission, an international body composed of representatives from 11 nations. *Id.* at 206 (Douglas, J., concurring).

The basic teaching of *Hirota* calls for dismissal of this action. In both cases, the habeas petitioners were in the physical custody of United States military officers, but those officers acted as part of a multinational force under international authority. While the United States is certainly a vital component of the MNF-I, that was no less true of the United States forces operating as part of the Allied Powers in Japan. See *Hirota*, 338 U.S. at 207 (Douglas, J., concurring). Here, the United Nations, the United States, and the 26 other nations participating in the multinational force all view the MNF-I as having a distinct identity from the forces of any particular nation. The courts below did not identify any basis to countermand that judgment and disregard the MNF-I's international origin and authority.[3]

_____

[3] The court of appeals stated that "the government concedes * * * that [U.S.] forces operate 'subject to' no independent MNF-I authority." App., *infra*, 14a-15a. It is not clear what the court intended by that statement. As the government has made clear throughout this litigation, however, the MNF-I is an international entity distinct from the United States and, while the MNF-I is under unified American command, the same was true of the multinational force in *Hirota*. See, *e.g.*, Pet. C.A. Br. 5-6, 30; Gov't C.A. Reply Br. 5-6; 9/11/2006 Oral Arg. Tr. 10-11. Indeed, the government specifically explained that it would "mischaracteriz[e]" the government's arguments to say that U.S. forces do not operate "subject to * * * multi-national authority." *Id.* at 20-21. In any event, the court of appeals explicitly recognized that this case is like *Hirota* in that respondent is detained abroad by a "multinational force." App., *infra*, 11a.

13

2.  The court of appeals acknowledged that this case is like *Hirota* in that it involves the detention of an individual "overseas" by a "multinational force."  App., *infra*, 11a.  But the court reasoned that "the critical factor in *Hirota* was the petitioners' convictions by an international tribunal," and it distinguished this case on the ground that respondent has not yet been convicted of a crime by an international or foreign tribunal.  *Id.* at 12a.  The court of appeals' focus on the existence of a criminal conviction—rather than the source of authority under which an individual is held by a multinational force—is inconsistent with *Hirota*'s basic reasoning.  Indeed, shortly after *Hirota* was decided, the District of Columbia Circuit itself recognized that the key to *Hirota*'s jurisdictional rule is the "source of [the] power" pursuant to which an individual is held.  *Flick* v. *Johnson*, 174 F.2d 983, 984, cert. denied, 338 U.S. 879 (1949).  Respondent here, like the petitioners in *Hirota*, is being held under international authority.

The court of appeals asserted that the fact of a conviction is dispositive because it means that "some form of judicial process has occurred."  App., *infra*, 13a.  But the fact that *Hirota* is silent as to what process the petitioners received completely belies the court of appeals' view that the form of judicial process animated this Court's decision in *Hirota*.  338 U.S. at 197-198.  Moreover, limiting *Hirota*'s jurisdictional rule to individuals who have received a certain degree of process before an international authority would contravene this Court's decisions instructing that United States courts may not second guess the adequacy of the criminal process afforded by international or foreign tribunals.  See *Neely* v. *Henkel*, 180 U.S. 109, 123 (1901); pp. 20-21, *infra*.  More fundamentally, the degree of process received—

14

whatever its impact on the merits—has nothing to do with the existence of jurisdiction. On the other hand, the determination whether a prisoner is in custody under the authority of the United States, or of a multinational entity, goes directly to the question of jurisdiction.[4]

The court of appeals based its ruling on the absence of a criminal conviction, and not on respondent's United States citizenship. App., *infra*, 12a-14a. Although (as Justice Douglas observed) the reasoning of *Hirota* applies to citizens as well as aliens, see 338 U.S. at 201-202, 205, a ruling limited to the relatively unusual circumstance of a citizen detained by an international force would have a reduced practical impact. The fact that the court of appeals' "criminal conviction" limitation on *Hirota* does not distinguish between aliens and citizens provides an additional basis for review, because it magnifies the potential practical effect of the decision.[5]

_____

[4] In any event, respondent received substantial process from the MNF-I tribunal that found that he was a security internee: he had the right to be present before that tribunal, hear the charges against him, make a statement, and call witnesses who were immediately available. App., *infra*, 3a. That hearing was modeled on, and exceeded, the procedures established by Article 5 of the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3322, 75 U.N.T.S. 140. See App., *infra*, 103a. Accordingly, respondent has received all the process called for by the law of war, including the Third Geneva Convention, for an individual being detained during an ongoing conflict as a security threat.

[5] Most individuals who have been held by the MNF-I are not United States citizens and several such individuals have already filed habeas petitions seeking injunctive relief prohibiting the MNF-I from transferring them to Iraqi custody. See, *e.g.*, *Ramadan* v. *Bush*, 127 S. Ct. 1512 (2007) (No. 06A894) (application for injunction pending appeal denied by the Court), No. 07-5078 (D.C. Cir.) (motion for injunction pending appeal denied on Mar. 15, 2007), No. 07-297 (D.D.C.) (habeas

15

3.  The dichotomy created by the court of appeals' rule between cases in which international convictions have already been entered, and those in which they have not, raises grave comity concerns:  Under the District of Columbia Circuit's approach, the existence of United States jurisdiction depends on how far criminal proceedings have progressed before an international tribunal. United States courts lack jurisdiction over habeas petitions that are filed on behalf of individuals (including citizens) who have already been convicted by an international or foreign body, see *Munaf* v. *Geren*, 482 F.3d 582, 584 (D.C. Cir.) (affirming dismissal of habeas petition brought by individual held by MNF-I following his conviction by CCCI), petition for cert. pending, No. 06-1666 (filed June 13, 2007), but have jurisdiction to entertain actions that are filed before foreign proceedings have reached that stage.  What is more, under the court of appeals' decision, when such jurisdiction exists, United States courts may exercise it to *prevent* criminal

---

petition dismissed for lack of jurisdiction under *Hirota* on Feb. 27, 2007); *Al-Bandar* v. *Bush*, No. 06A644 (application for injunction pending appeal denied by the Chief Justice on Jan. 3, 2007), 127 S. Ct. 854 (2007) (re-filed application referred by Justice Stevens to the Court denied), No. 06-5425 (D.C. Cir.) (application for injunction pending appeal denied on Dec. 29, 2006) (motion for en banc reconsideration of denial of injunction denied on Jan. 3, 2007), No. 06-2209 (D.D.C.) (motion for temporary restraining order denied and habeas petition dismissed for lack of jurisdiction under *Hirota* on Dec. 28, 2006); *In re Hussein*, Misc. No. 06-566 (D.C. Cir.) (motion for injunction denied and habeas petition denied for lack of jurisdiction under *Hirota* on Dec. 29, 2006).  While those petitioners had been convicted by a foreign tribunal before initiating their habeas actions, it is reasonable to assume, especially in the wake of the court of appeals' decision in this case, that foreign nationals detained by the MNF-I who have not yet been convicted by a foreign tribunal will file habeas actions in the United States courts.

16

proceedings before the foreign tribunal under the aus-
pices of *preserving* their own habeas jurisdiction.  App.,
*infra*, 55a.  As this case illustrates, the court of appeals'
jurisdictional rule therefore invites the United States
courts to interfere with the criminal prosecution of indi-
viduals before foreign tribunals.

### B. The Court Of Appeals' Ruling Upholding The District Court's Injunction Warrants This Court's Review

Because the court of appeals held that it possessed
jurisdiction over this habeas action, this case presents
a second—and complementary—question concerning
the limits on the appropriate exercise of such jurisdic-
tion.  That question is of fundamental importance and
likewise necessitates this Court's review.  Indeed, the
divided court of appeals held that—in order to "pre-
serve[]" its jurisdiction over this action, App., *infra*, 23a,
26a-27a—the district court had the power to enjoin the
multinational force from transferring respondent to
Iraqi custody, sharing with the Iraqi government details
concerning any decision to release respondent, and al-
lowing respondent to appear before the Iraqi courts to
answer for alleged crimes committed in Iraq.  *Id.* at 20a,
23a, 25a.  That ruling disregards the traditional limits
on habeas relief, conflicts with this Court's precedent
recognizing that foreign sovereigns have exclusive juris-
diction to try and punish individuals for offenses com-
mitted within their borders, and impermissibly intrudes
on the Executive's military and foreign policy powers.

1.  As a matter of traditional habeas principles, the
district court correctly recognized that respondent's re-
lease would moot his habeas petition and deprive the
court of whatever jurisdiction it had.  App., *infra*, 55a;
see *Spencer* v. *Kemna*, 523 U.S. 1 (1998) (habeas chal-

17

lenge to parole violation moot once prisoner released).
While the district court purported to enjoin respon-
dent's release from MNF-I custody in order to prevent
the case from becoming moot, the court of appeals cor-
rectly recognized that it could not do so. App., *infra*,
20a, 55a. Release from custody is the essential remedy
secured by habeas and part of the relief *sought* by re-
spondent. C.A. App. 17. Article III does not permit the
courts to prolong artificially a case or controversy by
enjoining a party from providing the requested relief.
Despite its correct recognition of the limits on relief, the
court of appeals upheld extraordinary restrictions on
the handling of a security internee abroad that are no
more justifiable than the district court's ban on respon-
dent's outright release.

a. There is no legal basis for enjoining the MNF-I
from transferring respondent—within Iraq—to Iraqi
custody. As Judge Brown recognized, respondent's
transfer to Iraqi authorities would not be an extradition,
because respondent traveled to Iraq voluntarily and has
been within the sovereign territory of Iraq at all rele-
vant times. App., *infra*, 35a. Moreover, "[w]here, as is
true here, the prisoner is physically in the territory of
the foreign sovereign that seeks to make the arrest, re-
lease is tantamount to transfer, and thus the logic un-
derlying stays on extradition does not apply." *Id.* at
36a. The court of appeals did not attempt to identify a
legal basis for blocking respondent's transfer to Iraqi
custody. Instead, the court reasoned that it is an open
question whether the United States would need treaty
or statutory authorization to transfer respondent within
Iraq to Iraqi custody, and then refused to consider that
question in upholding the district court's injunction on

18

transfer. *Id.* at 25a. That ruling is mistaken and conflicts with this Court's precedent.

This Court has long recognized that a "sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." *Wilson* v. *Girard*, 354 U.S. 524, 529 (1957); see *Reid* v. *Covert*, 354 U.S. 1, 15 n.29 (1957) (plurality opinion) ("[A] foreign nation has plenary criminal jurisdiction, of course, over all Americans * * * who commit offenses against its laws within its territory."); *Schooner Exch.* v. *M'Fadden*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute."). A foreign sovereign's "plenary" authority (*Reid*, 354 U.S. at 15 n.29) is not just the power to punish after conviction; it is also the power to arrest a suspect within its own sovereign territory, charge that suspect, and try that suspect in its courts.

In *Wilson*, this Court reversed a district court injunction against the transfer of an American soldier (Girard) serving in Japan from the custody of the United States Army to Japanese authorities in Japan to face trial for the alleged shooting of a civilian during a training exercise. 354 U.S. at 525-526. The Court held that Japan has "exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." *Id.* at 529. Because Japan had not surrendered that jurisdiction, a unanimous Court found "no constitutional or statutory barrier" to the Army's transfer of Girard to Japanese authorities to face trial. *Id.* at 530. Because Iraq has not surrendered its jurisdiction over criminal offenses committed within Iraq, and because

19

there is no treaty or statute that bars his transfer to Iraqi authority, *Wilson* controls here and requires that the injunction on transfer be set aside.[6]

Indeed, this case presents a more compelling situation than *Wilson* for setting aside the injunction on respondent's transfer to Iraqi authorities to answer for his conduct within Iraq. Unlike Girard, who was stationed in Japan when he committed the alleged offense, respondent voluntarily traveled to Iraq and committed alleged criminal offenses there. Moreover, unlike Girard, respondent was apprehended by a multinational force in a foreign combat zone, and bringing him to justice in Iraqi courts implicates vital military and foreign relations matters. Respondent was captured in an active combat zone and while harboring an Iraqi insurgent and four Jordanian fighters and while possessing weapons and Improvised Explosive Device-making materials. See App., *infra*, 103a. The decision to detain respondent was made for the safety and security of MNF-I troops in Iraq, as well as for the safety and security of the government and people of Iraq, and any decision to transfer respondent to Iraqi authorities to face trial would be consistent with the MNF-I's U.N. mandate to protect and assist Iraq's government institutions— including its criminal justice system.[7]

---

[6] Far from there being a statute or treaty *barring* respondent's transfer to Iraqi authorities, existing United States law and U.N. obligations positively authorize such a transfer. See note 8, *infra*.

[7] The court of appeals' decision upholding the injunction is also at odds with the District of Columbia Circuit's prior decision in *Holmes* v. *Laird*, 459 F.2d 1211, cert. denied, 409 U.S. 869 (1972). In that case, American servicemen were convicted by German courts for criminal offenses in Germany, then returned to the United States and filed an action seeking "an injunction restraining the American military from

20

There is no dispute that the MNF-I forces who apprehended respondent could have immediately handed him over to Iraqi authorities without approval by a court in the United States. The fact that a habeas petition has been filed on behalf of respondent does not deprive the MNF-I of its discretion to transfer respondent to the custody of Iraq. Nor does it in any way diminish Iraq's "exclusive jurisdiction to punish offenses against its laws committed within its borders." *Wilson*, 354 U.S. at 529.[8]

Nor can the injunction be sustained based on allegations that respondent may be deprived of due process by Iraqi authorities. As this Court long ago held, "[w]hen an American citizen commits a crime in a foreign coun-

---

surrendering them to [German authorities]." *Id.* at 1214. Citing, *inter alia*, separation-of-powers concerns, see *id.* at 1215-1217, the court held that "the contemplated surrender * * * is a matter beyond the purview of this Court," *id.* at 1225. This case presents an even stronger case for such judicial restraint because respondent, unlike the plaintiffs in *Holmes* (who had returned to the United States before filing suit seeking to enjoin their transfer), remains in the foreign country where he was captured and charged with criminal conduct. Although an intra-circuit conflict ordinarily does not warrant certiorari, because most if not all habeas petitions raising the sort of international concerns implicated by this case have been filed in the District of Columbia Circuit, the conflict with *Holmes* is pertinent here.

[8] The authority of United States forces to operate in Iraq, and to hold security internees on behalf of the Government of Iraq, necessarily includes any authority needed to transfer detainees to Iraqi authorities. That is particularly true where, as here, such a transfer would be carrying out a U.N. mandate and at the request of the Government of Iraq. See *Munaf*, 482 F.3d at 586 (Randolph, J., concurring in judgment) (citing Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498; Res. 1637, U.N. SCOR, U.N. Doc. S/Res. 1637 (2005); and Res. 1546, U.N. SCOR, U.N. Doc. S/Res. 1546 (2004)).

21

try, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States." *Neely*, 180 U.S. at 123. Even in the extradition context, therefore, "under what is called the 'rule of non-inquiry' * * * courts in this country refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely." *Lopez-Smith* v. *Hood*, 121 F.3d 1322, 1327 (9th Cir. 1997); see *United States* v. *Kin-Hong*, 110 F.3d 103, 110-111 (1st Cir. 1997). The separation-of-powers concerns embodied in the rule of non-inquiry are even stronger here than in the typical extradition case because respondent is already voluntarily in Iraq, and the United States is working closely with the Government of Iraq to restore order to that country, in part by working to build respect for Iraq's vital governmental institutions, including its courts.[9]

Significantly, the court of appeals declined to consider the government's arguments on this point, considering them irrelevant to the courts' jurisdiction. App., *infra*, 19a. But the court of appeals affirmed the district court's injunction as well as its jurisdictional finding, and in doing so it simply ignored the relevance of those arguments to respondent's likelihood of success on the

---

[9] To be clear, the United States would object to the MNF-I's transfer of respondent to Iraqi custody if it believed that he would be tortured. Under the rule of non-inquiry discussed above, however, that is fundamentally a foreign affairs determination, based in part on the Executive's assessment of the foreign country's legal system and the Executive's ability to obtain assurances it considers reliable. See App., *infra*, 37a n.6 (Brown, J., dissenting).

22

merits of his challenge to a potential transfer to Iraqi custody. Thus, the court of appeals affirmed the district court's unprecedented injunction against respondent's transfer only by assuming, incorrectly, that respondent could prevail on the merits of such a challenge.

b. The other aspects of the district court's unprecedented injunction are even more problematic under the principles discussed above and underscore the extent to which the courts have intruded on core Executive responsibilities and international comity. In addition to blocking respondent's transfer to Iraqi custody, the court of appeals ruled that the MNF-I may not release respondent after providing Iraqi authorities with information that would enable them to arrest respondent upon his release. App., *infra*, 22a-23a. However, as Judge Brown observed, "information sharing among sovereigns regarding the location of persons subject to arrest is a common and desirable practice, particularly in a situation like that in present-day Iraq, where the United States military is cooperating with Iraqi authorities to secure the country." *Id.* at 33a.[10]

Under the court of appeals' decision, the MNF-I could evidently release respondent in Iraq only if it gave him a head start before notifying Iraqi authorities that

_____

[10] As Judge Brown explained, the district court's injunction also conflicts with the traditional practice in the domestic context. The injunction at issue "is comparable to a court enjoining state authorities from lodging a detainer with respect to a prisoner held in federal custody and then requiring the federal prison officials to release the prisoner in a way that protects the prisoner from state arrest." App., *infra*, 36a. Even in the domestic context, "[s]uch interference by a court in the decisions of sovereigns acting jointly within the same territory is unprecedented." *Id.* at 36a-37a (citing *Floyd* v. *Henderson*, 456 F.2d 1117, 1119 (5th Cir. 1972)). Such interference is, of course, all the more unwarranted in the foreign and military context of this case.

23

it had released someone that those authorities believed to be a dangerous criminal. As Judge Brown noted, the upshot of the court of appeals' decision is therefore that "a single unelected district court judge can enjoin the United States military from sharing information with an allied foreign sovereign in a war zone and may do so with the deliberate purpose of foiling the efforts of the foreign sovereign to make an arrest on its own soil, in effect secreting a fugitive to prevent his capture. The trespass on Executive authority could hardly be clearer." App., *infra*, 34a.

Significantly, however, United States courts lack authority to interfere with the efforts of a foreign sovereign to arrest an individual within its territory who had voluntarily traveled there. See *Republic of the Philippines* v. *Westinghouse Elec. Corp.*, 43 F.3d 65, 79 (3d Cir. 1995). "When an American citizen commits a crime in a foreign country he cannot complain if required to submit to such modes of trial and to punishment as the laws of the country may prescribe for its own people." *Neely*, 180 U.S. at 123. That concern is especially pronounced here, where the MNF-I detained respondent precisely because he is a confirmed security threat in an active combat zone. Simply releasing him in an area of ongoing conflict, without advance notice to the local sovereign, could have grave diplomatic and practical consequences. Even if the injunction against respondent's transfer were sustainable, therefore, the injunction against communication among sovereigns concerning a potential arrest by Iraqi authorities in Iraq would remain an impermissible intrusion on the Executive's war powers and foreign affairs responsibilities, as well as on Iraq's sovereignty.

