No. 06-1666

# In the Supreme Court of the United States

MOHAMMAD MUNAF, ET AL., PETITIONERS

*v.*

PETE GEREN, SECRETARY OF THE ARMY, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

**BRIEF FOR THE RESPONDENTS**

PAUL D. CLEMENT
 *Solicitor General*
  *Counsel of Record*
PETER D. KEISLER
 *Assistant Attorney General*
DOUGLAS N. LETTER
JONATHAN H. LEVY
LEWIS S. YELIN
 *Attorneys*
 *Department of Justice*
 *Washington, D.C. 20530-0001*
 *(202) 514-2217*

## QUESTIONS PRESENTED

Petitioner, a dual Iraqi-United States national, has been tried and convicted by an Iraqi court of participation in a kidnapping-for-hire scheme in Iraq. During the pendency of the Iraqi government's criminal proceedings, petitioner is being held by United States military personnel who are serving as part of a multinational force acting under the authority of the United Nations Security Council and at the request of the Iraqi government. The questions presented are:

1. Whether the United States courts have jurisdiction to entertain petitioner's habeas corpus petition challenging his detention by the multinational force and seeking an injunction barring his transfer to Iraqi authorities upon completion of the Iraqi criminal proceedings.

2. Whether petitioner's claims and request for an injunction against his transfer to Iraqi authorities are otherwise justiciable and within the power of the courts.

(I)

## TABLE OF CONTENTS

Page

Opinions below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

Cases:

*Bennett* v. *Spear*, 520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . 17
*Braden* v. *30th Judicial Cir. Ct.*, 410 U.S. 484 (1973) . . . . . 6
*Hirota* v. *MacArthur* (1948):
    335 U.S. 876 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    338 U.S. 197 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 10, 11
*Holmes* v. *Laird*, 459 F.2d 1211 (D.C. Cir.), cert.
    denied, 409 U.S. 869 (1972) . . . . . . . . . . . . . . . . . . . . . 9, 17
*Johnson* v. *Eisentrager*, 339 U.S. 763 (1950) . . . . . . . . . . . 12
*Neely* v. *Henkel*, 180 U.S. 109 (1901) . . . . . . . . . . . . . . . . . . 14
*Omar* v. *Harvey*, 479 F.3d 1 (D.C. Cir. 2007), petition
    for cert. pending, 07-394 (filed Sept. 21, 2007) . . . . . 8, 18
*United States ex rel. Keefe* v. *Dulles*, 222 F.2d 390
    (D.C. Cir. 1954), cert. denied, 348 U.S. 952 (1955) . . . . 12
*Wilson* v. *Girard*, 354 U.S. 524 (1957) . . . . . . . . . 9, 14, 15, 16

Resolutions and statute:

Res. 1546, U.N. SCOR, U.N. Doc. S/Res. 1546 (2004) . 2, 15
Res. 1637, U.N. SCOR, U.N. Doc. S/Res. 1637 (2005) . . . . 2
Res. 1723, U.N. SCOR, U.N. Doc. S/Res. 1723 (2006) . . . . 2

(III)

IV

Statute—Continued:                                    Page

Authorization for Use of Military Force Against Iraq
    Resolution of 2002, Pub. L. No. 107-243, 116 Stat.
    1498 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15
        § 3(a)(2), 116 Stat. 1501 . . . . . . . . . . . . . . . . . . . . . . . 15

# In the Supreme Court of the United States

---

No. 06-1666

MOHAMMAD MUNAF, ET AL., PETITIONERS

*v.*

PETE GEREN, SECRETARY OF THE ARMY, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE DISTRICT OF COLUMBIA CIRCUIT*

---

## BRIEF FOR THE RESPONDENTS

---

### OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1-9) is reported at 482 F.3d 582. The opinion of the district court (Pet. App. 10-38) is reported at 456 F. Supp. 2d 115.

