IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SANDRA K. OMAR, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-2374 (RMU) |
| | ) | |
| PETE GEREN, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

**RESPONDENTS' RESPONSE TO ORDER TO SHOW CAUSE**

The United States does not oppose – and never has opposed – counsel's access to petitioner in Iraq. To the contrary, respondents repeatedly have made clear that counsel were and remain free to visit petitioner under the standard terms established for access to Iraq detainees. In fact, respondents are prepared to offer a special accommodation to counsel by affording them the same degree of assistance offered to civilian counsel traveling to Iraq to represent *United States service members* in court-martial proceedings. In particular, and as spelled out in greater detail below, *see infra* Part IV, respondents will arrange counsel's transportation into Iraq from Kuwait, and will provide counsel with lodging, meals, and access to their client, at a facility controlled by the Multi National Corps–Iraq ("MNC-I").[1] Like civilian counsel representing United States service members, however, counsel will be expected to reimburse respondents for the cost of these services.

Petitioner's counsel request much more, however; they seek to have this Court order the government to transport counsel to Iraq, house counsel in that country, and provide for their security

---

[1] The MNC-I is the tactical unit of the Multi National Force-Iraq ("MNF-I") responsible for command and control of operations throughout Iraq.

*– all at the government's expense*. Such an order, which would dictate to the military how it must expend its financial and personnel resources in an active zone of combat, not only would be an unprecedented exercise of judicial authority, but also would violate important constitutional and statutory limitations upon the Court's authority – including the separation of powers, the prohibition against expending funds for purposes not appropriated by Congress, and sovereign immunity.

If the Court is inclined to enter an affirmative injunction requiring the government to provide counsel with safe passage to Iraq and secure housing there, respondents respectfully request that the Court defer any such action until after the Supreme Court decides whether to grant the petition for a writ of certiorari previously filed and pending in this case. If the Supreme Court grants review, the government intends to seek a stay of all district court proceedings in this case; entering an injunction of the nature sought here while the Supreme Court decides whether this Court has jurisdiction to consider the petition threatens to waste substantial public resources.

## BACKGROUND

Respondents have consistently represented that petitioner's counsel may have access to their client in Iraq. *See* Respondents' Opposition to Petitioners' Emergency Renewed Request For Access and Motion for Records ("Resp. Emer. Opp.") at 1 ("Respondents agree to counsel's request for in-person access to Omar provided that petitioners' counsel agree to conduct such visits in accordance with all MNF-I detainee visitation rules."). Moreover, respondents previously have noted that they are willing to work with counsel to arrange access to the petitioner on the standard terms then applicable for visiting detainees in Iraq. *See id.* at 2. ("Respondents will agree to allow petitioners' counsel to meet with Omar in Iraq provided that petitioners' counsel agree to conduct such visits in accordance with all MNF-I detainee visitation rules in force at the time of her visit.").

Respondents further represent that they are willing to extend petitioner's counsel the same assistance they provide to civilian counsel traveling to Iraq to represent United States service members in court-martial proceedings. This offer represents a special accommodation, because these terms have never before been extended to counsel for individuals, like Omar, who are detained as enemy combatants and security internees. Under the standard terms for such visits, set forth in greater detail in Part IV below, civilian counsel are expected to make their own arrangements to travel to Kuwait. From Kuwait, ARCENT (the U.S. Army operational command in Kuwait), will transport counsel to Baghdad International Airport. Once in Iraq, counsel will be provided access to their client, as well as lodging and meals, at an MNC-I facility adjacent to the airport. Counsel will not be required to leave MNC-I-protected facilities at any time during their stay in Iraq, and will be loaned a body armor vest and helmet for additional protection. Prior to traveling to Iraq, counsel will be required to obtain a country clearance from CENTCOM (the U.S. Army operational command for the region), and obtain an Anti-terrorism Level 1 Training Course certificate. Because Iraq is an active war zone, counsel also will be required to sign a liability waiver.

In return for these services, counsel – like the civilian counsel representing United States service members in court-martial proceedings – will be required to reimburse respondents for the cost of the flight from Kuwait into Iraq (approximately $1,000 to $1,400) and for expenses associated with food, lodging, and other services (approximately $60 per day).

Therefore, respondents remain willing to facilitate counsel access, and reiterate their prior offer to "provide petitioners' counsel with a point of contact in Iraq that counsel may use to schedule an in-person visit." Resp. Emer. Opp. at 2.

