## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SANDRA K. OMAR,** ) <br> **# 8 AbduRahman bin Samurrah St.** ) <br> **Sweileh, Amman,** ) <br> **Jordan 11910** ) <br>  ) <br> **AHMED S. OMAR,** ) <br> **624A Smithdale Drive** ) <br> **Raleigh, NC 27606** ) <br> **as Next Friends of** ) <br>  ) <br> **SHAWQI AHMAD OMAR,** ) <br> **Camp Cropper, Iraq**; ) <br>  ) <br>    **Petitioners,** ) <br>  ) <br> **v.** ) <br>  ) <br> **PETE GEREN,** ) <br> **Secretary of the United States Army** ) <br> **101 Army Pentagon** ) <br> **Room 3E-506** ) <br> **Washington, DC 20301-0101;** ) <br>  ) <br> **REAR ADMIRAL GARLAND P. WRIGHT,** ) <br> **Commander,** ) <br> **Task Force 134, Multi-National Force-Iraq;** ) <br>  ) <br> **LT. COLONEL DAVID CHRISMER** ) <br> **Camp Cropper, Iraq,** ) <br>  ) <br>    **Respondents.** ) | **CIVIL ACTION NO. 05-2374 (RMU)** <br><br> **AMENDED PETITION FOR WRIT** <br> **OF HABEAS CORPUS** |

## I. INTRODUCTORY STATEMENT

1.  This amended petition for a writ of habeas corpus is on behalf of Shawqi Ahmad Omar ("Mr. Omar"), a United States citizen who has been illegally imprisoned by the United States military in Iraq for nearly four years.  By this habeas petition, Mr. Omar challenges the

1

legality of any transfer to Iraqi custody in light of the substantial risk of torture and/or cruel or unusual, inhuman, and degrading treatment or execution, and also the legality of continued detention absent such a transfer.

2. This petition was filed initially on December 12, 2005 by Ms. Sandra K. Omar and Mr. Ahmed S. Omar, Mr. Omar's wife and son respectively, as next friends of Mr. Omar, who at that time was being held virtually incommunicado and unable to petition this Court on his own behalf. Mr. Omar has since been granted limited access to counsel, but his contact with the outside world remains severely limited.

3. Before the Government filed a return to the petition, counsel for Mr. Omar learned that the Government planned to transfer Mr. Omar to Iraqi custody without notifying counsel or this Court and therefore sought a temporary restraining order to permit litigation of the serious constitutional issues presented. This Court granted that order and subsequently entered a preliminary injunction. *Omar v. Harvey*, 416 F. Supp. 2d 19 (D.D.C. 2006). The Court of Appeals for the District of Columbia Circuit affirmed, 479 F.3d 1 (D.C. Cir. 2007), and the Government sought certiorari review in the U.S. Supreme Court.

4. On June 12, 2008, the Supreme Court issued an opinion affirming the availability of judicial power to hear Mr. Omar's petition. *Munaf v. Geren*, 128 S. Ct. 2207, 2216-17 (2008). The Court held that "actual custody by the United States suffices for jurisdiction" and rejected Respondent's argument that the Court's 1948 decision in *Hirota v. MacArthur*, 338 U.S. 197 (1948) (per curium), barred habeas review of a multinational entity. *Munaf*, 128 S. Ct. at 2218 ("[W]e decline to extend our holding *Hirota* to preclude American citizens held

overseas by American soldiers subject to a U.S. chain of command from filing habeas petitions.").

5.  The Supreme Court left open for further adjudication by this Court the question of whether statutory and constitutional prohibitions on transfers to torture or cruel, inhuman, or degrading treatment bar a transfer to Iraqi custody, *id*. at 2225-26, although it rejected Mr. Omar's argument that the lack of legal authority precluded the United States from transferring him, *id*. at 2227-28. Specifically, the Court declined to rule on Mr. Omar's claims related to abuse or torture given the limited briefing of these issues. *Id.* at 2226 (holding that the Court "[would] not consider the question" of torture or cruel, inhuman and degrading treatment). The Court held that this petition, as originally filed, "rais[ed] no claim for relief under the FARR Act," which prohibits transfer when torture may result, and expressly left open the possibility of amendment to reach claims pertaining to torture. *Id.* at 2226 n.6. [1]

6.  Further, the Court made clear that, absent transfer to Iraqi custody for criminal prosecution, habeas remains the appropriate "remedy for unlawful executive detention." *Id.* at 2211 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion).). Quite simply, if Iraq has no interest in Mr. Omar's continued detention by the United States or if transfer to Iraqi custody is barred by the risk of torture or cruel, inhuman, and degrading treatment, then

---

[1] Because no responsive pleading was filed to Mr. Omar's original habeas petition, leave to amend is not required. Fed. R. Civ. Pro. 15(a)(1)(A). The Federal Rules govern the amendment of petitions for habeas corpus, 28 U.S.C. § 2242, and intervening litigation has focused entirely on this court's preliminary injunction, which the government opposed on jurisdictional grounds, moving to dismiss the case. "[A] motion to dismiss is not a responsive pleading for the purposes of Rule 15." *James V. Hurson Assocs. v. Glickman*, 229 F.3d 277, 283 (D.C. Cir. 2000). In the event that this Court holds that leave to amend is required, it should be freely given to allow consideration of the weighty issues of torture noted by the Supreme Court. *Munaf v. Geren*, 128 S. Ct. 2207, 2226 n.6; *see also id.* at 2228 (Souter, J., concurring). "In the absence of any apparent or declared reason . . . the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also In re Sunrise Sr. Living, Inc. Derivative Litigation*, 550 F. Supp.2d 1, 5 (D.D.C., 2008).

Mr. Omar is entitled to the process that *Hamdi* requires in order to challenge his continued detention by the United States. *Id.*

7. This petition addresses the two interrelated issues left open by the Supreme Court's June 12, 2008 opinion: first, the legality under the FARR Act and the Constitution of Mr. Omar's transfer to Iraqi custody in the face of a substantial risk of torture or cruel or unusual, inhuman, and degrading treatment or punishment; and second, the legality of Mr. Omar's continued detention by the United States absent a transfer to Iraqi authority.

8. Finally, the petition raises issues regarding cruel and unusual punishment under the Eighth Amendment that could not have been brought up when the original petition was filed, since no charges had then been brought and no sentence levied against Mr. Omar by any Iraqi court. Mr. Omar was, additionally, being held nearly incommunicado at the time the original petition was filed.

9. The United States Constitution, the laws of the United States, and the binding obligations of international law each prohibit the United States from transferring its citizens to a foreign sovereign in whose custody they face a substantial risk of torture or cruel, inhuman, or degrading treatment. Furthermore, when detention is not for the specific purpose recently recognized by the Supreme Court—transfer to a foreign sovereign for prosecution—the Constitution and U.S. law prohibit the United States from arresting its citizens and denying them a legal process by which they may challenge the basis of their detention. These prohibitions extend to any government agency and apply regardless of the location of the proposed transfer. Mr. Omar's threatened transfer to Iraqi custody, as well as his detention in U.S. custody without legal process violate:

4

a) The right not to be transferred involuntarily into custody that poses a substantial risk of torture, as guaranteed by the Fifth Amendment to the United States Constitution, the Foreign Affairs Reform and Restructuring Act, § 2242, Pub. L. No. 105-277, div. G, 112 Stat. 2681-822, the Convention Against Torture, Common Article 3 of the Geneva Conventions, and customary international law;

b) The right not to be transferred involuntarily into custody that poses a substantial risk of cruel, inhuman, or degrading treatment, or outrages on personal dignity, as guaranteed by the Fifth Amendment to the United States Constitution, Common Article 3 of the Geneva Conventions, and customary international law;

c) The right under the Eighth Amendment to the United States Constitution not to be transferred involuntarily to face execution for crimes not resulting in death or in which the actor was not a central participant in the fatal activities.

d) The fundamental right to be free of unlawful detention under the Due Process Clause of the Fifth Amendment to the United States Constitution;

f) The right to be free from arbitrary and indefinite executive detention pursuant to the Citizen Non-Detention Act, 18 U.S.C. § 4001(a); and

g) The right to be free from arbitrary and indefinite detention as guaranteed under, *inter alia*, the International Convention on Civil and Political Rights and customary international law, including the customary international law of armed conflict.

10. Accordingly, Mr. Omar respectfully seeks relief from this Court in the form of a writ of habeas corpus. Specifically, Mr. Omar requests that this Court immediately issue an order

prohibiting Respondents from transferring him to Iraqi because he faces a substantial risk of torture or cruel, inhuman, and degrading treatment.  Because the purported purpose of Mr. Omar's U.S. detention—transfer to Iraqi custody for prosecution—is foreclosed by the substantial risk of torture or cruel, inhuman, and degrading treatment, or unconstitutional execution Mr. Omar further requests that the Court order the government either to release him or to provide a lawful basis for his continued detention by the United States.

## II. JURISDICTION AND VENUE

11. Petitioner invokes this Court's jurisdiction pursuant to 28 U.S.C. §§ 2241(a), (c)(1) & (c)(3); 2242 and 2243.  In addition, this Court has jurisdiction under the United States Constitution, Article I, § 9, cl. 2 (the Suspension Clause), Article III, and the Due Process Clause of the Fifth Amendment because those provisions entitle Mr. Omar to a judicial forum in which to contest the legal validity of his detention.  Petitioner further invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651 (the All Writs Act), §§ 2201 & 2202 (the Declaratory Judgment Act).

12. The Supreme Court recently affirmed this Court's jurisdiction over Mr. Omar's habeas corpus petition under 28 U.S.C. § 2241, noting that the fact of detention "in the immediate 'physical custody' of American soldiers" is all that habeas jurisdiction over a U.S. citizen requires. *Munaf v. Geren*, 128 S. Ct. at 2216.

13. This Court has personal jurisdiction over Respondents because they are officers or agents of the United States carrying out their responsibilities in the District of Columbia, having substantial contacts in the District, and being physically located within this Court's territorial jurisdiction.

6

14. Venue is proper in the District of Columbia for this writ of habeas corpus because one or more of the Respondents resides within the jurisdiction of this Court and is amenable to service of process in the district. 28 U.S.C. § 1391(a), (b) & (e).

## III. PARTIES

15. Petitioner Shawqi Omar is a naturalized citizen of the United States of America. His United States Passport number is 710391701. *Exhibit 3 (copy of passport) to Habeas Pet. (dkt. no. 1).* His naturalization number is 11958854. *See Exhibit 4 (copy of naturalization certificate) to Habeas Pet. (dkt. no. 1).* He is incarcerated in United States military custody at Camp Cropper Theater Internment Facility, which is contiguous with the Baghdad International Airport.[2]

16. Petitioner Sandra K. Omar ("Sandra") is Shawqi Omar's wife and an American citizen who currently resides in Amman, Jordan. Because Mr. Omar's access to legal counsel and to the courts of the United States remains limited, Sandra acts as his next friend.

17. Petitioner Ahmed Omar ("Ahmed") is Mr. Omar's eldest son, and an American-born United States citizen who resides in North Carolina. Because Mr. Omar's access to legal counsel and to the courts of the United States remains limited, Ahmed acts as his next friend.

18. Respondent Pete Geren is the Secretary of the United States Army. Respondent Geren is the senior official of the Department of the Army and is responsible for all matters related to the United States Army. Respondent Geren has authority over the custody and control of United

---

[2] At the time the original petition was filed, Mr. Omar was detained at Camp Bucca Theater Internment Facility in the vicinity of Umm Qasr, in southern Iraq. He was later moved to different U.S. facilities before finally being transferred to Camp Cropper.

States Armed Forces detainee operations in Iraq, including those held at Camp Cropper and the custodian responsible for Mr. Omar's detention. He is sued in his official capacity.

19. Respondent Rear Admiral Garland P. Wright is the Commander of Task Force 134, Multi-National Force- Iraq. Respondent Wright has responsibility for detainee operations for United States Armed Forces in Iraq. Respondent Wright is charged with maintaining custody and control over all of the approximately 23,000 prisoners of the United States Army in Iraq, including those at Camp Cropper. He is sued in his official capacity.

20. Respondent Commander Lieutenant Colonel David Chrismer is with the U.S. Army. He is Mr. Omar's immediate custodian at Camp Cropper and has authority to release Mr. Omar from U.S. custody. Lieutenant Colonel Chrismer is sued in his official capacity.

## IV. STATEMENT OF FACTS

21. Shawqi Omar is an American citizen. Born to Jordanian parents in Kuwait on December 17, 1961, Mr. Omar came to the United States on a student visa in 1979 at age seventeen. *Habeas Pet. at 7 (dkt. no. 1).* In 1983, he married a United States citizen, Sandra Kay Sulzle (now Sandra Omar), in Mobridge, South Dakota. *Id.* With his new wife, Mr. Omar moved to Minnesota, where he served in the Minnesota National Guard. *Id.* He became a United States citizen on November 17, 1986. *Id.* He and Sandra have six children together, all of whom are United States citizens. *Id.*

22. Following the removal of Saddam Hussein's dictatorship, Mr. Omar traveled to Iraq with his ten-year-old son, Salahedin, seeking contract work in the reconstruction of that country. *Habeas Pet. at 7 (dkt. no. 1).* On October 29, 2004, American forces arrested Mr. Omar, an

American citizen, at his Baghdad home. *Id. at 8.* While his ten-year-old child stood by, U.S. soldiers ransacked Mr. Omar's house and beat Mr. Omar. *Id.* Mr. Omar sustained severe injuries in this and subsequent beatings at the hands of U.S. forces. *See Exhibits to Motion for Preservation Order (dkt. no. 49).*

23. U.S. forces initially imprisoned Mr. Omar at Camp Cropper, and then moved him to Camp Bucca (near Basra), where he was held for almost one year. *Exhibit A (Decl. of Susan Burke) to Supplemental Mem. in Support of Mot. TRO at 2 (dkt. no. 10).* On or about October 27, 2005, the U.S. government moved Mr. Omar to Abu Ghraib prison. *Id. at 2.* U.S. forces subsequently shuttled Mr. Omar between Bucca, Abu Ghraib, and Camp Cropper prisons. *Id. at 2, 3, 4, 6.* Mr. Omar is currently detained at Camp Cropper. *Id. at 6.*

24. Mr. Omar has repeatedly asserted his innocence, *Habeas Pet. at 11 (dkt. no. 1),* and has not been charged with a crime. *Mem. Op. Granting Prelim. Inj. at 2 (dkt. no. 22).* Respondents have only submitted a declaration—fifteen months after Mr. Omar's original arrest—briefly enumerating inflammatory and uncorroborated hearsay allegations of criminal conduct. *Exhibit 1 (Decl. of John G. Gardner) to Opp'n to Mot. for a TRO (dkt. no. 12).* At least some, if not all, of the hearsay evidence on which the government relies has proved unreliable since the witnesses against Mr. Omar have recanted. *See* Brief for Federal Parties, *Munaf v. Geren*, 128 S. Ct. 2207, 2226 n.2 (2008) ("[I]n March 2007, some of the individuals who were seized with Omar recanted their previous statements implicating Omar in insurgent activities.").

**Habeas Proceedings**

25. On December 12, 2005, Mr. Omar's wife and son filed a next-friend Petition for Writ of
    Habeas Corpus in this Court. *Habeas Pet. (dkt. no. 1)*

26. In January 2006, counsel learned that U.S. officials might be convening some form of legal
    proceeding against Mr. Omar and sought leave to participate. In response, counsel learned
    that Respondents were planning to hand Mr. Omar over to Iraqi authorities and would not
    provide notice to counsel or the District Court. *Exhibit A (Decl. of Susan Burke) to
    Supplemental Mem. in Support of Mot. for TRO at 4-6 (dkt. no. 10).* Counsel immediately
    filed, and this Court granted, an ex parte emergency motion for a temporary restraining order
    to stop Mr. Omar being transferred to Iraqi custody, where he would likely be tortured.
    *Order Granting* Ex Parte *Mot. for TRO (dkt. no. 9); Mem. Op. Granting Mot. for TRO (dkt.
    no. 11).* This Court subsequently entered a preliminary injunction enjoining Respondents
    from transferring Mr. Omar to Iraqi custody. *Order Granting Mot. for Prelim. Inj. (dkt. no.
    21).*

27. Before this Court, the Court of Appeals for the District of Columbia, and the United States
    Supreme Court, Respondents contested the subject matter jurisdiction based on the Supreme
    Court's decision in *Hirota v. MacArthur*, 338 U.S. 197 (1948) (per curium), which held that
    U.S. courts did not have habeas jurisdiction over U.S. personnel acting on behalf of a
    multinational tribunal. *See Resp't Opp'n to Pet.* Ex Parte *Mot. TRO at 12-13 (dkt. no. 12);*
    Reply Brief for Appellants at 4-18, *Omar v. Harvey,* 479 F.3d 1 (D.C. Cir. 2007) (No. 06-
    5126); Brief for Federal Parties at 17-31, *Munaf v. Geren*, 128 S. Ct. 2207 (2008) (Nos. 06-
    1666 and 07-394). The Supreme Court firmly rejected this argument, declining to extend

*Hirota* to bar Mr. Omar's petition. *Munaf v. Geren*, 128 S. Ct. 2207, 2218 (2008) ("[W]e decline to extend our holding *Hirota* to preclude American citizens held overseas by American soldiers subject to a U.S. chain of command from filing habeas petitions.").