24

The court of appeals compounded its error by directing that respondent not be brought before the CCCI for trial, even if he remained in MNF-I custody. App., *infra*, 25a. Even if the United States courts could prevent Iraq from assuming custody of respondent, there would be no justification for preventing the Iraqi courts from adjudicating respondent's guilt or innocence while he remained within the custody of the MNF-I. As long as respondent remains in MNF-I custody, the jurisdiction of the United States courts (if any) to review that custody would be unaffected. The court of appeals' unfounded speculation that Iraq might seize respondent from the MNF-I, *id.* at 25a-26a, is refuted by the government's declaration explaining that he would remain in MNF-I custody during proceedings before the CCCI, *id.* at 106a, and in any event provides no basis for interfering with a foreign sovereign's "exclusive jurisdiction to punish offenses against its laws committed within its borders." *Wilson*, 354 U.S. at 529.

2. While the injunction at issue suffers the specific defects discussed above, it likewise runs afoul of the political question doctrine. By interfering with core military determinations in a zone of active combat, and also with sensitive national security and foreign relations matters related to the rebuilding of Iraqi political and judicial institutions, the district court's injunction violates fundamental separation-of-powers principles. See App., *infra*, 33a (Brown, J., dissenting) (district court's injunction violates the "political question doctrine").

As discussed above, this case and the relief approved by the court of appeals directly implicate sensitive decisions made by the Executive in the conduct of a multinational force abroad. In the current volatile atmosphere in Iraq, a judicial order demonstrating a lack of respect

25

for the Executive Branch's determinations to hold a security internee to permit the Iraqi legal system to prosecute him could have unsettling consequences. As Justice Jackson observed in *Hirota:*

> For this Court now to call up these cases for judicial review under exclusively American law can only be regarded as a warning to our associates in the trials that no commitment of the President or of the military authorities, even in matters such as these, has finality or validity under our form of government until it has the approval of this Court. And since the Court's approval or disapproval cannot be known until after the event—usually long after—it would substantially handicap our country in asking other nations to rely upon the word or act of the President in affairs which only he is competent to conduct.

*Hirota* v. *MacArthur*, 335 U.S. 876, 878 (1948) (statement respecting oral argument). The unprecedented injunction in this case barring the MNF-I from releasing respondent to the custody of Iraq, sharing information with the Iraqi authorities over the handling of respondent, or allowing the Iraqi authorities to prosecute respondent for offenses committed in Iraq underscores the continuing wisdom of Justice Jackson's observation.

As Judge Brown explained, the injunction in this case "substantial[ly] impair[s] * * * the Executive's ability to prosecute the war efficiently and to make good on its commitments to our allies." App., *infra*, 38a. Such an extraordinary exercise of American judicial power over the conduct of important and sensitive foreign and military affairs abroad warrants this Court's review.

26

### C. The Court Should Grant The Petition In This Case And Hold The Petition In *Munaf*

The petition for a writ of certiorari in *Munaf* presents the same threshold jurisdictional question presented by this case. In *Munaf*, the District of Columbia Circuit held that United States courts lack jurisdiction over a habeas petition filed by an individual detained by the MNF-I *and convicted* by the CCCI. 482 F.3d at 583-584. That case, unlike this one, does not involve an injunction, in part because the district court dismissed the *Munaf* petition at the outset for lack of jurisdiction and the court of appeals affirmed. As a result, this case provides a superior vehicle than *Munaf* for considering the full set of issues concerning the authority of the United States courts to entertain habeas petitions filed on behalf of individuals detained by a multinational force abroad acting under international authority. Accordingly, this Court should grant the petition in this case and hold the petition in *Munaf* pending the disposition of this case. Alternatively, this Court could grant both petitions and consolidate the cases for oral argument.

27

**CONCLUSION**

The petition for a writ of certiorari should be granted.

Respectfully submitted.

PAUL D. CLEMENT
*Solicitor General*

PETER D. KEISLER
*Assistant Attorney General*

GREGORY G. GARRE
*Deputy Solicitor General*

DARYL JOSEFFER
*Assistant to the Solicitor
General*

DOUGLAS N. LETTER
JONATHAN H. LEVY
LEWIS S. YELIN
*Attorneys*

SEPTEMBER 2007

**APPENDIX A**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

––––––––––

No. 06-5126

SANDRA K. OMAR AND AHMED S. OMAR, AS NEXT
FRIENDS OF SHAWQI AHMAD OMAR, APPELLEES

*v.*

FRANCIS J. HARVEY, SECRETARY OF THE UNITED
STATES ARMY, ET AL., APPELLANTS

––––––––––

Argued: Sept. 11, 2006
Decided: Feb. 9, 2007
Rehearing En Banc Denied: May 24, 2007[1]

––––––––––

Before: TATEL and BROWN, Circuit Judges, and
EDWARDS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge TATEL.

Opinion dissenting in part filed by Circuit Judge
BROWN. TATEL, Circuit Judge:

In this case we have before us a petition for a writ of
habeas corpus filed on behalf of Shawqi Ahmad Omar,
an American citizen captured and detained in Iraq by
United States military forces operating as part of the
Multi-National Force-Iraq. Omar has been held under

––––––––––

[1] Circuit Judges Brown and Kavanaugh would grant the petition for
rehearing en banc.

(1a)

2a

the control of United States forces for over two years, allegedly without legal process and with no meaningful access to counsel. When the district court learned of Omar's imminent transfer to Iraqi authorities for trial on terrorism charges, it issued a preliminary injunction barring transfer in order to preserve its jurisdiction to entertain the habeas petition. The government appeals, arguing that the district court lacks jurisdiction to entertain the petition and that, in any event, it had no authority to enter the preliminary injunction because Omar's transfer to Iraqi authorities would afford him all the relief he seeks, i.e., release from U.S. custody. For the reasons set forth in this opinion, we affirm.

## I.

In late October 2004, United States military forces operating in Iraq arrested appellee Shawqi Ahmad Omar, a dual American/Jordanian citizen, at his Baghdad home. Born in Kuwait, Omar became a naturalized American citizen following his marriage to the former Sandra Kay Sulzle. According to Omar, after the overthrow of the Saddam Hussein government, he traveled to Iraq seeking reconstruction-related work and would have left by November 2004 but for his arrest and detention.

The government paints a very different picture of Omar's presence in Iraq. According to the government, U.S. military forces, operating in Iraq pursuant to U.N. Security Council Resolutions 1546 (2003) and 1637 (2004) as part of the Multi-National Force-Iraq (MNF-I), captured Omar during a raid on associates of Abu Musab al-Zarqawi. The government believes that Omar was part of Zarqawi's network and that he facilitated terrorist activities both in and outside of Iraq.

3a

The government alleges that four Jordanian foreign fighters and an Iraqi insurgent were captured along with Omar, and that weapons and improvised explosive device-making materials were found in his home.

Following Omar's arrest, an MNF-I panel of three American military officers conducted a hearing to resolve his status. According to the government, the process employed by the panel exceeded the requirements of Article 5 of the Third Geneva Convention. The record, however, reveals little about the panel's operation. We know only that the panel permitted Omar to see the evidence against him, to make a statement, and to call "immediately available" witnesses. Declaration of John D. Gardner, Deputy Commanding General for Detainee Operations, Multi-National Force Iraq, at 3-4 (Feb. 7, 2006), *reprinted in* Joint Appendix 138-39 (hereinafter "Gardner Decl."). After the hearing, the panel declared Omar to be a "security internee under the law of war" and an "'enemy combatant' in the war on terrorism." Appellants' Br. 9. The panel also found that Omar was not a prisoner of war for purposes of the Third Geneva Convention. Since the panel's decision, American MNF-I officials have held Omar at various detention facilities in Iraq. According to Omar, the military has transferred him between Camp Cropper, the Abu Ghraib prison, and Camp Bucca. Omar has been in custody for over two years without formal charges and, he alleges, without access to counsel.

In August 2005, the MNF-I decided to refer Omar to the Central Criminal Court of Iraq (CCCI) for trial. The record indicates neither who made this decision nor what procedures were followed. The CCCI, a Bagh-

4a

dad-based Iraqi court, has national jurisdiction over an array of criminal offenses, including terrorism.

According to the government, during the CCCI investigation and trial phases, the MNF-I maintains physical custody of detainees like Omar, turning them over to the Iraqi Ministry of Justice only after conviction.

On December 12, 2005, Omar's wife, Sandra, and son, Ahmed, filed a petition for a writ of habeas corpus as Omar's next friends. Brought in the United States District Court for the District of Columbia, the petition names as respondents Francis J. Harvey, Secretary of the Army; Major General William H. Brandenburg, then-Deputy Commanding General of Detainee Operations and Commanding General of Task Force 134, MNF-I; and Lieutenant Colonel Timothy Houser of the 105th Military Police Battalion, commanding officer at Camp Bucca. The petition asserts that Omar's detention by the United States military violates numerous constitutional provisions, chief among them the right to due process guaranteed by the Fifth Amendment. The petition asks the district court to "[i]ssue a Writ of Habeas Corpus requiring Respondents to release Shawqi Omar from detention, and/or requiring Respondents to bring Shawqi Ahmad Omar before a court of competent jurisdiction in the United States to show just cause for his continued detention." Habeas Pet. at 17. Also alleging that "the United States military may turn Mr. Omar over to the custody of Iraqi authorities in an effort to evade the strictures of United States law," *id*. at 12-13, the petition asks the district court to "[e]njoin Respondents from transferring Mr. Omar to the authority of any other government, sovereign, country, or agency until

5a

[the district court] has an opportunity to consider and decide the merits of this Petition." *Id.* at 17.

Approximately two months after filing the petition, Omar's attorney received an e-mail from the Department of Justice informing her of the MNF-I's earlier decision to refer Omar to the CCCI.  Believing that CCCI proceedings could interrupt American custody of Omar, thereby stripping the district court of jurisdiction, that transfer would amount to an illegal extradition, and that Omar would likely face torture by Iraqi authorities, the attorney sought and received an ex parte temporary restraining order requiring that Omar "not be removed from United States custody."  Order Granting the Ex Parte Motion for a TRO at 2.

In a memorandum filed shortly after entry of the TRO, the government challenged the district court's jurisdiction to entertain the petition.  The government relied principally on *Hirota v. MacArthur,* 338 U.S. 197, 69 S. Ct. 197, 93 L. Ed. 1902 (1948), in which the Supreme Court held that World War II Japanese officials could not invoke habeas to challenge their conviction by a multinational military tribunal.  The government also argued that the district court had no authority to issue injunctive relief because doing so would "inject [the court] into an exclusive Executive function" and because adjudication of Omar's potential referral to the CCCI "raises non-justiciable political questions."  Resp'ts' Opp'n to Pet'rs' Ex Parte Mot. for a TRO at 22, 25.

Following briefing, the district court converted the TRO into a preliminary injunction ordering that "the respondents . . . and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order  . . .  shall not remove [Omar]

6a

from United States or MNF-I custody, or take any other action inconsistent with this court's memorandum opinion." Order Granting the Mot. for a Prelim. Inj. (hereinafter "Prelim. Inj. Order"). In the accompanying memorandum opinion, the court explained that the jurisdictional issues in the case presented questions "so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation." *Omar v. Harvey*, 416 F. Supp. 2d 19, 23-24 (D.D.C. 2006) (internal quotation marks omitted) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)). Fearing imminent referral to the CCCI would forever preclude a more deliberative investigation of the weighty jurisdictional questions, the court issued the injunction to freeze the status quo. In doing so, the court credited Omar's contention that transfer could irreparably deprive him of this investigation by "undo[ing the] court's jurisdiction." *Id*. at 28. This, the court concluded, "would abuse the process now put in place for the purpose of adjudicating matters on their merits." *Id.*

The government appeals, arguing (as it did in the district court) that *Hirota* controls and that Omar's challenge presents non-justiciable political questions. The government also argues that even if the district court does have jurisdiction, its injunction was improper because, by prohibiting Omar's removal from American or MNF-I custody, it bars the government from providing Omar "all of the relief to which he is entitled through a writ of habeas corpus." Appellants' Br. 20. We consider each issue in turn.

7a

## II.

The "great writ" of habeas corpus, as Blackstone called it, has for centuries functioned as the "symbol and guardian of individual liberty." *Peyton v. Rowe*, 391 U.S. 54, 58, 88 S. Ct. 1549, 20 L. Ed. 2d 426 (1968). By the seventeenth century, the writ had become "the highest remedy in law, for any man that is imprisoned." WILLIAM F. DUKER, A CONSTITUTIONAL HISTORY OF HABEAS CORPUS 46-49 (1980) (internal quotation marks and citation omitted). In the eighteenth century, it was the only common law writ expressly mentioned in the United States Constitution. *See* U.S. CONST. art. I, § 9, cl. 2; *Hamdi v. Rumsfeld*, 542 U.S. 507, 558, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004) (Scalia, J., dissenting). And now, in the twenty-first century, the writ continues to protect fundamental rights as the United States confronts the challenge of international terrorism. Indeed, since September 11, the Supreme Court has considered habeas petitions filed on behalf of at least three accused terrorists, confirming "the federal courts' power to review applications for habeas relief in a wide variety of cases involving executive detention, in wartime as well as in times of peace." *Rasul v. Bush*, 542 U.S. 466, 474, 124 S. Ct. 2686, 159 L. Ed. 2d 548 (2004); *see also Hamdan v. Rumsfeld*, 548 U.S.—, 126 S. Ct. 2749, 165 L. Ed. 2d 723 (2006) (entertaining habeas petition of alien detained at Guantanamo Bay, Cuba); *Hamdi*, 542 U.S. 507, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (plurality opinion) (entertaining habeas petition of American citizen detained within the United States).

Notwithstanding the writ's long and celebrated history, the government argues that the district court lacks

8a

jurisdiction to consider Omar's petition. Although acknowledging both that U.S. military officials are holding Omar, Appellants' Br. 15, and that those officials operate "subject to" no independent MNF-I authority, Oral Arg. Tr. 11, the government contends that federal courts lack jurisdiction to entertain habeas corpus petitions filed by individuals detained by American military officials operating as part of a multinational force. In support, the government relies primarily on *Hirota*, in which the Supreme Court ruled that the courts of the United States had no jurisdiction to entertain habeas petitions filed by Japanese citizens convicted and sentenced by an American–led international military tribunal in Japan "set up by General MacArthur as the agent of the Allied Powers." 338 U.S. at 198, 69 S. Ct. 197. From *Hirota*, the government draws the general principle that federal courts lack habeas jurisdiction over individuals held by "United States military personnel under the auspices of a multinational force that is distinct from the United States military and ultimately derives its existence from an international body." Appellants' Br. 32. Applying that principle to this case and pointing out that Omar, like the *Hirota* petitioners, is in the custody of American officials acting as part of a multinational force, the government argues that *Hirota* "compels the dismissal of this habeas petition." Appellants' Br. 25.

Omar disagrees. Pointing out that the *Hirota* petitioners filed directly in the Supreme Court, he argues that "*Hirota's* holding concerns the scope of Supreme Court jurisdiction under Article III of the Constitution." Appellees' Br. 29. Yet just six months after *Hirota*, in *Flick v. Johnson*, 174 F.2d 983 (D.C. Cir. 1949), we applied *Hirota* to a habeas corpus petition filed not in the

9a

Supreme Court, but in the district court by an individual who, like the *Hirota* petitioners, had been convicted by an international tribunal.  In this circuit, then, *Hirota* applies to habeas proceedings in the district court.

Omar also argues that *Hirota* "lacks vitality today" given that the Supreme Court has since "clarified the broad availability of habeas corpus."  Appellees' Br. 23-24.  In support, Omar cites *Madsen v. Kinsella,* 343 U.S. 341, 72 S. Ct. 699, 96 L. Ed. 988 (1952), and *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S. Ct. 1, 100 L. Ed. 8 (1955).  In both of those cases, however, the habeas petitioners had been convicted not by multinational tribunals, but rather by American tribunals sitting in foreign countries, i.e., Germany (*Madsen*) and Korea (*Toth*).  Thus, neither case has anything to do with the issue the Supreme Court faced in *Hirota.*  Omar also relies on *Hamdi,* 542 U.S. 507, 124 S. Ct. 2633, 159 L. Ed. 2d 578, and *Rasul,* 542 U.S. 466, 124 S. Ct. 2686, 159 L. Ed. 2d 548.  Although we share Omar's view that these decisions provide a basis for questioning *Hirota's* vitality, the Supreme Court has never revisited the precise issue it confronted there, namely the availability of habeas to non-citizens convicted abroad by multinational tribunals.  As the Supreme Court has cautioned, "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989).

10a

That said—and setting aside Omar's suggestion that *Hirota* is distinguishable because the MNF–I may not be as authentically multinational as the Allied Forces in Japan—we agree with Omar that *Hirota* is not nearly as broad as the government insists.  A nine-sentence per curiam opinion, *Hirota* reads—in its entirety—as follows:

> The petitioners, all residents and citizens of Japan, are being held in custody pursuant to the judgment of a military tribunal in Japan.  Two of the petitioners have been sentenced to death, the others to terms of imprisonment.  They filed motions in this Court for leave to file petitions for *habeas corpus.* We set all the motions for hearing on the question of our power to grant the relief prayed and that issue has now been fully presented and argued.
>
> We are satisfied that the tribunal sentencing these petitioners is not a tribunal of the United States. The United States and other allied countries conquered and now occupy and control Japan. General Douglas MacArthur has been selected and is acting as the Supreme Commander for the Allied Powers.  The military tribunal sentencing these petitioners has been set up by General MacArthur as the agent of the Allied Powers.
>
> Under the foregoing circumstances the courts of the United States have no power or authority to review, to affirm, set aside or annul the judgments and sentences imposed on these petitioners and for this reason the motions for leave to file petitions for writs of *habeas corpus* are denied.

11a

338 U.S. at 198, 69 S. Ct. 197. As is apparent, *Hirota* nowhere explains which "circumstances" were controlling. Nor does anything in the opinion hold that federal courts lack habeas jurisdiction whenever, as the government insists, American officials detaining a petitioner are functioning as part of a multinational force. Indeed, the opinion articulates no general legal principle at all. The Court, moreover, has never cited *Hirota* for any substantive proposition, much less the one the government claims it supports. None of this should be surprising given that the Court heard *Hirota* not on a petition for certiorari granted to resolve an important question of law, *see* SUP. CT. R. 38(5) (1939) ("A review on writ of certiorari . . . will be granted only where there are special and important reasons therefor."), but rather as an original petition for habeas corpus. This, together with the terse per curiam opinion, reveals a Court determined to resolve the case on the narrowest possible grounds.

We thus take the Court at its word: it lacked habeas jurisdiction because of the "circumstances" of the case. As a matter of precedent, then, *Hirota* would "control" this case only if the "circumstances" significant to the Court's decision are present here. Two circumstances are clearly the same: detention overseas and the existence of a multinational force. But two other circumstances—foreign citizenship and criminal conviction—are absent. Were we writing on a clean slate, we would thus have to determine which of these circumstances influenced the Court's decision.