### JURISDICTION

The judgment of the court of appeals was entered on April 6, 2007. The petition for a writ of certiorari was filed on June 13, 2007. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

### STATEMENT

1. a. The Multinational Force-Iraq (MNF-I) is an internationally authorized entity consisting of forces from approximately 27 nations, including the United States. Pet. App. 11. It operates in Iraq at the request

(1)

2

of the Iraqi government and under a United Nations (U.N.) Security Council mandate authorizing it "to take all necessary measures to contribute to the maintenance of security and stability in Iraq." C.A. App. 30 (Res. 1546, U.N. SCOR, at 4, U.N. Doc. S/Res. 1546 (2004)).[1] The MNF-I is charged with, among other tasks, deterring and preventing terrorism and detaining individuals where necessary for imperative reasons of security. *Id.* at 36-37. Pursuant to its U.N. mandate, the MNF-I operates under the "unified command" of United States military officers, see *id.* at 30, but it is legally distinct from the United States, has its own insignia, and includes high-ranking officers from other nations (for example, the second in command, Lt. Gen. William Rollo, is a British officer).

Under the authority of the U.N. Security Council resolution, the Government of Iraq and the MNF-I agreed that the MNF-I would maintain physical custody of individuals suspected of criminal activity in Iraq pending investigation and prosecution in Iraqi courts under Iraqi law, because, among other reasons, many Iraqi prison facilities have been damaged or destroyed in connection with the ongoing hostilities. See Pet. App. 12. The MNF-I holds those individuals as security internees during Iraqi criminal proceedings, in accordance with the Security Council resolution and at the request of the Iraqi government. See C.A. App. 25-26. Thus, although the MNF-I maintains physical custody over criminal defendants, they are detained pursuant to the

---

[1] That authority is subject to periodic review and reconsideration by the U.N. Security Council. The Security Council extended the MNF-I's mandate through December 2006, see Res. 1637, U.N. SCOR, U.N. Doc. S/Res. 1637 (2005), and again through December 2007, see Res. 1723, U.N. SCOR, U.N. Doc. S/Res. 1723 (2006).

3

MNF-I's U.N. mandate and under the authority of the Iraqi government (which prosecutes them under Iraqi law). *Ibid*.

b. The Central Criminal Court of Iraq (CCCI) is an Iraqi court under Iraqi governance, staffed by Iraqi judges who apply Iraqi law. Pet. App. 13. The CCCI is divided into two chambers: an investigative court and a felony trial court. C.A. App. 22. The investigative court conducts an investigative hearing, during which witnesses present sworn testimony, to determine whether there is sufficient evidence to warrant a criminal trial. *Ibid*. After evidence is presented, the investigative judge questions the defendant, who has a right not to respond. *Ibid*. If the investigative court determines that there is sufficient evidence to proceed, it forwards a report to the trial court and recommends charges. *Ibid*. The trial court sits in panels of three judges, who review the evidence submitted by the investigative court and may take additional evidence in formal proceedings. *Id.* at 23.

In both investigative and trial proceedings, a defendant is entitled to representation by court-appointed counsel or counsel of his choosing, and he may submit evidence and call supporting witnesses. C.A. App. 23, 51. If a defendant is convicted and sentenced to death, his case is automatically appealed to the Iraqi Court of Cassation. *Id*. at 54.

2. In March 2005, petitioner, a dual Iraqi-United States citizen residing in Romania, voluntarily traveled with several Romanian journalists to Iraq. C.A. App. 12. Ostensibly, petitioner was to serve as the journalists' translator and guide. *Ibid*. Shortly after their arrival in Iraq, however, the group was kidnapped and held captive for over two months. *Ibid*. In May 2005, MNF-I

troops freed the captives during a military raid and detained petitioner because they suspected that he was involved in the kidnapping. *Id.* at 21.

In July 2005, a tribunal of three MNF-I officers conducted a comprehensive review of petitioner's status and detention. C.A. App. 21. Petitioner was present at the hearing, and he had an opportunity to hear the basis for his detention, make a statement, and call immediately available witnesses. *Ibid.* The panel determined that petitioner was a security internee who should continue to be detained for imperative reasons of security, in accordance with the MNF-I's U.N. mandate. *Ibid.* The MNF-I subsequently referred petitioner's case to the CCCI for investigation and possible trial. *Id.* at 22. That referral is consistent with the manner in which the MNF-I has treated other security internees being held by the MNF-I under international authority. *Ibid.*

Petitioner admitted on camera, in writing, and in front of the Iraqi investigative court that he participated as an accomplice in the kidnapping for profit of the Romanian journalists. C.A. App. 23. Petitioner also appeared as a witness against his accomplices, including his brother-in-law. *Id.* at 23, 25. In those hearings, petitioner identified the other kidnappers and admitted his role in the scheme. *Id.* at 25. Petitioner was represented by counsel of his choice at the hearings, and was afforded the opportunity to present evidence and call witnesses. *Id.* at 51. The Iraqi investigative court determined that there was sufficient evidence to proceed, and it referred the case to the trial court. *Id.* at 25.