# ARGUMENT

I.  **ANY ORDER DIRECTING THE MILITARY TO EXPEND FINANCIAL OR PERSONNEL RESOURCES IN AN ACTIVE THEATER OF COMBAT WOULD VIOLATE THE SEPARATION OF POWERS**

Any order from this Court requiring the United States Military to provide transportation, housing, and security to petitioner's counsel in Iraq would necessarily entail the diversion of military resources away from their current operational missions and towards the goal of facilitating petitioner's suit against the government. There is simply no authority that would permit this Court to enter such an order, which would quite literally dictate to the military how it must deploy its scarce vehicles, housing units, and troops in an active theater of combat operations. The Constitution, which vests in the President the power to be the "Commander in Chief of the Army and Navy of the United States," U.S. Const. art. II, § 2, leaves such determinations to the President, rather than to courts.

As the Supreme Court has observed, "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981). It is the President's "exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring). Courts must be particularly careful not to intrude into the Executive Branch's control over military operations. "Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense." *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991). This is because, as noted, the Constitution makes a "specific textual commitment of decision-making responsibility in the area of military operations in a theatre of war to the President, as Commander

in Chief." *DaCosta v. Laird*, 471 F.2d 1146, 1154 (2d Cir. 1973). "It is – and must – be true that the Executive should be accorded wide and normally unassailable discretion with respect to the conduct of the national defense and the prosecution of national objectives through military means." *Overseas Media Corp. v. McNamara*, 385 F.2d 308, 314 (D.C. Cir. 1967)); *see also Aktepe v. United States*, 105 F.3d 1400, 1403 (11th Cir. 1997) (noting that "[t]he Constitution emphatically confers authority over the military upon the executive and legislative branches of government" and that "[t]he Supreme Court has generally declined to reach the merits of cases requiring review of military decisions").

Any order directing the military to take specific and judicially-determined steps to bring petitioner's counsel into Iraq would be flatly inconsistent with these well-recognized separation of powers principles. Petitioner has not cited a single case suggesting otherwise. Indeed, petitioner has not cited any authority whatsoever establishing that this Court has the power to order the military to take such affirmative steps. The closest that petitioner has come to identifying such authority is a citation to *Al-Odah v. United States*, 346 F. Supp. 2d 1, 6 (D.D.C. 2004), which found that a district court is "authorized to craft procedures necessary to" effectuate counsel access for a habeas petitioner. *Al-Odah* found that "the courts' authority to fashion these procedures is 'expressly confirmed in the All Writs Act.'" *Id.* at 6-7 (citing *Harris v. Nelson*, 394 U.S. 286, 299 (1969)).

The All Writs Act, however, does not provide courts with limitless authority, but instead merely preserves courts' residual power to "to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977). An order requiring respondents to pay for counsel to be transported to Iraq is neither "necessary or

appropriate in aid of [the Court's] jurisdiction," 28 U.S.C. § 1651, nor "necessary to 'protect its authority to issue the writ' of habeas corpus, " *O.K. v. Bush*, 344 F. Supp. 2d 44, 57 (D.D.C. 2004) (quoting *Wallace v. Reno*, 194 F.3d 279, 285 (1st Cir.1999)). This is especially true where, as here, respondents do not oppose counsel access and, indeed, are willing to undertake substantial efforts to facilitate it. Petitioner can make no showing that this Court will somehow be deprived of *jurisdiction* over this case if counsel were required to visit their client under the terms set out for visits by civilian counsel representing United States service members in court-martial proceedings, which respondents are willing to extend to counsel in this case.

Moreover, even if the All Writs Act would permit the Court to issue an order concerning counsel access, the Act would not permit this particular order, which, as noted, would violate the separation of powers. Courts have repeatedly held that their "residual" authority under the All Writs Act cannot overcome the important structural principles underlying that doctrine. *See, e.g.*, *Renteria-Gonzalez v. I.N.S.*, 322 F.3d 804, 812 (5th Cir. 2002) (finding that the All Writs Act did not grant a court the authority to "encroach[] on the President's power and discretion to pardon" pursuant to Article II); *Doe v. I.N.S.*, 120 F.3d 200, 205 (9th Cir. 1997) (finding that the court's authority under the All Writs Act could not overcome valid "separation of powers concerns"); *Almurbati v. Bush*, 366 F. Supp. 2d 72, 81 (D.D.C. 2005) (refusing to find that All Writs Act granted the court the power "to delay the respondents' transfer to another country once a decision for release is made by the respondents" because such a conclusion "would violate the separation of powers doctrine").