28. On the merits, the Supreme Court held that Iraq has a sovereign right to prosecute individuals for crimes committed in its territory and that U.S. courts may not normally interfere with this right. *Id.* at 2221-24. The Court rejected Mr. Omar's argument that Respondents required specific legal authority permitting a transfer to Iraqi custody. *Id.* at 2227-28. The Court did not address, however, whether a substantial risk of torture or cruel, inhuman, and degrading treatment would bar a transfer, but held that the issue had been insufficiently briefed. *Id.* at 2225-26. The Court specifically noted that the FARR Act had not been adequately raised in Mr. Omar's habeas petition and invited this amended petition. *Id.* at 2226 n.6. In concurrence, Justice Souter also suggested that "substantive due process [would] bar[] the Government from consigning its own people to torture." *Id.* at 2228 (Souter, J., concurring).

29. Mr. Omar remains in the physical custody of U.S. forces at Camp Cropper. The United States has represented that Mr. Omar will remain in U.S. custody "pending investigation and prosecution in Iraqi courts under Iraqi law." Brief for Federal Parties at 3, *Munaf v. Geren,* 128 S. Ct. 2207 (2008) (Nos. 06-1666 and 07-394).

**Likelihood of Torture in Iraqi Custody**

30. Adjudicating Mr. Omar's motions for a TRO and preliminary injunction in February 2006, this Court received uncontested evidence of torture and cruel, inhuman, and degrading treatment in Iraqi prisons, particularly involving Sunni Muslim prisoners such as Mr. Omar. *See Exhibits to Supplemental. Mem. in Support of Mot. for TRO (dkt. no. 10).* This evidence

included declarations detailing the Iraqi government's systematic use of torture with electric shocks, strangulation, breaking of limbs, sexual abuse, cigarette burns, electric drills, and suffocation and evidence Mr. Omar "would be at grave and serious risk of being tortured" in Iraqi custody. *Exhibit B (Decl. of Curt Goering) to Supp. Memo. in Support of Mot. for Temp. Restraining Ord. (dkt. no. 10).* The evidence shows that Mr. Omar faces a likelihood of torture and cruel, inhuman, and degrading treatment if transferred to Iraqi custody.

31. The Supreme Court, however, did not consider this evidence because it held that Mr. Omar had not adequately alleged a claim in his initial habeas petition under the Foreign Affairs Reform and Restructuring Act, Pub. L. No. 105-277, div. G, 112 Stat. 2681-822, which implements the United States' obligations under the Convention Against Torture. *Munaf v. Geren*, 128 S. Ct. 2207 (2008). The Court invited Mr. Omar to amend his petition and seek relief under the FARR Act. *Id.* at 2226 n.6.

32. The evidence of Mr. Omar's likely torture adduced in his petition is reinforced and supplemented by continued reports of torture and abuse within Iraqi prisons that the United Nations has described as the "widespread and routine torture and ill-treatment of detainees." U.N. Assistance Mission for Iraq [UNAMI], *Human Rights Report* at 22 (Dec. 2007) http://www.uniraq.org/FileLib/misc/HR%20Report%20Jul%20Dec%202007%20EN.pdf. (reporting on UN monitoring of Iraqi prison facilities). Amnesty International, which also monitors Iraqi prisons and documents the experience of detainees, confirms that Iraqi forces "routinely torture and mistreat detainees." *Supplemental Decl. of Curt Goering at ¶ 3 (Exhibit 1).*

33. This risk extends to the Justice Ministry, to whose custody Respondents say Mr. Omar would be transferred.  Reply Brief for the Federal Parties at 23-24, *Munaf v. Geren,* 128 S. Ct. 2207 (2008) (Nos. 06-1666 & 07-394); *Supplemental Decl. of Curt Goering at ¶ 4-5 (Exhibit 1)* ("Ministry of Justice (MoJ) prisons are not exempt from these risks.")  Only two years ago, Respondents' own declarant, Major-General Gardner, promised that the military would not turn over *any* prisoners to Justice Ministry prisons due to the risk of torture.  Jonathan Finer & Ellen Knickmeyer, *Shiite Militias Control Prisons, Officials Say*, Wash. Post, June 16, 2006.  Iraq's Deputy Minister of Justice, Pusho Ibrahim Ali Daza Yei further declared that "[w]e cannot control the [Justice Ministry] prisons. It's as simple as that . . . . Our jails are infiltrated by the militias from top to bottom, from Basra to Baghdad."  *Id.*

34. Abuse of detainees, including torture and the use of cruel, inhuman, and degrading treaty, still continues at Justice Ministry facilities in Iraq.  *Supplemental Decl. of Curt Goering at ¶¶ 4-5 (Exhibit 1).*  Furthermore, initial transfer to a Justice Ministry facility does not, and cannot eliminate the substantial risk that Mr. Omar may subsequently be transferred to an Interior or Defense Ministry prison, whatever assurances the United States may seek. *Supplemental Decl. of Curt Goering at ¶ 9 (Exhibit 1).*  Moreover, transferring an individual detainee to Justice Ministry custody does nothing to eliminate the risk that he will be interrogated by Interior or Defense officials, whom the government concedes continue to use torture, Reply Brief for Federal Parties at 24-26, *Munaf v. Geren,* 128 S. Ct. 2207 (2008) (Nos. 06-1666 & 07-394), and who retain access to "re-interrogate prisoners within the Ministry of Justice."  *Supplemental Decl. of Curt Goering at ¶ 8 (Exhibit 1).*  Additionally, "MoJ prisons are vulnerable to infiltration by members of Shi'a militia groups" that pose a

particular danger to a Sunni Muslim such as Mr. Omar. *Supplemental Decl. of Curt Goering at ¶ 6 (Exhibit 1).*

35. Additionally, the Iraqi justice system still makes frequent use of capital punishment with a method of execution—hanging—that itself constitutes cruel, inhuman, and degrading treatment—if not torture.  Iraqi hangings have frequently been beset by problems, often subjecting condemned prisoners to torture and to cruel and inhuman deaths.  John F. Burns, *Two Hussein Allies Are Hanged; One Is Decapitated,* N.Y. Times, Jan. 15, 2007; Brian Bennett, *The Secrets of Iraq's Death Row,* Time, Nov. 12, 2006.  There exists a substantial risk that Mr. Omar may face a death penalty carried out in a manner that violates the bar on torture and cruel and unusual punishment. *Supplemental Decl. of Curt Goering at ¶¶ 10, 12 (Exhibit 1).*

36. Finally, the Iraqi justice system applies the death penalty for acts of terrorism which do not result in fatalities, as well as the support and participation in the activities of "terrorist armed gangs."  Iraqi Penal Code (IPC), articles 190-97.  Mr. Omar is thus at serious risk of being sent by the United States to be executed for a crime for which capital punishment is constitutionally prohibited in the United States.

### CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**THREAT OF UNLAWFUL EXPOSURE TO TORTURE**

37. Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

38. Respondents threaten to transfer Mr. Omar to Iraqi custody notwithstanding the substantial risk that he will be tortured while in Iraqi custody.

39. The transfer or threatened transfer of a U.S. citizen to a foreign sovereign whose custody presents a substantial risk of torture violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution; the Foreign Affairs Reform and Restructuring Act (FARR Act) § 2242, Pub. L. No. 105-277, div. G, 112 Stat. 2681-822; the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85; Common Article 3 of the Geneva Conventions; and customary international law.

### SECOND CLAIM FOR RELIEF
### THREAT OF UNLAWFUL EXPOSURE TO CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT

40. Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

41. Respondents threaten to transfer Mr. Omar to Iraqi custody notwithstanding the substantial risk that he will be subjected to cruel inhuman, or degrading treatment or punishment, or to outrages upon personal dignity.

42. The transfer or threatened transfer of a U.S. citizen to a foreign sovereign whose custody presents a substantial risk of cruel inhuman, or degrading treatment, or of outrages upon personal dignity violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution; Common Article 3 of the Geneva Conventions; and customary international law.

## THIRD CLAIM FOR RELIEF
## CRUEL OR UNUSUAL PUNISHMENT UNDER THE EIGHTH AMMENDMENT TO THE UNITED STATES CONSTITUTION

43. Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

44. Respondents threaten to transfer Mr. Omar to Iraqi custody notwithstanding the substantial risk that he will be sentenced to death for activities in support of terrorism that did not result in a fatality, or in which he played a relatively minor role, pursuant to the Iraqi Penal Code (ICP) Articles 190-97.

45. Such a transfer would violate the Eight Amendment, regardless of whether it were consistent with due process. *Compare McGautha v. California*, 402 U.S. 183 (1971) *with Gregg v. Georgia*, 28 U.S. 153, 195 n. 47 (1976). The administration of the death penalty for crimes not resulting in a fatality violates the "cruel and unusual punishment clause" of the Eighth Amendment to the U.S. Constitution, which provides that a punishment must be "graduated and proportioned to [the] offense" and is informed by evolving international standards of decency. It may not be applied in "instances where the victim's life was not taken." *Kennedy v. Louisiana*, 128 S. Ct. 2641, 2659 (2008); *Coker v. Georgia*, 433 U. S. 584 (1977). And even where criminal activities result in deaths, the Eighth Amendment prohibits the imposition of the death penalty on those participants who are not major actors or do not share the plans' purpose of taking innocent life. *Compare Tison v. Arizona*, 481 U.S. 137 (1987) *with Enmund v. Florida*, 458 U.S. 782 (1982).

**FOURTH CLAIM FOR RELIEF**
**UNLAWFUL DETENTION UNDER THE FIFTH AMENDMENT TO THE UNITED**
**STATES CONSTITUTION**

46. Petitioners reallege and incorporate by reference each and every allegation contained in the

preceding paragraphs as if set forth fully herein.

47. Respondents' have detained Mr. Omar without lawful process, which violates the "most

elementary of liberty interests – the interest in being free from physical detention by one's

own government." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality opinion). The

United States Constitution affords Mr. Omar, as a United States citizen, its full protection.

48. Because the purpose of United States detention of Mr. Omar—transfer to Iraqi custody for

criminal prosecution—is prohibited by the substantial risk that he will be subjected to torture

or cruel, inhuman, and degrading treatment, his continued detention by the United States is

arbitrary and unlawful. Mr. Omar has not been afforded any adequate procedure, notice, or

opportunity to be heard to permit him to show his innocence of any and all wrongdoing in

violation of the Due Process Clause of the Fifth Amendment to the Constitution. The United

States, accordingly, must afford him the opportunity to challenge his detention recognized by

the Supreme Court. *Hamdi*, 542 U.S. at 533 (plurality opinion); *id. at 553-54* (Souter, J.,

concurring in part, dissenting in part, and concurring in the judgment).

49. Second, the United States has not charged Mr. Omar with a crime or otherwise articulated the

grounds for Mr. Omar's detention beyond the purpose of transfer to Iraqi custody relied upon

by the Supreme Court. *Munaf v. Geren*, 128 S. Ct. at 2221-22. Because that purpose is

barred by the substantial risk of that Mr. Omar will be subjected to torture or cruel, inhuman,

and degrading treatment or punishment, there remains no valid justification for his continued

detention.  The unjustified detention of an American citizen without trial is a violation of substantive Due Process rights.

## FIFTH CLAIM FOR RELIEF
## UNLAWFUL DETENTION CONTRARY TO THE CITIZEN NON-DETENTION ACT

50. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

51. Respondents' arrest and detention of Mr. Omar violates the Citizen Non-Detention Act, 18 U.S.C. § 4001(a).  The Act commands that: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress."  No Act of Congress authorizes the continued detention of Mr. Omar, and therefore his continued detention violates the Citizen Non-Detention Act.

## SIXTH CLAIM FOR RELIEF
## PROLONGED ARBITRARY DETENTION IN VIOLATION OF INTERNATIONAL LAW

52. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

53. Respondents have breached, and continue to breach their obligations under customary international law, accepted by and binding on the United States, by seizing and continuing to hold Mr. Omar, a United States citizen, without justification, charge, or judicial proceeding. International law, including the International Covenant on Civil and Political Rights and the customary international law of armed conflict, prohibits prolonged arbitrary detention.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner prays for relief as follows:

(a) Immediately prohibit Respondents from any form of transfer of Mr. Omar to transient or permanent Iraqi custody;

(b) Enjoin Respondents from transferring Mr. Omar to the authority of any other government, sovereign, country, international entity or agency until this Court has an opportunity to consider and decide the merits of this Petition;

(c) Order Respondents to cease all interrogations of Mr. Omar, whether direct or indirect;

(d) Issue a Writ of Habeas Corpus requiring Respondents to release Mr. Omar from detention, and/or requiring Respondents to provide such judicial process as will establish the lawfulness of Mr. Omar's detention;

(e) Convene an evidentiary hearing and order Respondents to produce Mr. Omar for the hearing, either by video or in person;

(f) Order Respondents to continue to allow counsel to meet and confer with Mr. Omar, in private and unmonitored attorney-client conversations, both by phone and in person; and

(g) Order such other relief as the Court may deem necessary and appropriate to protect Mr. Omar's rights.

Dated:  July 24, 2008                    Respectfully submitted,


_____/s/ Jonathan Hafetz_____
Jonathan Hafetz (admitted *pro hac vice*)
Aziz Z. Huq
BRENNAN CENTER FOR
    JUSTICE NEW YORK
    UNIVERSITY SCHOOL OF LAW
161 Avenue of the Americas,
12th Floor
New York, NY  10013
Telephone:    (212) 998-6730
Facsimile:    (212) 995-4550


JOSEPH MARGULIES
MACARTHUR JUSTICE CENTER
NORTHWESTERN UNIVERSITY
    SCHOOL OF LAW
357 East Chicago Avenue
Chicago, IL  60611
Telephone:    (312) 503-0890
Facsimile:    (312) 503-1272


Eric M. Freedman
250 West 94th Street
New York, NY  10025
Telephone:    (212) 665-2713


Susan L. Burke
Katherine Hawkins
BURKE O'NEIL LLC
4112 Station Street
Philadelphia, PA 19127
Telephone:    (215) 487-6590
Facsimile:    (215) 482-0874

Vincent Moccio
Amy Magid
ROBINS, KAPLAN, MILLER &
   CIRESI L.L.P.
2800 LaSalle Plaza
Minneapolis, MN 55402
Telephone:   (612) 349-8500

*Counsel for Petitioner*

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDRA K. OMAR, *et al.*, <br> Petitioners, <br><br> v. <br><br> PETE GEREN, *et al.*, <br> Respondents. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     CIVIL ACTION <br> NO. 05-2374 (RMU) |

## SUPPLEMENTAL DECLARATION OF CURT GOERING

I declare under penalty of perjury that the following is true and correct:

1. My name is Curt Goering. I am the Deputy Executive Director of Amnesty International, USA. Amnesty International is regarded as the leading human rights watchdog organization. Amnesty International received the Nobel Peace Prize in 1977. Amnesty's work is considered by experts around the world to be authoritative and reliable.

2. I have served as Deputy Director for the past twenty years. In that position, I have been personally responsible for overseeing and supervising teams of researchers in the United States who observe and monitor adherence to the rule of law on human rights norms. In addition, I have been a researcher in the Middle East Department at Amnesty International's headquarters in London and have traveled to Iraq to investigate allegations of torture and abuse and interview survivors of torture.

3. According to Amnesty International's research, security forces at police stations, prisons, and detention centers under Iraqi control routinely torture and mistreat detainees. Methods of torture include beatings with hosepipes, cables, and other

implements, prolonged suspension from the limbs in contorted and painful positions for extended periods of time sometimes resulting in dislocation of joints, electric shocks to sensitive parts of the body, breaking of limbs, forcing detainees to sit on sharp objects, and causing serious injury.

4. Amnesty International's research further indicates that Ministry of Justice (MoJ) prisons are not exempt from these risks.

5. For example, MoJ prisons are vulnerable to infiltration by members of Shi'a militia groups, such as Badr Organization, the armed wing of the Supreme Islamic Council of Iraq, and the Mahdi Army, followers of Muqtada al-Sadr. Many members of the security forces pledge their allegiance to their religious, Sunni or Shi'a, leaders, and in some instances, to leaders of militia groups.

6. Sunni prisoners or prisoners affiliated with foreign entities such as aid and press organizations are at increased risk of mistreatment or retaliation from MoJ officials. The risk of torture and ill-treatment of Sunni prisoners is very high in facilities where prison authorities are followers of the Shi'a Mahdi Army or Badr Organization.