But our slate is not clean. In *Flick,* we considered a habeas petition filed by a German citizen held by American troops in Germany pursuant to his conviction by an

12a

entity known as the Military Tribunal IV. 174 F.2d 983. Given *Hirota*, we asked: "Was the court which tried and sentenced Flick a tribunal of the United States?" *Id.* at 984. "If it was not," we explained, then under *Hirota*, "no court of this country has power or authority to review, affirm, set aside or annul the judgment and sentence imposed on Flick." *Id.* Concluding that the Military Tribunal IV was not, in fact, an American tribunal, we dismissed the petition.

*Flick* thus holds that the critical factor in *Hirota* was the petitioners' convictions by an international tribunal, and for good reason. Throughout its brief opinion, the *Hirota* Court repeatedly referred to the petitioners' sentences, including imprisonment and death, concluding it lacked habeas jurisdiction "to review, to affirm, set aside or annul the judgments and sentences imposed on these petitioners." *Hirota*, 338 U.S. at 198, 69 S. Ct. 197. Such language demonstrates that the Court's primary concern was that the petitions represented a collateral attack on the final judgment of an international tribunal.

Viewed in this light, *Hirota* does not control this case. Unlike the *Hirota* and *Flick* petitioners, Omar has not been charged with a crime related to the allegations now lodged against him, much less convicted of one. Omar seeks not to collaterally attack a final international conviction, but only to test the lawfulness of his extrajudicial detention in Iraq, where he has remained in the control of U.S. forces for over two years without legal process. True, a panel of three military officers found him to be a "security internee" and an "enemy combatant," but those determinations, based as they are on military considerations, are a far cry from trial, judg-

13a

ment, and sentencing. *See Hamdi,* 542 U.S. at 518-19, 124 S. Ct. 2633 (discussing enemy combatant status); Major General George R. Fay, AR 15-6 Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade 12 (Aug. 23, 2004), *available at* http://www.defenselink.mil/news/Aug2004/d20040825 fay.pdf (describing military definition of security internees as "[c]ivilians interned during conflict or occupation for their own protection or because they pose a threat to the security of coalition forces, or its mission, or are of intelligence value"). Habeas proceedings here run no risk, as they did in both *Hirota* and *Flick,* of judicial second-guessing of an international tribunal's final determination of guilt.

The fact that Omar has never been convicted of criminal activity thus distinguishes this case from both *Hirota* and *Flick,* and rightly so, given that challenging extrajudicial detention is among the most fundamental purposes of habeas. "At its historical core," the Supreme Court has explained, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *INS v. St. Cyr,* 533 U.S. 289, 301, 121 S. Ct. 2271, 150 L. Ed. 2d 347 (2001); *see also Brown v. Allen,* 344 U.S. 443, 533, 73 S. Ct. 397, 97 L. Ed. 469 (1953) (Jackson, J., concurring in the judgment) ("The historic purpose of the writ has been to relieve detention by executive authorities without judicial trial."). Acting in tandem with its partners-in-liberty—the Due Process Clauses of the Fifth and Fourteenth Amendments—the great writ is "the instrument by which due process [can] be insisted upon by a citizen illegally imprisoned." *Hamdi,* 542 U.S. at 555-56, 124 S. Ct. 2633 (Scalia, J., dissenting). Where, as in *Hirota*

14a

and *Flick*, individuals have been convicted and sentenced by a criminal tribunal, some form of judicial process has occurred, reducing the risk of unlawful extra-judicial detention. But where, as here, the Executive detains an individual without trial, the risk of unlawful incarceration is at its apex.

In addition to *Hirota*, the government cites cases holding that federal courts may not grant habeas relief to Americans held by foreign governments, *see, e.g., United States ex rel. Keefe v. Dulles,* 222 F.2d 390 (D.C. Cir. 1954), and that habeas is unavailable to Americans held in U.S. custody pursuant to a foreign conviction, *see, e.g., Bishop v. Reno,* 210 F.3d 1295 (11th Cir. 2000). Such propositions, however, have nothing to do with this case since Omar is neither detained nor convicted by a foreign nation.

With *Hirota* and the other cases the government cites thus distinguished, Omar's petition fits comfortably within the terms of the modern habeas statute—a proposition the government nowhere contests. Under 28 U.S.C. § 2241, federal courts have authority to issue the writ "within their respective jurisdictions" to prisoners "in custody under or by color of the authority of the United States." 28 U.S.C. § 2241(a), (c)(1). Omar's petition satisfies both requirements. First, the petition is "within the jurisdiction" of the district court because respondents, the Secretary of the Army and two high-ranking Army officers, are amenable to service in the District of Columbia. *See Rasul,* 542 U.S. at 478-79, 124 S. Ct. 2686 ("[A] district court acts within [its] respective jurisdiction within the meaning of § 2241 as long as the custodian can be reached by service of process." (second alteration in original) (internal quotation marks omit-

15a

ted)).  Second, although American personnel in Iraq op-
erate as part of the MNF-I, the government concedes
that Omar is "held" by U.S. forces, Appellants' Br. 15,
and that those forces operate "subject to" no independ-
ent MNF-I authority, Oral Arg. Tr. 11.  Omar is thus
"in custody under or by color of the authority of the
United States."  As a consequence, the district court has
jurisdiction to entertain Omar's habeas petition.

## III.

The government next argues that the district court
lacked jurisdiction to enter the preliminary injunction
because this case "raise[s] quintessential political ques-
tions beyond the authority or competence of the judi-
ciary to answer."  Appellants' Br. 41.  The political ques-
tion doctrine puts beyond judicial cognizance "political
decisions that are by their nature committed to the poli-
tical branches."  *Schneider v. Kissinger*, 412 F.3d 190,
193 (D.C. Cir. 2005) (internal quotation mark omitted).
For example, and relevant to this case, the doctrine bars
courts from considering claims whose adjudication
would require judicial wading into foreign policy or mili-
tary waters.  Thus, in *Schneider* we invoked the political
question doctrine to dismiss a claim that would have
required us to second-guess U.S. policy towards Chile.
*Id*. at 197-98.  Similarly, in *Bancoult v. McNamara*, 445
F.3d 427, 436-37 (D.C. Cir. 2006), we dismissed a
complaint that would have required us to review the ma-
nner in which the United States established a military
base in the Indian Ocean.  Here, the government argues
that Omar's petition would likewise require the court to
interfere with the "Executive's textual constitutional au-
thority to implement foreign policy and military func-

16a

tions for the purpose of protecting national security."
Appellants' Br. 43.

As the political question doctrine is one "of 'political
questions,' not one of 'political cases,'" *Baker v. Carr,*
369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962),
we must focus on Omar's specific claims. First, he chall-
enges his detention, claiming that U.S. military officials
are holding him in violation of the Constitution, federal
law, Army regulations, and international law. Critically
for present purposes, Omar alleges that he is held in
violation of the Due Process Clause of the Fifth Amend-
ment because his "arrest and arbitrary, indefinite
detention without process . . . violates . . . [his] 'in-
terest in being free from physical detention by one's own
government.'" Habeas Pet. at 13 (quoting *Hamdi,* 542
U.S. at 529, 124 S. Ct. 2633). Second, he challenges his
transfer, arguing both that the military lacks treaty or
statutory authorization to transfer him to Iraqi author-
ities and that the U.S. Constitution forbids transfer to a
government likely to torture him.

The Supreme Court's recent decision in *Hamdi*
makes abundantly clear that Omar's challenge to his de-
tention is justiciable. In *Hamdi,* as here, the petitioner
challenged his detention by U.S. military authorities
pursuant to an "enemy combatant" determination. Al-
though the government never directly invoked the polit-
ical question doctrine, it argued that separation of pow-
ers concerns—the very concerns underlying the political
question doctrine—preclude courts from inquiring into
the factual basis of an enemy combatant designation. "A
commander's wartime determination that an individual
is an enemy combatant," the government urged, "is a
quintessentially military judgment representing a core

17a

exercise of the Commander-in-Chief authority." Br. for the Resp'ts at 25, *Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004) (No. 03-6696). Unequivocally rejecting this contention, the *Hamdi* plurality explained that "it does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here." *Hamdi*, 542 U.S. at 535, 124 S. Ct. 2633.

Omar's challenge to his transfer is equally justiciable. He argues (1) that the military may not transfer him to Iraqi authorities without treaty or statutory authorization, and (2) that the military lacks such authorization. In the extradition context, of course, treaty or statutory authorization has long been required, *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 8, 57 S. Ct. 100, 81 L.Ed. 5 (1936) ("[A]lbeit a national power, [authority to extradite] is not confided to the Executive in the absence of treaty or legislative provision."), and we have some reason to believe this rule applies beyond the extradition context, *see Wilson v. Girard*, 354 U.S. 524, 528-30, 77 S. Ct. 1409, 1 L. Ed. 2d 1544 (1957) (per curiam) (permitting in-country transfer of American service member to Japanese custody after noting that an agreement authorized by a treaty provided for transfer).

Our decisions in *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972), and in countless other cases make clear that courts may determine whether the Executive possesses the necessary authority for transfer—the second of the two questions Omar raises. In *Holmes*, American soldiers convicted by a German court of attempted rape escaped U.S. military custody, returned to the United States, and then sought to prevent the military from

18a

transferring them to German custody. *Id*. at 1214. In support, they argued (among other things) that they were "surrenderable only pursuant to the terms of an extradition treaty." *Id*. at 1219 n.59. Although ultimately rejecting the petitioners' authorization claim, we first satisfied ourselves that a valid treaty in fact authorized the transfers. *Id*.; *see also Neidecker*, 299 U.S. at 18, 57 S. Ct. 100 (denying extradition after determining that "the treaty with France fails to grant the necessary authority").

The antecedent question—whether Omar's transfer even requires treaty or statutory authorization—is also fully justiciable. On the merits, the government will surely argue that under Article II of the Constitution, the military needs no express authority to transfer detainees like Omar. Resolving this claim will involve difficult questions of constitutional law—questions which, significantly for our purposes, will require no judicial intrusion into the exclusive domain of the political branches. To be sure, a decision on the merits might well have *implications* for military and foreign policy, but that alone hardly makes the issue non-justiciable. For example, in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S. Ct. 863, 96 L.Ed. 1153 (1952), the government's assertion that wartime seizure of steel mills was "necessary to avert a national catastrophe which would inevitably result from a stoppage of steel production," *id*. at 582, 72 S. Ct. 863, failed to prevent the Supreme Court from deciding whether the President may seize private property without congressional authorization. Likewise, in *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S. Ct. 216, 81 L.Ed. 255 (1936), the Court, despite the obvious implications for U.S. foreign policy, decided whether the President could

19a

constitutionally issue export controls on munitions absent specific statutory authorization.  In each of these cases, the Court resolved a fundamental question of Executive authority without making any foreign policy or military judgments of its own.  This case, like *Youngstown* and *Curtiss-Wright* and unlike *Schneider* and *Bancoult, supra,* presents constitutional issues that courts can resolve without making any judgments about foreign policy or the war in Iraq.

Finally, the "rule of non-inquiry," which bars courts from "investigating the fairness of a requesting nation's justice system," *In re Extradition of Howard,* 996 F.2d 1320, 1329 (1st Cir. 1993), does not require a different result.  According to the government, Omar's allegation that he faces torture at the hands of the Iraqis is precisely the type of claim the rule of non-inquiry bars courts from considering.  This may be correct.  *See, e.g., In re Extradition of Manzi,* 888 F.2d 204, 205-06 (1st Cir. 1989) (permitting extradition to Italy and refusing to allow evidence on the petitioner's claim that his life would be threatened by the transfer).  *But see Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir. 1960) (suggesting in dicta that there may one day arise a transfer so "antipathetic to a federal court's sense of decency as to require reexamination of" the rule of non-inquiry).  But since the only question before us at this stage of the litigation relates to the district court's jurisdiction, and given our earlier conclusion that the political question doctrine presents no jurisdictional bar to Omar's challenge to his detention and transfer, we need not address his torture claims.  The rule of non-inquiry therefore has no relevance to our disposition of the matter before us at this stage of the litigation.

20a

## IV.

Having established that the district court has jurisdiction, we turn to the propriety of the preliminary injunction. Applying the standard four-factor analysis, *see Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (listing requirements for preliminary injunctions), the district court enjoined Omar's removal from American or MNF-I custody in order to preserve its jurisdiction to address the case's "serious, substantial, difficult, and doubtful" issues. 416 F. Supp. 2d at 28 (internal quotation marks omitted) (quoting *Holiday Tours*, 559 F.2d at 844).

The government challenges the injunction, claiming that the district court improperly barred Omar's outright release even though such release is precisely what his "petition ultimately seeks." Appellants' Br. 57. The injunction, in relevant part, orders that the respondents "shall not *remove* the petitioner from United States or MNF-I custody." Prelim. Inj. Order (emphasis added). Although "remove" could include outright release, given the circumstances of this case, we interpret the word differently. Omar did not seek an injunction barring his outright release, nor could he have; he sought an injunction prohibiting his transfer to Iraqi authorities in order to preserve the district court's jurisdiction to entertain his habeas petition. We thus understand the court to have used the word "remove" to prevent Omar's transfer *in any form*, whether by an official handoff or otherwise. Viewed this way, the injunction does not bar a bona fide release of Omar, even if the military releases him inside Iraq.

The government's primary challenge to the injunction (other than the jurisdictional arguments we have

21a

rejected in parts II and III), is its claim that transfer to Iraqi authorities constitutes release from American/ MNF-I custody—"all of the relief to which [Omar] is entitled through a writ of habeas corpus." Appellants' Br. 20. The government asserts that transfer is release because transfer "would end his detention by the MNF-I, which is the sole arguable basis for the district court's jurisdiction." Appellants' Br. 58. In other words, the government sees transfer as a subset of release; one can be "released" either by being let go into the open, or by being transferred to a different authority.

There is, however, an obvious and quite significant difference between transferring Omar to Iraqi authorities and releasing him to walk free from his current detention. If transferred, Omar would remain in custody and detention; if released, he might not. Indeed, were the government correct, federal courts would have no authority to stay an extradition long enough to test its validity since transfer to the foreign authority would, as the government sees it, be the same as release. Yet courts routinely stay extraditions, *see, e.g., Ntakirutimana v. Reno*, 184 F.3d 419, 423 n.7 (5th Cir. 1999) (stay of extradition pending appeal); *Then v. Melendez*, 92 F.3d 851, 853 n.1 (9th Cir. 1996) (same), and for good reason: transferring a petitioner to the foreign country seeking extradition is obviously not the same as releasing him.

To be sure, as the government argues, Iraqi authorities might arrest Omar the moment U.S. forces release him. Expanding on this point, the dissent speculates that "if the government simply releases Omar and allows him to walk out of Camp Bucca, he might well find a dozen armed Iraqi soldiers waiting for him." Dis-

22a

senting Op. at 6.  The dissent also thinks that U.S. military officials could "notify Iraqi authorities as to the exact time and place of [his] release, thereby effectively ensuring his immediate recapture and detention." *Id*. As a result, the dissent maintains, Omar has failed to demonstrate irreparable injury because even if he prevails at his habeas hearing, he may nonetheless end up in Iraqi custody.  We disagree.

To begin with, such speculation at the appellate level cannot defeat Omar's right to a habeas hearing on the lawfulness of his detention and transfer.  *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995) ("We review a district court decision regarding a preliminary injunction for abuse of discretion  . . . .").  At this point in time, we have no way of knowing how the U.S. military would release Omar if the district court ultimately rules in his favor, much less whether and to what extent the military would communicate with Iraqi authorities.  Nor do we have any idea what would happen to Omar once released.  Perhaps he would end up in Iraqi custody, but perhaps he would not. For example, perhaps because of developments at the habeas hearing, such as the appearance of defects in the government's case or the introduction of exculpatory evidence, the Iraqis would decide that Omar is no longer worth prosecuting.  Or perhaps by the time the district court ordered Omar's release, Iraqi priorities would have changed, leaving Iraqi authorities uninterested in allocating scarce military resources—much less the dissent's dozen soldiers—to his arrest.  The point is that on the record before us at this stage of these proceedings, neither the government nor the dissent nor we can possibly know what would happen to Omar if the district court barred his transfer and ordered his release.  Given

23a

this uncertainty, a preliminary injunction protecting Omar from the *certainty* of transfer now is hardly an "empty gesture." *See* Dissenting Op. at 18.

The dissent's speculation about a U.S. military "tip-off" to the Iraqis suffers from a second defect. If the district court ultimately rules that the U.S. military lacks authority to transfer Omar, the military will be unable to transfer him either directly through a formal handoff or indirectly by "releasing" him with a wink-and-a-nod to the Iraqis. The United States may certainly share information with other sovereigns, *see id.* at 4-5, but it may not do so in a way that converts Omar's "release" into a transfer that violates a court order. The district court has jurisdiction to hear Omar's habeas petition, *see* part III *supra*, and federal courts have authority to enforce their orders; contrary to the dissent, *see* Dissenting Op. at 17, the political question doctrine is not implicated. In any event, we think it exceedingly unlikely that American military officers, sworn to uphold the law and represented by the Justice Department, would evade an order of a United States district court. Indeed, if the district court orders Omar's release, we are confident that military officials and their lawyers will work in good faith with the district court to fashion an order that, based on then-existing circumstances, ensures his lawful release from American custody.

The government's observation that "a court may not artificially prolong a case or controversy by issuing an injunction the effect of which is to prevent the Government from rendering the petition moot by granting relief," Appellants' Br. 57, though undoubtedly correct, has nothing to do with the issue before us. Because the

24a

military plans to transfer Omar to Iraqi authorities, not to release him, the preliminary injunction, far from "prevent[ing] the Government from rendering the petition moot by granting relief," preserves the district court's jurisdiction to review the lawfulness of that transfer.

The government cites *Spencer v. Kemna,* 523 U.S. 1, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998), for the proposition that a prisoner's final release from prison moots his habeas petition.  It also cites a series of cases, including *Yohey v. Collins,* 985 F.2d 222 (5th Cir. 1993), for the proposition that conviction moots a pre-trial habeas petition.  Omar, however, has not been released nor has he been convicted of a crime, so the cited decisions have no bearing on this case.

Taking a different tack, the dissent believes Omar has failed to demonstrate likelihood of success on the merits because "to make an injunction against transfer to Iraqi authorities a viable form of preliminary relief, Omar would need to show  . . . .  [what] we might call 'release plus,'" i.e., "release combined with immunity to Iraqi prosecution, release following surreptitious transport out of Iraq, or release with a promise to conceal the time and place of the release."  Dissenting Op. at 18.  Like the dissent's other arguments, this argument is wholly speculative, for it assumes, without record support, that Omar will, once released, require protection from Iraqi authorities.  But as we indicate above, no one knows at this time what will happen to Omar if the district court orders his release.  Speculating about the conditions under which the military might release Omar or the lawfulness of those conditions is thus not only premature—the matter may never arise—but irrelevant

25a

to the issue before us: whether the district court abused
its discretion in issuing the injunction. In any event,
Omar's petition does not seek "release plus"; rather, al-
leging that Omar is being held by the U.S. military in
violation of his constitutional rights, the petition seeks
his release from military custody.