A United States military officer, who is a member of the MNF-I, appeared in the trial court at the request of the Romanian government to make a formal complaint against petitioner and his codefendants, as is customary

5

under the inquisitorial system.  C.A. App. 52.  Weeks
before he made the complaint, the officer filed with the
trial court a formal letter from the Romanian Embassy
authorizing him to make the complaint on Romania's
behalf.  *Ibid.*

During the trial, petitioner and his codefendants re-
canted the confessions they had made in the investiga-
tive court, alleging that Iraqis or Romanians had forced
them to confess.  C.A. App. 52.  Although petitioner has
been in MNF-I custody since his capture, neither peti-
tioner nor any of the other defendants alleged that the
MNF-I had coerced their confessions.  *Id.* at 52.

At his trial in the CCCI, petitioner and his attorneys
again had the opportunity to present evidence and call
witnesses.  Pet. App. 14.  After considering the evidence
gathered by the investigative court, taking additional
statements from the defendants, and hearing argument
from the Iraqi prosecutor and multiple defense attor-
neys, the trial court found petitioner and his five code-
fendants guilty of kidnapping and sentenced them to
death.  C.A. App. 51-53.

An automatic appeal to the Iraqi Court of Cassation
is pending.  See C.A. App. 54.  The MNF-I is continuing
to hold petitioner on behalf of the Iraqi government un-
til the resolution of his appeal in Iraq.  (Because the
court of appeals granted an injunction pending appeal
and later stayed the issuance of its mandate pending the
disposition of petitioner's certiorari petition, respon-
dents may not transfer petitioner to the Iraqi authori-
ties while that petition is pending before this Court.).[2]

---

[2]  Relying entirely on hearsay evidence, petitioner suggests that the
United States military officer who represented Romania in the CCCI
proceeding "met *ex parte* with the presiding Iraqi judge for approxi-
mately fifteen minutes" and that "[i]mmediately thereafter, that judge

6

3. Petitioner, through his sister as next friend, filed this habeas corpus action seeking, among other things, his release from custody and an order barring his transfer to Iraqi custody. Pet. App. 14.

The district court dismissed this habeas action for lack of subject matter jurisdiction. Pet. App. 10-38. The court explained that custody is a critical factor in establishing habeas jurisdiction because "[t]he writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him." *Id.* at 19-20 (quoting *Braden* v. *30th Judicial Cir. Ct.*, 410 U.S. 484, 494-495 (1973)).

The district court determined that petitioner is not in the custody of the United States, but instead is "in the [physical] custody of coalition troops operating under the aegis of MNF-I, who derive their ultimate authority from the United Nations and the MNF-I member nations acting jointly," as well as in the "constructive custody of the Republic of Iraq, which is seized of jurisdiction in the criminal case against him." Pet. App. 22. With regard to Iraq, the court emphasized that "[t]he writ of habeas corpus will not reach to a foreign sovereign," and here, "[p]etitioner voluntarily entered the sovereign country of Iraq and has been convicted by the courts of that country for a violation of Iraqi law." *Ibid.*

Relying on *Hirota* v. *MacArthur*, 338 U.S. 197 (1948) (per curiam), the district court further held that "[i]t does not change the outcome to point out that [petitioner] is in the physical custody of U.S. troops in their

_____

convicted and sentenced [petitioner] to die." Pet. 7 (citing C.A. App. 49 (affidavit of law student reporting conversation conveyed to him)). The officer has affirmed unequivocally, however, that "[a]t no time during the trial was I present in the courtroom with members of the court when defense counsel were not also present." C.A. App. 53.