Simply put, there is no authority under the Constitution for this Court to direct the military, in a time of war, to take specific, affirmative steps on a battlefield halfway across the world. To hold

otherwise would usurp the President's constitutional authority as Commander-in-Chief of the armed forces.

**II.     ORDERING THE GOVERNMENT TO PAY FOR PETITIONER'S COUNSEL TO TRAVEL TO IRAQ, AND ALL THE EXPENSES INCIDENT THERETO, WOULD IMPERMISSIBLY REQUIRE THE GOVERNMENT TO EXPEND FUNDS THAT HAVE NOT BEEN APPROPRIATED FOR THAT PURPOSE AND WOULD VIOLATE SOVEREIGN IMMUNITY**

   **A.     Civil Litigants Are Expected to Bear Their Own Costs**

The traditional rule in civil litigation, including *habeas* actions, is that the parties bear their own costs. Hence, courts routinely refuse requests by civil litigants – even those in government custody – to transfer the costs of accessing the courts onto the government. For example, in *Manning v. Tefft*, 839 F. Supp. 126 (D.R.I. 1994), a prisoner attempted to have the government finance his transportation to court to prosecute a civil suit against the government. The court refused that request, noting: "generally speaking, a prisoner who is a plaintiff in a civil case must bear the cost of transporting himself to the place of trial and is not entitled to have that cost paid by the government." *Id.* at 130; s*ee also id.* at 129 ("It is fundamental that, in appropriate cases, a federal court may direct that a prisoner who has filed a civil suit be permitted to attend the trial . . . . However, Manning has cited no authority for the proposition that the Court is authorized or required to direct payment of the costs associated with such appearances." (citations omitted)).

Many subsequent cases, citing *Manning*, hew to this rule that the government generally should not be made to finance the expenses of a party who has brought a civil action against it. *See, e.g.*, *White v. City of Fresno*, 2007 WL 1847642, *2 (E.D.Cal. 2007) ("Further, even though Derrick White is *in pro per* and incarcerated, under the law, he is responsible for making arrangements and payment for his transportation expenses to and from the Federal Courthouse." (citing *Manning*, 839 F. Supp. at 129-30)); *Adams v. City of Marshall*, 2007 WL 2078463, *1 (W.D. Mich. 2007) ("Nor

is there any constitutional requirement that public funds be used to transport a prisoner to a civil trial and to provide security during the course of the trial." (citing *Manning*, 839 F. Supp. at 129)); *Bacon v. United States*, 2007 WL 778412, *1 (N.D.N.Y. 2007) ("The court simply is not positioned, however, to defray the expense associated with bringing the plaintiff to trial to testify and participate in his trial.  And, while the plaintiff has been granted *in forma pauperis* status, the cost of transporting him to court for purposes of his litigation falls outside of the scope of 28 U.S.C. § 1915 . . . . In the event that the plaintiff desires to be physically present for his trial, his options are limited . . . . [P]laintiff may choose to defer prosecution of his claims until his release . . . . Alternatively, plaintiff may advance the estimated expenses associated with transportation here by the United States Marshal."). *Cf. Diaz v. Chatterton*, 229 F. Supp. 19, 22 (C.D. Cal. 1964) (vacating order that habeas petitioner be "transported at Government expense pursuant to said Writ of Habeas Corpus").

> **B.    Congress Created a Mechanism Whereby Courts, Not Respondents, Provide Funds to *Habeas* Petitioners That Cannot Afford the Expenses Associated With Their Representation**

Congress has acknowledged the general rule that respondents should not be made to bear the costs of *habeas* litigation by providing a mechanism whereby the Court itself may provide funds to defray the expenses of a *habeas* petitioner.  The Criminal Justice Act, 18 U.S.C. §§ 3006A(a)(2)(B), (e)(1), allows the court to provide counsel and "other services adequate for necessary representation" to a person bringing a *habeas* petition under 28 U.S.C. §§ 2241, 2254, or 2255.  *See also Al-Odah*, 346 F. Supp. 2d at 8 ("Rule 8 of the Rules Governing § 2254 Cases authorizes appointment of counsel pursuant to the Criminal Justice Act at any stage of the habeas proceedings.").  Under that Act, if the court determines that the requested "services are necessary and that the person is financially unable to obtain them," the court may order the payment of funds "appropriated to the