7. The risk of torture in MoJ prisons is also elevated in the case of "high value" detainees. "High value" detainees are those believed by U.S. or Iraqi security forces to possess information regarding groups designated as terrorist organizations, or information that could be used to prevent insurgent attacks. Prisoners—even after conviction and sentencing—may also be determined to be "high value" if they are believed to possess information that could assist in further prosecutions.

8. Amnesty International has received numerous reports of re-interrogation and torture at the hands of Iraqi security forces in the case of "high value" detainees. Officials from the Ministry of the Interior (MoI) or the Ministry of Defense (MoD) can re-interrogate prisoners within the Ministry of Justice by taking them into private rooms or back offices or private rooms and subjecting them to torture and other abuses.

9. Prisoners housed at MoJ facilities are also vulnerable to being transferred to MoI or MoD prisons, which are well known for ill-treatment of prisoners. Torture and abuse can occur in situations even under conditions of temporary transfer, including transfers lasting only a few hours. This is true even when the U.S. government guarantees the prisoners will remain in MoJ custody.

10. Finally, as per Amnesty's April 2007 report on the death penalty in Iraq, capital sentences have increased dramatically over the past several years. Executions conducted using methods such as hanging in and of themselves constitute cruel, inhuman, and degrading treatment, if not torture, especially when improperly carried out.

11. I understand that Shawqi Omar, an American-Jordanian Sunni, is accused of kidnapping and terrorism, is currently designated a "security internee" and "enemy combatant," is believed to have ties to al Qaeda and al Zarqawi, is pending investigation by the Central Criminal Court of Iraq (CCCI), and that Iraqi officials have not guaranteed he will remain in MoJ custody at all times or will not be re-interrogated. In light of the foregoing, and based on Amnesty

International's research in Iraq, I believe that there is a serious risk that Shawqi Omar will be tortured if transferred to MoJ custody.

12. Further, there is a significant likelihood that Mr. Omar will not receive a fair trial under the CCCI, and, if sentenced to death, that this sentence will be conducted in a cruel and unusual fashion.

Date:      7/22/2008

_____
Curt Goering

# Exhibit 2

# Unjust and unfair: The death penalty in Iraq

## Introduction

The use of the death penalty has increased rapidly in Iraq since it was reinstated in mid-2004. Since then more than 270 people have been sentenced to death and at least 100 people have reportedly been executed. There were no executions reported in 2004 and at least three men were executed in 2005, but since then there has been a rapid rise in executions with at least 65 people, including at least two women, reportedly executed by hanging in 2006.[1] Iraq now figures among the countries with the highest numbers of executions reported in 2006. Higher totals were recorded only in China, Iran and Pakistan.[2]

The death sentences against Saddam Hussain and three of his co-accused by the Supreme Iraqi Criminal Tribunal (SICT) and their subsequent executions at the end of 2006 and in early 2007 provoked wide international condemnation and a controversial debate within the Arab world. UN human rights experts and international human rights organizations, including Amnesty International, concluded that the executions were carried out after a trial which failed to meet international fair trial standards, and an appeal process which was fundamentally flawed.[3] However, Amnesty International is concerned that, in addition to these high profile cases, the death penalty has been increasingly imposed following unfair trials before other Iraqi criminal courts, including the Central Criminal Court of Iraq (CCCI).

---

[1] However, not all executions are known to have been reported in the media (New York Times, Kirk Semple, *Iraqis Line Up to Put Hussein in the Noose*, 9 December 2006).

[2] Iraq was among the countries with the highest number of reported execution per capita in 2006. The annual rate of reported executions in Iraq in 2006 was estimated at approximately 2.7 per one million of the population.

[3] Amnesty International, *Iraq: Death sentence for former Vice President deals another blow to justice*, 12 February 2007, AI Index: MDE 14/008/2007; Amnesty International, *Iraq: Amnesty International concerned about possible death sentence for former vice-president Taha Yassin Ramadan*, 9 February 2007, AI Index: MDE 14/007/2007; Amnesty International: *Iraq: Execution of Saddam Hussein aides is a further slide into errors of the past*, 15 January 2007, AI Index: MDE 14/002/2007; Amnesty International: *Iraq: Amnesty International deplores execution of Saddam Hussain*, 30 December 2006, AI Index: MDE 14/043/2006; Amnesty International: *Iraq: Amnesty International condemns Iraqi Appeal Court verdict against Saddam Hussein and co-accused*, 28 December 2006, AI Index MDE 14/044/2006; Amnesty International: *Iraq: Amnesty International deplores death sentences in Saddam Hussein trial*, 5 November 2006, AI Index: MDE 14/037/2006.

Since the reinstatement of the death penalty in mid-2004 more than 250 people have been sentenced to death by the CCCI. They include Jum'a Sabah Jum'a:

**Jum'a Sabah Jum'a**, a 25-year old technician, married with two children, was reportedly detained on 7 October 2006 by security forces of the Interior Ministry in the Sayidiya district of Baghdad. His family did not know about the detention until an eye-witness told them some two days later. However, it was not until his court appearance in February 2007 that his relatives had any official acknowledgement of his arrest.

After his arrest Jum'a Sabah Jum'a was taken to a detention centre near or in the city of Kut where he was reportedly tortured, including by having electric shocks to various parts of his body and burns to his thighs. He was brought before the investigating judge on 22 October 2006 where he reportedly had no access to legal counsel and confessed, reportedly due to fear of further torture to killing a man.  He now insists that he had no involvement in the murder.

On 13 February 2007 at around 9am Jum'a Sabah Jum'a called his family from the court room of the Central Criminal Court of Iraq (CCCI) in Baghdad saying that he was about to be tried. He was represented by a court-appointed lawyer. About two hours later Jum'a Sabah Jum'a called again and informed his family that he had been sentenced to death. In early March 2007 his relatives hired a lawyer in order to file an appeal before the Court of Cassation. At that time traces of the alleged torture, in particular burns, were reportedly still visible on his body.

Under the government of Saddam Hussain, the death penalty was applicable for a wide range of offences and was used extensively. Following the US-led invasion of Iraq the death penalty was suspended in June 2003 but reinstated by the Iraqi Interim Government in August 2004.  The return to the death penalty was opposed by the European Union, the United Nations and international human rights organizations, including Amnesty International.

The Iraqi authorities argued, when reinstating the death penalty, that it was necessary as a deterrent in view of the grave security situation prevailing in the country. In the more than two years that have since elapsed, however, the extent of violence in Iraq has increased rather than diminished, clearly indicating that the death penalty has not proved to be an effective deterrent. If anything, it may have contributed to the continuing brutalization of Iraqi society.  Since the death penalty was reinstated in August 2004, tens of thousands of people have been victims of violent killings and hundreds of thousands of other Iraqis have been internally displaced by spiralling, increasingly sectarian violence or have been forced to flee as

refugees to neighbouring countries. According to the estimates of the United Nations Assistance Mission for Iraq (UNAMI), some 34,452 civilians were violently killed in Iraq in 2006 alone.[4] Armed groups opposed to the government or the presence of foreign troops in Iraq and others with links to political parties represented in the government have targeted civilians with deliberate killings, abductions and other abuses. Amnesty International utterly condemns these killings of civilians and other human rights abuses and calls for the perpetrators to be brought to justice. But such abuses do not justify the use of the death penalty.

At the international level, Iraq's restoration of the death penalty represents a seriously retrograde development, one that runs counter to the worldwide trend away from the use of this cruel and inhuman punishment.  At the beginning of 2007, no less than 128 countries had taken the momentous step of abolishing the death penalty in law or in practice. Today, only some 69 countries retain and use the death penalty, and of these the number that carry out executions is much smaller. Indeed, over the past decade on average more than three countries per year have abolished the death penalty in law or, having abolished it for ordinary crimes, have taken the further step of abolishing it for all crimes. Once abolished, the death penalty is seldom reintroduced.

This worldwide trend reflects a growing awareness that there are alternative, effective punishments to the death penalty which do not involve the premeditated and cold-blooded killing of a human being by the state supposedly in the name of justice. Increasingly, it has come to be recognized that the death penalty has never been shown to deter crime more effectively than other punishments and that it brutalizes all those involved in its application. The irrevocable punishment of death removes not only the victim's right to seek legal redress for wrongful conviction, but also the judicial system's capacity to correct error.

Amnesty International opposes the death penalty in all cases without exception as a violation of the right to life and as the ultimate form of cruel, inhuman or degrading punishment. The right to life and the right not to be subjected to torture or other cruel, inhuman or degrading treatment or punishment are enshrined in international standards to which Iraq is a state party, including the International Covenant on Civil and Political Rights (ICCPR).

The restoration of the death penalty in Iraq and its extension to additional crimes was a grave and retrograde step. More than this, it was a grievously short-

---

[4] UNAMI, *Human Rights Report, 1 November – 31 December 2006*, page 4.

sighted development, one that has contributed to, rather than helped alleviate, the continuing crisis in Iraq. What was needed in Iraq after the overthrow of Saddam Hussain's abusive regime was a recognition of the importance of fundamental human rights and of ensuring that the new Iraq should abide by its obligations under international human rights law. Under Saddam Hussain, these obligations had been routinely, flagrantly ignored. Suspected critics and opponents of his government, and members of ethnic and other minorities, were subjected to enforced disappearance, torture, summary execution and other gross abuses, and the perpetrators had impunity. There were no fair trials and hundreds, more likely thousands, of people were sentenced to death and executed. The numbers of victims of gross human rights violations were so great that their true total will never be known.

After a quarter of a century under Saddam Hussain's regime, Iraq had little experience of the rule of law. There was no independent and impartial judiciary, there were no independent investigative and prosecutorial mechanisms and the court system was not one which could be relied upon to ensure fair trials. Moreover, the police, so long an instrument of Saddam Hussain, had been disbanded and overhauled but increasingly infiltrated by members of armed groups with links to political parties represented in the government, and the struggle for power in Iraq was taking on an increasingly violent and sectarian nature. Amid such a deepening maelstrom, it was entirely predictable that the restoration of the death penalty would not contribute to peace and security and the establishment of the rule of law, but would perpetuate and exacerbate the abuse of human rights and come to be seen, as in the case of Saddam Hussain's execution, as an instrument of vengeance far removed from any notions of justice.

Now, as the violence continues to worsen, the death penalty is increasingly used and the number of executions mounts. But this has had no effect in reducing violence. And even if it had, this would be no justification for the use of such of cruel, inhuman and irrevocable punishment at a time when the right to fair trial and other basic safeguards are absent. The Iraqi government should take decisive action now to reassert its commitment to human rights, including the right to life. It should immediately institute a moratorium on executions and then take steps to abolish the death penalty for all offences. Without such action, Iraq will continue to live under the brutal legacy of the past.

# The death penalty under the government of Saddam Hussain

Under the government of Saddam Hussain (1979-2003), tens of thousands of people were made victims of enforced disappearance or extrajudicial executions. Hundreds, probably thousands, of others were executed, often after unfair trials, as the death penalty was used for a wide range of criminal and political offences. They included hundreds of people who were sentenced to death and executed during the first few years of Saddam Hussain's presidency: Amnesty International recorded more than 800 executions between 1980 and 1983, including many for non-violent political activities.[5]  In November and December 1987 alone, as many as 360 people were reported to have been executed.[6]

Amnesty International was never able to establish precisely how many people were sentenced to death and executed under Saddam Hussain. The Iraqi authorities provided no detailed figures and often did not make it public when executions were carried out. However, it is known that those executed under Saddam Hussain included members of banned political parties and other suspected government opponents, students, army deserters, and even children. Some victims' bodies were returned to their families bearing the marks of physical violence.

As of the mid-1970s and before Saddam Hussain became President, the Iraqi government introduced new legislation making the death penalty applicable for a wide range of political offences, including non-violent political activity such as membership or affiliation of the banned al- Da'wa al-Islamiya (Islamic Call) political party. The death penalty was also introduced for members of the armed forces who engaged in prohibited political activities.[7]

---

[5] Following a mission to Iraq in January 1983 Amnesty International published a report and recommendations to the Iraqi government stating that it had recorded the names of 520 people reported to have been executed for political offences between 1978 and 1981.

[6] *Amnesty International Annual Report 1988*, AI Index: POL 10/01/88.

[7] For example the following offences could be punished by death:
- members of the Ba'ath Party who wilfully keep previous political affiliation secret or who have links with other political groups (amendments to Article 200 of the Penal Code in 1974)
- military personnel participating in prohibited political organizations or carrying out prohibited political activity (this provision of 1976 related particularly to Communist Party activities within the armed forces

During the war between Iraq and Iran (1980-1988), the death penalty was extended to cover additional offences by members of the armed forces. Desertion and absenteeism from the army were made capital offences in 1981 and 1982 while 11 offences were made punishable by the death penalty in the Penal Code of the Popular Army promulgated in 1984. In addition, certain offences considered harmful to the national economy were made punishable by death, notably smuggling of Iraqi foreign currencies or gold (1984) and forgery of official documents prejudicial to the national economy (1986)).

Further, a Revolutionary Command Council Decree of November 1986[8] provided the death penalty for publicly and flagrantly insulting the President of the Republic or his deputy, members of the Revolutionary Command Council, the Ba'th Party, National Assembly or the government.

In 1996 Amnesty International reported that since April 1994 the Iraqi authorities had introduced new decrees, widening the scope of the death penalty even further and covering at least 18 new offences.[9] In its fourth periodic report to the UN Human Rights Committee of November 1996, the Iraqi government argued that the economic sanctions imposed internationally following Iraq's invasion of Kuwait in 1990 had led to increased crime rates forcing the legislature "to adopt heavier penalties (…) as a public deterrent".[10] The Iraqi government report listed eight new capital offences introduced by decrees of the Revolutionary Command Council – including theft of vehicles and forgery of currency.[11]

- any political activity other than that of the Ba'th Party by former members of the armed forces (Revolutionary Council Resolution No 884 of 17 July 1978)
- membership of or affiliation with the party  al-Da'wa al-Islamiya (Revolutionary Council Number 461 of 31 March 1980) .

[8] Amendment of Article 225 of the Penal Code based on Revolutionary Command Council Decree Number 840 of 4 November 1986.

[9] Amnesty International, *Iraq: State cruelty: branding, amputation and the death penalty*, April 1996, AI Index : MDE 14/03/96, chapter 5 : Expansion of the use of the death penalty

[10] UN document: CCPR/C/103/Add.2, para.23 (1996).

[11] The following Revolutionary Council decrees were listed in Iraq's fourth periodic  report to the UN Human Rights Committee (UN document: CCPR/C/103/Add.2 1996)):

- theft of vehicles (Revolutionary Command Council Decree Number 13 of 1992)
- forgery of Iraqi or foreign currency or circulating forged currency (Revolutionary Command Council Decree Number 9 of 1993)
- theft in aggravating circumstances (Revolutionary Command Council Decree Number 59 of 1994)
- theft by members of armed or security forces or government employee (Revolutionary Command Council Decree Number 114 of 1994)

Under the government of Saddam Hussain people were executed for offences considered to be harmful to the national economy. For example, on 26 July 1992 at least 42 merchants, traders and businessmen were reportedly executed in Baghdad after being accused of profiteering.

Others were executed for alleged prostitution, often without formal trial and sometimes for political reasons. In November 2001 the Revolutionary Command Council issued a decree to provide the death penalty for the offences of prostitution, homosexuality, incest and rape.

Although the Iraqi Code of Criminal Procedure (CCP)[12] stipulates that juveniles up to the age of 20 may not be sentenced to death, children under the age of 18 were sentenced to death and executed under the government of Saddam Hussain.[13] For example, following an assassination attempt on Saddam Hussain in 1982 in the village of Dujail, 148 people were sentenced to death, including more than 20 children.[14]

## Suspension and return of the death penalty

Following the US-led invasion of Iraq, the Coalition Provisional Authority (CPA) initially installed by the US-led Multinational Force (MNF) to administer Iraq pending the handover of power to a new Iraqi government issued Order Number 7 on 10 June 2003. This stipulated (in section 3) that "capital punishment is suspended."

Consequently, no sentences of death or judicial executions were carried out in the period of the CPA, prior to its replacement by the Iraqi Interim Government (IIG)

---

- smuggling a motor vehicle outside Iraq (Revolutionary Command Council Decree Number 94 of 1994)
- leadership of a group of pimps (Revolutionary Command Council Decree Number 118 of 1994)
- falsification of military service record book (Revolutionary Command Council Decree Number 179 of 1994
- fraudulent investment acts if such acts undermine the economy during time of war or embargo (Revolutionary Command Council Decree Number 16 of 1995).

[12] Code of Criminal Procedure (Law Number 23 of 1971 as amended).

[13] Amnesty International, Iraq: The death penalty, AI Index: MDE 14/01/1989, February 1989; Amnesty International: Iraq: *Children: Innocent Victims of Political Repression*, AI Index: MDE 14/04/89, February 1989.