The dissent asserts that "interference by a court in
the decisions of sovereigns acting jointly within the
same territory is unprecedented," Dissenting Op. at
19-20, citing only *Floyd v. Henderson*, 456 F.2d 1117
(5th Cir. 1972), in support. In *Floyd*, a federal prisoner
argued that the federal government could no longer ex-
ercise jurisdiction over him because the Attorney Gen-
eral had transferred him to a state prison, where he
served a state sentence concurrently with his federal
sentence. Because a statute, 18 U.S.C. § 4082, auth-
orized the Attorney General to assign federal prisoners
to state prisons, the court ruled that "[the statutory]
authority is sufficient to permit the transfer of petition-
er from one institution to another prison." 456 F.2d at
1119. But as we have explained, whether the military
has authority to transfer Omar is one of the central
questions in this habeas litigation. *Floyd* and the propo-
sition for which the dissent cites it would thus become
relevant only if the district court rules either that the
military possesses the requisite statutory or treaty auth-
ority to transfer Omar, or that no such authority is nec-
essary.

According to the dissent, "the bar on Omar's presen-
tation before the CCCI while in United States custody
is improper." Dissenting Op. at 17. Although we agree
with the dissent that the injunction prohibits the mili-
tary from presenting Omar to the CCCI for trial, we

26a

think this an appropriate exercise of the district court's discretion. The dissent's argument hinges on the assumption, unsupported in the record, that Omar's "presentation does not hamper the ability of the government to order Omar's release should the district court rule in his favor." *Id*. Although the government has advised us that the "MNF-I maintains physical custody of detainees while their cases are being heard by the CCCI," Gardner Decl. at 6, we cannot determine from the record whether this means *legal* custody. We are thus uncertain whether once Omar is in a CCCI courtroom, the Iraqi judge could remand him to Iraqi custody, an action that would obviously defeat the district court's habeas jurisdiction. Nor can we determine whether Omar's presentation for trial might by itself amount to the very "transfer" that Omar argues the military lacks authority to execute. Given these uncertainties and their potential implications for habeas jurisdiction, the district court, by enjoining Omar's presentation for trial, clearly acted within its discretion.

Pointing out that "American citizenship is not a grant of immunity to commit crimes in other countries with impunity," the dissent thinks our decision has the "remarkable effect of enabling a court sitting in Washington, D.C., to block the efforts of a foreign sovereign to make an arrest on its own soil." Dissenting Op. at 19. U.S. courts, of course, have no authority to constrain the actions of Iraqi authorities. But in this case the government concedes that Omar is in the custody of United States officials, and Omar's petition merely calls on the district court to determine whether those officials are complying with American law—an altogether unremarkable action for a United States district court.

27a

## V.

In sum, neither *Hirota* nor the political question doctrine deprives the district court of jurisdiction to entertain Omar's petition for a writ of habeas corpus. Because transfer would not afford Omar all the relief he could obtain through a writ of habeas corpus and because the district court's preliminary injunction properly preserves its jurisdiction to entertain his petition, we affirm.

*So ordered.*

BROWN, Circuit Judge, dissenting in part.

With only minor hesitation,[1] I join the majority's analysis of the district court's jurisdiction over Omar's habeas petition. But I disagree with the majority's view that, while the district court cannot enjoin Omar's release outright, it may indeed dictate the *terms* of his release. Hence, I write separately to explain why I would vacate the district court's injunction.

## I

This case reached us when the government appealed the district court's Order dated February 13, 2006. The sole question before us, then, is whether that Order was proper. In relevant part, it states as follows:

---

[1] To the extent the majority's opinion might be read to imply citizenship was one of the determinative factors in *Hirota v. MacArthur*, 338 U.S. 197, 69 S. Ct. 197, 93 L. Ed. 1902 (1948), I note the question remains open in this circuit. *Compare Flick v. Johnson*, 174 F.2d 983, 984 (D.C. Cir. 1949) (focusing on conviction by a foreign tribunal as the hallmark of *Hirota* without discussing citizenship), *with* Maj. Op. 6 (describing the issue in *Hirota* as "the availability of habeas to noncitizens convicted abroad by multinational tribunals").

28a

[It is] ORDERED that the motion for a preliminary injunction is GRANTED, and it is

FURTHER ORDERED that the respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order by personal service or otherwise, shall not remove the petitioner from United States or MNF-I custody, or take any other action inconsistent with this court's memorandum opinion.

The Motion for a Preliminary Injunction referenced by the Order was originally styled a Motion for a Temporary Restraining Order, and it asked the court to prevent "the transfer of Shawqi Omar to the authority of any other government, sovereign, country, or agency until this Court has an opportunity to consider and decide the merits" of Omar's habeas petition.

The injunction, by its terms, grants the original Motion, thereby barring Omar's transfer to different custodians. The injunction also explicitly instructs the respondents not to "remove [Omar] from United States or MNF-I custody," an act necessary for his release.[2] Finally, the discussion in the district court's memorandum opinion makes sense only if the court further intended to proscribe Omar's presentation before the Central

_____

[2] The majority interprets this instruction as covering transfer but not release. Maj. Op. 11-12. Given such an interpretation, it is not clear why the district court had to "FURTHER ORDER[ ]" that Omar not be removed, when the court's grant of Omar's Motion for a Preliminary Injunction already barred his transfer. However, since the majority finds that an injunction against release was not intended, and I find that it was intended but improper, we all agree that the United States is free to release Omar from custody.

29a

Criminal Court of Iraq ("CCCI"), even while he re-
mained in the custody of the United States or MNF-I.
The Order gives effect to this intention by enjoining
"any other action inconsistent with this court's memor-
andum opinion."  In summary, the injunction bars Om-
ar's transfer to a foreign custodian, his outright release,
and his presentation before the CCCI while within Uni-
ted States or MNF-I custody.[3]

## II

In addressing the propriety of this injunction, I note
first that we heard arguments in this case on the por-
tentous date of September 11, 2006, precisely five years
after the terrorist attacks that so fundamentally altered
this country's attitude toward security.  No longer could
we sit back and consider ourselves safe from foreign
enemies so long as no other *nation* wished us harm.  The
Founders envisioned wars in the paradigm of the time,
with official declarations from heads of states announ-
cing the beginning and end of hostilities.  In today's
world, by contrast, global alliances of non-state actors
can visit death and destruction on the American home-
land without warning, on a scale equal to that seen in
conventional wars.  In such an environment, it would be
dangerous folly to deny what this case involves:  the cap-
ture of an alleged enemy combatant by American mili-
tary personnel operating in a war zone.  It is in this con-
text that we must measure Omar's likelihood of succee-

---

[3]  Indeed, as the government has recognized, the final portion of this
injunction effectively bars Omar's *prosecution* by the CCCI, as well.
*See* Opp'n to Pet'rs' Emergency Mot. for Injunctive Relief at 18-19,
*Munaf v. Harvey*, No. 06-5324 (D.C. Cir.  Oct. 25, 2006) ("[Omar] has
not yet had a trial or even an investigative hearing in the CCCI due to
the district court's unprecedented injunction in that case.").

30a

ding in his habeas petition, the harm the injunction imposes on the respondents, and the interest of the public in the case.[4]

While the test for preliminary injunctions is a flexible one—a strong showing on the merits may compensate for a relatively slight showing of irreparable injury—a petitioner must nonetheless demonstrate "some injury." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (internal quotation marks omitted) (quoting *Population Inst. v. McPherson*, 797 F.2d 1062 app. at 1078 (D.C. Cir. 1986)). Specifically, we ask whether the petitioner "would suffer irreparable injury if the injunction is not granted." *Id.* at 746. Thus, if the injunction would not reduce the risk of the feared injury—whether because the injury would not occur even absent the injunction or because it would remain equally likely even with the injunction in place—the injunction should not be granted. In particular, when the feared injury is the loss of a remedy the petitioner seeks from the courts, we must determine whether the action to be enjoined would preclude or

---

[4] Were this an isolated case, the district court's cavalier approach to the difficult questions it presents would be less worrisome. But in fact several related cases have recently come before this court, with many more sure to follow. *See, e.g., Al-Bandar v. Bush*, No. 06-5425, 2006 U.S. App. LEXIS 32239 (D.C. Cir. Dec. 29, 2006) (non-citizen seeking habeas after conviction in Iraq); *Munaf, supra* note 3 (U.S. citizen seeking habeas after conviction in Iraq). The proper contours of court jurisdiction in such cases remain unclear, as do the rights to be accorded the petitioners on the merits. In such circumstances, this court has a duty to provide clear guidance based on the cases presented for its consideration.

31a

impair the desired relief, and, if so, whether the petitioner is likely to obtain that relief on the merits.

To state this rule is to demonstrate immediately that the injunction should be vacated at least to the extent it operates to bar Omar's release. Release would provide Omar with all the relief to which he might be entitled by way of his habeas petition. While courts do have power to grant equitable habeas remedies beyond mere release, Omar has demonstrated no grounds whatsoever for such remedies. Equitable remedies typically involve either an order to a custodian to ameliorate the conditions of a petitioner's detention, *e.g., Miller v. Overholser*, 206 F.2d 415 (D.C. Cir. 1953), or an order freeing a petitioner from penalties resulting from conviction that persist beyond the end of detention, *e.g., Carafas v. LaVallee*, 391 U.S. 234, 88 S. Ct. 1556, 20 L. Ed. 2d 554 (1968). Release from detention trumps ameliorated detention, and Omar has pointed to no statutory penalties that would persist after his release. *Cf. Lane v. Williams*, 455 U.S. 624, 631-33, 102 S. Ct. 1322, 71 L. Ed. 2d 508 (1982) (limiting the *Carafas* exception to "civil disabilities" imposed on former detainees by operation of law). Thus, if Omar prevails on his habeas petition, he would be released and nothing more, and release at this early stage of the proceeding would only *accelerate* that relief, not impair it. In such circumstances, the district court's action blatantly violates the rule that injunctions must be "narrowly tailored to remedy the harm shown." *Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990).

Similarly, the bar on Omar's presentation before the CCCI while in United States custody is improper. Provided such presentation does not hamper the ability of

32a

the government to order Omar's release should the district court rule in his favor, it presents no impediment to relief Omar might receive. While it might be argued that *conviction* by the CCCI would prevent Omar's release, the same principles of comity and respect for foreign sovereigns that preclude judicial scrutiny of foreign convictions necessarily render invalid attempts to shield citizens from foreign prosecution in order to preempt such non-reviewable adjudications. *Cf. Hirota v. MacArthur,* 338 U.S. 197, 197, 69 S. Ct. 197, 93 L.Ed. 1902 (1948); *Neely v. Henkel,* 180 U.S. 109, 123, 21 S. Ct. 302, 45 L. Ed. 448 (1901).

Omar concedes the district court cannot enjoin his release, *see* Appellees' Br. 47, and his briefs before us barely address the bar on his presentation before the CCCI. However, Omar dedicates much more energy to his argument that the remaining portion of the injunction—the bar on his transfer to a new custodian—should be enforced. The propriety of this part of the injunction is unquestionably the closest question before us.

If this portion of the injunction stands by itself, then the government will be permitted to release Omar, but not to transfer him to Iraqi control. But just how far may the courts go in effectuating such an order? Because Omar seeks an injunction against his transfer to Iraqi authorities, we have to assume that the United States seeks to transfer him to Iraqi authorities and that Iraqi authorities seek to gain custody. Therefore, if the government simply releases Omar and allows him to walk out of Camp Bucca, he might well find a dozen armed Iraqi soldiers waiting for him. This possibility becomes an inevitability if United States military offi-

33a

cials notify Iraqi authorities as to the exact time and place of Omar's release, thereby effectively ensuring his immediate recapture and detention. The majority calls this reasoning speculative, but it is precisely the sort of consideration of future likelihoods that is required of a court when it weighs the propriety of preliminary relief. *CityFed*, 58 F.3d at 746. In short, the practical effect of Omar's release with a tip-off to Iraqi authorities would be indistinguishable from his formal transfer to those authorities. Therefore, absent a limitation on intergovernmental communication, an injunction against transfer will have no significant effect on the likelihood of Omar's detention by Iraq subsequent to his release from United States custody.

But information sharing among sovereigns regarding the location of persons subject to arrest is a common and desirable practice, particularly in a situation like that in present-day Iraq, where the United States military is cooperating with Iraqi authorities to secure the country. Any judicial order barring this sort of information sharing in a military zone would clearly constitute judicial interference in a matter left solely to Executive discretion and would hence be improper under the political question doctrine. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 531, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004) (plurality opinion) ("Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them."); *cf. Bancoult v. McNamara*, 445 F.3d 427, 436-37 (D.C. Cir. 2006); *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005). Thus, the courts are powerless to enjoin the United States from informing Iraqi officials about the planned release of Omar, and under these circumstances, an in-

34a

junction against outright transfer is an empty gesture that cannot be sustained. *See CityFed*, 58 F.3d at 746.

The majority recognizes the practical equivalence between transferring Omar and "'releasing' him with a wink-and-a-nod to the Iraqis," Maj. Op. 13, but draws the opposite conclusion. The majority's logic proceeds as follows: (1) An injunction barring transfer is permissible. (2) Unrestricted intergovernmental communication could convert release into transfer. (3) Therefore, federal courts must have the power to limit intergovernmental communication, in order to give effect to the main injunction against transfer. Summarizing its position, the majority declares: "The United States may certainly share information with other sovereigns . . . , but it may not do so in a way that converts Omar's 'release' into a transfer that violates a court order." *Id*. This is a striking conclusion. The majority in effect holds that, in the proper circumstance, a single unelected district court judge can enjoin the United States military from sharing information with an allied foreign sovereign in a war zone and may do so with the deliberate purpose of foiling the efforts of the foreign sovereign to make an arrest on its own soil, in effect secreting a fugitive to prevent his capture. The trespass on Executive authority could hardly be clearer.

### III

To obtain injunctive relief, the moving party "must demonstrate 1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *CityFed*, 58 F.3d at 746. The first two factors

35a

clearly favor the government here, and the district court's findings in favor of Omar on the remaining two factors are dubious at best.

With regard to the first factor—Omar's likelihood of succeeding on the merits—we must first determine *in what sense* he must be likely to succeed. It may be true that he is likely to succeed on the merits *if all he seeks from his habeas petition is release with no additional protections,* but then the United States would be free to notify Iraqi officials of the time and place of his release, effectively ensuring Iraqi detention. Omar's "success on the merits," in that case, would be Iraqi detention, and an injunction against transfer would not be necessary. Therefore, to make an injunction against transfer to Iraqi authorities a viable form of preliminary relief, Omar would need to show some likelihood of obtaining permanent relief protecting him from Iraqi custody. This remedy we might call "release plus," consisting of release combined with immunity to Iraqi prosecution, release following surreptitious transport out of Iraq, or release with a promise to conceal the time and place of the release. But Omar has asserted no legal grounds justifying such an extraordinary remedy, and even had he done so, it would be beyond the court's power to grant. Imposing such conditions on Omar's release would substantially interfere with the Executive's prerogative, especially in time of war. Thus, the first factor favors the government.

In an attempt to show that the district court's bar on Omar's transfer to the Iraqi authorities would indeed secure Omar's chance at some better outcome on the merits, the majority draws an analogy between that injunction and garden-variety stays on extradition. *See*

36a

Maj. Op. 12.  As the majority notes, "transferring a petitioner to the foreign country seeking extradition is obviously not the same as releasing him."  *Id*.  But Omar is physically detained *in Iraq*.  Therefore, transfer in this context is not akin to extradition.  *Cf. Ntakirutimana v. Reno,* 184 F.3d 419 (5th Cir. 1999); *Then v. Melendez,* 92 F.3d 851 (9th Cir. 1996).  Rather, "transfer" here means simply allowing Iraqi officials to arrest and take custody of a person who was captured in Iraq and has remained there continuously—something they undeniably have a right to do.  "A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction," *Wilson v. Girard,* 354 U.S. 524, 529, 77 S. Ct. 1409, 1 L. Ed. 2d 1544 (1957),[5] and American citizenship is not a grant of immunity to commit crimes in other countries with impunity, *Neely,* 180 U.S. at 123, 21 S. Ct. 302.  As noted, the majority's holding has the remarkable effect of enabling a court sitting in Washington, D.C., to block the efforts of a foreign sovereign to make an arrest on its own soil.  Where, as is true here, the prisoner is physically in the territory of the foreign sovereign that seeks

---

[5]  To the extent the majority reads *Girard* as permitting in-country transfer of an American service member to foreign custody only if a treaty or similar international agreement provides for the transfer, *see* Maj. Op. 10, the majority misreads that opinion.  In *Girard*, the Court did not describe any treaty or agreement providing for the transfer of the detainee, and it would be odd to hold that a foreign sovereign needs the authorization of an international agreement to take custody of someone detained in its own territory or that the United States needs such authorization to release the detainee in compliance with the foreign sovereign's wishes.  Significantly, the *Girard* Court reversed an injunction against transfer very much like the one at issue here.  *Girard*, 354 U.S. at 526, 530, 77 S. Ct. 1409.

37a

to make the arrest, release is tantamount to transfer, and thus the logic underlying stays on extradition does not apply. The majority's contrary view is comparable to a court enjoining state authorities from lodging a detainer with respect to a prisoner held in federal custody and then requiring the federal prison officials to release the prisoner in a way that protects the prisoner from state arrest. Such interference by a court in the decisions of sovereigns acting jointly within the same territory is unprecedented. *Cf. Floyd v. Henderson,* 456 F.2d 1117, 1119 (5th Cir. 1972) ("[The state prisoner] could not complain about being returned [from state custody] to federal prison, because the question of jurisdiction and custody over a prisoner is one of comity between governments and not a personal right of the prisoner.").

The second *CityFed* factor, the risk of "irreparable injury" to Omar if the injunction is not granted, likewise favors the government. Irreparable injury must be measured in terms of the relief the litigant ultimately seeks, and as outlined above, the preliminary injunction against transfer does not alter in any way the likelihood Iraqi authorities will take Omar into custody if he ultimately prevails on the merits of his petition and gains his release from United States custody. Thus, the claimed "irreparable injury" (Iraqi custody) is not different from the most likely consequence of the relief Omar is pursuing. Only if Omar is seeking not just release, but release with protection from Iraqi custody, can he argue transfer to Iraqi authorities poses a threat of irreparable injury. But as noted, Omar has not established

38a

any legal basis for protection from Iraqi custody.[6]  It simply defies logic for a court to conclude Omar needs a preliminary injunction to protect him from the consequences of the relief he is ultimately seeking.  Similarly, while the district court treated loss of habeas jurisdiction as a second irreparable injury, this is truly injurious only to the extent the exercise of jurisdiction might produce relief beyond release into Iraqi custody, and (once again) no such additional relief could be warranted.