7

capacity as participants in MNF-I." Pet. App. 23.  In
*Hirota*, Japanese citizens filed motions in the Supreme
Court for leave to file habeas petitions challenging their
sentences by a military tribunal in Japan.  338 U.S. at
198.  As the district court here noted, "American mili-
tary personnel participated in the tribunal, and the pris-
oners were in the physical custody of U.S. troops."  Pet.
App. 24.  In his capacity as Supreme Commander for the
Allied Powers, United States General Douglas MacAr-
thur established the tribunal "as the agent of the Allied
Powers."  *Ibid.* (quoting *Hirota*, 338 U.S. at 198).  The
Supreme Court denied the petitioners' motions because
"the authority under which the tribunal acted  *  *  *
emanated from the multinational Allies and not the
United States in its independent capacity."  *Ibid.*  Ac-
cordingly, the district court explained, the tribunal in
*Hirota* was "not a tribunal of the United States," and
the prisoners were not in the custody of the United
States.  *Ibid.* (quoting *Hirota*, 338 U.S. at 198).

The district court rejected petitioner's attempt to
distinguish *Hirota* on the ground that it did not involve
the detention of a United States citizen.  Pet. App. 24-25.
The court explained that *Hirota* turned on the fact that
"the petitioners were held under the authority of enti-
ties that were 'not a tribunal of the United States,'" and
"[t]he identity of the custodian, and the concomitant lack
of habeas jurisdiction, would remain the same regard-
less of the petitioners' citizenship."  *Id.* at 25 (quoting
*Hirota*, 338 U.S. at 198).

The district court also rejected petitioner's conten-
tion that the United States merely used the MNF-I as
an intermediary to carry out its wishes.  Pet. App. 29-32.
It explained that "[t]here is evidence that this force is a
true coalition over which no single nation has sover-

8

eignty, and petitioner has not demonstrated that it is a mere sham by which the United States seeks to avoid constitutional accountability." *Id.* at 36.

4. The court of appeals affirmed. Pet. App. 1-9.

a. The court of appeals held that dismissal was required by *Hirota* and subsequent District of Columbia Circuit precedents because neither the MNF-I nor the CCCI is "a tribunal of the United States." Pet. App. 2, 3-4. Like the district court, the court of appeals explained that "*Hirota* did not suggest any distinction between citizens and noncitizens who were held abroad pursuant to a judgment of a non-U.S. tribunal." *Id.* at 4. Rather, the court determined, "the critical factor in *Hirota* was the petitioners' convictions by an international tribunal." *Ibid.* (quoting *Omar* v. *Harvey*, 479 F.3d 1, 7 (D.C. Cir. 2007), petition for cert. pending, No. 07-394 (filed Sept. 21, 2007)). "As in *Hirota*," the court explained, "[petitioner's] case involves an international force, detention overseas, and a conviction by a non-U.S. court." *Ibid.* "[C]onducting habeas proceedings in the face of such a conviction," the court continued, "risks judicial second-guessing of a non-U.S. court's judgments and sentences." *Id.* at 4-5.

The court of appeals rejected petitioner's contention that he challenged only the lawfulness of his detention, as opposed to his Iraqi conviction. Pet. App. 5-6. It explained that petitioner is detained by a multinational force and his continued detention depends on his Iraqi conviction. *Id.* at 5. "[I]f the charges were dismissed, and the United States forces were to continue to hold" petitioner, the court stated, "this would be a different case" under the *Omar* decision. *Ibid.*

b. Judge Randolph concurred in the judgment. Pet. App. 7-9. He concluded that the district court had juris-

9

diction because petitioner "is an American citizen * * * held by American forces overseas." *Id.* at 7. Nevertheless, Judge Randolph would have denied the habeas petition and request for an injunction against transfer on the merits because "the United States is holding [petitioner] because of his conviction by a foreign tribunal." *Id.* at 8.

Judge Randolph concluded that this case is governed by this Court's decision in *Wilson* v. *Girard*, 354 U.S. 524 (1957), where the Court set aside an injunction against the transfer of an American soldier within Japan to Japanese authorities to face charges stemming from a shooting in Japan. In *Wilson*, Judge Randolph recognized, this Court reaffirmed that a "sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." Pet. App. 9 (quoting *Wilson*, 354 U.S. at 529). Pointing to the Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498, and the U.N. Security Council Resolutions establishing the MNF-I, Judge Randolph concluded that *Wilson* compels dismissal of this habeas action and request for an injunction against transfer. See Pet. App. 9 (citing *Holmes* v. *Laird*, 459 F.2d 1211 (D.C. Cir.), cert. denied, 409 U.S. 869 (1972)).