United States courts, out of any money in the Treasury not otherwise appropriated," subject to certain statutory caps for such expenditures. 18 U.S.C. §§ 3006A(e)(1), (e)(3), (i).[2]

In contrast to this Court's authority to provide limited funds to *habeas* petitioners under the Criminal Justice Act, Congress has made no similar authorization for *respondents* to expend funds for that purpose. Thus, any order requiring respondents to provide petitioner's counsel with safe passage to, and housing in, Iraq would contravene Congress' clearly-expressed intent to have the courts advance such funds, where necessary, and would be inappropriate as a matter of law. The Supreme Court has unambiguously held that "the expenditure of public funds is proper only when authorized by Congress." *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (citing *Reeside v. Walker*, 11 How. 272, 291 (1851)) (holding habeas petitioner was not entitled to a free trial transcript where Congress had not appropriated funds for that purpose).[3]

---

[2] In addition to services provided under the Criminal Justice Act, indigent litigants proceeding *in forma pauperis* may also obtain the waiver of certain filing fees under 28 U.S.C. § 1915. That statute is not relevant to this proceeding, because petitioner is not proceeding *in forma pauperis*. Even if he were, however, it would still not authorize the payment of travel fees for his counsel. That statute says nothing about travel or other counsel expenses, and courts have routinely rejected attempts to use § 1915 to force the United States to pay for items not explicitly mentioned in that provision. *See, e.g.*, *Pedraza v. Jones*, 71 F.3d 194, 197 (5th Cir. 1995) (expert witness fees not covered by § 1915); *Boring v. Kozakiewicz*, 833 F.2d 468 (3d Cir.1987) (same); *Malik v. Lavalley*, 994 F.2d 90, 90 (2d Cir. 1993) (witness fees not provided by § 1915); *Tedder v. Odel*, 890 F.2d 210, 211 (9th Cir. 1989) (same).

[3] Moreover, because no Congressional appropriation exists for such an expenditure by respondents, any order requiring the Department of Defense to expend such funds would force an untenable choice upon Department personnel. They would be required to choose between disobeying this Court's order, thereby risking a contempt finding, or violating the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A), which states that "[a]n officer or employee of the United States Government or of the District of Columbia government may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." Nor would that dilemma be lessened by the fact that the Court ordered the unappropriated expenditure. *See Hercules Inc. v. United States*, 516 U.S. 417, 428 (1996) (rejecting argument that Anti-Deficiency Act did not apply to a "judicially fashioned" implied

### C. An Order Requiring Respondents To Expend Resources to Provide Petitioner's Counsel With Safe Passage to, and Housing in, Iraq Would Violate Sovereign Immunity

In addition to violating Congress's clearly expressed intent that, where exceptions are to be made to the general rule that habeas petitioners bear their own expenses, they must be paid from funds appropriated to the courts, and not by the respondents, the contemplated order would also violate the United States' sovereign immunity. An order requiring respondents to transport counsel to Iraq, at respondents' expense, would require the government to take specific, affirmative actions, and to expend public funds to provide for counsel's travel. Such an order would violate sovereign immunity, as the Supreme Court recognized in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949):

> Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.

*See also Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945) ("[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit . . . ."), *overruled on other grounds by Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 614-15 (2002).[4] The government

---

indemnification provision because "'[t]he limitation upon the authority to impose contract obligations upon the United States is as applicable to contracts by implication as it is to those expressly made.'" (quoting *Sutton v. United States*, 256 U.S., 575, 580 (1921) (Brandeis, J.))).

   [4] To be sure, sovereign immunity does not bar prospective, equitable orders that have some "ancillary effect on the . . . treasury" as an "inevitable consequence" of conforming the sovereign's behavior to that required by law. *Edelman v. Jordan*, 415 U.S. 651, 668 (1974). But that doctrine is entirely inapplicable here, because petitioner has not suggested – and the Court the court has not held – that *respondents* are obliged to provide petitioner with counsel to maintain this suit against

remains free from such compulsion unless it explicitly waives this immunity. *See Lane v. Pena*, 518 U.S. 187, 197 (1996) ("[T]he available remedies are not those that are 'appropriate,' but only those for which sovereign immunity has been expressly waived."). Because petitioner can point to no waiver allowing suits against the respondents to require that the government provide, and fund, counsel travel to visit detainees held abroad, this Court cannot order that relief.[5]