[14] According to the verdict of the Supreme Iraqi Criminal Tribunal of 5 November 2006, among the 148 there were 22 under the age of 18 who had been sentenced to death.

in late June 2004.  Even before this new, Iraqi-led administration (which held office from 28 June 2004 to 3 May 2005) had assumed power, however, Iraqi leaders appointed to become members of its cabinet called publicly for the death penalty to be reinstated. For example, in early June 2004 following his appointment as Minister of Justice in the new administration, Malik Dohan Hassan, declared to the media his intention to reinstate the death penalty for certain offenders, citing as examples those "responsible for mass graves or plundering the country's oil wealth".[15] The incoming Minister of Finance likewise stated: "In the present circumstances, we cannot but reinstate the death penalty. We have already discussed the issue in the Governing Council and the majority was favourable to the death penalty".[16]

On 12 July 2004, after the IIG had come into office, Vice President Ghazi al-Yawir told the media in Baghdad that the death penalty would be reinstated. His announcement was strongly opposed on the same day by the foreign ministers of the European Union following a meeting with their Iraqi counterpart.[17]

Despite such opposition, however, the IIG issued Decree Number 3 on 8 August 2004, only a few weeks after it replaced the CPA, which restored the death penalty for a number of offences that, previously, under Saddam Hussain, had been punishable by death under the Iraqi Penal Code (IPC).[18] In addition, the Decree made certain other offences punishable by death.

The issuance of this Decree was strongly criticised, not least by Amnesty International and other international human rights organizations, as a seriously retrograde step.[19] The Iraqi authorities' response was to argue that the reintroduction of the death penalty was necessary as a deterrent for potential perpetrators of serious crimes but that, in the longer term, it might be abolished when more stable and secure conditions had been achieved.[20] Several months later, Iraq's Human Rights Minister Wijdan Salem reportedly reassured the UN Human Rights Council in March 2007 that

---

[15] AFP, *Iraq to Restore Death Penalty After June 30 Sovereignty Handover*, 7 June 2004.

[16] AFP, *Iraq to Restore Death Penalty After June 30 Sovereignty Handover*, 7 June 2004.

[17] Washington Post, Rajiv Chandrasekaran *Iraq Plans to Offer a Broad Amnesty*, 13 July 2004.

[18] Iraqi Penal Code with amendments, Third Edition, Law 111 of 1969.

[19] Amnesty International, *Iraq: Reimposition of death penalty is a step backwards* (AI Index: MDE 14/043/2004), 9 August 2004; International Federation for Human Rights (FIDH), *No to restoration of the death penalty*, 11 August 2004.

[20] See for example an undated statement of the Iraqi Supreme Judicial Council communicated via the Embassy of the Republic of Iraq, Paris, on 28 July 2005 and the Embassy of the Republic of Iraq, Canberra, on 12 September 2005.

the death penalty was used only for the most serious crimes and that the government was working towards abolition.[21]

Iraq's current President, Jalal Talabani, is the only high ranking Iraqi official who has publicly expressed his principal opposition to the death penalty, stating in an interview on 18 April 2005: "I personally signed a call for ending execution throughout the world. And I'm respecting my signature".[22] However, the President's refusal to sign death warrants, as in the cases of Saddam Hussain and his co-accused, has not prevented their execution.

UN representatives have expressed opposition to the reintroduction of the death penalty in Iraq. For example, in August 2005 the special representative of the UN Secretary-General, Ashraf Qazi, stated in response to official announcements of the first post-2003 executions to be carried out: "in the process of transition that Iraq is experiencing, one should look at consolidating the right to life instead of imposing the death penalty which has a very poor recognized effect in deterring crimes".[23]

## Post-2003 Iraqi legislation on the death penalty not in compliance with international standards

Over a period of two years the Iraqi authorities enacted four laws relating to the restoration or introduction of the death penalty for a number of offences:

- Decree Number 3 of 2004 (issued on 8 August 2004) providing for the restoration of the death penalty
- the Statute of the Supreme Iraqi Criminal Court (SICT) of Law 10 of 2005 (promulgated on 18 October 2005)
- the Iraqi Anti Terrorism Law of 7 November 2005
- the Anti Terrorism Law of the Kurdish Region of Iraq as of 16 July 2006

Amnesty International is concerned that all four of these legal provisions fail to meet international human rights standards relating to the use of the death penalty. The ICCPR and other international instruments aiming at the abolition of the death

---

[21] UN Radio, *Iraq says it plans to abolish the death penalty*, 14 March 2007, http://radio.un.org/print_all.asp?NewsDate=3/14/2007; Reuters, Laura MacInnis, *Iraq wants to abolish death penalty – minister*, March 14, 2007.
[22] BBC, *Jalal Talabani, the Kurdish politician newly inaugurated as president of Iraq, was interviewed by the BBC's Jim Muir in Baghdad*. 18 April 2005.
[23] UN News Center, *UN envoy in Iraq urges Government to eschew death penalty*, 20 August 2005.

penalty place strict restrictions on its imposition in countries which have not yet abolished it.[24]

According to Iraq's international obligations under the ICCPR, death sentences may only be imposed for the most serious crimes, understood as those with lethal or extremely grave consequences.[25]  Decree Number 3 of 2004, the Iraqi Anti Terrorism Law of November 2005 and the Kurdish Anti Terrorism Law breach this requirement by including capital offences which cannot be considered "most serious crimes" (see below). Further, the Statute of the SICT violates international standards for countries that have not abolished the death penalty, because it does not allow for commutation of sentence or pardon.[26]

## *Decree Number 3 of 2004*

Decree Number 3 of 2004[27] stipulates the restoration of the death penalty for:

* offences against the internal security of the state, including offences not resulting in fatalities (Paragraph 1 (1) and Paragraph 2 of the Decree on the basis of Articles 190-197 of the IPC)
* offences that endanger the public – including the use of germs -  resulting in fatalities (Paragraph 1 (2) on the basis of Articles 349 and 351 of the IPC)
* attacks on means of transportation resulting in fatalities (Paragraph 1 (3) of the Decree on the basis of Articles 354 and 355 of the IPC)
* premeditated murder (Paragraph 1 (4) of the Decree on the basis of Article 406 of the IPC)
* drug trafficking with the aim of financing or abetting the overthrow of the government by force (Paragraph 2 of the Decree on the basis of Article 190 of the IPC)
* abductions not resulting in death (Paragraph 3 of the Decree on the basis Articles 421-423 of the IPC)

All of the above offences are contained in the Iraqi Penal Code (IPC). Whilst several of them were already capital offences in the IPC; others only became capital offences

---

[24] The Second Optional Protocol to the ICCPR, adopted by the UN General Assembly in 1989, obliges states parties to take all necessary measures within its jurisdiction to abolish the death penalty. Iraq has acceded to the ICCPR but not signed or ratified the Protocol.

[25] Article 6 (2) of the ICCPR; Paragraph 1 of the United Nations Safeguards guaranteeing protection of the rights of those facing the death penalty (Death Penalty Safeguards).

[26] Article 6 (4) of the ICCPR; Paragraph 7 of the Death Penalty Safeguards .

[27] See Annex 1 for the text of Decree Number 3 of 8 August 2004 on the restoration of the death penalty.

as a result of Decree Number 3 of 2004, notably committing abductions not resulting in death:

- abduction in aggravating circumstances – including abductions carried out by armed persons and/or by threatening the victim with death (Article 421)
- abduction of a child under 18 years of age (Article 422)

## Death penalty for offences not resulting in death

The UN Human Rights Committee has specifically referred to a number of offences – including abduction not resulting in death – as offences which cannot be characterized as the "most serious crimes" under Article 6(2) of the International Covenant on Civil and Political Rights and has stated that the imposition of the death penalty for such an offence therefore violates that article.[28] The UN Special Rapporteur on extrajudicial, summary or arbitrary executions similarly has concluded, based on relevant UN jurisprudence, that "the death penalty can only be imposed in such a way that it complies with the stricture that it must be limited to the most serious crimes, in cases where it can be shown that there was an intention to kill which resulted in the loss of life."[29]

Besides abductions not resulting in death, Decree Number 3 of 2004 provides the death penalty for a number of other offences which, according to international standards, cannot be considered "most serious crimes". The Decree provides the death penalty for certain offences against the internal security of the state without lethal consequences. These include:

- attempted overthrow of the government by violent means (Article 190)
- damage to public property (Article 197 (1)) - including government buildings, infrastructure of the oil industry and power stations if it is aimed at the overthrow of the government.
- damage to public property where explosives have been used Article 197 (2).

According to Article 7 of Decree Number 3 of 2004, death sentences for capital offences committed before the Decree came into force would be reduced to life imprisonment.

---

[28] Concluding observations of the Human Rights Committee: Guatemala, UN document CCPR/CO/72/GTM, 27 August 2001, para. 17.
[29] Human Rights Council: Civil and Political Rights, Including the Questions of Disappearances and Summary Executions, *Advance Edited Version, Report of Special Rapporteur on extrajudicial, summary or arbitrary executions, Philip Alston*, UN document A/HRC/4/20, 29 January 2007, para 53.

## The Statute of the Supreme Iraqi Criminal Court (SICT)

The Statute of the Supreme Iraqi Criminal Court (SICT)[30] – Law Number 10 of 2005 – was promulgated by the Presidential Council on 9 October 2005 and published in the Official Gazette on 18 October 2005. The SICT was established as a special court with jurisdiction over crimes committed during the period of Saddam Hussain's government.  The law does not specifically mention the death penalty. However, Article 24 (1) of the Statue stipulates: "The penalties that shall be imposed by the court shall be those prescribed by the Iraqi Penal Code". With regard to those convicted of the crime of genocide (Article 11), crimes against humanity (Article 12) or war crimes (Article 13), the sentences of the Iraqi Penal Code (IPC) for murder and rape apply (Article 24(4). Further, Article 24 (5) stipulates that penalties for offences under Articles 11, 12 and 13, which have no counterpart in Iraqi law, shall be determined by the court taking into account the gravity of the crime as well as the individual circumstances, judicial precedents and relevant sentences issued by international criminal courts.

Thereby, the SICT is empowered to impose the death penalty on the basis of provisions in the IPC and it is entitled to determine appropriate sentences for the crime of genocide, crimes against humanity and war crimes.

## No right to pardon or commutation of sentence

The Statute is seriously deficient in that it fails to provide essential human rights safeguards for people facing a possible death sentence. Although the Iraqi Code of Criminal Procedure (CCP) allows for the imposition of the death penalty, it also provides for the possibility of commutation: Article 286 of the Iraqi CCP states that the President of the Republic of Iraq has the power to commute a death sentence or issue a pardon. The 2005 Statute did not retain this aspect of the Code, establishing that no Iraqi authority, including the President, may grant a pardon or reduce the penalties issued by the Tribunal (Article 27 (second)).[31] This provision clearly violates the International Covenant on Civil and Political Rights.[32] The UN Special Rapporteur on the independence of judges and lawyers subsequently commented "the

---

[30] An English translation of the Statute can be found on the web site of International Center for Transitional Justice (ICTJ) http://www.ictj.org/static/MENA/Iraq/iraq.statute.engtrans.pdf.

[31]

[32] Article 6(2) of the ICCPR requires that: "anyone sentenced to death shall have the right to seek pardon or commutation of the sentence. Amnesty, pardon or commutation of the sentence of death may be granted in all cases.

Tribunal's power to impose the death penalty demonstrates the extent to which it contravenes international human rights standards."[33]

## *The Iraqi Anti Terrorism Law*

On 7 November 2005 the Iraqi Transitional Government, which replaced the IIG and formed the government of Iraq from 3 May 2005 until 20 May 2006, issued Decree Number 14 of 2005, the so-called Iraqi Anti Terrorism Law.[34] This law provides only a vague definition of "terrorism" (Article 1) and lists a number of "terrorist" acts (Article 2) as well as offences against state security (Article 3). The Iraqi Anti Terrorism Law stipulates the death penalty for those convicted of conducting or participating in "terrorist" acts, as these are defined in this law (Article 4): "The *death penalty* will be the punishment of any person found guilty - as the main actor or associate - of any of the terrorist acts mentioned in Article 2 or Article 3 of this Law. The *same punishment* is reserved for the instigators, planners, financial sponsors and anyone who enables the terrorists to carry out their acts."

The Iraqi Anti Terrorism Law defines terrorism in broad and vague terms as "any criminal act carried out by an individual or an organized group, targeting an individual, a group of individuals, groups, public or private organizations, and causing damage to private or public property with the aim of undermining security and stability or national unity, or instilling fear, terror and panic in people or creating chaos in order to achieve terrorist goals."

This vague definition is particularly worrying as the law stipulates the death penalty for terrorist acts. Amnesty International is concerned that this vague definition is open to wide interpretation and abuse, and does not satisfy the requirements of legality in international law.

The UN Human Rights Committee has expressed concerns regarding legislation in other countries where the definition of capital offences was considered too vague or broad.[35]  For example, in 1993 the Committee found that the Egyptian Anti Terror Law (Law Number 97 of 1992) was in violation of Egypt's international obligations under the ICCPR. The Committee stated: "The definition of terrorism contained in that law is so broad that it encompasses a wide range of acts of differing

---

[33] Special Rapporteur of the Commission on Human Rights on the independence of judges and lawyers, Report to the General Assembly, UN Doc. A/60/321, 31 August 2005, para. 42.
[34] See Annex 2 for the text of Decree Number 14 of 7 November 2005 – the Iraqi Anti Terror Law.
[35] Human Rights Council: Civil and Political Rights, Including the Questions of Disappearances and Summary Executions, Advance Edited Version, Report of Special Rapporteur on extrajudicial, summary or arbitrary executions, Philip Alston, UN document A/HRC/4/20, 29 January 2007, para 51.

gravity. The Committee is of the opinion that the definition in question should be reviewed by the Egyptian authorities and stated much more precisely especially in view of the fact that it enlarges the number of offences which are punishable with the death penalty".[36]

## Terrorist acts – including offences without lethal consequences

The Iraqi Anti Terrorism Law lists a number of offences considered as terrorist acts (Article 2) and crimes against state security (Article 3). These include several offences for which Decree Number 3 of 2004 also provides the death penalty – including those with no lethal consequences, such as Article 2 (8) concerning abductions and Article 3 (2) concerning overthrow of the government by violent means.[37]

Extending the Iraqi Penal Code (IPC) and Decree Number 3 of 2004, the Iraqi Anti Terrorism Law prescribes not only acts of violence but threats to commit such acts. For example, Article 2 (2) defines as a capital offence "Violence or the threat of deliberately causing damage or destruction to public buildings and properties, government facilities, governmental or non governmental institutions and public services, or the attempt to occupy or seize any of those facilities or services and preventing their use for their designated purposes with the aim of disturbing public safety and security." This could potentially be used to prosecute individuals who have not used violence on account of their alleged affiliation with political opposition groups who do espouse the use of violence. Furthermore, mere affiliation with a violent political group could lead to a person being held liable for violent acts committed by the group, regardless of actual involvement in the act, and sentenced to death.

While Article 194 of the IPC provides the death penalty for leadership of armed groups and life imprisonment for membership, Article 2 (3) of the Iraqi Anti Terror Law defines as a capital offence not only the leadership of a "terrorist armed gang" but also the support and participation in its activities.

## *The Anti Terrorism Law of the Kurdish Region of Iraq*

The Kurdish parliament in Northern Iraq passed its own anti-terrorism legislation (Law Number 3 of 2006 in the Kurdish Region of Iraq) which came into force on 16 July 2006 and has effect in the area administered by the Kurdish Regional

---

[36] Human Rights Committee, Comments on Egypt, U.N. Doc. CCPR/C/79/Add.23 (1993), 9 August 1993, para 8.
[37] These articles of the ATL follow largely provisions of the Iraqi Penal Code – namely Article 421 and 190.

Government (KRG) .[38] As with the Iraqi Anti Terrorism Law, the Kurdish Anti Terrorism Law (KATL) also defines terrorism only vaguely and refers to the threat of violence as a terrorist act.