The third factor queries the injuries other parties might sustain as a result of the injunction.  Here, the substantial impairment to the Executive's ability to prosecute the war efficiently and to make good on its commitments to our allies cannot be denied.  Given the gravity of such impairment in these troubled times, the third factor places much on the government's side of the ledger.

Finally, the fourth *CityFed* factor asks the district court to weigh the balance of public interest.  The same concerns raised by the third factor apply here and render suspect a finding that, in the present environment, the balance of public interest favors limiting Executive discretion to transfer Omar.

The district court couched its analysis in terms of the *CityFed* factors but followed an entirely different path.

---

[6]  I do not make light of Omar's assertion he will receive severe treatment as a result of Iraqi detention.  To recognize that our courts lack the authority to dictate the actions of a foreign sovereign is not to sanction human rights violations.  As part of a tripartite system of government, we need not assume the political branches are oblivious to these concerns.  Indeed, the other branches possess significant diplomatic tools and leverage the judiciary lacks.

39a

The court did not address the merits of Omar's under-
lying habeas claim or discuss what relief would justify
each portion of the injunction. Rather, the court merely
determined that it *might* have jurisdiction over Omar's
habeas petition and then deemed this possibility suffi-
cient to satisfy the first *CityFed* factor. *Omar v. Har-
vey,* 416 F. Supp. 2d 19, 23-28 (D.D.C. 2006). Addres-
sing the second factor, the court treated its potential
loss of jurisdiction as an irreparable injury without ex-
plaining how its retention of jurisdiction could provide
Omar with relief that would somehow preclude his being
taken into Iraqi custody. *Id*. at 28-29. Even assuming
deference requires us to uphold the district court's
findings on the final two factors, *see CSX Transp., Inc.
v. Williams,* 406 F.3d 667, 670 (D.C. Cir. 2005), its
analysis of the first two is clearly erroneous, and its
overall weighing of the *CityFed* factors represents an
abuse of discretion.

## IV

I agree with the majority that the district court has
jurisdiction to entertain Omar's petition for a writ of
habeas corpus. However, because each part of the dis-
trict court's injunction—the bar on Omar's release, the
bar on his transfer to a separate custodian, and the bar
on his presentation before the CCCI while he remains in
United States or MNF-I custody—is improper, I would
vacate the injunction. Thus, in relation to however much
of the injunction the majority affirms, I must respect-
fully dissent.

40a

APPENDIX B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————

No. 05-2374 (RMU)

SANDRA K. OMAR ET AL., PETITIONERS

*v.*

FRANCIS J. HARVEY, ET AL., RESPONDENT

———————

[Filed:  Feb. 13, 2006]

———————

**<u>MEMORANDUM OPINION</u>**

GRANTING THE PETITIONER'S[1] MOTION FOR A
PRELIMINARY INJUNCTION[2]

———————

**I.  INTRODUCTION**

This matter is before the court on the petitioner's motion for a preliminary injunction.  The petitioner is an

———————

[1]  There are three petitioners in this case, two of whom are acting as next friends of Shawqi Ahmad Omar.  Because Shawqi Ahmad Omar is the only petitioner allegedly subject to transfer to the Iraqi authorities, the court refers to the petitioners in the singular.

[2]  The petitioner filed a motion for a temporary restraining order.  Because the motion has been fully briefed on an expedited schedule, the court treats it as a motion for a preliminary injunction.  *See, e.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Nat'l Park Serv.*, 1989 WL 39374, at *4 (D.D.C. 1989).

41a

American citizen seeking to enjoin his transfer from
Camp Cropper, a detainee camp operated by the Multi-
national Force-Iraq, to the custody of the Central Cri-
minal Court of Iraq ("CCCI"). Because this controversy
presents serious, substantial and difficult questions that
give rise to the petitioner's right to present proof to
support his claims, because the likelihood the petitioner
will suffer irreparable injury is high, and because the
public interest strongly favors vigorous application of
the writ of habeas corpus on behalf of United States cit-
izens, the court grants the petitioner's motion for a pre-
liminary injunction.

## II. BACKGROUND

The petitioner is an American citizen held by the
Multinational Force-Iraq ("MNF–I") since October 29,
2004. Pet. for Writ of Habeas Corpus ("Pet.") ¶ 2. The
petitioner has not been charged with any crime.[3] *Id.* On
January 24, 2006, United States officials allegedly
moved the petitioner from Camp Bucca to Abu Ghraib.
Pet'r's Supplemental Br. in Supp. of Mot. for a TRO
("Pet'r's Mot. for Prelim. Inj.") at 3. The petitioner is
currently at Camp Cropper. *Id.* at 5. On February 2,
2006, the petitioner's attorneys received an e–mail from
the respondents, United States military officials, stating

---

[3] The petitioner asserts that he was in Iraq seeking reconstruction
work. Pet. for Writ of Habeas Corpus ("Pet.") ¶ 18. The respondents
allege, however, that the petitioner is an associate of Abu Musab al
Zarqawi, "the recognized leader of Al-Qaeda in Iraq," and that he was
harboring foreign fighters intent on engaging in jihad. Resp'ts' Opp'n
to Pet'r's' Mot. for TRO ("Resp'ts' Opp'n") at 6. The foreign fighters
allegedly stated that the petitioner "made comments about his fluency
in English which allowed him to visit Baghdad hotels in order to entice
foreigners to return to Mr. Omar's home for the purpose of their kidnap
and ransom." *Id.*

42a

that "a determination was previously made to refer his case to the Central Criminal Court of Iraq."[4]  *Id*. at 4.

Fearing the consequences of the petitioner's impending transfer to the custody of the CCCI, the petitioner's attorneys filed a motion for an *ex parte* temporary restraining order late in the evening of February 2, 2006.  On February 3, 2006, the court granted that motion and issued a temporary restraining order valid until Monday, February 13, 2006.  Pursuant to the court's order, the petitioner and the respondents submitted briefs addressing the factors for injunctive relief and the constitutional implications arising out of the exercise of judicial authority over the matter.  Order Granting *Ex Parte* TRO (Feb. 3, 2006).  The court now turns to the petitioner's motion for a preliminary injunction.

## III. ANALYSIS

### A. Legal Standard for Injunctive Relief

This court may issue interim injunctive relief only when the movant demonstrates:

> (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995));

---

[4]  The petitioner alleges that the respondents decided to refer him to the Central Criminal Court of Iraq in an attempt to evade judicial review.  Pet'r's Mot. for *Ex Parte* TRO at 1.

43a

*see also World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 64 (D.D.C. 2000). It is particularly important for the movant to demonstrate a substantial likelihood of success on the merits. *Cf. Benten v. Kessler*, 505 U.S. 1084, 1085 (1992) (per curiam). Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (internal quotation omitted). In cases that raise questions "going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground . . . for more deliberative investigation," however, courts should eschew an "exaggeratedly refined analysis of the merits at an early stage in the litigation." *Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 844 (D.C. Cir. 1977). This is particularly true when the moving party seeks to maintain the status quo pending a final determination of the merits. *Id.*; *see also Carabillo v. ULLICO Inc. Pension Plan and Trust*, 355 F. Supp. 2d 49, 53 (D.D.C. 2004).

The four factors should be balanced on a sliding scale, and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor. *CSX Transp., Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005) (citing *CityFed Fin. Corp.*, 58 F.3d at 747). "An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 747.

Moreover, the other salient factor in the injunctive relief analysis is irreparable injury. A movant must "de-

44a

monstrate at least 'some injury'" to warrant the gran-
ting of an injunction. *CityFed Fin. Corp.*, 58 F.3d at 747
(quotation omitted). Indeed, if a party makes no show-
ing of irreparable injury, the court may deny the motion
for injunctive relief without considering the other fac-
tors. *Id.*

Because interim injunctive relief is an extraordinary
form of judicial relief, courts should grant such relief
sparingly. *Mazurek v. Armstrong*, 520 U.S. 968, 972
(1997). As the Supreme Court has said, "[i]t frequently
is observed that a preliminary injunction is an extraordi-
nary and drastic remedy, one that should not be granted
unless the movant, by a clear showing, carries the
burden of persuasion." *Id.* (citation omitted). There-
fore, although the trial court has the discretion to issue
or deny a preliminary injunction, it is not a form of relief
granted lightly. In addition, any injunction that the
court issues must be carefully circumscribed and tail-
ored to remedy the harm shown. *Nat'l Treasury
Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C.
Cir. 1990) (citation omitted).

### B. The Court Grants the Petitioner's Motion for Injunctive Relief

As a legal matter, resolution of the petitioner's mo-
tion for a preliminary injunction and his underlying hab-
eas petition centers on whether the petitioner is held in
either physical or constructive custody of the respon-
dents. The parties dispute whether the MNF–I, the
entity that is technically holding the petitioner in its cus-
tody, is an entity that is synonymous with, or a part of,
the respondents, such that the petitioner is in the res-
pondents' constructive custody. Concluding that the ma-
tter presents serious and difficult questions and that the

45a

risk of irreparable injury is high, the court rules that the petitioner meets the requirements for a preliminary injunction. The preliminary injunction factors are analyzed in turn below.

### (1) Substantial Likelihood of Success on the Merits

The petitioner argues that he is likely to succeed on his underlying habeas petition because it is "well–established that prisoners held by the United States cannot be imprisoned without legal process." Pet'r's Mot. for Prelim. Inj. at 16 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004)). The respondents, on the other hand, argue that the petitioner cannot succeed on his underlying habeas petition because the court does not have jurisdiction to hear a habeas case when the respondents do not have custody of the petitioner. Resp'ts' Opp'n to Pet'r's Mot. for TRO ("Resp'ts' Opp'n") at 12. The respondents further argue that the court's involvement in this case violates the separation of powers[5] between the judicial and executive branches of government. *Id.* at 21. The court addresses each of these arguments in turn.

### a. Jurisdiction

The respondents describe the MNF–I as "an international coalition force, acting on behalf and at the request of a foreign government," and argue that they do

_____

[5] "Under this constitutional doctrine of 'separation of powers,' one branch is not permitted to encroach on the domain or exercise the powers of another branch." Black's Law Dictionary 1365 (6th ed. 1990). The related doctrine of "political question" "holds that certain issues should not be decided by the courts because their resolution is committed to another branch of government." *Id.* at 1158. In the international context, the "act of state" doctrine "precludes the courts of this country from inquiring into the validity of governmental acts of a recognized sovereign committed within its own territory." *Id.* at 34.

46a

not have custody of the petitioner. *Id.* at 3, 4. The petitioner, on the other hand, argues that, at the very least, he is in the constructive custody of the respondents. Pet'r's Reply at 4. Without resolving the factual dispute between the parties, the court determines that the case at bar "raise[s] questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation."[6] *Holiday Tours, Inc.*, 559 F.2d at 844.

A court's jurisdiction over a habeas petition rests on its jurisdiction over the petitioner's custodian. *Rumsfeld v. Padilla*, 542 U.S. 426, 442 (2004); *Rasul v. Bush*, 542 U.S. 466, 478-79 (2004). Where a court does not have actual jurisdiction over a habeas petitioner's custodian, a court may nonetheless have jurisdiction if the petitioner is held in the constructive custody of a respondent within the court's jurisdiction. 28 U.S.C. § 2241(c)(1) (stating that the writ of habeas corpus extends to an individual "in custody under *or by color of the authority of the United States*" (emphasis added)); *see also United States ex rel. Keefe v. Dulles*, 222 F.2d 390, 392 (D.C. Cir. 1955) (analyzing whether the respondents had constructive custody of a habeas petitioner when the petitioner was detained by French authorities); *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 47 (D.D.C. 2004) (explaining that the language of the habeas statute provides for habeas jurisdiction when the custodian possesses constructive custody of the petitioner).

---

[6] As the D.C. Circuit has explained, a preliminary injunction is appropriate for preserving the status quo in cases raising difficult issues. *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).

47a

In the instant case, the respondents argue that the petitioner cannot succeed on the merits of his underlying habeas petition because the court does not have jurisdiction over the entity that officially serves as the petitioner's custodian, the MNF–I. Resp'ts' Opp'n at 16. The respondents further assert that the "MNF–I operates with the consent of the sovereign government of Iraq to maintain security and stability in Iraq, and receives its authority pursuant to United Nations Security Council resolutions." *Id.* at 13. The respondents rely primarily on *Hirota v. MacArthur*, a case in which the Supreme Court declined to exercise jurisdiction over habeas petitions filed by Japanese citizens seeking review of convictions of a military tribunal in Japan even though the military tribunal was set up by a United States military officer, General Douglas MacArthur. *Hirota v. MacArthur*, 338 U.S. 197, 198 (1948) (per curiam). The court reasoned that the tribunal sentencing these petitioners was not a United States tribunal because General MacArthur was acting as the head of the Allied forces. *Id.*

Three important distinguishing factors lead the court to the conclusion that *Hirota* is inapplicable in the present situation. First, *Hirota* involved habeas petitions filed by residents and citizens of Japan. *Id.* at 198. Shawqi Omar is an American citizen, and Supreme Court case law after the *Hirota* decision indicates that citizens are entitled to the highest level of protection from detention at the hands of the executive. *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950) (describing an "ascending scale of rights" with "citizenship as the head of jurisdiction"). Indeed, Justice Douglas, in his concurring opinion in *Hirota*, expressed alarm at the potential implications of denying an American citizen access to

48a

the habeas writ simply because the citizen stood con-
demned by an multinational military tribunal.[7] *Hirota*,
338 U.S. at 201-202.

Second, the petitioner in this case presents evidence
showing that he is in the constructive custody of the res-
pondents.  Specifically, the petitioner submits two e–
mails from the State Department to the petitioner's
wife, stating that the petitioner is "under U.S. military
care, custody and control," and that the petitioner is
"under control of Coalition Forces (U.S. and MNF)."
Pet'r's Reply, Exs. 1 & 2.  These e–mails cast doubt on
the respondents' claim that the petitioner has been un-
der MNF–I custody[8] since his original detention.  Res-
p'ts' Opp'n at 6.  In short, whereas the *Hirota* decision
indicates that the Japanese detainees were held by an
entity other than the United States, the petitioner here

---

[7] With perhaps prescient insight, Justice Douglas wrote:

> Today Japanese war lords appeal to the Court for applica-
> tion of American standards of justice.  Tomorrow or next
> year an American citizen may stand condemned in Ger-
> many or Japan by a military court or commission. If no
> United States court can inquire into the lawfulness of his
> detention, the military have acquired, contrary to our
> traditions  .  .  .  a new and alarming hold on us.

*Hirota v. MacArthur*, 338 U.S. 197, 201-202 (1949) (Douglas, J.,
concurring) (internal citations omitted).

[8] It is worth noting the well–established principle in the analogous
criminal law context that constructive possession may happen through
another person or by one or more persons at the same time.  CRIMINAL
JURY INSTRUCTIONS:  DISTRICT OF COLUMBIA, Instruction No. 3.08
(4th ed. 2004); *see also United States v. Harrison*, 931 F.2d 65 (D.C.
Cir. 1991), *cert. denied*, 502 U.S. 953 (1991).

49a

has presented strong evidence that he is in the constructive custody of the United States military.[9]

Third, the *Hirota* case was decided prior to significant evolution of the Supreme Court's habeas jurisprudence. In the time between the *Hirota* decision and the Supreme Court's most recent habeas decisions, the Supreme Court has expanded and clarified the application of the "Great Writ" to better fulfill its ultimate purpose of allowing an individual to present "a simple challenge to physical custody imposed by the Executive." *Padilla*, 542 U.S. at 441 (discussing the historical development of habeas jurisprudence). For example, in 1953, the Court expanded jurisdiction over habeas cases to include petitions brought by individuals convicted in military tribunals who alleged that their court martials denied them of basic rights. *Burns v. Wilson*, 346 U.S. 137 (1953); 95 A.L.R. Fed. 472 §2(a) (discussing the importance of *Burns v. Wilson*). In the concurring opinion, Justice Frankfurter explained that "[t]he right to invoke habeas corpus to secure freedom is not to be confined by any a priori or technical notions of 'jurisdiction.'" *Id*. at 148 (Frankfurter, J., concurring). By 1973, the majority of the Supreme Court, embracing the sentiments first expressed by Justice Frankfurter twenty years earlier, "rejected interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms or hobble its effectiveness with the manacles of arcane and scholastic procedural requirements," and expanded the

---

[9] Stated differently, *Hirota* analyzed the matter of custody in a different stage of the litigation. Here, the question remains whether the coalition force that holds the petitioner is an entity controlled by the United States. *Holiday Tours, Inc.*, 559 F.2d at 844 (explaining that a preliminary injunction is appropriate for preserving the status quo in cases raising difficult issues).

50a

relief addressable by the writ to include restraints other than physical confinement. *Hensley v. Mun. Court, San Jose Milpitas Judicial Dist., Santa Clara County*, 411 U.S. 345, 350 (1973).

The Supreme Court has recently further clarified the scope of the traditional habeas to respond to new situations, illuminating this court's present path. *See, e.g., Rasul*, 542 U.S. at 483 (extending the reach of habeas to nonresident aliens detained in Guantanamo Bay, Cuba and reasoning that "[a]s Lord Mansfield wrote in 1759, even if a territory was 'no part of the realm,' there was 'no doubt' as to the court's power to issue writs of habeas corpus if the territory was 'under the subjection of the Crown.'" (citing *King v. Crowle*, 2 Burr. 834, 854-55, 97 Eng. Rep. 587, 598-99 (K.B.)).  The Court's expansions and clarifications of habeas have served the ultimate purpose of preserving the writ's status as the "stable bulwark of our liberties."[10] *Hamdi v. Rumsfeld*, 542 U.S. 507, 557 (2004) (Scalia, J., dissenting) (quoting WILLIAM BLACKSTONE, 1 COMMENTARIES *153). *Hirota* is therefore distinguishable from the case at bar in a

---

[10] As the Supreme Court recognized when deciding whether a citizen's physical location made a "determinative constitutional difference" for purposes of habeas:

> This creates a perverse incentive. Military authorities faced with the stark choice of submitting to the full–blown criminal process [in the United States] or releasing a suspected enemy combatant captured on the battlefield will simply keep citizen–detainees abroad.

*Hamdi v. Rumsfeld*, 542 U.S. 508, 524 (2004).