## DISCUSSION

The court of appeals correctly held that United States courts lack jurisdiction to adjudicate petitioner's detention by a multinational force operating in a foreign nation pursuant to international authority. Even if United States courts had such jurisdiction, petitioner's action and, in particular, his request for an injunction

10

against transfer to Iraqi authorities, would be non-justiciable under the separation-of-powers and international-comity doctrines. This habeas petition amounts to an impermissible collateral attack on petitioner's conviction by an Iraqi court based on serious criminal conduct that petitioner—a dual Iraqi citizen—committed in Iraq in violation of Iraqi law. The United States courts lack authority to accommodate such attacks.

Although the court of appeals correctly resolved this case, the basic questions presented are exceptionally important. The same basic questions, however, are presented by the government's petition for a writ of certiorari in *Geren* v. *Omar*, No. 07-394 (filed Sept. 21, 2007). *Omar* provides a better vehicle for considering the full set of issues concerning the authority of the United States courts to entertain habeas petitions filed on behalf of individuals detained abroad by a multinational force acting under international authority. Accordingly, this Court should hold the petition for a writ of certiorari in this case and dispose of it as appropriate in light of its disposition of *Omar*. Alternatively, the Court could grant both petitions and consolidate the cases for oral argument.

1. As explained in the government's petition for a writ of certiorari in *Omar* (at 11-16), the threshold jurisdictional question presented by this habeas action is governed by *Hirota* v. *MacArthur*, 338 U.S. 197 (1948) (per curiam). In both this case and *Hirota*, the habeas petitioners were in the physical custody of United States military officers, but those officers acted as part of a multinational force under international authority. Here, the United Nations, the United States, and the 26 other nations participating in the multinational force all view the MNF-I as having a distinct identity from the forces

11

of any particular nation. There is no basis for a United States court to countermand that judgment and disregard the MNF-I's international origin and authority.[3]

Petitioner argues (Pet. 12-16) that the United States courts nonetheless have jurisdiction over his habeas petition because he is a United States citizen detained by United States military personnel. As Justice Douglas recognized in his concurring opinion in *Hirota*, however, the rationale of *Hirota* does not lend itself to a citizenship exception. 338 U.S. at 202-203, 205; see Pet. App. 4 ("*Hirota* did not suggest any distinction between citizens and noncitizens who were held abroad pursuant to the judgment of a non-U.S. tribunal.").

The cases on which petitioner relies (Pet. 13) in arguing to the contrary are inapposite because, as the district court observed, they involve "petitioners * * * in the custody of the United States alone, in its capacity as the United States, and not by any multinational force" acting under international authority. Pet. App. 29. Citizenship, in itself, does not create jurisdiction when a United States national is held abroad under international authority. If it did, United States courts could entertain habeas actions brought by citizens detained pursuant to foreign convictions. But it is beyond dispute that such jurisdiction is lacking. The same basic principle that prevents a United States citizen from filing a habeas petition in the United States courts challenging

---

[3] Petitioner misses the point by arguing (Pet. 26) that "a unilateral determination by the Executive to participate in multilateral military operations [cannot] suspend the Great Writ for American citizens." The question is not whether the writ has been suspended (it has not); rather, the question is whether it has any application to custody by a multinational force operating abroad under international authority, and under *Hirota* it does not.

12

his detention in a French prison under French law (see *United States ex rel. Keefe* v. *Dulles*, 222 F.2d 390 (D.C. Cir. 1954), cert. denied, 348 U.S. 952 (1955)) prevents him from challenging his detention pursuant to the international authority at issue.[4]

*Johnson* v. *Eisentrager*, 339 U.S. 763 (1950), to which petitioner points (Pet. 12-13), does not compel a different result.  In that case, the Court observed that citizenship is a "head of jurisdiction," 339 U.S. at 769, but that statement was made in the context of a case in which the habeas petitioners (who were not United States citizens) were indisputably being held under the exclusive authority of the United States.  Indeed, this Court went out of its way to note at the outset of its decision that "[t]he proceeding [pursuant to which the habeas petitioners were detained] was conducted wholly under American auspices." *Id.* at 766.  Accordingly, *Eisentrager* does not compel the exercise of jurisdiction in this case, where the habeas petitioner is being detained abroad by a multinational force under international authority.