Petitioner simply has not identified, and cannot identify, an appropriation permitting the expenditure of Department of Defense funds to bring civilian *habeas* counsel into an active theater of war.[6] Thus, any order directing such expenditure would be inappropriate. *See Bank One, Michigan v. United States*, 62 Fed. Cl. 474, 478 (Ct. Fed. Cl. 2004) ("It is beyond cavil that payment by the United States that is not legally authorized is contrary to both Article I, Section 9, Clause 7

---

them. Nor could this Court so hold. As noted *supra*, the law does not require the government to pay for a habeas petitioner's legal expenses; indeed, it presumes just the opposite. Thus, any award of travel, housing, and security services cannot be viewed as an equitable remedy for some past violation committed by the government; instead, it could only be seen as a new obligation to provide services to the petitioner and, thus, as a violation of sovereign immunity.

[5] As this Court recently noted, the All Writs Act – the only authority identified for such an order, *see supra* – "does not waive sovereign immunity." *Reading v. United States*, __ F. Supp. 2d __, 2007 WL 2678329, *6 (D.D.C. 2007). Nor does the APA's waiver of sovereign immunity, *see* 5 U.S.C. § 702, authorize this request. Although, under D.C. Circuit precedent, the APA's waiver of sovereign immunity does apply even in suits not brought under the APA, *see Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996), that Act specifically excludes challenges to "military authority exercised in the field in time of war or in occupied territory." 5 U.S.C. § 701(b)(1)(G). Because petitioner is attempting to obtain an order to command the military to take action in a time of war in an active combat zone, the APA therefore cannot provide the necessary waiver of sovereign immunity. Moreover, that waiver applies only to suits seeking equitable relief. As noted, *supra*, this suit seeks to create an affirmative obligation to expend funds in support of the petitioner's case and, thus, would fall outside the scope of the APA's waiver even if it did apply.

[6] As noted, the standard practice is to seek reimbursement from civilian counsel for the expenses associated with traveling to Iraq.

of the Constitution (the Appropriations Clause), which provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . .', and the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A), which states that "[a]n officer or employee of the United States Government or of the District of Columbia government may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation.'").

### III. THIS COURT SHOULD NOT ORDER PETITIONER REMOVED FROM IRAQ TO MEET WITH HIS COUNSEL

This Court denied without prejudice petitioner's request he be transferred to the United States to meet with counsel. *See* Memorandum Opinion Denying Without Prejudice the Petitioner's Emergency Motion for Access; Granting the Petitioner's Emergency Motion for Medical Records and Photographs (Sept. 28, 2007) at 5. The Court properly denied that request, which would violate sovereign immunity and exceed the Court's authority, by requiring the military to take specific, affirmative steps and expend funds for purposes not authorized by Congress. Moreover, like the request to send counsel to Iraq, this proposal also would violate the separation of powers because it would dictate to the military how personnel and equipment are to be used in a war zone (in this case, to transfer someone out of that arena).

But this request arguably carries even greater possibility for violating important separation of powers principles and for impeding the United States' relationship with the Government of Iraq. This is so because petitioner is being held in part as a security internee pursuant to United Nations Security Counsel Resolutions. Ordering him taken out of Iraq – where he voluntarily traveled, was arrested, and is awaiting trial before the CCCI (if this Court lifts its injunction against presenting petitioner for CCCI proceedings) – before the CCCI convenes an investigative hearing would impede

-12-

upon the President's military and foreign affairs powers, pursuant to which he has determined that U.S. military forces, as part of the MNF-I, should "take all necessary measures to contribute to the maintenance of security and stability in Iraq," U.N. Security Council Res. 1511, at 3 ¶ 13, 11 (Oct. 16, 2003), including "*internment, where this is necessary for imperative reasons of security.*" U.N. Security Council Res. 1546, at 11 (Jun. 8, 2004) (annexing letters sent to the President of the U.N. Security Council by the Prime Minister of Iraq, Dr. Ayad Allawi, and the U.S. Secretary of State, Colin Powell) (emphasis added).[7]  This power to commit U.S. military personnel in support of the MNF-I's mission derives directly from the President's Article II Commander-in-Chief prerogatives, which "commit[] to the President the discretion to command the Armed Forces of the United States 'in the manner he may deem most effectual to harass and conquer and subdue the enemy.'" *U.S. ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 99 (D.D.C. 2004) (quoting *Fleming v. Page*, 50 U.S. 603, 615, 9 How. 603, 13 L.Ed. 276 (1850)).