Article 1 of the KATL stipulates: "A terrorist act is the organized use of violence or the threat of use of violence or the instigation to it or the glorification of it by the perpetrator of a crime who is acting on his own or in a group and either targeting an individual, a group of individuals or groups or acting indiscriminately with the objective of spreading fear, terror, panic and chaos among the people in order to undermine the public order or to expose the well-being of the society and the region or the lives, freedoms, inviolableness or safety of people to danger (…)"

Article 2 of the KATL lists eight offences carrying the death penalty:
- Formation or leadership of a terrorist group
- Assassination for political or religious motives
- Use of explosives, poison gas, germs for terrorist objectives
- Hostage-taking in order to influence authorities or other institutions
- Killing of persons under international protection or diplomats for terrorist objectives
- Joining of a terrorist group by members of the security forces
- Cooperation with foreign states or groups in order to commit terrorist acts
- Support of terrorists – including by facilitating entry and exit into the region, by providing shelter and by providing information used for the preparation of terrorist acts

The KATL's provision of the death penalty for certain offences is in conflict with the jurisprudence and opinion of the UN's principal bodies dealing with the issue. According to the UN Special Rapporteur on extrajudicial, summary or arbitrary executions, "the death penalty can only be imposed in such a way that it complies with the stricture that it must be limited to the most serious crimes, in cases where it can be shown that there was an intention to kill which resulted in the loss of life."[39] Contrary to international standards, the KATL prescribes the death penalty for certain

---

[38] Kurdish Regional Government, News and Articles, *al-Barlaman al-kurdistani yuqirr qanun mukafaha al-irhab* (The Kurdish Parliament passes the Law to Combat Terrorism), 4 April 2006, http://www.krg.org/articles/article_detail.asp?LangNr=14&RubricNr=&ArticleNr=10237&LNNr=35&RNNr=69

[39] Human Rights Council: Civil and Political Rights, Including the Questions of Disappearances and Summary Executions, *Advance Edited Version, Report of Special Rapporteur on extrajudicial, summary or arbitrary executions, Philip Alston*, UN document A/HRC/4/20, 29 January 2007, para 53.

offences that cannot be considered to be the most serious crimes – including abduction not resulting in death.

# Post-2003 procedures and safeguards regarding the implementation of the death penalty

Capital offences may be tried in Iraq before local criminal courts, the Central Criminal Court of Iraq (CCCI) and the Supreme Iraqi Criminal Tribunal (SICT). The CCP and the IPC provide a number of safeguards and regulations with regard to the implementation of the death penalty which are applicable to local criminal courts and the CCCI – and partially to the SICT. Most of these safeguards were also applicable under the government of Saddam Hussain although they were frequently breached, particularly in cases tried before special courts.

### *No automatic or mandatory death sentence*

The UN Human Rights Committee has stated that "the automatic and mandatory imposition of the death penalty constitutes an arbitrary deprivation of life, in violation of article 6, paragraph 1, of the [International] Covenant [on Civil and Political Rights], in circumstances where the death penalty is imposed without any possibility of taking into account the defendant's personal circumstances or the circumstances of the particular offence."[40]

Under Iraqi legislation the death penalty is not automatic or mandatory for any offence. Article 132 of the IPC states: "If the court considers that the circumstances of an offence or of the offender call for leniency, it may substitute a lesser penalty for the penalty prescribed for the offence, as follows:

(1) Life imprisonment or imprisonment for a term not less than 15 years may be substituted for the death penalty (…)".

In addition, Decree Number 3 of 2004 notes in the section "Underlying reasons" at the end of the text "However, there is a chance of mitigating this punishment to life imprisonment before its execution."

---

[40] Pagdayawon Rolando v. Philippines, Views of the Human Rights Committee… Communication Number 1110/2002, UN document CCPR/C/82/D/1110/2002, 8 December 2004, para. 5.2. Article 6(1) of the International Covenant on Civil and Political Rights proclaims the right to life and forbids the arbitrary deprivation of life.

Amnesty International has obtained verdicts by the CCCI where several accused were convicted for capital offences, but sentenced to various terms of imprisonment under mitigating circumstances on the basis of Article 132.[41]

### Mandatory appeals procedure

Verdicts issued by Iraqi criminal courts may be appealed against before the Court of Cassation (CCP Article 249). However, according to CCP Article 254, criminal courts have to submit every death sentence to the Court of Cassation within 10 days. Therefore, as recommended by international standards, all death sentences issued by criminal courts are brought before the Court of Cassation, including those cases where the defendant does not file an appeal.[42] Further, criminal courts must inform those sentenced to death about the appeals procedures; these include an automatic review before the Court of Cassation as well as the right to submit an appeal before the Court of Cassation within 30 days (Article 224(d)). Death sentences are reviewed by the General Committee of the Court of Cassations which normally comprises at least 12 judges who decide by majority.[43]

The Court of Cassation may confirm or challenge both the sentence and the conviction. It may request a less severe sentence or, if challenging the conviction, may return the case for a review or retrial (Article 259).

### President's privilege to commute or pardon

Article 286 of the Iraqi CCP requires that all death sentences which have been upheld by the Court of Cassation must be submitted to the President who may decide to ratify or commute the sentence or to issue a pardon. Article 6 of Decree Number 3 of 2004 introduced an amendment to Articles 285 (b) and 286 stipulating that as an exception to the previous regulation the execution of any death sentence requires the approval of the Prime Minister in addition to the ratification by the Presidential Council.

---

[41] For example, on 10 July 2005 and in case 544/3 Jim/2005 the CCCI convicted six accused for the abduction of an 11-year-old boy - who survived the incident which occurred in November 2004 – to prison terms from 15 years of imprisonment to life imprisonment. In a similar case, on 26 July 2005 and in case 581/2 Jim/2005 the CCCI convicted two men of abduction of a boy and sentenced them based on Article 132 under mitigating circumstances to life imprisonment.

[42] See UN Economic and Social Council resolution 1984/50 of 25 May 1984, Safeguards guaranteeing protection of the rights of those facing the death penalty, Safeguard 6. In resolution 1989/64, adopted on 24 May 1989, the UN Economic and Social Council recommended that UN member states provide for "mandatory appeals or review with provisions for clemency or pardon in all cases of capital offence".

[43] Amnesty International obtained copies of several reviews of death penalty cases by the Federal Court of Cassation; the number of judges involved in each of these reviews ranged from 17 to 21.

### Exclusion of child offenders from the death penalty

Under Iraq's international obligations – namely Article 6(5) of the International Covenant on Civil and Political Rights and Article 37(a) of the Convention on the Rights of the Child - child offenders may not be sentenced to death.[44]

According to the IPC young people and children may not be sentenced to death. The maximum punishment for a child offender aged between 7 and 14 is five years' confinement in a correctional institution (Article 72); for a juvenile offender aged between 15 and 17 it is 15 years' confinement in a correctional institution (Article 73(1); and for young people between 18 and 19 years of age at the time of committing the offence it is life imprisonment (Article 79).

However, in Iraq's fourth periodic report to the UN Human Rights Committee, the government reported that provisions of Article 79 of the IPC had been amended by Revolutionary Command Council Decree Number 86 of 25 July 1994 to provide that offenders aged 18 to 19 years may be sentenced to death if there are no mitigating circumstances.[45]

### No executions of pregnant women and mothers with infants

International standards exclude the execution of pregnant women and new mothers.[46] According to Article 287 of the CCP, a pregnant prisoner may not be executed; she may only be executed four months after giving birth.

### The Execution

The CCP provides that no executions are carried out on official public holidays (Article 290). Prisoners on death row are entitled to be visited by their relatives on the day before the execution is scheduled (Article 291). Executions in Iraq are conducted by hanging and in the presence of a judge, a prosecutor (if available), a representative of the Ministry of Interior, the prison director, a physician and upon request the lawyer of the accused (Article 288).

---

[44] Iraq ratified the ICCPR on 25 January 1971 and acceded to the CRC on 15 June 1994.
[45] UN document: CCPR/C/103/Add.2, para. 30 (1996).
[46] See UN Economic and Social Council resolution 1984/50 of 25 May 1984, Safeguards guaranteeing protection of the rights of those facing the death penalty, Safeguard 3.

# Death sentences by the Central Criminal Court (CCCI) and unfair trial concerns

The establishment of the Central Criminal Court of Iraq (CCCI) was announced by the Coalition Provisional Authority in June 2003 and more detailed regulations were issued by CPA Order Number 13 of 22 April 2004. Judges of the CCCI were initially appointed by the CPA Administrator, US diplomat Paul Bremer, who also had the power to remove judges under certain conditions. Since the handover of power at the end of June 2004, the appointment and removal of judges follows ordinary procedures of Iraqi law (CPA Order Number 13 of 22 April, Section 5). Further, the order provides for certain conditions which judges of the CCCI have to meet, including being an Iraqi national and not having been a member of the Ba'ath Party in a leadership position.

With regard to the jurisdiction of the CCCI, CPA Order Number 13 provides that the CCCI should concentrate on certain cases – including those related to terrorism, organized crime, government corruption and violence based on race, nationality, ethnicity or religion.[47] Further, the order stipulates that "The decision of the CCCI to take jurisdiction of a case will end all local courts jurisdiction over such case".[48] The CCCI was established in Baghdad and later opened branches in other governorates.[49] Cases at the CCCI are generally tried before a bench of three judges.

From mid-April 2004 until early January 2007 more than 1,800 detainees held by the MNF were tried before the CCCI resulting in over 1,500 convictions.[50] Since the reinstatement of the death penalty in August 2004, dozens of people have been sentenced to death by the CCCI, increasingly for offences under the Anti Terrorism Law of November 2005. In mid-March 2007, the MNF held at least 17 people who had been sentenced to death by the CCCI. According to Amnesty International's information, at the time of writing none had been executed.

Due to the precarious security situation in Iraq, Amnesty International was not able to attend hearings before the Central Criminal Court of Iraq (CCCI). However, in

---

[47] CPA Order Number 13 of 22 April 2004, Section 18 (2).
[48] CPA Order Number 13 of 22 April 2004, Section 18 (6).
[49] Azzaman, *Tashkil mahkamtain markaziyatain fi Wasat wa Babil li-l-nathir  fi qadaya al-irhab* (Establishment of two central courts in Wasat and in Babel to look at cases of terrorism), 14 May 2005.
[50] MNF, *CCCI convicts 48 insurgents*, 3 January 2007.

researching this report Amnesty International has examined hundreds of verdicts issued by the CCCI in 2005 and 2006.[51] These verdicts included cases concerning 43 individuals who were charged with capital offences; 22 of them were sentenced to death, 16 were sentenced to imprisonment and five were released. These 22 death sentences represent only a fraction of more than 250 death sentences issued by the CCCI since 2004.

Amnesty International has been able to obtain only limited information on capital offences tried before local criminal courts in Iraq. For example, in July 2004 it was reported that a court in Kerbala had sentenced three men to death – before the death penalty was reinstated.[52] On 11 September 2005, three men were sentenced to death for murder by a criminal court of the governorate of Babel.[53]

Amnesty International does not take a position on the guilt or innocence of the defendants whose cases are cited in this report. The organization's concerns focus on the issues of due process of law and whether the administration of the death penalty was in violation of international laws and standards pertaining to the death penalty. The UN Human Rights Committee, which monitors states parties' compliance with the ICCPR, has repeatedly stated that it is imperative that in death penalty cases the procedural guarantees in the ICCPR be observed, including the right to a fair hearing by an independent tribunal, minimum guarantees for the defence and the right to review by a higher tribunal.[54]

---

[51] At the time of writing, Amnesty International had learned of death sentences of six individuals having been issued by the CCCI during the first three months of 2007 (MNF, *CCCI convicts 48 insurgents*, 3 January 2007; Amnesty International, *Urgent Action, Iraq: Death penalty/Fear of imminent execution*, 9 February 2007, AI Index: MDE 14/005/2007; MNF, CCCI convicts 13 insurgents, 14 February 2007; Amnesty International, *Urgent Action: Iraq; Death penalty/ Fear of imminent execution: Muhannad Hamza Matar* , 12 March 2007, AI Index MDE 14/012/2007; MNF, CCCI convicts 23 insurgents, 16 March 2007.) The organization has so far not been able to obtain verdicts in these cases.

[52] AFP, *Three Iraqis condemned to death even before capital punishment ban lifted,* 10 July 2004. This sentence was in violation of Iraqi law. Amnesty has no information whether or not the verdict was annulled.

[53] Amnesty International obtained a copy of the initial verdict, but has no further information on the developments in that case.

[54] Human Rights Committee, General Comment 6 (on Article 6, the right to life), para. 7.

## "Confessions" of capital offences broadcast on television – violation of presumption of innocence

Amnesty International examined the cases of a number of accused who were forced to make televised "confessions" which they later withdrew: some were subsequently acquitted, others were sentenced to death and several were executed.

In 2005 Iraqi television stations showed scores of people giving self-incriminating testimony while held in pre-trial detention. This practice is severely prejudicial to a fair judicial process. A confession admitting guilt is one of the most powerful pieces of evidence against any individual accused of a serious crime. Amnesty International is concerned that the Iraqi authorities authorised the participation of the public and courts in viewing the confessions before they were examined under due legal process.

A regular programme on the al-Iraqiya television channel called "Terrorism in the Grip of Justice" frequently broadcast "confessions" by detainees who admitted to a variety of capital offences, including membership of an armed group, premeditated murder, abduction and rape. Tapes of the confessions were provided by the Iraqi authorities[55] and a high-ranking officer of the special police force, the Wolf Brigade, was a prominent presenter of that programme.[56] "Confessions" of pre-trial detainees in Iraq were also broadcast on other TV stations such as Kurdistan TV and the United Arab Emirates-based Iraqi TV stations al-Fayhaa and al-'Arabiya.[57]

Such televised "confessions" were criticised by international human rights organizations as well as by Iraqi organizations and individuals. In April 2005 Amnesty International criticised the televised "confessions" as an "alarming development" and expressed concerns that some detainees showed signs of torture or ill-treatment.[58]  In April 2005 the Iraqi Bar Association issued a report following a

---

[55] Boston Globe, Thanassis Cambanis, *Confessions rivet Iraqis*, 18 March 2005.

[56] Major General Muhammad Qureishi (frequently referred to as "Abu Walid"), a commander of the Wolf Brigade under the control of the Interior Ministry, was a prominent presenter of the TV-programme  "Terrorism in the Grip of Justice"(Christian Science Monitor, Neil MacDonald, *Iraqi reality-TV hit takes fear factor to another level*, 7 June 2005.)

[57] A non-comprehensive archive with "confessions" of 28 detainees in Iraq broadcast during the period January – April and August 2005 has been stored by The Middle East Media Research Institute under http://memritv.org. "Confessions" of 15 other detainees broadcasted on al-Iraqiya TV in May 2005 were been summarized by the BBC: *al-Iraqiya TV shows terror suspect "confessing" under questioning*, 12 May 2005, and Iraqi TV airs five episodes "confessions" by terror suspects, 5 June 2005.

[58] Amnesty International: USA/IRAQ: *Abuses without accountability a year after Abu Ghraib*, 28 April 2005. Human Rights Watch expressed similar concerns about the televised "confessions" in an

research visit to Mosul (Ninawa Governorate) where numerous "confessions" had been recorded. The report criticized the practice of showing these on television, claiming that many of them had been extracted under coercion.[59]

Statements by Iraqi officials reveal different views concerning the broadcasting of "confessions" on television. In March 2005 then Iraqi Minister of Human Rights defended the practice, saying: "These programmes have had a sobering effect on people (…) they show that our forces are making a difference".[60]

At the end of August 2005 the official spokesperson for the Iraqi government, Layth Kubbah, said that broadcasting detainees' "confessions" was illegal.[61] Regular showings of "confessions" on Iraqi TV reportedly stopped in the second half of 2005. However, many detainees were still tried by the CCCI months after their "confessions" had been broadcast.

Amnesty International is concerned that the television broadcasting of self-incriminating testimony of pre-trial detainees violated their right to a fair trial. According to Iraq's international obligation under Article 14 (2) of the International Covenant on Civil and Political Rights, "Everyone charged with a criminal offence has the right to be presumed innocent until proven guilty according to the law."[62] Scores of pre-trial detainees were presented to a large audience as perpetrators of crimes for which they had not been convicted.

---

On 24 February 2005 **Shqair Farid Shait**, a police officer, appeared on al-Iraqiya TV claiming responsibility for the killing of 36 people: including the killing and rape of several women.[63] His "confession" and those of others, including other police officers, some of whom claimed to have committed rape and killing with him, were also broadcast on other TV stations.[64] In March 2005 an Iraqi newspaper referred to Shqair Farid Shait as who - according to a high-ranking officer of a special police

---

interview (*Washington Post*, Caryle Murphy and Khalid Saffar,  *Actors in the Insurgency Are Reluctant TV Stars*, 5 April 2005).
[59] Niqabat al-Muhamiyin: *Taqrir Ayfad al-Musul* (Bar Association: Report of the Mosul Delegation), http://darbabl.net/artciles/article102.htm.
[60] AFP, *Trying and shaming insurgents on prime time Iraqi TV*, 14 March 2005.
[61] BBC, *Iraqi spokesman says detainees' "confessions" broadcast by TV unlawful*, 24 August 2005.
[62] See also Universal Declaration of Human Rights, Article 11.
[63] MEMRI TV, *Iraqi Policemen Who Joined a Terrorist Squad Tell of Murders and Rapes*, http://www.memritv.org/Transcript.asp?P1=582.
[64] For example on about 24 February 2005 on the local Ninawa Governorate TV station.

forces unit[65] under the control of the Interior Ministry - made further "confessions" of killing 113 people.[66]

The presentation of Shqair Farid Shait's "confession" on an Iraqi TV programme in close collaboration with Iraqi authorities and comments by Iraqi officials about his subsequent "confessions" prior to his trial and conviction violated his right to be presumed innocent as guaranteed under international human rights law.[67]

On 16 August 2005 Shqair Farid Shait, Sizar Khidr 'Ali and Ahmad Muhammad Ramadhan were referred to trial under charges of premeditated murder of two men.  The Central Criminal Court of Iraq noted in its verdict of 9 September 2005 that the accused had been identified by a relative of the victims who came forward after he had watched Shqair Farid Shait's "confession" on TV. However, Amnesty International fears that this evidence may be unreliable.