51a

fashion rendering it inapplicable to the present situation.[11]

The lack of precedent directly on point requires this court to examine the fundamental concepts underlying habeas jurisprudence. Courts analyzing whether a respondent has custody of a habeas petitioner "must avoid 'legalistic' and 'formalistic' distinctions and honor the 'breadth and flexibility' of the Great Writ." *Abu Ali*, 350 F. Supp. 2d at 46. To this end, "federal courts have long disregarded legalistic requirements in examining applications for the writ and judged the papers by the simple statutory test of whether facts are alleged that entitle the applicant to relief." *United States v. Morgan*, 346 U.S. 502, 506 n.3 (1954). And, as stated *supra*, "[t]he

_____

[11] In addition to *Hirota*, the respondents cite a few other cases for the well-established proposition that United States courts cannot review decisions taken by the tribunals of other sovereign nations. Resp'ts' Opp'n at 17 (citing *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972), *Keefe v. Dulles*, 222 F.2d 390 (D.C. Cir. 1954), *Duchow v. Elmore*, 1995 WL 425037 (E.D. La. July 19, 1995) (unpublished opinion)). Although the respondents do not explicitly state it, they are arguing that the MNF–I has the status of a sovereign nation. *Id.* In contrast to the cases cited by the respondents, the petitioner here has not been convicted by a foreign tribunal and is not contesting a decision taken by another sovereign nation. The petitioner here alleges that United State officials, through a multinational military force made up mostly of American troops, holds him in violation of American laws. Pet. ¶ 2. The petitioner, in other words, is not challenging a decision taken by another sovereign nation; he merely challenges the role that American officials, through a multinational force, have in his detention. Where a habeas petitioner challenges actions taken allegedly at the behest of the United States, the court engages in a constructive custody analysis. *See, e.g., Abu–Ali*, 350 F. Supp. 2d, 28 47 (D.D.C. 2004) (stating that habeas jurisdiction exists where United States officials possess either actual or constructive custody of a petitioner) (citing *Keefe*, 222 F.2d at 392).

52a

right to invoke habeas corpus to secure freedom is not to be confined by any a priori or technical notions of 'jurisdiction.'" *Burns*, 346 U.S. at 148 (Frankfurter, J., concurring). Thus, contrary to the respondents' argument that this court should avoid ruling on the issues presented in either the underlying habeas petition or the motion for injunctive relief because it is allegedly devoid of jurisdiction, Resp'ts' Opp'n at 3, the court's analysis must focus on whether the petitioner has alleged any facts that entitle him to relief.[12]

The petitioner alleges that the respondents, through a multinational military force comprised largely of American troops and commanded by American officials, Pet'r's Reply at 5 (stating that 87.5 percent of the foreign forces in Iraq are from the United States), are holding him in violation of his due process, *see generally* Pet. These facts alone allow the court to entertain the petitioner's habeas petition. *Hirota*, 338 U.S. at 204 (Douglas, J., concurring) (explaining that the writ of habeas corpus runs not to an official of an international coalition, but to the American officials in such a coalition). As Justice Douglas stated:

> If an American General holds a prisoner, our process can reach him wherever he is. To that extent at least the Constitution follows the flag. It is no defense for him to say that he acts for the Allied Powers. He is an American citizen who is performing functions for our government. It is our Constitution which he sup-

---

[12] In situations where the court's jurisdiction is a contested issue, moreover, district courts routinely order jurisdictional discovery to better analyze their ability to hear a case. *See, e.g.*, *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 580 (1999) (explaining that the district court dismissed a case after it permitted jurisdictional discovery).

53a

ports and defends.  If there is evasion or violation of
its obligations, it is no defense that he acts for ano-
ther nation.  There is at present no group or confed-
eration to which an official of this Nation owes a
higher obligation than he owes to us.

*Id.*  Viewed in conjunction with the need to avoid "an
exaggeratedly refined analysis of the merits at an early
stage in the litigation," particularly where the requested
injunctive relief seeks to maintain the status quo, *Holi-
day Tours*, 559 F.2d at 844, the possibility that formulaic
concepts of habeas may deprive the court of jurisdiction
at a later stage of the litigation is not enough for this
court to deny the motion for a preliminary injunction.
With a view to ensuring that the petitioner does not be-
come a victim of a lack of precedent and because the
facts as alleged entitle the petitioner to relief, the court
concludes that the jurisdictional issues in the present
case do not pose a fatal obstacle at this stage of the liti-
gation.

### b.  Separation of Powers

The respondents argue that the court's consideration
of the petitioner's underlying habeas case and the mo-
tion for injunctive relief violates fundamental principles
of separation of powers.  Resp'ts' Opp'n at 21.  The res-
pondents posit that the court's consideration of the peti-
tioner's claims requires the court to "inject itself into an
exclusive Executive function: the United States mili-
tary's role in MNF–I, a multinational coalition force
dispatched at the request of the Iraqi government pur-
suant to United Nations Security Council Resolution
1546 to assist Iraq with its wartime security and re-
building efforts."  *Id*. at 22.  But doctrines such as act of
state, separation of powers and political question, al-

54a

though important considerations, do not "extinguish[] the fundamental right of a citizen to challenge his detention colorably alleged to be at the behest of the executive." *Abu–Ali*, 350 F. Supp. 2d at 57 (denying the government's motion to dismiss a habeas petition filed by an American citizen who was detained by the Saudi government allegedly at the request of the United States). "The competing interests of the executive to manage foreign affairs and the judiciary to protect the due process rights of citizens has never been resolved wholly in the executive's favor." *Id*. at 62.

The court is mindful that this case presents complex questions regarding the Executive's power in enigmatic times, mindful of American citizens' due process rights and humbled by the gravity of the judiciary's role as the arbiter of the two. *Marbury v. Madison*, 5 U.S. 137, 180 (1803). The court's obligations, however, requires inquiry into the legality of American officials holding American citizens. *See Hirota*, 338 U.S. at 204. Therefore, the court concludes that the petitioners have satisfied their burden of persuasion on the first of the four preliminary injunction factors. That is, this case presents questions "going to the merits that are so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Holiday Tours*, 559 F.2d at 844.

## (2) Irreparable Injury

The petitioner's original request for *ex parte* injunctive relief alleged that the United States military was set to present him to the CCCI for a hearing on February 3, 2006. The court, concerned that such a transfer would cause irreparable harm to the petitioner, either because it exposed the petitioner to the risk of torture or

55a

because it could moot the petitioner's pending habeas petition, granted the motion for an *ex parte* temporary restraining order. Order Granting *Ex Parte* TRO (Feb. 3, 2006). The respondents' opposition asserts, and the court has no reason to doubt, that the alleged February 3, 2006 hearing did not take place.[13] Resp'ts' Opp'n at 10.

The petitioner's supplemental briefing reiterates the general argument that he is likely to suffer irreparable injury if transferred to Iraqi custody. Pet'r's Mot. for Prelim. Inj. at 17. Specifically, the petitioner alleges that a transfer "would expose him to a substantial risk of torture, even death by Iraqi authorities," and that a transfer "would deprive him of his rights to due process." *Id.* at 17, 19. The respondents assert that the petitioner is not in danger of imminent torture because the "MNF–I retains physical custody of [the petitioner] throughout the CCCI proceedings." Resp'ts' Opp'n at 33. That is, the petitioner is not subject to transfer from the MNF–I to the Iraqi authorities unless the CCCI determines that the petitioner's case should be referred to a trial, and the petitioner is subsequently convicted at the trial. *Id.*

Without assessing the statistical probability that the petitioner may be tortured in the near future, the respondents' assertions have not allayed the court's original concern that any physical transfer of the petitioner may prematurely moot the case or undo this court's jurisdiction. See 28 U.S.C. § 1651. Divesting the court of jurisdiction, either as a matter of law or *de facto*, would abuse the process now put in place for the purpose of ad-

---

[13] Indeed, the respondents state that no hearing was scheduled for February 3, 2006. Resp'ts' Opp'n at 9 n.5.

56a

judicating matters on their merits. *See Rasul*, 542 U.S. at 465; *see also Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936) (observing that courts "must guard against depriving the processes of justice of their suppleness of adaptation to varying conditions"). Accepting the respondents' contention that the petitioner's appearance before the CCCI does not constitute an immediate transfer to the Iraqi authorities does little to ease the court's apprehension of irreparable injury. Specifically, the respondents assert that much time may pass before the petitioner's initial appearance at the CCCI and his ultimate conviction and corresponding transfer in that same forum. Resp'ts' Opp'n at 14 (stating that the decision to refer the petitioner's case to the CCCI will not imminently result in a transfer and explaining that the petitioner "will be transferred to the physical custody of the Iraqi authorities only if he is convicted after trial (and [the petitioner] will proceed to trial only if the investigative judge believes his case merits a trial)"). The respondents, however, do not address the possibility that the petitioner may be presented to the CCCI and in that same day, be tried, convicted and transferred to the CCCI's jurisdiction and beyond the jurisdiction of this court. The court's own unfamiliarity with the functioning of the CCCI increases, rather than decreases, its concern about the risk of injury to the petitioner. *Avramidis v. Arco Petroleum Prods. Co.*, 748 F.2d 12, 15 n.8 (1st Cir. 1986) (affirming a district court's decision to issue a preliminary injunction when the district court based its decision on a lack of information).

57a

### (3)  Harm to the Respondents & Public Interest Considerations

Although the direct harm to the respondents in this case is difficult to ascertain, the court does not take lightly the harm that may result from a possible encroachment into executive authority.  Balancing executive and judicial authority is a "delicate exercise." *Baker v. Carr*, 369 U.S. 186, 211 (1962) (stating that "deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation").  The respondents argue that for the court to exercise jurisdiction would be to interfere with the workings of MNF–I as well as the Iraqi government.  Resp'ts' Opp'n at 20–21.  According to the respondents, federal courts must "avoid inserting themselves in the middle of pending foreign criminal proceedings." *Id.* at 21.  Indeed, "federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Hwang Geum Joo v. Japan*, 413 F.3d 45, 49 (D.C. Cir. 2005) (citing *Sosa v. Alvarez–Machain*, 542 U.S. 692, 733 (2004)); *see also Hamdi*, 542 U.S. at 531 (explaining that "[w]ithout doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them"); *see also INS v. Chadha*, 462 U.S. 919, 960 (1983) (Powell, J., concurring) (noting that "[t]he Framers perceived that '[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny'") (citing THE

58a

FEDERALIST NO. 47, at 324 (J. Madison) (J. Cooke ed., 1961)).

In balancing the hardships to the parties, however, the court must conclude that the threat of tangible harm to the petitioner resulting from the court's failure to act outweighs any potential harm to the Executive's exercise of its war powers. The court, moreover, notes that it is in the public's interest to have a judiciary that does not shirk its obligations, *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986) (explaining that "one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones"), particularly where the Great Writ is concerned, *Hamdi*, 542 U.S. at 536 (reasoning that the "Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining this delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions").

## IV. CONCLUSION

For the foregoing reasons, the court grants the petitioner's motion for a preliminary injunction. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 13th day of February, 2006.

RICARDO M. URBINA
United States District Judge

59a

**APPENDIX C**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———

No. 05-2374
Document No.: 10

SANDRA K. OMAR ET AL., PETITIONERS

*v.*

FRANCIS J. HARVEY ET AL., RESPONDENTS

———

**ORDER**

———

**GRANTING THE MOTION FOR A PRELIMINARY
INJUNCTION**

———

For the reasons stated in the accompanying Memorandum Opinion, it is this 13th day of February, 2006,

**ORDERED** that the motion for a preliminary injunction is **GRANTED**, and it is

**FURTHER ORDERED** that the respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order by personal service or otherwise, shall not remove the petitioner from United States or MNF-I custody, or take any other action inconsistent with this court's memorandum opinion.

60a

**SO ORDERED.**

RICARDO M. URBINA
United States District Judge

61a

## APPENDIX D

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

September Term, 2006
No. 06-5126

SANDRA K. OMAR AND AHMED S. OMAR,
AS NEXT FRIEND OF SHAWQI AHMAD OMAR,
APPELLEES

*v.*

PETE GEREN, SECRETARY OF THE UNITED STATES
ARMY, ET AL., APPELLANTS

———————

[Filed:  May 24, 2007]

———————

## ORDER

———————

Before:  Tatel and Brown,[*] Circuit Judges, and
Edwards, Senior Circuit Judge.

Upon consideration of appellant's petition for rehearing filed March 26, 2007, the response thereto, and appellant's Fed. R. App. P. 28(j) letter, it is

**ORDERED** that the petition be denied.

———————

[*] Circuit Judge Brown would grant the petition for rehearing.

62a

**<u>Per Curiam</u>**

    **FOR THE COURT:**
    Mark J. Langer, Clerk

By:

    Michael C. McGrail
    Deputy Clerk

63a

**APPENDIX E**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

No. 06-5126
05cv02374
September Term, 2006

SANDRA K. OMAR AND AHMED S. OMAR,
AS NEXT FRIEND OF SHAWQI AHMAD OMAR,
APPELLEES

*v.*

PETE GEREN, SECRETARY OF THE UNITED STATES
ARMY, ET AL., APPELLANTS

————

[Filed: May 24, 2007]

————

**ORDER**

————

Before: GINSBURG, Chief Judge, and SENTELLE,
HENDERSON, RANDOLPH, ROGERS, TATEL, GARLAND,
BROWN,[*] GRIFFITH, and KAVANAUGH,[*] Circuit Judges.

Appellants' petition for rehearing en banc and the
response thereto were circulated to the full court, and a
vote was requested.  Thereafter, a majority of the

———————————
[*] Circuit Judges Brown and Kavanagh would grant the petition for
rehearing en banc.

64a

judges eligible to participate did not vote in favor of the petition.    Upon consideration of the foregoing and appellants' Fed. R. App. P. 28(j) letter, it is

**ORDERED** that the petition be denied.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

By:

Michael C. McGrail
Deputy Clerk

65a

## APPENDIX F

1.  28 U.S.C. 2241 provides in pertinent part:

**Power to grant writ**

(a)  Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions.  The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had.

\* \* \* \* \*

(c)  The writ of habeas corpus shall not extend to a prisoner unless—

(1)  He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

\* \* \* \* \*

(3) He is in custody in violation of the Constitution or laws or treaties of the United States \* \* \*

\* \* \* \* \*

2.  Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498, provides:

\* \* \* \* \*

66a

**SECTION 1.  SHORT TITLE.**

This joint resolution may be cited as the "Authorization for Use of Military Force Against Iraq Resolution of 2002".

**SEC. 2.  SUPPORT FOR UNITED STATES DIPLOMATIC EFFORTS.**

The Congress of the United States supports the efforts by the President to—

(1)  strictly enforce through the United Nations Security Council all relevant Security Council resolutions regarding Iraq and encourages him in those efforts; and

(2)  obtain prompt and decisive action by the Security Council to ensure that Iraq abandons its strategy of delay, evasion and noncompliance and promptly and strictly complies with all relevant Security Council resolutions regarding Iraq.

**SEC. 3.  AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.**

(a)  AUTHORIZATION.—The President is authorized to use the Armed Forces of the United States as he determines to be necessary and appropriate in order to—

(1)  defend the national security of the United States against the continuing threat posed by Iraq; and

67a

(2)  enforce all relevant United Nations Security
Council resolutions regarding Iraq.

\* \* \* \* \*

68a

## APPENDIX G

United Nations                    **S**/RES/1546 (2004)

[Seal Omitted]

**Security Council**                Distr.: General
                                    8 June 2004

---

**Resolution 1546 (2004)**

**Adopted by the Security Council at its 4987th meeting, on 8 June 2004**

*The Security Council,*

*Welcoming* the beginning of a new phase in Iraq's transition to a democratically elected government, and *looking forward* to the end of the occupation and the assumption of full responsibility and authority by a fully sovereign and independent Interim Government of Iraq by 30 June 2004,

*Recalling* all of its previous relevant resolutions on Iraq,

*Reaffirming* the independence, sovereignty, unity, and territorial integrity of Iraq,

*Reaffirming also* the right of the Iraqi people freely to determine their own political future and control their own natural resources,

69a

*Recognizing* the importance of international support, particularly that of countries in the region, Iraq's neighbours, and regional organizations, for the people of Iraq in their efforts to achieve security and prosperity, and *noting* that the successful implementation of this resolution will contribute to regional stability,

*Welcoming* the efforts of the Special Adviser to the Secretary-General to assist the people of Iraq in achieving the formation of the Interim Government of Iraq, as set out in the letter of the Secretary-General of 7 June 2004 (S/2004/461),

*Taking note* of the dissolution of the Governing Council of Iraq, and *welcoming* the progress made in implementing the arrangements for Iraq's political transition referred to in resolution 1511 (2003) of 16 October 2003,

*Welcoming* the commitment of the Interim Government of Iraq to work towards a federal, democratic, pluralist, and unified Iraq, in which there is full respect for political and human rights,

*Stressing* the need for all parties to respect and protect Iraq's archaeological, historical, cultural, and religious heritage,

*Affirming* the importance of the rule of law, national reconciliation, respect for human rights including the rights of women, fundamental freedoms, and democracy including free and fair elections,

*Recalling* the establishment of the United Nations Assistance Mission for Iraq (UNAMI) on 14 August 2003, and *affirming* that the United Nations should play a leading role in assisting the Iraqi people and gov-

70a

ernment in the formation of institutions for representative government,

*Recognizing* that international support for restoration of stability and security is essential to the well-being of the people of Iraq as well as to the ability of all concerned to carry out their work on behalf of the people of Iraq, and *welcoming* Member State contributions in this regard under resolution 1483 (2003) of 22 May 2003 and resolution 1511 (2003),

*Recalling* the report provided by the United States to the Security Council on 16 April 2004 on the efforts and progress made by the multinational force,

*Recognizing* the request conveyed in the letter of 5 June 2004 from the Prime Minister of the Interim Government of Iraq to the President of the Council, which is annexed to this resolution, to retain the presence of the multinational force,

*Recognizing also* the importance of the consent of the sovereign Government of Iraq for the presence of the multinational force and of close coordination between the multinational force and that government,

*Welcoming* the willingness of the multinational force to continue efforts to contribute to the maintenance of security and stability in Iraq in support of the political transition, especially for upcoming elections, and to provide security for the United Nations presence in Iraq, as described in the letter of 5 June 2004 from the United States Secretary of State to the President of the Council, which is annexed to this resolution,

71a

*Noting* the commitment of all forces promoting the maintenance of security and stability in Iraq to act in accordance with international law, including obligations under international humanitarian law, and to cooperate with relevant international organizations,

*Affirming* the importance of international assistance in reconstruction and development of the Iraqi economy,

*Recognizing* the benefits to Iraq of the immunities and privileges enjoyed by Iraqi oil revenues and by the Development Fund for Iraq, and *noting* the importance of providing for continued disbursements of this fund by the Interim Government of Iraq and its successors upon dissolution of the Coalition Provisional Authority,

*Determining* that the situation in Iraq continues to constitute a threat to international peace and security,

*Acting* under Chapter VII of the Charter of the United Nations,

1. *Endorses* the formation of a sovereign Interim Government of Iraq, as presented on 1 June 2004, which will assume full responsibility and authority by 30 June 2004 for governing Iraq while refraining from taking any actions affecting Iraq's destiny beyond the limited interim period until an elected Transitional Government of Iraq assumes office as envisaged in paragraph four below;

2. *Welcomes* that, also by 30 June 2004, the occupation will end and the Coalition Provisional Authority will cease to exist, and that Iraq will reassert its full sovereignty;

72a

3.  *Reaffirms* the right of the Iraqi people freely to determine their own political future and to exercise full authority and control over their financial and natural resources;