There is no question that, despite petitioner's United States citizenship, United States courts would lack jurisdiction to entertain his habeas petition if he were already in Iraqi custody pursuant to his criminal convic-

---

[4] Petitioner asserts (Pet. 4) that the government conceded in *Omar* that Omar is under the authority and control of the United States.  That is incorrect.  As the government has consistently argued throughout this litigation and the *Omar* case, both petitioner and Omar are in the custody of the MNF-I, which is a distinct, multinational entity that operates under the unified command of the United States pursuant to the U.N.'s mandate, just as the Allied Powers operated under General MacArthur's command in *Hirota*.  See Pet. at 12 n.3, *Omar, supra* (No. 07-394).

13

tion for conduct in Iraq. The result is no different where, as here, United States forces are simply holding petitioner during the Iraqi criminal proceedings against him as part of a multinational force acting under international authority and at the request of the Iraqi government. In any event, because *Omar* also involves a United States citizen, questions concerning the relevance of United States citizenship are squarely presented by the government's petition in that case.

2. Even if the United States courts had subject matter jurisdiction, the judgment of the court of appeals would be correct because petitioner is not entitled to the extraordinary relief he seeks, as Judge Randolph concluded in his concurring opinion.

Like Omar, petitioner voluntarily traveled to an active combat zone in Iraq and committed criminal offenses there. If petitioner should not be detained in Baghdad by United States troops in their role as part of the MNF–I, or should not be transferred at the appropriate time to Iraqi authorities, those are decisions to be made by the Executive Branch based on military and foreign policy determinations that would be heavily influenced by the judgments of United States officials on the ground in Iraq in the midst of the war there. Respondents are not aware of any judicial decision (other than *Omar*) overriding the military's determination of how to deal with an individual captured in an active combat zone abroad who is determined to pose a security threat to United States forces and local authorities and residents alike. See Pet. App. 37. And the United States courts lack authority to grant such relief, as the government's petition in *Omar* explains (at 17-22, 24-25).

Moreover, exercise of habeas jurisdiction in this case is barred by principles of international comity. Like

14

Omar, petitioner seeks to enjoin respondents from turning him over to the custody of the Iraqi government. C.A. App. 18-19. He even seeks an order requiring the United States to remove him from Iraq and bring him to this country. *Ibid.* As the government's *Omar* petition explains (at 18-22), that is not the sort of relief available in habeas, and it is inconsistent with overriding principles of comity. Indeed, as this Court long ago observed, an American citizen "cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States." *Neely* v. *Henkel*, 180 U.S. 109, 123 (1901).

While petitioner cites authority (Pet. 17-18) for the proposition that the Executive's *extradition* of a person from the United States to another country requires treaty or statutory authorization, and is therefore subject to limited judicial review, petitioner is already in Iraq, having traveled there voluntarily. As such, this case does not involve an extradition and the Executive has discretion—backed by both statute and the Nation's international commitments, see note 5, *infra*—to determine whether to surrender him to Iraqi authorities for criminal proceedings and punishment under Iraqi law. See Pet. at 17-20, *Omar, supra* (No. 07-394).

As Judge Randolph determined, this Court's decision in *Wilson* v. *Girard*, 354 U.S. 524 (1957), is "conclusive" in that regard. Pet. App. 8. In *Wilson*, this Court upheld the Executive's discretion, in the absence of a contrary treaty or statute, to surrender a United States soldier in Japan to Japanese authorities for criminal prosecution based on a crime that he allegedly committed in Japan. 354 U.S. at 529-530. Because Iraq has not

15

surrendered its jurisdiction over criminal offenses committed within Iraq, and because no treaty or statute bars petitioner's transfer to Iraqi authority, *Wilson* controls here. Any order by a United States court that interferes with petitioner's continued detention while his Iraqi criminal appeal is pending, or that prohibits his transfer to Iraqi custody after his appeal (should that be unsuccessful), would impermissibly interfere with the sovereign acts of a foreign nation. See Pet. at 17-22, 24-25, *Omar, supra* (No. 07-394).[5]

3. The foregoing separation-of-powers and international-comity concerns are even more pronounced in this case than in *Omar* because petitioner is a dual Iraqi-United States citizen who has already been tried *and convicted* by an Iraqi court. Petitioner's Iraqi citizenship distinguishes this case and heightens the comity concerns inherent in preventing Iraq from punishing him for crimes he committed in that country.