The power to hold security internees pursuant to those United Nations Security Counsel Resolutions also falls under the President's inherent authority over the foreign affairs of the United States. The Constitution makes the President "the guiding organ in the conduct of our foreign affairs." *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948). Therefore, where the President has determined that the United States military personnel should assist the Government of Iraq by helping

---

[7] The U.N. Security Council has repeatedly reaffirmed MNF-I's mandate. U.N. Security Council Resolution 1546, passed in 2004, "[n]ote[d] that the presence of the multinational force in Iraq is at the request of the incoming Interim Government of Iraq, and therefore reaffirm[ed] the authorization of the multinational force under unified command established under resolution 1511 (2003)." U.N. Security Council Res. 1546, at 4 ¶ 9 (June 8, 2004). Since Resolution 1546, the U.N. Security Council has twice extended MNF-I's mandate in Iraq for an additional twelve months, each time concluding (based on communications from Iraqi officials) that the Government of Iraq desired MNF-I's continued presence. *See* U.N. Security Council Res. 1637, at 3 ¶1 (Nov. 11, 2005); U.N. Security Council Res. 1723, at 3 ¶ 1 (Nov. 28, 2006).

detain security internees, this Court is not free to override that determination by ordering a security internee taken out of Iraq. To do so would undermine "the very capacity of the President to speak for the Nation with one voice in dealing with other governments," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000), and would constitute a direct affront to an ally of the United States.

Even if the President lacked this inherent constitutional authority to determine whether United States military personnel should assist the Government of Iraq by detaining security internees – authority he clearly possesses – Congress has sanctioned the use of U.S. military forces for this specific purpose. In the Authorization for Use of Military Force in Iraq ("AUMF-Iraq"), Congress authorized the President to, *inter alia*, "use the Armed Forces of the United States as he determines to be necessary and appropriate in order to . . . enforce all relevant United Nations Security Council resolutions regarding Iraq." Authorization for Use of Military Force in Iraq, Pub. Law No. 107-243 (Oct. 16, 2002) ("AUMF-Iraq"), § 3(a). As noted above, those U.N. Security Council resolutions, in turn, clarify that one of the myriad functions of the MNF-I is to detain security internees in Iraq. *See* U.N. Security Counsel Res. 1511; U.N. Security Counsel Res. 1546.

Therefore, the President's decision to hold petitioner as a security internee is sanctioned by the Constitution, Congressional statute, and U.N. Security Counsel resolutions. The President's authority is thus at its apex. *See Youngstown Sheet & Tube Co.*, 343 U.S. at 635-36 (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."). In such situations, where both the executive and the legislative branches concur on a course of foreign affairs, courts are not free to override their unified determination. *See*

*Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative – 'the political' – departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."); *Aktepe*, 105 F.3d at 1403 ("The relationship between the United States and its allies, like the broader question of which nations we number among our allies, is a matter of foreign policy. As courts are unschooled in 'the delicacies of diplomatic negotiation [and] the inevitable bargaining for the best solution of an international conflict,' the Constitution entrusts resolution of sensitive foreign policy issues to the political branches of government." (citation omitted)).

Finally, it must be noted that any order removing petitioner from Iraq might – when combined with this Court's injunction preventing petitioner's presentation to the CCCI – amount to an order permanently enjoining petitioner's prosecution in Iraq before it even begins. That uncertainty stems from the fact that if petitioner, who is an American citizen, were brought onto American soil, he likely could not be returned to stand trial before the CCCI unless he were extradited. Pursuant to 18 U.S.C. §§ 3181, 3184, persons in the United States who have committed crimes in foreign countries may only be surrendered to the foreign country pursuant to a treaty with the foreign country. There is a 1936 Extradition Treaty with Iraq. However, no extraditions have occurred under this treaty for decades and the treaty has never been applied in the context of the recently-created CCCI. Moreover, because this Court has enjoined even the initial CCCI investigative hearing from proceeding, it is also unclear whether the Government of Iraq would have sufficient information to allow it to meet the requirements provided for in the treaty. Thus, it simply cannot be stated with certainty that petitioner could be returned to Iraq to stand trial for crimes he

allegedly committed there.