The court further noted that the three men had confessed to the charges before an investigator and the investigating judge but withdrew their confessions before the court. Nevertheless, in its decision to sentence the three men to death, the court referred to their withdrawn confessions as part of the evidence.

Shqair Farid Shait's lawyer was quoted as saying that "the accused was sentenced for his name and not on the basis of sufficient evidence against him. This is due to the mobilization of the public opinion (…) – in particular when the Iraqi TV channels Ninawa and al-Iraqiya broadcasted his confessions before he was charged (…)".[68] The lawyer was further quoted as having claimed that Shqair Farid Shait had made his confessions under torture.

---

[65] The officer was referred to as "Abu Walid" from the Wolf Brigade. Major General Muhammad Qureishi, a commander of the Wolf Brigade who also presented confessions of alleged terrorist on TV, is popularly known as "Abu Walid".

[66] Al-Mada, *Fi dau' I'tirafat al-irhabiyin bi al-mosul al-mulazim shurta yu'akid irtikabihi 113 jarima qatl bi nafsihi* (In the light of the confessions of terrorists in Mosul, the police officer confesses to the killings of 113 by himself), 12 March 2005, http://www.almadapaper.com/sub/03-338/p03.htm#3.

[67] As stated above: According to Article 14 (2) of the ICCPR to which Iraq is a state member: "Everyone charged with a criminal offence has the right to be presumed innocent until proven guilty according to the law".

[68] Al-Iraqnews, *Isdal al-sitar fi qadiya Shqair and Sizar* (Closing of the curtains in the case of Shqair and Sizar), posted on 25 September 2005,
http://www.aliraqnews.com/modules/news/article.php?storyid=1057.

> Shqair Farid Shait was reportedly executed together with 12 others who were not named on 9 March 2006. Amnesty International has no information as to whether or not Sizar Khidr 'Ali and Ahmad Muhammad Ramadhan are still alive.

## Releasing detainees who "confessed" on TV to capital offences

Decisions by Iraqi courts to release defendants despite their televised "confessions" to capital offences have confirmed the dangerous nature of such TV programmes and their damaging effect with regard to a fair legal process.

The "confessions" of four Palestinian residents of Iraq claiming responsibility for bomb attacks in Baghdad were broadcast on 14 May 2005 on al-Iraqiya TV. However, approximately one year later the Central Criminal Court of Iraq decided to release them because there was no reliable evidence of their involvement in criminal acts. The four - Faraj, 'Adnan and Amir 'Abdullah Mulhim and Mas'ud Nur al-Din al-Mahdi – had been seized on 12 May 2005, when Wolf Brigade forces of the Interior Ministry stormed homes in the Baladiyat Palestinian Building in Baladiyat Camp in Baghdad.

Relatives who saw their appearance on television told Amnesty International that the four men had injuries to their faces suggesting that they had been tortured or ill-treated. When the men were allowed to see a lawyer in July 2005 they retracted their confessions and alleged that they had been systematically tortured for 27 days while being held by the Wolf Brigade in a Ministry of Interior building in the al-Ziyouna district of Baghdad. They said that they had been beaten with cables and had electric shocks applied to their hands, wrists, fingers, ankles and feet. They also said they were burned on the face with lighted cigarettes and placed in a room with water on the floor through which an electric current was passed.

In October 2005 Amnesty International issued an appeal to the Iraqi authorities urging that an independent investigation into the torture allegations of the four Palestinians be carried out immediately and for any confession extracted under torture not to be used as evidence in court.[69] By the beginning of 2007, the organization had not received any information suggesting that investigations were being conducted.

Another example of a televised "confession" where the detainee was later released without being charged is the case of Khalida Zakiya, a 46-year-old woman

---

[69] Amnesty International, *Urgent Action, Iraq, Fear of torture/Fear of unfair trial*, AI Index: MDE 14/042/2005, 28 October 2005.

from Mosul. She was shown in February 2005 on al-'Iraqiya alleging that she had supported an armed group. However, she later withdrew her "confession" and alleged that she had been coerced into making it while in a detention facility under the control of the Iraqi Interior Ministry. She was reportedly whipped with a cable by members of the Wolf Brigade and threatened with sexual abuse.[70]

According to media reports a prosecutor in Mosul stated in November 2005 that "the confessions which were shown on television have been stained with doubt and suspicion, because marks of torture were apparent on the detainees' faces.[71]

Amnesty International is concerned that the Iraqi authorities failed to ensure that thorough and impartial investigations were conducted into numerous allegations of torture or ill-treatment of detainees whose "confessions" had been shown on TV.

## Coercion and confession

There have been numerous reports about widespread and systematic torture or ill-treatment of people held in Iraqi detention since the US-led invasion of Iraq in 2003.[72] In the vast majority of incidents perpetrators have acted with total impunity. In some high profile cases the Iraqi authorities have announced an investigation into allegations of torture. For example, at the time of writing no findings had been made public of investigations launched in 2005 into alleged human rights violations in an Interior Ministry detention centre in the al-Jadiriyah district of Baghdad. US military forces had raided the detention centre in November 2005 and reportedly found at least 168 detainees in appalling conditions, many of whom had allegedly been tortured.

According to Article 123 of the CCP, detainees must be brought before an investigating judge within 24 hours of their arrest. If implemented, this provision would constitute an important safeguard for detainees against the risk of torture and ill-treatment, which is particularly high during the initial period in police detention or in other detention centres under the control of the security forces. However, in reality

---

[70] Associated Press, Mariam Fam, *Iraqis Say Security Forces Use Torture*, 6 July 2005; Los Angeles Times, Solomon Moore and Scott Gold, National Guard tied to Iraqi police, 28 July 2005.
[71] Al-Hayat, *Al-mud'i al-'am fi al-mosul yutalib bi muqadah qada liwa' al-dib* (The prosecutor in Mosul calls for a trial of commanders of the Wolf Brigade), 9 November 2005; Al-Anjah al-Akhir, *Al-mud'i al-'am fi al-mosul yutalib bi muqadah qada liwa' al-dib* (The prosecutor in Mosul calls for a trial of commanders of the Wolf Brigade), 12 November 2005, http://www.iraqirabita.org/index3.php?do=article&id=2647.
[72] For example: Human Rights Watch, *The New Iraq? Torture and ill-treatment of detainees in Iraqi custody*, January 2005, Vol.17, No 1; Amnesty International, *Beyond Abu Ghraib: detention and torture in Iraq,* 6 March 2006, AI Index: MDE 14/001/2006.

the provision is frequently breached and many detainees are held for days or weeks in detention before being seen by an investigating judge.

Iraqi legislation provides that initial investigations into criminal offences are generally conducted by an investigating judge or by investigators acting under his or her supervision (Article 51 of the CCP). Within the Iraqi legal system, it is the responsibility of the investigating judge[73] to gather evidence, including interviewing witnesses and suspected detainees, and on that basis to decide whether a detainee is to be released or referred to trial (Articles 130 and 131 of the CCP).

However, it appears that in practice many detainees – in particular those suspected of capital offences - make their first "confession" while interrogated at police stations or other detention centres under the control of the Ministry of Interior. Detainees who have confessed to offences at a police station – including those who confessed as a result of torture or ill-treatment - are frequently escorted by staff of that police station to their first appearance before an investigating judge. Amnesty International is concerned that in such circumstances detainees may have feared further torture or ill-treatment by police or other security forces and therefore, may have reiterated their previous "confession" in front of the investigating judge. Lawyers with clients before the CCCI have told Amnesty International that confessions made before the investigating judge are considered by the court as weighty evidence.

Amnesty International is concerned that self-incriminating testimony of detainees who later claimed that it was coerced has been used as evidence against them in court.  Various international standards contain a prohibition on the use of statements gained through torture or ill-treatment in any proceedings, except against a person accused of responsibility for torture or other ill-treatment. For example, in General Comment No 20 on the ICCPR, the UN Human Rights Committee stated: "It is important for the discouragement of violations under Article 7 that the law must prohibit the use of admissibility in judicial proceedings of statements or confessions obtained through torture or other prohibited treatment."[74]

According to Article 35 (C) of the Iraqi Constitution, adopted on 15 October 2005, "All forms of psychological and physical torture and inhumane treatment shall be prohibited. Any confession coerced by force, threat, or torture shall not be relied

---

[73] Investigating judges gather evidence during the pre-trial period, but are not members of the court panel deciding on cases which have been referred to court.
[74] General Comment Number 20 on Article 7 (1992), UN Doc. A/47/40

on."[75] In addition Article 127 of the Iraqi Code of Criminal Procedure (CCP) stipulates that "it is not allowed to use any illegal means to influence the detainee for making a confession. As illegal means are considered ill-treatment or the threat of inflicting pain (…)". However, the CCP does not specifically prohibit the use of testimony obtained under coercion as evidence in court.

**'Amar 'Ubaid Kassar** was detained at the end of April 2005. His court files show that he confessed to affiliation with an armed group, a capital offence, during an interrogation session at the police station of the city of al-Musaib, in the governorate of Babel. On or about 24 May 2005 he was brought before the investigating judge in al-Musaib where he withdrew his confession claiming that he had been subjected to torture. However, on 8 June 2005 'Amar 'Ubaid Kassar was brought before an investigating judge and prosecutor in al-Hilla, the capital of the Babel governorate, where he confessed to links with an armed groups and detonating explosives.

A report issued on 19 July 2005 by the Forensic Medical Institute of Babel reportedly noted scars on his body including on the back of his left forearm.[76] In its verdict the CCCI of Babel made reference to testimony which 'Amar 'Ubaid Kassar had given in relation to another trial before the same court in which he stated that he had been injured before being detained.

'Amar 'Ubaid Kassar was tried under Article 194 of the IPC on charges concerning leadership or formation of an armed group but he was not accused of having caused any deaths. On 28 December 2006 the CCCI of Babel sentenced him to death stating that the details about detonations of explosives which 'Amar 'Ubaid Kassar had provided in his confessions could only have been known by the perpetrator.[77] At the time of writing, the Court of Cassation had yet to decide about the appeal.

---

[75] Before the adoption of the constitution coerced confessions were banned as evidence under the Law of Administration for the State of Iraq for the Transitional Period of 8 March 2004, Article 15/J "Torture in all its forms, physical or mental, shall be prohibited under all circumstances, as shall be cruel, inhuman, or degrading treatment. No confession made under compulsion, torture, or threat thereof shall be relied upon or admitted into evidence for any reason in any proceeding, whether criminal or otherwise."

[76] It is not clear from the verdict whether the forensic examination was conducted with regard to 'Amar 'Ubaid Kassar's torture allegation or in order to establish his alleged involvement in the detonation of explosives.

[77] The verdict does not refer to any other evidence than testimony of the accused – including his confessions - and the forensic medical examination.

Tahsin Ali Matar was also sentenced to death on the basis of an allegedly coerced "confession":

> On 25 May 2005 the Central Criminal Court of Iraq (CCCI) in Babel sentenced **Tahsin Ali Matar** to death in connection with the killing of two brothers on 2 January 2005. The verdict notes that relatives of the killed men filed a case against Tahsin Ali Matar on 24 March 2005 following the broadcasting of his "confession" on Iraqi TV. In its verdict the CCCI did not refer to any evidence linking Tahsin Ali Matar to the killing except his initial confessions before an investigator followed by a further confession before the investigating judge in early March 2005.[78] However, the court noted that the accused withdrew his confessions to the killing before the CCCI alleging that it was untrue and extracted under torture.
>
> When the court challenged Tahsin Ali Matar's withdrawal of his confessions asking how he knew the details of the incident, he claimed that he had heard these from people living in the neighbourhood. Despite the withdrawal of his pre-trial confessions, the court decided that they were convincing because they provided details about the killing which only the perpetrator could know.
>
> There is nothing in the verdict which suggests that Tahsin Ali Matar's torture allegations were investigated. This is especially important since, given the above, the whole conviction rests upon the confession. If the confession was extracted under torture, those responsible would have access to details about the crime which they could have "fed" to the accused, thereby giving them the appearance of first hand knowledge of the crime.
>
> On 25 May 2005 Amnesty International issued an appeal to the Iraqi authorities concerning the death sentence of Tahsin Ali Matar urging that the sentence be commuted.[79] However, on 31 October 2005 the Federal Court of Cassation confirmed the death sentence. Amnesty International has no information as to whether or not Tahsin Ali Matar is still alive.

## No adequate defence

Despite guarantees in Iraqi legislation for the right of access to legal counsel in pre-trial proceedings and at court, in practice many detainees or accused were not

---

[78] Other evidence than the confession referred in the verdict includes an examination of the injuries of one of the killed victims and the death certificate. However, the verdict also notes restrictions on the investigations due to the security situation.

[79] Amnesty International, *Urgent Action, Iraq, Death Penalty/Fear of imminent execution*, AI Index: MDE 14/014/2005, 15 May 2005.

provided with adequate protection or expertise by their lawyers. The *New York Times* published an article in December 2006 where severe shortcomings in several hearings before the CCCI were observed – including the right to an adequate defence.[80]

Every person accused before a court has the right to be represented by a legal counsel. This right is recognized in Article 19(4) of the Iraqi Constitution of October 2005: "The right to a defence shall be sacred and guaranteed in all phases of investigation and trial." An amendment to Article 123 of the CCP provides for the right to be represented by a legal counsel when being questioned during the pre-trial period, including the right to have a court-appointed legal counsel free of charge, if the detainee is not able to afford legal counsel. Further, Iraqi authorities have to inform detainees about their rights with regard to legal counsel before questioning.[81] If a person tried before a criminal court has no legal counsel, he or she will be represented by a court-appointed lawyer free of charge (Article 144 of the CCP).

The US Department of State recently summarized the main shortcomings in Iraqi courts as follows: "Defense attorneys were theoretically provided, but detainees rarely had access to them before the initial judicial hearing, often for security reasons. Many detainees met their lawyers for the first time during the initial hearing. Defense attorneys rarely played a substantive role in the trials or hearings".[82]

Article 14 of the International Covenant on Civil and Political Rights (ICCPR) includes a number of rights aimed at ensuring a proper defence: adequate time and preparation; the right to legal assistance and to communicate with counsel of the defendant's choosing; the right to free legal assistance for defendants unable to pay; and the right to examine witnesses for the prosecution and to present witnesses for the defence.

In resolution 1989/64, adopted on 24 May 1989, the UN Economic and Social Council recommended that UN member states strengthen further the rights for an adequate defence of those facing the death penalty by "(a)ffording special protection to persons facing charges for which the death penalty is provided by allowing time and facilities for the preparation of their defence, including the adequate assistance of

---

[80] New York Times, Michael Moss, *Iraq's Legal System Staggers Beneath the Weight of War*, 17 December 2006.
[81] Coalition Provisional Authority Memorandum Number 3, *Criminal Procedures*, Section 3, 27 June 2004.
[82] US Department of State, *Iraq - Country Reports on Human Rights Practices*, 6 March 2007, chapter 1.e. Denial of Fair Public Trial .

counsel at every stage of the proceedings, above and beyond the protection afforded in non-capital cases".

Many of those tried before the CCCI and accused of capital offences and their relatives are not able to afford to pay for defence counsel of their choice and are represented by a lawyer appointed by the court. The system of allocation of court-appointed lawyers in cases tried before the CCCI frequently works to the disadvantage of the accused. For example, it appears to be common practice that a court-appointed lawyer who attended the questioning of a person before the investigating judge will not continue to work on the case.