4.  *Endorses* the proposed timetable for Iraq's political transition to democratic government including:

(a)  formation of the sovereign Interim Government of Iraq that will assume governing responsibility and authority by 30 June 2004;

(b)  convening of a national conference reflecting the diversity of Iraqi society; and

(c)  holding of direct democratic elections by 31 December 2004 if possible, and in no case later than 31 January 2005, to a Transitional National Assembly, which will, inter alia, have responsibility for forming a Transitional Government of Iraq and drafting a permanent constitution for Iraq leading to a constitutionally elected government by 31 December 2005;

5.  *Invites* the Government of Iraq to consider how the convening of an international meeting could support the above process, and *notes* that it would welcome such a meeting to support the Iraqi political transition and Iraqi recovery, to the benefit of the Iraqi people and in the interest of stability in the region;

6.  *Calls on* all Iraqis to implement these arrangements peaceably and in full, and on all States and relevant organizations to support such implementation;

7.  *Decides* that in implementing, as circumstances permit, their mandate to assist the Iraqi people and government, the Special Representative of the Secretary-General and the United Nations Assistance Mission

73a

for Iraq (UNAMI), as requested by the Government of Iraq, shall:

    (a)    play a leading role to:

    (i)    assist in the convening, during the month of July 2004, of a national conference to select a Consultative Council;

    (ii)    advise and support the Independent Electoral Commission of Iraq, as well as the Interim Government of Iraq and the Transitional National Assembly, on the process for holding elections;

    (iii)    promote national dialogue and consensus-building on the drafting of a national constitution by the people of Iraq;

    (b)    and also:

    (i)    advise the Government of Iraq in the development of effective civil and social services;

    (ii)    contribute to the coordination and delivery of reconstruction, development, and humanitarian assistance;

    (iii)    promote the protection of human rights, national reconciliation, and judicial and legal reform in order to strengthen the rule of law in Iraq; and

    (iv)    advise and assist the Government of Iraq on initial planning for the eventual conduct of a comprehensive census;

8. *Welcomes* ongoing efforts by the incoming Interim Government of Iraq to develop Iraqi security

74a

forces including the Iraqi armed forces (hereinafter referred to as "Iraqi security forces"), operating under the authority of the Interim Government of Iraq and its successors, which will progressively play a greater role and ultimately assume full responsibility for the maintenance of security and stability in Iraq;

9.  *Notes* that the presence of the multinational force in Iraq is at the request of the incoming Interim Government of Iraq and therefore *reaffirms* the authorization for the multinational force under unified command established under resolution 1511 (2003), having regard to the letters annexed to this resolution;

10.  *Decides* that the multinational force shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq in accordance with the letters annexed to this resolution expressing, inter alia, the Iraqi request for the continued presence of the multinational force and setting out its tasks, including by preventing and deterring terrorism, so that, inter alia, the United Nations can fulfil its role in assisting the Iraqi people as outlined in paragraph seven above and the Iraqi people can implement freely and without intimidation the timetable and programme for the political process and benefit from reconstruction and rehabilitation activities;

11.  *Welcomes*, in this regard, the letters annexed to this resolution stating, inter alia, that arrangements are being put in place to establish a security partnership between the sovereign Government of Iraq and the multinational force and to ensure coordination between the two, and *notes also* in this regard that Iraqi security forces are responsible to appropriate Iraqi ministers,

75a

that the Government of Iraq has authority to commit Iraqi security forces to the multinational force to engage in operations with it, and that the security structures described in the letters will serve as the fora for the Government of Iraq and the multinational force to reach agreement on the full range of fundamental security and policy issues, including policy on sensitive offensive operations, and will ensure full partnership between Iraqi security forces and the multinational force, through close coordination and consultation;

12. *Decides* further that the mandate for the multinational force shall be reviewed at the request of the Government of Iraq or twelve months from the date of this resolution, and that this mandate shall expire upon the completion of the political process set out in paragraph four above, and *declares* that it will terminate this mandate earlier if requested by the Government of Iraq;

13. *Notes* the intention, set out in the annexed letter from the United States Secretary of State, to create a distinct entity under unified command of the multinational force with a dedicated mission to provide security for the United Nations presence in Iraq, *recognizes* that the implementation of measures to provide security for staff members of the United Nations system working in Iraq would require significant resources, and *calls upon* Member States and relevant organizations to provide such resources, including contributions to that entity;

14. *Recognizes* that the multinational force will also assist in building the capability of the Iraqi security

76a

forces and institutions, through a programme of recruitment, training, equipping, mentoring, and monitoring;

15. *Requests* Member States and international and regional organizations to contribute assistance to the multinational force, including military forces, as agreed with the Government of Iraq, to help meet the needs of the Iraqi people for security and stability, humanitarian and reconstruction assistance, and to support the efforts of UNAMI;

16. *Emphasizes* the importance of developing effective Iraqi police, border enforcement, and the Facilities Protection Service, under the control of the Interior Ministry of Iraq, and, in the case of the Facilities Protection Service, other Iraqi ministries, for the maintenance of law, order, and security, including combating terrorism, and *requests* Member States and international organizations to assist the Government of Iraq in building the capability of these Iraqi institutions;

17. *Condemns* all acts of terrorism in Iraq, *reaffirms* the obligations of Member States under resolutions 1373 (2001) of 28 September 2001, 1267 (1999) of 15 October 1999, 1333 (2000) of 19 December 2000, 1390 (2002) of 16 January 2002, 1455 (2003) of 17 January 2003, and 1526 (2004) of 30 January 2004, and other relevant international obligations with respect, inter alia, to terrorist activities in and from Iraq or against its citizens, and specifically *reiterates* its call upon Member States to prevent the transit of terrorists to and from Iraq, arms for terrorists, and financing that would support terrorists, and *re-emphasizes* the importance of strengthening the cooperation of the countries of the region, particularly neighbors of Iraq, in this regard;

77a

18. *Recognizes* that the Interim Government of Iraq will assume the primary role in coordinating international assistance to Iraq;

19. *Welcomes* efforts by Member States and international organizations to respond in support of requests by the Interim Government of Iraq to provide technical and expert assistance while Iraq is rebuilding administrative capacity;

20. *Reiterates* its request that Member States, international financial institutions and other organizations strengthen their efforts to assist the people of Iraq in the reconstruction and development of the Iraqi economy, including by providing international experts and necessary resources through a coordinated programme of donor assistance;

21. *Decides* that the prohibitions related to the sale or supply to Iraq of arms and related materiel under previous resolutions shall not apply to arms or related materiel required by the Government of Iraq or the multinational force to serve the purposes of this resolution, *stresses* the importance for all States to abide strictly by them, and *notes* the significance of Iraq's neighbours in this regard, and *calls upon* the Government of Iraq and the multinational force each to ensure that appropriate implementation procedures are in place;

22. *Notes* that nothing in the preceding paragraph affects the prohibitions on or obligations of States related to items specified in paragraphs 8 and 12 of resolution 687 (1991) of 3 April 1991 or activities described in paragraph 3 (f) of resolution 707 (1991) of 15 August 1991, and *reaffirms* its intention to revisit the

78a

mandates of the United Nations Monitoring, Verification, and Inspection Commission and the International Atomic Energy Agency;

23. *Calls on* Member States and international organizations to respond to Iraqi requests to assist Iraqi efforts to integrate Iraqi veterans and former militia members into Iraqi society;

24. *Notes* that, upon dissolution of the Coalition Provisional Authority, the funds in the Development Fund for Iraq shall be disbursed solely at the direction of the Government of Iraq, and *decides* that the Development Fund for Iraq shall be utilized in a transparent and equitable manner and through the Iraqi budget including to satisfy outstanding obligations against the Development Fund for Iraq, that the arrangements for the depositing of proceeds from export sales of petroleum, petroleum products, and natural gas established in paragraph 20 of resolution 1483 (2003) shall continue to apply, that the International Advisory and Monitoring Board shall continue its activities in monitoring the Development Fund for Iraq and shall include as an additional full voting member a duly qualified individual designated by the Government of Iraq and that appropriate arrangements shall be made for the continuation of deposits of the proceeds referred to in paragraph 21 of resolution 1483 (2003);

25. *Decides further* that the provisions in the above paragraph for the deposit of proceeds into the Development Fund for Iraq and for the role of the IAMB shall be reviewed at the request of the Transitional Government of Iraq or twelve months from the date of

79a

this resolution, and shall expire upon the completion of the political process set out in paragraph four above;

26. *Decides* that, in connection with the dissolution of the Coalition Provisional Authority, the Interim Government of Iraq and its successors shall assume the rights, responsibilities and obligations relating to the Oil-for-Food Programme that were transferred to the Authority, including all operational responsibility for the Programme and any obligations undertaken by the Authority in connection with such responsibility, and responsibility for ensuring independently authenticated confirmation that goods have been delivered, and *further decides* that, following a 120-day transition period from the date of adoption of this resolution, the Interim Government of Iraq and its successors shall assume responsibility for certifying delivery of goods under previously prioritized contracts, and that such certification shall be deemed to constitute the independent authentication required for the release of funds associated with such contracts, consulting as appropriate to ensure the smooth implementation of these arrangements;

27. *Further decides* that the provisions of paragraph 22 of resolution 1483 (2003) shall continue to apply, except that the privileges and immunities provided in that paragraph shall not apply with respect to any final judgement arising out of a contractual obligation entered into by Iraq after 30 June 2004;

28. *Welcomes* the commitments of many creditors, including those of the Paris Club, to identify ways to reduce substantially Iraq's sovereign debt, *calls on* Member States, as well as international and regional

80a

organizations, to support the Iraq reconstruction effort, *urges* the international financial institutions and bilateral donors to take the immediate steps necessary to provide their full range of loans and other financial assistance and arrangements to Iraq, *recognizes* that the Interim Government of Iraq will have the authority to conclude and implement such agreements and other arrangements as may be necessary in this regard, and *requests* creditors, institutions and donors to work as a priority on these matters with the Interim Government of Iraq and its successors;

29. *Recalls* the continuing obligations of Member States to freeze and transfer certain funds, assets, and economic resources to the Development Fund for Iraq in accordance with paragraphs 19 and 23 of resolution 1483 (2003) and with resolution 1518 (2003) of 24 November 2003;

30. *Requests* the Secretary-General to report to the Council within three months from the date of this resolution on UNAMI operations in Iraq, and on a quarterly basis thereafter on the progress made towards national elections and fulfilment of all UNAMI's responsibilities;

31. *Requests* that the United States, on behalf of the multinational force, report to the Council within three months from the date of this resolution on the efforts and progress of this force, and on a quarterly basis thereafter;

32. *Decides* to remain actively seized of the matter.

81a

**Annex**

**Text of letters from the Prime Minister of the Interim Government of Iraq Dr. Ayad Allawi and United States Secretary of State Colin L. Powell to the President of the Council**

5 June 2004
Republic of Iraq
Prime Minister Office

Excellency:

On my appointment as Prime Minister of the Interim Government of Iraq, I am writing to express the commitment of the people of Iraq to complete the political transition process to establish a free, and democratic Iraq and to be a partner in preventing and combating terrorism. As we enter a critical new stage, regain full sovereignty and move towards elections, we will need the assistance of the international community.

The Interim Government of Iraq will make every effort to ensure that these elections are fully democratic, free and fair. Security and stability continue to be essential to our political transition. There continue, however, to be forces in Iraq, including foreign elements, that are opposed to our transition to peace, democracy, and security. The Government is determined to overcome these forces, and to develop security forces capable of providing adequate security for

82a

the Iraqi people. Until we are able to provide security for ourselves, including the defence of Iraq's land, sea and air space, we ask for the support of the Security Council and the international community in this endeavour. We seek a new resolution on the Multinational Force (MNF) mandate to contribute to maintaining security in Iraq, including through the tasks and arrangements set out in the letter from Secretary of State Colin Powell to the President of the United Nations Security Council. The Government requests that the Security Council review the mandate of the MNF at the request of the Transitional Government of Iraq, or twelve months from the date on which such a resolution is adopted.

In order to discharge the Iraqi Government's responsibility for security, I intend to establish appropriate security structures that will allow my Government and Iraqi security forces to progressively take on that responsibility. One such structure is the Ministerial Committee for National Security, consisting of myself as the Chair, the Deputy Prime Minister, and the Minister of Defense, Interior, Foreign Affairs, Justice, and Finance. The National Security Advisor, and Director of the Iraqi National Intelligence Service will serve as permanent advisory members of the committee. This forum will set the broad framework for Iraqi security policy. I intend to invite, as appropriate, the MNF commander, his Deputy, or the MNF Commander's designative representative, and other appropriate individuals, to attend and participate as well, and will stand

83a

ready to discuss mechanisms of coordination and cooperation with the MNF. Iraqi armed forces will be responsible to the Chief of Staff and Minister of Defense. Other security forces (the Iraqi police, border guards and Facilities Protection Service) will be responsible to the Minister of the Interior or other government ministers.

In addition, the relevant ministers and I will develop further mechanisms for coordination with the MNF. Intend to create with the MNF coordination bodies at national, regional, and local levels, that will include Iraqi security forces commanders and civilian leadership, to ensure that Iraqi security forces will coordinate with the MNF on all security policy and operations issues in order to achieve unity of command of military operations in which Iraqi forces are engaged with MNF. In addition, the MNF and Iraqi government leaders will keep each other informed of their activities, consult regularly to ensure effective allocation and use of personnel, resources and facilities, will share intelligence, and will refer issues up the respective chains of command where necessary, Iraqi security forces will take on progressively greater responsibility as Iraqi capabilities improve.

The structures I have described in this letter will serve as the fora for the MNF and the Iraqi government to reach agreement on the full range of fundamental security and policy issues, including policy on sensitive offensive operations, and will ensure full partnership between Iraqi forces and the MNF, through close coordination

84a

and consultation. Since these are sensitive issues for a number of sovereign governments, including Iraq and the United States, they need to be resolved in the framework of a mutual understanding on our strategic partnership. We will be working closely with the MNF leadership in the coming weeks to ensure that we have such an agreed strategic framework.

We are ready to take sovereign responsibility for governing Iraq by June 30. We are well aware of the difficulties facing us, and of our responsibilities to the Iraqi people. The stakes are great, and we need the support of the international community to succeed. We ask the Security Council to help us by acting now to adopt a Security Council resolution giving us necessary support.

I understand that the Co-sponsors intend to annex this letter to the resolution on Iraq under consideration. In the meantime, I request that you provide copies of this letter to members of the Council as quickly as possible.


(*Signed*) Dr. Ayad Allawi


His Excellency
Mr. Lauro L. Baja, Jr.
President of the Security Council
United Nations
New York, New York

85a

The Secretary of State
Washington

5 June 2004

Excellency:

Recognizing the request of the government of Iraq for the continued presence of the Multi-National Force (MNF) in Iraq, and following consultations with Prime Minister Ayad Allawi of the Iraqi Interim Government, I am writing to confirm that the MNF under unified command is prepared to continue to contribute to the maintenance of security in Iraq, including by preventing and deterring terrorism and protecting the territory of Iraq. The goal of the MNF will be to help the Iraqi people to complete the political transition and will permit the United Nations and the international community to work to facilitate Iraq's reconstruction.

The ability of the Iraqi people to achieve their goals will be heavily influenced by the security situation in Iraq. As recent events have demonstrated, continuing attacks by insurgents, including former regime elements, foreign fighters, and illegal militias challenge all those who are working for a better Iraq.

Development of an effective and cooperative security partnership between the MNF and the sovereign Government of Iraq is critical to the stability of Iraq. The commander of the MNF will work in partnership with the sovereign Government of Iraq in helping to provide security while recognizing and respecting its sovereignty. To that end, the MNF stands ready to participate in discussions of the Ministerial Committee for National Security on the broad framework of security policy, as referred to in the letter from Prime Minister

86a

of the Interim Government of Iraq Allawi dated June 5, 2004. On the implementation of this policy, recognizing that Iraqi security forces are responsible to the appropriate Iraqi ministers, the MNF will coordinate with Iraqi security forces at all levels—national, regional, and local—in order to achieve unity of command of military operations in which Iraqi forces are engaged with the MNF. In addition, the MNF and the Iraqi government leaders will keep each other informed of their activities, consult regularly to ensure effective allocation and use of personnel, resources, and facilities, will share intelligence, and will refer issues up the respective chains of command where necessary. We will work in the fora described by Prime Minister Allawi in his June 5 letter to reach agreement on the full range of fundamental security and policy issues, including policy on sensitive offensive operations, and will ensure full partnership between MNF and Iraqi forces, through close coordination and consultation.

Under the agreed arrangement, the MNF stands ready to continue to undertake a broad range of tasks to contribute to the maintenance of security and to ensure force protection. These include activities necessary to counter ongoing security threats posed by forces seeking to influence Iraq's political future through violence. This will include combat operations against members of these groups, internment where this is necessary for imperative reasons of security, and the continued search for and securing of weapons that threaten Iraq's security. A further objective will be to train and equip Iraqi security forces that will increasingly take responsibility for maintaining Iraq's security. The MNF also stands ready as needed to participate in the provision of humanitarian assistance, civil affairs support, and relief

87a

and reconstruction assistance requested by the Iraqi Interim Government and in line with previous Security Council Resolutions.

In addition, the MNF is prepared to establish or support a force within the MNF to provide for the security of personnel and facilities of the United Nations. We have consulted closely with UN officials regarding the United Nations' security requirements and believe that a brigade-size force will be needed to support the United Nations' security effort. This force will be under the command and control of the MNF commander, and its missions will include static and perimeter security at UN facilities, and convoy escort duties for the UN mission's travel requirements.

In order to continue to contribute to security, the MNF must continue to function under a framework that affords the force and its personnel the status that they need to accomplish their mission, and in which the contributing states have responsibility for exercising jurisdiction over their personnel and which will ensure arrangements for, and use of assets by, the MNF. The existing framework governing these matters is sufficient for these purposes. In addition, the forces that make up the MNF are and will remain committed at all times to act consistently with their obligations under the law of armed conflict, including the Geneva Conventions.

The MNF is prepared to continue to pursue its current efforts to assist in providing a secure environment in which the broader international community is able to fulfil its important role in facilitating Iraq's reconstruction. In meeting these responsibilities in the period ahead, we will act in full recognition of and respect for Iraqi sovereignty. We look to other member states and

88a

international and regional organizations to assist the people of Iraq and the sovereign Iraqi government in overcoming the challenges that lie ahead to build a democratic, secure and prosperous country.

The co-sponsors intend to annex this letter to the resolution on Iraq under consideration. In the meantime, I request that you provide copies of this letter to members of the Council as quickly as possible.