---

[5] While the government's principal submission is that no treaty or statutory authority is required for the MNF-I to transfer petitioner within Iraq to Iraqi custody, the government does not concede, as petitioner asserts (Pet. 23 n.13), that no statute authorizes the transfer. Rather, the Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498, authorizes United States forces to "enforce all relevant United Nations Security Council resolutions regarding Iraq," Pub. L. No. 107-243, § 3(a)(2), 116 Stat. 1501, and U.N. Security Council Resolutions 1546 and 1637 call on the MNF-I to establish a security partnership with the Government of Iraq and to coordinate with it on matters of security, see, *e.g.*, Res. 1546, U.N. SCOR, para. 11, U.N. Doc. S/Res. 1546 (2004). As Judge Randolph recognized, those provisions provide any authority needed for United States forces, acting as part of the MNF-I, to transfer a security internee like petitioner within Iraq to Iraqi custody. Pet. App. 8. In any event, as *Wilson* makes clear, the burden is on petitioner to identify a treaty or statute *barring* such a transfer, see 334 U.S. at 529-530, and he has not done so.

16

Even setting petitioner's Iraqi citizenship to the side, his habeas petition amounts to an impermissible collateral attack on his foreign conviction. A "sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its own borders." *Wilson*, 354 U.S. at 529. Thus, as petitioner concedes (Pet. 21), "it is axiomatic that an American court does not provide collateral review of the proceedings in a foreign tribunal."[6]

Petitioner's contention (Pet. 22) that he is not attacking his Iraqi conviction is contradicted by the record. In his filings below, petitioner argued that he had been convicted and sentenced "by an Iraqi court operating under glaring procedural deficiencies and the direct manipulation of U.S. military personnel." Docket Entry No. 12, at 1 (D.D.C. Oct. 13, 2006); see *id.* at 3 ("The proceeding's gross procedural deficiencies and manipulation by U.S. military officials highlights the vital importance of this Court's habeas corpus review."). In this Court, petitioner continues to assert (Pet. 22 & n.12) that those proceedings were improperly influenced by the United States—a contention the United States vigorously denies, see pp. 4-5 & n.2, *supra*, but that strongly confirms that petitioner is attacking his Iraqi conviction and sentence.

Any doubt that petitioner is trying to use this habeas action to evade the jurisdiction of the Iraqi courts and to prevent his sentence from being carried out is eliminated by the relief he seeks, including an injunction bar-

---

[6] Respondents agree with petitioner (Pet. 19) that the jurisdiction of the United States courts under *Hirota* does not depend on whether an individual has been convicted by a foreign tribunal. See Pet. at 13-16, *Omar, supra* (No. 07-394). As explained in the text, however, petitioner's conviction by the Iraqi court nevertheless provides further support for the conclusion that his claims are non-justiciable.

17

ring respondents from transferring petitioner to Iraqi
custody and instead requiring respondents to transport
petitioner to the United States. See C.A. App. 18-19; see
also *Holmes* v. *Laird*, 459 F.2d 1211, 1225 (D.C. Cir.)
(holding that it would be "beyond the purview of this
Court" to enjoin the Executive's surrender to German
custody of United States servicemen who had been con-
victed by a German court before fleeing to the United
States), cert. denied, 409 U.S. 869 (1972).[7]

c. Petitioner incorrectly asserts (Pet. 9) that, in the
lower courts, "neither party had briefed" the concerns
that Judge Randolph identified in his separate opinion,
which found that there was jurisdiction but nevertheless
concluded that this action must be dismissed. To the
contrary, the government devoted 22 pages of its court
of appeals brief to its political-question and internation-
al-comity arguments, and petitioner likewise briefed the
justiciability of his claims in that court. See Gov't C.A.
Br. 34-56; *id.* at 44 n.7 (specifically relying on *Wilson*,
the case Judge Randolph found conclusive); Pet. C.A.
Reply 22-25. The government is entitled to defend the
court of appeals' judgment on alternative grounds, espe-
cially considering that Judge Randolph himself relied on
those grounds. See, *e.g.*, *Bennett* v. *Spear*, 520 U.S. 154,
166 (1997). And here, the jurisdictional and justiciability
concerns are interrelated because, as the court of ap-