In light of these important separation of powers and foreign relations concerns, and the legal uncertainties that would be created by such an order, respondents respectfully request that this Court decline to order that petitioner be taken outside of Iraq to meet with his counsel, particularly when respondents are willing to offer petitioner's counsel special accommodations to facilitate access in Iraq.

IV.     **THE UNITED STATES REMAINS WILLING TO FACILITATE COUNSEL'S ACCESS TO PETITIONER IN IRAQ, AND IS WILLING TO DO SO ON THE SAME TERMS THAT APPLY TO OTHER CIVILIAN ATTORNEYS REPRESENTING UNITED STATES SERVICE MEMBERS IN COURT-MARTIAL PROCEEDINGS**

Respondents have consistently represented that they "will agree to allow petitioners' counsel to meet with Omar in Iraq provided that petitioners' counsel agree to conduct such visits in accordance with all MNF-I detainee visitation rules in force at the time of her visit." Resp. Emer. Opp. at 2. As noted above, respondents are further willing to offer counsel special accommodations by permitting them to travel to Iraq on the same terms that apply to civilian counsel representing United States service members in court-martial proceedings. Respondents reiterate their offer to "provide petitioners' counsel with a point of contact in Iraq that counsel may use to schedule an in-person visit." *Id.* While counsel would need to coordinate the precise logistical details of such a visit with that point of contact, respondents can represent the following to be true about the terms under which civilian counsel are currently permitted to visit United States service members detained in Iraq:

(1)     Prior to traveling to Iraq, counsel must coordinate with the point of contact provided by respondents. Counsel will be required to: (1) obtain a country clearance from CENTCOM to enter Iraq (a process that typically requires 30 days); (2) sign a liability waiver; and (3) complete an Anti-terrorism Level 1 Training Course;

    (2)    Counsel will have to make their own arrangements (and at their own expense) to travel to Kuwait;

    (3)    ARCENT (the U.S. Army command in Kuwait) will arrange for counsel to fly from Kuwait to Baghdad International Airport. Counsel will be asked to reimburse the cost of this flight (typically $1,000 to $1,400);

    (4)    After arriving at Baghdad International Airport, counsel will not have to leave the area protected by the MNC-I. Counsel will be lodged and fed, and will be able to meet with their client, at one of the MNC-I protected facilities adjoining the airport.[8]

    (5)    Counsel will be expected to reimburse the government approximately $60 per day for food, lodging, and other expenses while in Iraq.

    (6)    Counsel will be loaned a body armor vest and helmet for their additional protection while in Iraq.

These conditions illustrate that the respondents remain willing to facilitate access for counsel, and, in fact, are willing to make a special accommodation never before offered to counsel for individuals detained as enemy combatants and security internees. These conditions also illustrate that the Court's contemplated order is altogether unnecessary; counsel is free to take advantage of the same procedures that have provided civilian attorneys for United States service members with effective access to their clients detained in Iraq.

\* \* \* \* \*

For all the foregoing reasons, the court should not order respondents to provide "safe passage, safe and secure housing and appropriate security for petitioner's counsel while in Iraq for the purpose of consulting with her client."

---

[8] This Court's Order asked respondents to show cause why they should not be required to provide petitioner's counsel with, *inter alia*, "safe passage" to Iraq. To the extent that this order contemplated respondents guaranteeing the safety of counsel while in Iraq, the impossibility of offering such a guarantee in an active theater of combat would provide a further reason for the Court not to issue the proposed order. Nevertheless, as noted above, once in Iraq counsel will remain inside the MNC-I protected facility adjoining to the Baghdad International Airport at all times.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

CARL J. NICHOLS
Deputy Assistant Attorney General

JEFFERY A. TAYLOR
United States Attorney

JOSEPH H. HUNT (D.C. Bar No. 431134)
Branch Director

VINCENT M. GARVEY (D.C. Bar No. 127191)
Deputy Branch Director

/s/ Michael P. Abate
MICHAEL P. ABATE (IL. Bar No. 6285597)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.  Room 7302
Washington, D.C. 20530
Tel: (202) 616-8209
Fax: (202) 616-8470
email: Michael.Abate@usdoj.gov

*Attorneys for Respondents*

Dated: October 8, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of October 2007, I caused the foregoing Respondents' Response to Order to Show Cause to be served on petitioner's counsel of record electronically by means of the Court's ECF system.


*/s/ Michael P. Abate*