In addition, it is often difficult for the accused or his relatives to identify an expert lawyer in criminal law who is prepared to defend people accused of capital offences – including "terrorism"-related acts. Several lawyers who have defended such clients have reported that they frequently face threats. One lawyer showed Amnesty International a text messages he had received in January 2007 in which he was called a traitor. The lawyer further said that he had been advised by contacts within the security forces that he should stop defending so-called "terror cases".[83] Another lawyer told Amnesty International about an arson attack on his office in Baghdad in summer 2006. Following the incident as a security measure he sent his family to live in the countryside. However, he subsequently decided to refrain from working on cases at the CCCI because of the risks involved.[84]

---

**Shihab Ahmad Khalaf** was arrested on 30 January 2005 by US and Iraqi forces at the al-Saberin mosque in the northern city of Mosul. He had been a Colonel in the Iraqi army while Saddam Hussain was in power and had fled Iraq with his family just before the 1991 Gulf War, returning in October 2003. A number of other people suspected of involvement in "terrorist acts", including **'Abdullah Kelana**, were reportedly arrested with him. For the first seven months of his detention Shihab Ahmad Khalaf reportedly had no access to a lawyer of his choice.[85]

During interrogation Shihab Ahmad Khalaf was reportedly beaten with cables and forced to confess to being a leading member of a terrorist group. On 23 February he appeared on al-Iraqiyya television programme "Terrorism in the Grip of Justice" claiming that he had been approached by 'Abdullah Kelana in 2001 who had sent him

---

[83] Interview, 3 March 2007, Amman.
[84] Interview, 11 March 2007, Amman.
[85] Amnesty International has no information as to whether or not a court-appointed lawyer was present when Shihab Ahmad Khalaf was brought before the investigating judge.

to Islamabad, Pakistan, for training in fighting the US forces. He further claimed that he later received training and instructions by Syrian intelligence officers.[86]

Shihab Ahmad Khalaf was brought before an investigative judge in Baghdad in March 2005. He denied the charges and said that he had confessed under duress. The judge reportedly ordered further investigation into the case. When he was brought before the same judge at the end of that month, Shihab Ahmad Khalaf was asked to sign a confession. He was not allowed to consult with lawyers until the end of September 2005. The first court hearing was scheduled to take place on 11 October 2005, but was postponed several times and eventually took place on 23 November 2005.

During the court session Shihab Ahmad Khalaf reportedly told the judge that he had confessed after the investigator threatened to assault his wife and tortured him into a coerced "confession". His lawyers reportedly presented documents at court proving that he had been in the Netherlands at a time when he was accused of having received training in Pakistan. The judge, however, reportedly refused to accept the documents, or to consider a request by the lawyers to seek help from the Iraqi Foreign Affairs Ministry to confirm Shihab Ahmad Khalaf's whereabouts in 2001.

The trial of Shihab Ahmad Khalaf and 'Abdullah Kelana lasted only lasted 45 minutes and ended with the Iraqi Central Criminal Court sentencing both to death for leadership of an armed group under Article 194 of the IPC. The charges included "threatening security and stability, formation of armed groups and using cars for the purpose of bomb attacks".

The case was referred to the Federal Court of Cassation, which upheld the death sentences, and passed them to the Presidential Council for ratification. On 24 May 2006 Amnesty International appealed to the Iraqi authorities not to execute the men.[87] Shihab Ahmad Khalaf's family were able to speak to him by telephone in September 2006. When they have tried to contact him since then, however, they have been told that he has been transferred to another prison, and given no further information. At the time of writing, Amnesty International had no further information concerning the fate of Shihab Ahmad Khalaf's and 'Abdullah Kelana.

---

[86] MEMRI TV, *Top Iraqi Terrorist Shihab Al-Sab'awi Tells of His Training in Syria and Activity in Iraq*, http://www.memritv.org/Transcript.asp?P1=573.
[87] Amnesty International, *Urgent Action, Iraq: Death penalty/fear of imminent execution*, 24 May 2006, AI Index: MDE 14/023/2006).

### *Death sentences for alleged abductions not resulting in death*

The UN Human Rights Committee has specifically referred to "abductions not resulting in death" as offences which cannot be characterized as the "most serious crimes" under Article 6(2) of the International Covenant on Civil and Political Rights and that the imposition of the death penalty for such an offence therefore violates that article.[88]

According to media reports, between August and November 2006 nine people were sentenced by the CCCI to death for abduction not resulting in death.[89] Among them were Muhammad Munaf Muhammad al-Amin, a US-Iraqi citizen, his brother Yusuf Munaf Muhammad al-Amin, and four others[90] convicted for their alleged involvement in the abduction in Iraq of three Romanian journalists in March 2005.

**Muhammad Munaf Muhammad al-Amin** was born in Iraq and emigrated to the USA in 1990. In 2001 he moved to Romania with his Romanian wife and three children. He accompanied the three kidnapped Romanian journalists to Iraq, acting as a guide and interpreter. The journalists were held for two months before being released unharmed during a military rescue operation in May 2005. Muhammad Munaf Muhammad al-Amin was arrested following the rescue operation, and was accused of posing as a kidnap victim and of involvement in the kidnapping plot. His brother, Yusuf Munaf Muhammad al-Amin, and at least three of the other accused were detained in early April 2005 while the hostages were still being held.

Muhammad Munaf Muhammad al-Amin is alleged to have made statements at preliminary hearings admitting to participating in the kidnapping but he retracted his

---

[88] Concluding observations of the Human Rights Committee: Guatemala, UN document CCPR/CO/72/GTM, 27 August 2001, para. 17.

[89] Azzaman (www.azzaman.com), *Al-mahkama al-jina'iya tusdir ahkaman bi-l-i'dam wa al-sijn l-'iraqiyin wa ajanib* (The criminal court sentences Iraqis and foreigners to death and imprisonment), 1 August 2006; Azzaman, *Sa'udiyan ya'biran al-hudud ila al-'iraq – al-jina'iya al-markaziya tudin 13 muttahaman wa tusdir hukmain bi-l-i'dam* (2 Saudis cross the boarder into Iraq – The central criminal court sentences 13 defendants and issued 2 death sentences), 27 August 2006; Azzaman (no title), 26 September 2006; MNF Combined Press Information Center, *CCCI convicts 27 insurgents: Five sentenced to death, two sentenced to 15 years imprisonment*, 18 October 2006; MNF Combined Press Information Center, *CCCI convicts 27 insurgents: Five sentenced to death, two sentenced to 15 years imprisonment*, 18 October 2006; Azzaman, *Majlis al-qada': al-i'dam li-muttaham khatf tiflan fi hay al-andalus* (Judicial Council: Death sentence for accused of abduction of a child in the Al-Andalus district), 20 November 2006.

[90] The names of the four other accused are Salam Hikmat Mohammad Farhan al-Qassir, 'Abd al-Jabbar 'Abbas Jasim al-Salman, 'Omar Jasim Mohammad 'Ali al-Salman, Ibrahim Yassin Kadhim Hussain al-Jibouri.

confession at trial, claiming that it was made after threats of violence and sexual assault were made against him and his family. Three of the other accused were reportedly tortured with electric shocks and beatings with cables during the first weeks after their detention in April 2005. Amnesty International has learned that the Forensic Medical Institute in Baghdad issued a report on the examination of at least one of the accused. However, the examination was conducted on 1 June 2006, more than a year after the detention. The examination found several physical marks from injuries which had occurred more than six months previously but was not able to provide conclusive evidence as to the causes.

The trial on 12 October 2006 before the CCCI considered the case of all six defendants at the same hearing and is reported to have lasted about one hour. During the trial hearing some of the accused reportedly showed marks on their bodies which they alleged had been caused by torture or ill-treatment. All six were sentenced to death on charges of abduction. Amnesty International issued an appeal to the Iraqi authorities against the sentences.[91]

Mohammad Munaf Muhammad al-Amin has been in US custody in Iraq since his capture in May 2005, under an agreement which allows pre-trial detainees awaiting criminal prosecution in Iraqi courts to be held in detention centres run by the Multinational Force (MNF). At the time of writing he has a habeas corpus application pending before the US courts, challenging the lawfulness of his detention and seeking a temporary restraining order to stay his transfer to Iraqi custody; although a US district court has ruled that the US courts have no jurisdiction in cases still under appeal.

At the time of writing, Yusuf Munaf Muhammad al-Amin and the four others were held in Iraqi custody whilst their appeal case had yet to be decided by the Court of Cassation.

## Appeals before the Court of Cassation

Although any person convicted for a criminal offence has the right to appeal against his or her conviction and sentence before the Court of Cassation within 30 days after the verdict, for many people sentenced to death in Iraq no appeals may be filed through their legal counsel. In these cases the Court of Cassation will generally have to base its review of the verdict on the court dossiers.

---

[91] Amnesty International, *Urgent Action, Iraq: Death penalty/torture/legal concern*, 24 October 2006, AI Index: MDE 14/035/2006.

Amnesty International is particularly concerned that no appeals may be filed in the cases of many who have been sentenced to death and who have been represented by a court-appointed lawyer. However, even where the accused has been able to hire a lawyer of his own choosing, Amnesty International has been informed about serious obstructions regarding the preparation of appeal cases. One lawyer whose client was sentenced to death by the CCCI in April 2006 on charges of leadership of an armed group told Amnesty International that he met the accused for the first time during the only court session in the trial when he was not allowed to talk to him. He was not able to meet his client for several months after the verdict and was therefore forced to prepare the appeal without being able to consult him.[92]

## Court of Cassation demands increase from life sentence to death sentence

Muhannad Hamza Matar was sentenced to death by the CCCI of the governorate of Babel on 21 November 2006. He was one of five men detained in March 2005, in the town of al-Hilla, south of Baghdad, in connection with the killing of a police officer.

The officer had been shot dead from a car in the al-Mashru'a district of al-Hilla. Muhannad Hamza Matar reportedly confessed to the killing during the initial police investigation, and later before an investigative judge. The five men were tried by the CCCI in al-Hilla in April 2006 in two sessions, during which Muhannad Hamza Matar withdrew his confessions, reportedly on the grounds that he had made them under duress. However, he was found guilty of murder and sentenced to life imprisonment while the other four men were acquitted and released.

On 27 July 2006 the Court of Cassation ruled that the life sentence was too lenient and referred the case back to the CCCI, which on 21 November 2006 sentenced Muhannad Hamza Matar to death. In accordance with Iraqi law, the case was referred back to the Court of Cassation. At the time of writing the Court of Cassation had not made a ruling on the case but was expected to confirm the death sentence.[93]

---

[92] Interview, 11 March 2007, Amman.
[93] Amnesty International, *Urgent Action, Iraq: Death penalty/Fear of imminent execution: Muhannad Hamza Matar*, 12 March 2007, AI Index: MDE 14/012/2007

# Death sentences by the Supreme Iraqi Criminal Tribunal (SICT) and unfair trial concerns

Amnesty International is concerned that the Statute of the SICT (Law Number 10 of 2005) did not provide sufficient safeguards with regard to fair trial, in particular with regard to the right to be tried before an independent and impartial tribunal. The Statute does not include any provision that either require or allow judges to recuse themselves (withdraw from proceedings) when their impartiality is, or may reasonably be perceived to be, affected.[94] In addition, the 2005 Statute also included a provision allowing the Presidency Council, upon a recommendation from the Council of Ministers, to transfer judges and prosecutors from the Tribunal to the Supreme Judicial Council "for any reason" (article 4(fourth), 2005 Statute).

## *Trial and execution of Saddam Hussain and his co-accused*

The first trial before the Tribunal, renamed Supreme Iraqi Criminal Tribunal after a 2005 revision of its Statute, began in October 2005 and ended on 27 July 2006. Saddam Hussain and seven co-defendants were charged with crimes against humanity committed against the population of Dujail, a predominantly Shi'a village northeast of Baghdad, following an alleged attempted assassination of the former President, who was visiting the village in 1982. The verdict, announced on 5 November 2006, imposed the death penalty on Saddam Hussain and two of his co-defendants, Barzan Ibrahim al-Tikriti and Awad al-Bandar, and varying terms of imprisonment against four others (Taha Yassin Ramadhan, Abdullah Kadhim al-Ruweid, Ali Daih and Mizher 'Abdullah al-Ruweid). The sentences were confirmed by the Appeals Chamber, which also ordered the Trial Chamber to modify Taha Yassin Ramadhan's penalty of life imprisonment, considered too lenient. On 12 February 2007 the SICT sentenced Taha Yassin Ramadhan to death and on 15 March 2007 the Appeals Chamber upheld the verdict.

Saddam Hussain was executed on 30 December 2006. Barzan Ibrahim al-Tikriti and Awad al-Bandar were executed on 15 January 2007. The executions were

---

[94] The 2004 Rules of Procedure and Evidence only partially compensated for this important omission, stating that judges must withdraw from any case in which their impartiality or independence might reasonably be doubted (Rule 11(4), 2004 Rules).

conducted following an authorization by Prime Minister al-Maliki[95] but without ratification of the Presidential Council as required under the Statute of the SICT.[96] On 20 March 2007 Taha Yassin Ramadhan was executed. Prior to their executions Saddam Hussain, Barzan Ibrahim al-Tikriti, Awad al-Bandar and Taha Yassin Ramadhan were handed over by US forces into Iraqi custody.

The speed with which the appeals procedures and executions of Saddam Hussain and his co-accused were conducted was in violation of international standards. In resolution 1989/64, adopted on 24 May 1989, the UN Economic and Social Council called on UN member states in which the death penalty may be carried out "to allow adequate time for the preparation of appeals to a court of higher jurisdiction and for the completion of appeal proceedings, as well as petitions for clemency". The UN Special Rapporteur on extrajudicial, summary or arbitrary executions has recommended "that States establish in their internal legislation a period of at least six months before a death sentence imposed by a court of first instance can be carried out, so as to allow adequate time for the preparation of appeals to a court of higher jurisdiction and petitions for clemency".[97] The Special Rapporteur has stated that "Such a measure would prevent hasty executions while affording defendants the opportunity to exercise all their rights".[98]

The death sentences and executions provoked international condemnation by international governmental organizations and international human rights organizations.[99] EU officials stated in November 2006 that a ban on capital punishment would be aimed for in the context of negotiations towards a trade and aid pact with Iraq.[100]

---

[95] According to Amnesty International's information, Prime Minister al-Maliki signed an authorization based on legislation of the Revolutionary Command Council under Saddam Hussain's government enabling a member of the cabinet to ratify the death sentences.

[96] After the verdict in the Dujail trial was upheld a presidential spokesperson reportedly suggested that it may not require the approval of the president (AP, Christopher Torchia, *Saddam Death Sentence May Not Need OK*, 27 December 2006)

[97] Report by the Special Rapporteur on Extrajudicial, summary or arbitrary executions, UN document E/CN.4/1996/4, 25 January 1996, para.556. See also Third Geneva Convention of 1949, Article 101; Fourth Geneva Convention of 1949, Article 75.

[98]Report of the Special Rapporteur on Extrajudicial, summary or arbitrary executions, UN document E/CN.4/1998/68, 23 December 1997, para.118.

[99] Amnesty International: *Iraq: Amnesty International deplores execution of Saddam Hussain*, 30 December 2006, AI Index: MDE 14/043/2006; Human Rights Watch, *Iraq: Saddam Hussen Put to Death Hanging after Flawed Trial Undermines Rule of Law*, 30 December 2006.

[100] International Herald Tribune, *European Union officials told Iraq on Monday that it would seek commitments on human rights standards, including a ban on capital punishment, during negotiations on a trade and aid pact*, 20 November 2006.

Commenting on the execution of Saddam Hussain, the UN Special Rapporteur on extrajudicial, summary or arbitrary executions declared that "the Iraqi Government engaged in an unseemly and evidently politically motivated effort to expedite the execution by denying time for a meaningful appeal and by closing off every avenue to review the punishment".[101] With regard to the death sentence against Taha Yassin Ramadhan, the same Rapporteur stated that his execution would violate international law adding that "The trial of Mr Ramadan was marred by serious irregularities denying him a fair hearing."[102]

Amnesty International expressed on numerous occasions its concerns that the trial of Saddam Hussain and his co-accused was unfair. Delegates of the organization were present at the opening of the al-Dujail trial on 19 October 2005 in Baghdad. The organization monitored the case throughout the trial's duration, appealed against the death sentences and condemned the executions.[103]

The trial was undermined by political interference, which caused one lead judge to resign, the appointment of another to be blocked, and by a failure on the part of the court to ensure the safety of defence lawyers, witnesses and others. Three defence lawyers were murdered during the course of the trial

## *Pending trials before the SICT*

At the time of his execution, Saddam Hussain was being tried in a second trial, together with six others, on separate charges arising from the 1988 so-called Anfal campaign, during which thousands of people belonging to Iraq's Kurdish minority

---

[101] UN Special Rapporteur on extrajudicial, summary or arbitrary executions, *Tragic mistakes made in the trial and execution of Saddam Hussain must not be repeated* (press release), 3 January 2007, http://www.unhchr.ch/huricane/huricane.nsf/view01/771742A22EA6FE2EC125725800678C7D?opend ocument

[102] UN Special Rapporteur on extrajudicial, summary or arbitrary executions, *UN human rights expert calls on Iraq not to carry out the execution of Taha Yassin Ramadan pursuant to an unfair trial* (press release), 12 February 2007,
http://www.unhchr.ch/huricane/huricane.nsf/view01/EA4427040B107C8DC1257281004BBBF6?open document.