Sincerely,
(*Signed*) Colin L. Powell

——————

His Excellency
Mr. Lauro L. Baja, Jr.
President of the Security Council
United Nations
New York, New York

89a

United Nations                              **S**/RES/1637 (2005)[*]
[Seal Omitted]

**Security Council**                    Distr.: General
                                        11 November 2005

---

**Resolution 1637 (2005)**

**Adopted by the Security Council at its 5300th meeting, on 8 November 2005**

*The Security Council,*

*Welcoming* the beginning of a new phase in Iraq's transition and looking forward to the completion of the political transition process as well as to the day Iraqi forces assume full responsibility for the maintenance of security and stability in their country, thus allowing the completion of the multinational force mandate,

*Recalling* all of its previous relevant resolutions on Iraq,

*Reaffirming* the independence, sovereignty, unity, and territorial integrity of Iraq,

*Reaffirming also* the right of the Iraqi people freely to determine their own political future and control their own natural resources,

---

[*] Second issue for technical reasons.

90a

*Welcoming* the commitment of the Transitional Government of Iraq to work towards a federal, democratic, pluralistic, and unified Iraq, in which there is full respect for political and human rights,

*Calling upon* the international community, particularly countries in the region and Iraq's neighbours, to support the Iraqi people in their pursuit of peace, stability, security, democracy, and prosperity, and *noting* the contribution that the successful implementation of this resolution will bring to regional stability,

*Welcoming* the assumption of full governmental authority by the Interim Government of Iraq on 28 June 2004, the direct democratic elections of the Transitional National Assembly on 30 January 2005, the drafting of a new constitution for Iraq and the recent approval of the draft constitution by the people of Iraq on 15 October 2005,

*Noting* that the Government of Iraq established as a result of the election scheduled to take place by 15 December 2005 will play a critical role in continuing to promote national dialogue and reconciliation and in shaping the democratic future of Iraq and *reaffirming* the willingness of the international community to work closely with the Government of Iraq with respect to efforts to assist the Iraqi people,

*Calling upon* those who use violence in an attempt to subvert the political process to lay down their arms and participate in the political process, including in the election scheduled for 15 December, and encouraging the Government of Iraq to engage with all those who renounce violence and to promote a political atmosphere conducive to national reconciliation and political competition through peaceful democratic means,

91a

*Reaffirming* that acts of terrorism must not be allowed to disrupt Iraq's political and economic transition, and further *reaffirming* the obligations of Member States under resolution 1618 (2005) of 4 August 2005 and other relevant resolutions and international obligations with respect, inter alia, to terrorist activities in and from Iraq or against its citizens,

*Recognizing* the request conveyed in the letter of 27 October 2005 from the Prime Minister of Iraq to the President of the Council, which is annexed to this resolution, to retain the presence of the multinational force in Iraq, and *further recognizing* the importance of consent of the sovereign Government of Iraq for the presence of the multinational force and of close coordination between the multinational force and that government,

*Welcoming* the willingness of the multinational force to continue efforts to contribute to the maintenance of security and stability in Iraq, including participating in the provision of humanitarian and reconstruction assistance, as described in the letter of 29 October 2005 from the United States Secretary of State to the President of the Council, which is annexed to this resolution,

*Recognizing* the tasks and arrangements set out in the letters annexed to resolution 1546 (2004) of 8 June 2004 and the cooperative implementation by the Government of Iraq and the multinational force of those arrangements,

*Affirming* the importance for all forces promoting the maintenance of security and stability in Iraq to act in accordance with international law, including obligations under international humanitarian law, and to

92a

cooperate with relevant international organizations, and *welcoming* their commitments in this regard,

*Recalling* the establishment of the United Nations Assistance Mission for Iraq (UNAMI) on 14 August 2003, *underlining* the particular importance of UNAMI assistance for the upcoming election by 15 December 2005 of a government pursuant to a newly adopted Constitution, and *affirming* that the United Nations should continue to play a leading role in assisting the Iraqi people and government with further political and economic development, including advising and supporting the Government of Iraq, as well as the Independent Electoral Commission of Iraq, contributing to coordination and delivery of reconstruction, development and humanitarian assistance, and promoting the protection of human rights, national reconciliation, as well as judicial and legal reform in order to strengthen the rule of law in Iraq,

*Recognizing* that international support for security and stability is essential to the well-being of the people of Iraq as well as the ability of all concerned, including the United Nations, to carry out their work on behalf of the people of Iraq, and *expressing* appreciation for Member State contributions in this regard under resolution 1483 (2003) of 22 May 2003, resolution 1511 (2003) of 16 October 2003 and resolution 1546 (2004),

*Recognizing* that the Government of Iraq will continue to have the primary role in coordinating international assistance to Iraq and *reaffirming* the importance of international assistance and development of the Iraqi economy and the importance of coordinated donor assistance,

93a

*Recognizing* the significant role of the Development Fund for Iraq and the International Advisory and Monitoring Board in helping the Government of Iraq to ensure that Iraq's resources are being used transparently and equitably for the benefit of the people of Iraq,

*Determining* that the situation in Iraq continues to constitute a threat to international peace and security,

*Acting* under Chapter VII of the Charter of the United Nations,

1. *Notes* that the presence of the multinational force in Iraq is at the request of the Government of Iraq and, having regard to the letters annexed to this resolution, *reaffirms* the authorization for the multinational force as set forth in resolution 1546 (2004) and *decides* to extend the mandate of the multinational force as set forth in that resolution until 31 December 2006;

2. *Decides* further that the mandate for the multinational force shall be reviewed at the request of the Government of Iraq or no later than 15 June 2006, and *declares* that it will terminate this mandate earlier if requested by the Government of Iraq;

3. *Decides* to extend until 31 December 2006 the arrangements established in paragraph 20 of resolution 1483 (2003) for the depositing into the Development Fund for Iraq of proceeds from export sales of petroleum, petroleum products, and natural gas and the arrangements referred to in paragraph 12 of resolution 1483 (2003) and paragraph 24 of resolution 1546 (2004) for the monitoring of the Development Fund for Iraq by the International Advisory and Monitoring Board;

94a

4. *Decides* further that the provisions in the above paragraph for the deposit of proceeds into the Development Fund for Iraq and for the role of the International Advisory and Monitoring Board shall be reviewed at the request of the Government of Iraq or no later than 15 June 2006;

5. *Requests* that the Secretary-General continue to report to the Council on UNAMI's operations in Iraq on a quarterly basis;

6. *Requests* that the United States, on behalf of the multinational force, continue to report to the Council on the efforts and progress of this force on a quarterly basis;

7. *Decides* to remain actively seized of the matter.

95a

## Annex I

### Letter dated 27 October 2005 from the Prime Minister of Iraq addressed to the President of the Security Council

[Original: Arabic]

Sir,

On 15 October 2005 Iraq voted in a general referendum held at the national level for the purpose of approving a new Constitution for Iraq. The country thus took another important step towards building a strong democratic future and establishing a Government elected in accordance with a permanent Constitution. At the same time, Iraq is approaching the completion of its political transformation through the process of electing its future legislative authority and forming a new Government, which is to take place in December 2005. There still remains an extensive agenda for reconstruction and political development, the realization of which will require security and stability.

We are proceeding towards political stability and economic prosperity and taking fundamental steps towards restoring security and stability. Yet Iraq is still confronted by forces of terrorism that incorporate foreign elements which carry out horrific attacks and terrorist acts in an attempt to thwart political and economic development in Iraq. The Iraqi security forces, which are growing in size, capacity and experience day by day, need more time to fill out their ranks, fully equip themselves and complete their training with a

96a

view to assuming responsibility for all security matters and providing adequate security for the Iraqi people. Until such time as the Iraqi security forces assume full responsibility for Iraq's security, we need the continued support of the international community, including the participation of the Multinational Force, in order to establish lasting peace and security in Iraq. We understand that the Multinational Force is willing to continue its efforts. We therefore request the Security Council to extend, for a period of 12 months starting 31 December 2005, the mandate of the Multinational Force, as provided in Council resolution 1546 (2004), including the tasks and arrangements specified in the letters annexed thereto, with the proviso that the Council shall review that mandate upon being so requested by the Government of Iraq or at the end of a period of eight months from the date of the resolution and declare, in the extension, that it will terminate the mandate before the expiry of that period should the Government of Iraq so request.

The Government of Iraq believes that the provisions of resolution 1546 (2004) relating to the deposit of proceeds into the Development Fund for Iraq and the role of the International Advisory and Monitoring Board will help to ensure that Iraq's natural resources are used for the benefit of the Iraqi people. We understand that the funds deposited in the Development Fund for Iraq belong to Iraq and will continue to enjoy the immunities and privileges of the Fund, given the importance of those terms for the Iraqi people during this critical period. We request the

97a

Security Council to extend the validity of those terms for an additional 12 months and to review them upon being so requested by the Government of Iraq or at the end of a period of eight months from the date of the resolution.

The Iraqi people are determined to establish for themselves a stable, peaceful democracy, which will provide the basis for the establishment of a vibrant economy. This vision of Iraq's future can become a reality with the help of the international community.

It is my understanding that the sponsors intend to have the present letter annexed to the resolution on Iraq currently being drafted. In the meantime, I should be grateful if you would have copies of this letter circulated to the members of the Security Council as soon as possible.

(*Signed*) Ibrahim Aleshaiker Al-Jaafari
Prime Minister

27 October 2005

98a

**Annex II**

**Letter dated 29 October 2005 from the Secretary of State of the United States of America to the President of the  Security Council**

Having reviewed the request of the Government of Iraq to extend the mandate of the Multinational Force (MNF) in Iraq (S/2005/687) and following consultations with the Government of Iraq, I am writing to confirm, consistent with this request, that the MNF under unified command stands ready to continue to fulfil its mandate as set out in Security Council resolution 1546 (2004).

Since the end of the occupation on 28 June 2004, the Government of Iraq and the MNF have developed an effective and cooperative security partnership to address the evolving nature of Iraq's security environment, including the continuing need to prevent and deter acts of terrorism.  This partnership plays a critical role in the daily efforts to improve security throughout Iraq.  In the context of this partnership, the MNF is prepared to continue to undertake a broad range of tasks to contribute to the maintenance of security and stability and to ensure force protection, acting under the authorities set forth in resolution 1546 (2004), including the tasks and arrangements set out in the letters annexed thereto, and in close cooperation with the Government of Iraq. The forces that make up the MNF will remain committed to acting consistently with their obligations under inter-

99a

national law, including the law of armed conflict.

Substantial progress has already been made in helping to build and train the Iraqi Security Forces (ISF), allowing them to take on increasing security responsibilities. The Government of Iraq and the MNF are developing a security plan to set forth the conditions necessary for transfer of security responsibility from the MNF to the ISF. Conditions permitting, we look forward to notable progress in the next year. Together, we will build towards the day when the Iraqi forces assume full responsibility for the maintenance of security and stability in Iraq.

The co-sponsors intend to annex the present letter to the resolution on Iraq under consideration. In the meantime, I request that you provide copies of the present letter to members of the Council as quickly as possible.

(*Signed*) Condoleezza Rice

————————

100a

**APPENDIX H**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————

No. 05-2374

SANDRA K. OMAR, ET AL., PETITIONERS

*v.*

FRANCIS J. HARVEY, ET AL., RESPONDENTS

———————

**<u>DECLARATION OF JOHN D. GARDNER</u>**

I, Major General John D. Gardner, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.  I currently serve as the Deputy Commanding General for Detainee Operations (DCG-DO), Multi-National Force—Iraq (MNF-I).  In this capacity, I am charged with the responsibility for oversight in several areas, including:

   - Safeguard and secure all persons who are in custody at the MNF-I detention centers and protected areas.

   - Operation and focus of the MNF-I Joint Inter-rogation and Debriefing Center to provide

101a

high-quality actionable strategic, operational, and tactical intelligence to the warfighters.

- Maximize efficiency and provide due process in the referral of security internees and detainees to the Iraqi legal system.

- Integrate Iraqi leadership and partnership in all facets of Detainee Operations.

I make these statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. MNF-I is a coalition force consisting of approximately twenty-seven different nations that operates in accordance with the mandate of United Nations Security Council Resolutions 1546 (2004) and 1637 (2005). Resolution 1637 extended the mandate of MNF-I for another year on behalf of and at the request of the Iraqi Government. MNF-I is authorized "to take all necessary measures to contribute to the maintenance of security and stability in Iraq." Such measures include the ability to detain individuals "where this is necessary for imperative reasons of security."

3. Mr. Shawqi Omar, a dual American-Jordanian citizen, is in MNF-I custody pursuant to UNSCR 1546 and 1637, which allow MNF-I to intern individuals who are considered to be an imperative threat to the security of Iraq. He was born in Kuwait and has been living in Iraq at different intervals since 2002. He has been under investigation by many foreign intelligence agencies, including Iraq's. He was captured by MNF-I on October 30, 2004, in a raid targeting associates of Abu Musab al Zarqawi, the recognized leader of al-Qaeda in Iraq who has committed numerous acts of terrorism and

102a

violence in Iraq, including killing civilians and taking hostages.  Mr. Omar is named on the same Jordanian indictment as Abu Musab al Zarqawi for plotting an unsuccessful chemical attack in Jordan.  Mr. Omar is personally related to al Zarqawi by marriage.  His second wife and al Zarqawi's first wife are sisters.  Mr. Omar's son, Ahmad, is married to the daughter of Abu Muhammad al Maqdesi, who is al Zarqawi's spiritual advisor.  Maqdesi has been imprisoned multiple times in Jordan for crimes against the Jordanian government.  There is testimonial evidence of Mr. Omar's numerous private meetings with al Zarqawi.  He was captured harboring an Iraqi insurgent and four Jordanian foreign fighters who illegally entered Iraq.  In their sworn statements, the four Jordanians captured with Mr. Omar state that they traveled illegally to Iraq from Jordan for the express purpose of committing militant Jihad against American and other Coalition Forces.  The Iraqi insurgent captured with Mr. Omar also admits in his sworn statement to joining the insurgency for the purpose of militant Jihad and to attack Coalition Forces.  Each of the five detainees captured with Mr. Omar admitted that while living in Mr. Omar's home, they conducted surveillance of potential kidnap victims within Baghdad and they conducted weapons training in Fallujah.  The four Jordanians stated that Mr. Omar directed and participated in the insurgent cell activities of selection and surveillance of potential kidnap victims.  All five insurgents admit that Mr. Omar made comments about his fluency in English, which allowed him to visit Baghdad hotels in order to entice foreigners to return to Mr. Omar's home for the purpose of their kidnap and ransom.

103a

4. Mr. Omar has multiple ties to the Zarqawi terrorist network in Iraq and is believed to have acted as al Zarqawi's personal emissary to insurgent groups in several cities in Iraq. There is evidence that indicates Mr. Omar provided aid to the Zarqawi network in Iraq, including such actions as: facilitating the Zarqawi network's connection to other terrorist groups, aiding the movement of foreign fighters into Iraq, and aiding in the planning and execution of kidnappings in Iraq. At the time of his capture, Mr. Omar had several weapons and Improvised Explosive Device (IED)-making materials in his home. Additional information that is classified regarding Mr. Omar can be made available for the Court's ex parte, in camera review at the Court's request.

5. Following Mr. Omar's capture, a panel of three officers conducted a proceeding that exceeded the due process requirements of Article 5 of the Third Geneva Convention of 1949. The panel reviewed the facts and circumstances surrounding the capture, interviewed witnesses, and considered available intelligence information. Mr. Omar was present at the hearing and had the opportunity to hear the basis on which he was being detained, to make a statement, and to call witnesses who were immediately available. The panel determined that Mr. Omar did not meet the criteria for status as a prisoner of war under the Third Geneva Convention; that Mr. Omar did meet the criteria for status as a security internee under the law of war; and that he did meet the definition of an enemy combatant in the war on terrorism.

6. In August 2005, after consultation with U.S. authorities, as appropriate in the case of a U.S. national such

104a

as Mr. Omar, MNF-I ascertained that the Iraqi Judiciary would proceed with charging Mr. Omar in the Central Criminal Court of Iraq (CCCI). In November 2005, U.S. authorities indicated no objection to Iraqi plans to prosecute Mr. Omar in the CCCI. Mr. Omar is currently pending an Investigative Hearing before the CCCI. Such action before the CCCI is typical of actions taken with regard to other foreign fighters captured in Iraq by MNF-I, for which credible evidence of their crimes exit.

7. The CCCI in Baghdad is the only court in Iraq with nationwide jurisdiction, thereby eliminating venue and jurisdictional issues across the various courts of session among the 18 provinces. The CCCI has discretionary investigative and trial jurisdiction over all crimes that threaten the sovereignty of Iraq and crimes committed against Coalition Forces, including acts of terrorism. The CCCI operates under the Iraqi Penal Code of 1969 and the 1971 Iraqi Law on Criminal Proceedings. It is an Iraqi Court under Iraqi governance, and it is composed of Iraqi Judges who have attended the Iraqi Judicial School and is administered by the Iraqi Higher Juridical Council.

8. The CCCI operates using a modified continental, inquisitorial judicial process, and not the English adversarial judicial system. The CCCI is divided into two chambers—an investigative court and a felony trial court. Under this system, the investigative judge conducts an investigative hearing in chambers to determine if there is sufficient evidence to warrant a trial. Witnesses provide sworn testimony, and the investigative judge questions the witnesses to clarify their testimony. Defense counsel is allowed to present questions to the

105a

court for review.  If the investigative judge accepts any question, he asks the question of the witness.  Upon the conclusion of evidence presentation, the investigative judge questions the defendant, who is not required to respond.  The investigative judge makes the determination of whether there are sufficient grounds to forward the case to the Trial Court.  If he finds there is sufficient evidence, he forwards a report of the investigative proceeding and recommends charges to the Trial Court. If he determines there is insufficient evidence, he orders the release of the defendant.  The Trial Court sits in panels of three judges, who review the findings of the investigative judge and listen to any additional evidence in a formal courtroom setting.  After a case is forwarded for trial, a Trial Panel may return the case for further investigation before a date is set for trial.  Trial Panel judges may ask questions, similar to the process used in the investigative hearing.  Prosecutors and defense counsel have a more limited role than do their counterparts in the American and British adversarial system. Upon the conclusion of the case, the Trial Panel judges enter a verdict and either release the defendant or sentence him, which can include a prison term.  Sentences imposed by the Trial Court are those prescribed in the Iraqi Penal Code as amended by CPA orders. Sentences may be reduced at the discretion of the Chief Judge of the Trial Court while appeals are made to the Iraqi Court of Cassation.

9. Defendants are represented at the investigative hearing by counsel retained at their own expense or, more typically, by court-appointed defense counsel. Defense counsel at the investigative hearing function primarily to ensure the defendant's procedural rights

106a

are not violated.  The defendant is also entitled to court-appointed defense counsel for trial.

10.  MNF-I maintains physical custody of detainees while their cases are being heard by the CCCI.  They are held as security internees in accordance with UN Security Council Resolutions 1546 and 1637 until the case is resolved.  If they are convicted and sentenced to a term of imprisonment, the Trial Court will issue an Order, which is sent to the DCG-DO.  The DCG-DO will issue a subsequent transfer order releasing the detainee to an Iraqi Ministry of Justice facility.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 7th day of February 2006.

/s/   <u>JOHN GARDNER</u>
John D. Gardner
Major General, U.S. Army
Deputy Commanding General
    Detainee Operations