---

[7] Petitioner asserts (Pet. 22) that, in addition to challenging the Iraqi
proceedings and his potential transfer within Iraq to Iraqi custody, he
also challenges his custody by United States forces acting as part of the
MNF-I. But petitioner's challenge to his MNF-I custody would be
mooted by his transfer to Iraqi custody (which he seeks to block). Thus,
this action boils down to an attempt by petitioner to evade the jurisdic-
tion of the Iraqi courts and to prevent his conviction from being given
effect.

18

peals recognized, the political-question and international-comity problems would directly stem from the United States' courts' assertion of jurisdiction over actions of a multinational force operating under international authority in a foreign war zone. See Pet. App. 4-5 ("[C]onducting habeas proceedings in the face of [a foreign] conviction risks judicial second-guessing of a non-U.S. court's judgments and sentences.").

Justice Jackson noted that very fact in *Hirota*:

For this Court now to call up these cases for judicial review under exclusively American law can only be regarded as a warning to our associates in the trials that no commitment of the President or of the military authorities, even in matters such as these, has finality or validity under our form of government until it has the approval of this Court. And since the Court's approval or disapproval cannot be known until after the event—usually long after—it would substantially handicap our country in asking other nations to rely upon the word or act of the President in affairs which only he is competent to conduct.

*Hirota* v. *MacArthur*, 335 U.S. 876, 878 (1948).

3. As noted, the government's petition for a writ of certiorari in *Omar*, *supra*, presents the same threshold jurisdictional question presented in this case. In *Omar*, a dual United States-Jordanian citizen who voluntarily traveled to Iraq, allegedly committed serious crimes there, and was captured in an active combat zone by the MNF-I is challenging his detention by United States troops acting as part of the MNF-I, as well as his potential transfer to Iraqi custody or trial by the CCCI. *Omar* v. *Harvey*, 479 F.3d 1, 3 (D.C. Cir. 2007), petition for cert. pending, No. 07-394 (filed Sept. 21, 2007). The

19

District of Columbia Circuit held that the United States courts have jurisdiction over Omar's habeas petition and that his claims are justiciable. *Id.* at 9, 10-11. That court also upheld an injunction against Omar's transfer to Iraqi custody or presentation to the CCCI for investigation and prosecution. *Id.* at 11-12, 14.

Because the District of Columbia Circuit upheld the district court's injunction as well as its assertion of jurisdiction in *Omar*, that case provides a better vehicle than this case for considering the full set of issues concerning the authority of the United States courts to entertain habeas petitions filed on behalf of individuals detained by a multinational force abroad acting under international authority. In addition, this case, unlike *Omar*, involves a dual Iraqi-United States citizen who has already been convicted by the Iraqi courts for violating Iraqi law. As discussed, that unusual fact pattern makes the justiciability concerns even stronger in this case than in others, which makes it a less ideal vehicle for considering questions of more general applicability.

Accordingly, the Court should hold the petition for a writ of certiorari in this case and dispose of it as appropriate in light of its disposition of *Omar*. Alternatively, this Court could grant both petitions and consolidate the cases for oral argument.

20

**CONCLUSION**

The petition for a writ of certiorari should be held pending *Geren* v. *Omar*, No. 07-394, and disposed of as appropriate in light of this Court's disposition of *Omar*.

Respectfully submitted.

<div style="margin-left:auto">

PAUL D. CLEMENT
*Solicitor General*

PETER D. KEISLER
*Assistant Attorney General*

DOUGLAS N. LETTER
JONATHAN H. LEVY
LEWIS S. YELIN
*Attorneys*

</div>

SEPTEMBER 2007