[103] Amnesty International, *Iraq: Death sentence for former Vice President deals another blow to justice*, 12 February 2007, AI Index: MDE 14/008/2007; Amnesty International: *Iraq: Execution of Saddam Hussein aides is a further slide into errors of the past*, 15 January 2007, AI Index: MDE 14/002/2007; Amnesty International: *Iraq: Amnesty International deplores execution of Saddam Hussain*, 30 December 2006, AI Index: MDE 14/043/2006; Amnesty International: *Iraq: Amnesty International condemns Iraqi Appeal Court verdict against Saddam Hussein and co-accused*, 28 December 2006, AI Index MDE 14/044/2006; Amnesty International: *Iraq: Amnesty International deplores death sentences in Saddam Hussein trial*, 5 November 2006, AI Index: MDE 14/037/2006.

were subject to mass killings, torture and other crimes. Begun in August 2006 and still ongoing at the time of writing, the Anfal trial is marred by many of the same serious flaws that rendered the Dujail trial unfair, including heavy government intervention into the composition of the judges' panel and failure to provide effective security measures.

In September 2006 the chief prosecutor accused the presiding judge, Abdullah al-Amiri, of being too lenient towards the defendants and formally requested him to resign. Several days later the presiding judge was dismissed by the government, which claimed that he had lost his neutrality, and substituted by his deputy, Mohammed al-Ureybi. Officially, judge Abdullah al-Amiri was transferred to the Supreme Judicial Council under article 4 (fourth) of the 2005 Statute.

Like the Dujail trial, the Anfal trial is being held within Baghdad's heavily-fortified Green Zone due to the continuing high level of violence and insecurity in Iraq. Ten days after he was named, gunmen killed the brother-in-law of presiding judge Mohammed al-Ureybi.[104] In October 2006 the chief prosecutor's brother was killed.[105]

After the execution of Saddam Hussain the charges against him with respect to the Anfal case were dropped on 8 January 2007. The trial is now continuing against the other accused, charged with genocide, war crimes and crimes against humanity: Ali Hassan al-Majid, Sultan Hashim Ahmed, Saber Abdul Aziz, Hussain Rashid al-Tikriti, Taher Muhammad al-Ani and Farhan al-Jiburi.

On 18 January the chief prosecutor announced the opening of a third case against former government officials for charges linked to killings during an uprising in the predominantly Shiite southern Iraq after the 1991 Gulf War. The accused include Saddam Hussain, Taha Yassin Ramadhan and Ali Hassan al-Majid.

## Death sentences and executions in the Kurdish Region of Iraq

In July 2005 Kurdish news channels broadcast "confessions" to offences of murder and rape by Shaikh Zana 'Abdul Karim Barzanji and other men, delivered in Kurdish. In addition, several of the men reportedly admitted to homosexual relations. The video tapes of their "confessions" were reportedly provided to the TV stations by

---

[104] Independent, David Rising, *Gunmen kill relative of new judge trying Saddam*, 30 September 2006
[105] Reuters, *Gunman kills brother of Saddam prosecutor*, 16 October 2006.

Kurdish security and intelligence services.[106]

On 21 September 2006, 11 people were executed by hanging in the city of Arbil, in the Kurdish-controlled area of Northern Iraq. To Amnesty International's knowledge these were the first executions to be carried out in the Kurdish region since 1992. According to reports, the 11 men, said to be members of the armed group Ansar al-Islam, had been sentenced to death in March 2006 in connection with offences of killings and kidnappings in 2003 and 2004. Among those executed were Shaikh Zana 'Abdul Karim Barzanji, Burhan Tal'at Muhammad, Dilir Haidar 'Abdullah, Mariwan Karim Hassan, Karukh Burhan Muhammad, Hafal Fariq Isma'il, Aza' Mu'tasam Karim, Fariq Isma'il 'Abdullah, Dilir Abu Bakr Isma'il, Yusuf 'Aziz Qadir and Ziyad Rif'at 'Abdul Karim.

# Women on death row

According to Amnesty International's information, at least two women were executed in 2006. In March 2007 four women who had been sentenced to death were held at the al-Kadhimiya Women's Prison in Baghdad, two of them with their children: Samar Sa'ad 'Abdullah, aged about 25; Wassan Talib , aged 31; Zeynab Fadhil , aged 25, and her three-year-old daughter; and Liqa' Qamar, aged 25, and her one-year-old daughter. Since the end of 2005 members of the Organization of Women's Freedom in Iraq (OWFI) have conducted regular visits of women prisoners at al-Kadhimiya Prison, including women on death row. OWFI, an Iraqi non-governmental organization working on women's rights, calls for the abolition of the death penalty.[107]

Samar Sa'ad 'Abdullah was sentenced to death by the Central Criminal Court of Iraq (CCCI) on 15 August 2005 for the murder of her uncle, his wife and three of their children in the al-Khudra' district of Baghdad. She reportedly blamed the killings on her fiancé who, she said, had carried them out in order to rob her uncle. Her fiancé was said to have been accused of the same crime and sought by the authorities.

Wassan Talib and Zeynab Fadhil were sentenced to death by the CCCI on 31 August 2006 for the murder of several members of the Iraqi security forces in 2005 in

---

[106] New York Times, James Glanz, *Televised confessions revolt, and rivet, Kurds*, 19 July 2005.
[107] OWFI, *Nida mu'ayid: Yajib ilgha' 'uqubat al-i'dam* (Supportive appeal: the death penalty has to be abolished), 7 June 2006, http://www.wpiraq.net/arabic/tekst/owfi/owfi070606.htm.

the Baghdad district of Hay al-Furat. Both women denied they had been involved, and Zeynab Fadhil reportedly claimed that she was abroad at the time of the killings.

Liqa' Qamar was sentenced to death on 6 February 2006 by the CCCI for an abduction not resulting in death which reportedly took place in 2005. Her husband is said to have been accused of the same crime, but fled abroad. On 9 February 2007 Amnesty International issued an appeal to the Iraqi authorities against the death sentences imposed on the four women.[108]

At the time of writing the Court of Cassation had not yet decided on their appeal cases.

# Conclusions

Since the reintroduction of the death penalty in August 2004 more than 270 people have been sentenced to death in Iraq and at least 100 people have reportedly been executed. In many cases death sentences have been issued following proceedings which failed to meet international fair trial standards. This represents a profoundly retrograde step, and one that should not be overlooked simply because far larger numbers of lives have been lost due to ongoing violence. The death penalty is a cruel, inhuman and degrading punishment and the ultimate violation to the right to life; furthermore, it is not an effective deterrent against violence and crime, as the continuing crisis in Iraq underlines.

Whilst the trial before the Supreme Iraqi Criminal Tribunal and subsequent executions of former President Saddam Hussain and three of his co-accused gained much public attention and generated international criticism, less attention has been given to the more than 250 people who have been sentenced to death by the Central Criminal Court of Iraq; including at least 85 who have been executed. Amnesty International is concerned that many of those sentenced to death by the CCCI did not receive a fair trial. Shortcomings in cases before the CCCI where the death penalty was pronounced have included: pre-trial televised "confessions", confessions allegedly obtained through torture or ill-treatment and insufficient access to lawyers. Further, pre-trial televised "confessions" were also reported in connection with a trial in the Kurdish-controlled region in which 11 people were sentenced to death; they were executed in September 2006.

---

[108] Amnesty International, *Urgent Action, Iraq: Death penalty/Fear of imminent execution*, 9 February 2007, AI Index: MDE 14/005/2007.

Amnesty International calls on the Iraqi government to immediately establish a moratorium on executions with a view to total abolition of the death penalty. The organization opposes the death penalty in all cases without exception as a violation of the right to life as the ultimate form of cruel, inhuman or degrading punishment.

# Recommendations

### To the Iraqi authorities

Amnesty International recalls Resolution 2005/59 adopted by the UN Commission on Human Rights on 20 April 2005 regarding the death penalty. The resolution stated that "the abolition of the death penalty contributes to the enhancement of human dignity and to the progressive development of human rights" and that "the abolition of the death penalty is essential for the protection of [the right to life]".

Amnesty International calls on the Iraqi authorities:
- to establish an immediate moratorium on executions;
- to commute all pending death sentences;
- to move towards the abolition of the death penalty and to respect international standards restricting the scope of the death penalty pending abolition;
- to ensure the most rigorous standards for fair trial are respected in all cases including:
    - the right to be tried before an independent and impartial tribunal
    - the right to a competent defence counsel of one's choice at all stages of the of the proceedings
    - the right to be presumed innocent until proven guilty according to law
    - the highest standards for the gathering and assessment of evidence, in particular a prohibition of any statement obtained through torture or other ill-treatment being used as evidence in court.

### To governments of countries contributing to the MNF – in particular the US and UK authorities

Amnesty International calls on governments of countries contributing to the MNF:
- not to hand over to the Iraqi authorities any detainee who has been sentenced to death;
- not to hand over any detainee to the Iraqi authorities without obtaining written guarantees that no death penalty will be imposed;
- to press for an immediate moratorium on executions in Iraq.

## To the European Union

Amnesty International calls on the European Union:

- that none of its members states contributing to the MNF hand over any detainee to the Iraqi authorities without obtaining written guarantees that no death penalty will be imposed;
- to press for an immediate moratorium on executions in Iraq.

# <u>Annex 1:</u> Decree: The reintroduction of the death penalty

**Decree Number 3 — 2004**

In the name of the people,

Pursuant to Article 26, paragraphs A and C of the Iraqi Interim Administration Act and the provisions of Part II of the attachment thereof, and the approval of the Presidential Council, the Council of Ministers decided to issue the following Decree:

**First:**

As an exception from Decree Number 7, Part 3, Paragraph 1, of 10 June 2003 issued by the Coalition Interim Authority, it is hereby resolved to restore the death penalty provided for in the Penal Code no 111 of 1969 as a punishment for anyone found guilty of any of the following crimes:

1- Any crime compromising the internal security of the State as provided in Articles 190, 191, 192 (iii), 193, 194, 195, 196 and Article 197, paragraphs i and ii. And for the purpose of implementing this Decree, the term « the Provisional Iraqi Government », « the Interim Iraqi Government » or the succeeding government after the adoption of the Constitution will replace « the Governing Regime » or « the Government » wherever these terms appear in any of these Articles.

2- Any crime that constitutes a public danger or the use of bacteriological materials set forth in Articles 349 and 351 (i) of the Penal Code.

3- Crimes relating to attacking transport and telecommunication systems as stipulated by Articles 354 and 355 of the Penal Code.

4- Premeditated murder as provided for in Article 406.

**Second:**

The provisions of paragraph 1 herein shall apply also to anyone who commits any of the crimes set forth in sections B, C and D of the first paragraph of Article 14 of the Narcotics Act Number 68 for 1965, relating to trafficking of narcotics, with the aim of funding or abetting any of the activities and acts mentioned in the Penal Code, Article 190.

**Third:**

Any one who commits the crime of abduction as specified in articles 421, 422 and 423 of the penal code will be subject to the death penalty.

**Fourth:**

The provisions of the Penal Code no 111 for 1969 (third edition (amendment)) for 1985 shall apply to all articles mentioned herein.

**Fifth:**

Paragraph 2 of Section 2 of Decree Number 7 issued by the Coalition Interim Authority on10 June 2003 shall be repealed.

**Sixth:**

As an exception from the provision of Article 285 (b) of the criminal procedures Act Number 23 (1971) and Article 286 thereof, the death penalty will be implemented only after being approved by the Prime Minister and confirmed by the Presidential Council.

**Seventh:**

The death penalty set forth in the peremptory provisions applicable before the entering into force of this Decree will be reduced to life imprisonment.

**Eighth:**

The provisions of this Decree shall prevail over any provision to the contrary.

**Ninth:**

This Decree will come into force as of its issuing date, and shall be published in the Official Gazette.

Executed in Baghdad on the twenty - first of Jumada el-Aakhirah 1425 hijra, corresponding to August 8th 2004 AD.

Dr. Ayad Allawi

The Prime Minister

## The Underlying Reasons

Given the current situation in Iraq, and in order to protect Iraq's internal security, ensure the safety of its people and to observe their human rights and their right to life, it has become necessary to restore the death penalty against those who commit serious crimes that threaten the security and economy of Iraq, the lives of its people and the future of its next generations,

And for the purpose of preventing such crimes and imposing on those who commit them the punishment that would match the gravity of such crimes on one hand, and giving a chance to those who have been sentenced to death before this Decree took effect and giving them the chance to stay alive by reducing this punishment to life imprisonment, so that they can become good citizens again, after completing their sentence on the other hand

### *The Decree will hereby come into effect*

# <u>Annex 2</u>: The Iraqi Anti Terrorism Law

## Act Number 14 - 2005

**In the name of the People**
**Presidential Council**

Based on the decision of the National Association, according to Paragraphs A and B of Article 33 of the interim Iraqi constitution, and in reference to the provisions of Article 37 of this constitution, the Presidential Council, at its meeting of 7 November 2005, decided to adopt the following law:

**Article 1**: <u>Definition of terrorism</u>

Terrorism is defined as any criminal act carried out by an individual or an organized group, targeting an individual, a group of individuals, groups, public or private organizations, and causing damage to private or public property with the aim of undermining security and stability or national unity, or instilling fear, terror and panic in people or creating chaos in order to achieve terrorist goals.

**Article 2**: <u>The following are considered terrorist acts</u>

1- Violence or the threat of violence that aims at terrorizing people and putting their lives, safety and liberties at risk, or causing them to lose their money and property, regardless of the motive or purpose thereof, as long as it's aim is to serve a terrorist scheme or design organized by an individual or a group;

2- Violent act or threat of deliberately vandalizing, causing damage or destruction to public buildings and property, government facilities, governmental or non governmental institutions and public services and places that are frequented by the public or designed for public meetings or constitute public assets, or the attempt to occupy, seize or endanger any such facilities or services and preventing their use for their designated purposes with the aim of disturbing public safety and security;

3- Whoever organizes, heads or leads a terrorist armed gang that trains and plans for such activities, or whoever supports or participates in such activities;

4- Causing, through acts of violence and threats, a sectarian sedition or civil war or inter-communal clashes by arming citizens or instigating and funding them to arm themselves;

5- Armed attacks on military posts, police stations, recruitment centres or security departments or attacks on national military units, including their

supply and communications lines and their camps and bases, stemming from
terrorist motives;

6- Armed aggression, for terrorist purposes, on the foreign embassies and the
diplomatic community throughout Iraq, or on any Iraqi institution, or Arab or
foreign companies and international governmental or non governmental
organizations operating in Iraq under an existing agreement with the Iraqi
government;

7- The use, with terrorist intentions, of explosive or incendiary devices designed
to and capable of taking lives, or aimed at causing panic amongst the
population through the use of car bombs or exploding, planting and booby-
trapping any object of any kind or shape, or poisonous chemical substances or
biological agents or any similar material, or radioactive substances or toxins.

8- Abducting people or restricting their freedom, or detaining them for ransom or
extortion or for purposes of any political, factional, nationalist, religious or
racial or financial nature, which may threaten public security and national
unity and encourage terrorism.

**Article 3**: The following acts are specifically considered crimes against state security

1- Any act, with terrorist intentions, that is capable of threatening national unity
and public safety and compromising the security of the State and its stability,
or an act that can weaken the ability of state security services to defend and
protect the citizens' safety, security and property, and the state borders and
institutions, be it by means of armed clashes with the state security forces or
any other form that goes beyond the freedom of expression guaranteed by the
law;

2- Any act that involves the use force or violence to overthrow the government or
change the nature of the  regime as established in the Constitution;

3- Any person, with a criminal intention, that heads a section of the armed forces,
a military post, a seaport, an airport or a military or civilian unit without an
explicit order from government;

4- Anyone who calls for an armed rebellion against the existing constitutional
authorities or participates in a plot or a gang formed for such purpose;

5- Any act by a person commanding members of the national armed forces by
which such person asks them or orders them to disobey the orders of the
government.

**Article 4**: Punishment

1- Any person found guilty —as the main perpetrator or accomplice— of any of the terrorist acts mentioned in articles 2 and 3 hereof will be subject to the *death penalty*. The *same punishment* will be imposed on the instigators, planners, financial sponsors and anyone who enables the terrorists to carry out their acts;

2- Anyone who deliberately withholds information about a terrorist or a terrorist act shall be punished by *Life imprisonment*.

**Article 5**: <u>Amnesty, Legal Justifications and Mitigating Legal Circumstances</u>

1- Anyone who informs the authorities about a terrorist crime before it takes place or while it is in a planning stage and his/her information helps arrest the criminals or foil the crime will be relieved from the above punishments;

2- A person's punishment will be mitigated if she/he provides the competent authorities with information about the crime after its occurrence or its discovery, provided she/he did this voluntarily and before her/his arrest by the authorities and her/his information leads to the arrest and indictment of those responsible for the crime.

**Article 6**: <u>Final Provisions</u>

1- The crimes mentioned in this Act shall be deemed crimes that usually affects one's honour;

2- All the assets and materials used in criminal acts will be seized;

3- The aforementioned punishments will be applied to anyone found guilty of any of the above crimes, unless an exceptional provision in this Act makes him/her liable for a lesser penalty;

4- This Act comes into full force and effect as from the date of its publication in the Official Gazette.

Ghazi Ajeel El-Yawar
Vice-President

Adel Abdul Mahdi
Vice-President

Jalal Talabani
President of the Republic