IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDRA K. OMAR *et al.*, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 05-2374 (RMU) |
| ) | |
| PETE GEREN, *et al.*, ) | |
| ) | |
| Respondents. ) | |
| ) | |

**MEMORANDUM OPPOSING RESPONDENTS' MOTION TO DISMISS
PETITIONERS' AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

**INTRODUCTION**

Petitioner Shawqi Omar, a United States citizen currently detained by United States Armed Forces at Camp Cropper in Iraq, seeks habeas relief to prevent his transfer to Iraqi custody. Such transfer would, *inter alia*, violate the Foreign Affairs Reform and Restructuring Act ("FARR Act"), Pub. L. No. 105-277, div. G, 112 Stat. 2681-822, (codified at 8 U.S.C. § 1231 note). As Petitioner has stated a cognizable claim for habeas relief, and because this court has jurisdiction under the habeas statute, Mr. Omar respectfully requests that the Court deny the government's motion to dismiss.

Since Mr. Omar first filed a habeas petition on December 12, 2005, the government has insisted that it be dismissed for want of subject-matter jurisdiction, preventing any hearing on the facts of Mr. Omar's case or the consequences of a transfer. *See*, *e.g.*, Resp'ts' Opp. to Pet'rs' Ex Parte Motion for a Temporary Restraining Order (dkt. 12). The Supreme Court soundly rejected the government's jurisdictional argument. *Munaf v. Geren*, 128 S. Ct. 2207, 2218 (2008). The Court also rejected some—*but not all*—of Mr. Omar's substantive claims for relief. Of special relevance for the purpose of

this motion, the Court stated explicitly and unequivocally that it "will not consider the question" whether the FARR Act would bar a transfer because it had not been pleaded in Mr. Omar's initial petition—a statement the government somehow transmogrifies into a holding that bars claims. *Id.* at 2226. This FARR Act claim is now squarely presented by the amended habeas petition. *See* Amended Pet. For Habeas ¶¶ 9(a), 30-42 (dkt. 55); *see also id.* ¶¶ 43-46 (alleging that some torture will in addition violate the Eighth Amendment). Nothing in the Supreme Court's holding bars this claim from being adjudicated and the facts of Mr. Omar's case being heard.[1]

The government's motion to dismiss Mr. Omar's amended petition based on the asserted absence of a cognizable FARR Act claim and purported jurisdictional bars in the FARR Act and § 242(a)(4) of the Immigration and National Act ("INA"), 8 U.S.C. § 1252(a)(4), furthermore should be denied.

*First*, the FARR Act prohibits the United States Government from "expel[ling], extradit[ing] or otherwise effect[ing] the involuntary return of *any person* to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, *regardless of whether the person is physically present in the United States*." FARR Act § 2242(a) (emphases added). This prohibition extends on its face to protect Mr. Omar regardless of his extraterritorial locus. It is an absolute, categorical prohibition against transfer to likely torture, and contains no exceptions. The purpose and history of the FARR Act also demonstrate that the government's attempt to craft an

---

[1] The government claims that Mr. Omar's claims concerning torture are "foreclosed" because the Supreme Court rejected the analytically distinct claim that Mr. Omar cannot be transferred to Iraqi custody without legal authority. *See* Resp'ts' Mem. in Support of Resp'ts' Mot. to Dismiss Pet'rs' Am. Pet. for Writ of Habeas Corpus at 12-15 (dkt 59-2). The government supplies no reason or precedent for dismissing one claim because a higher court previously dismissed an analytically distinct claim. Similarly, the government's argument that Mr. Omar's Eighth Amendment claim is foreclosed is simply a variant on the same flawed assertion. *Id.* at 15-16.

extra-textual loophole to the statute should be rejected.  The FARR Act, as United States law implementing a treaty of the United States, hence provides ample basis for relief under the habeas statute.

*Second*, neither the FARR Act nor INA § 242(a)(4) contains the "clear statement" necessary to terminate this court's habeas jurisdiction under 28 U.S.C. § 2241 and the Suspension Clause.  *Boumediene v. Bush.*, 128 S. Ct. 2229, 2244 (2008) (citing *Ex parte Yerger*, 75 U.S. (8 Wall) 85, 102-03 (1869)); *accord INS v. St. Cyr*, 533 U.S. 289, 298 (2001).  The government's interpretations of these provisions ignore holdings from multiple circuit courts that habeas jurisdiction remains to adjudicate claims under the FARR Act.  *See Cadet v. Bulger*, 377 F.3d 1173, 1182-83 (11th Cir. 2004); *Saint Fort v. Ashcroft*, 329 F.3d 191 (1st Cir. 2003); *Wang v. Ashcroft*, 320 F.3d 130 (2d Cir. 2003); *Ogbudimpka v. Ashcroft*, 342 F.3d 207 (3d Cir. 2003); *Prasopat v. Benov*, 421 F.3d 1009 (9th Cir. 2005); *Cornejo-Barreto v. Seifert*, 218 F.3d 1004 (9th Cir. 2000).

Because there is no threshold bar to adjudication of this case, this court should proceed to the merits of the case—Mr. Omar's claims concerning torture.  Petitioner now faces a substantial likelihood of torture if transferred to the custody of the Iraqi government and accordingly seeks by this habeas petition an injunction barring such transfer.

Finally, and contrary to the government's arguments, Mr. Omar's fourth, fifth, and sixth claims for relief (all respecting illegal detention), *see id.* ¶¶46-53, explicitly address the potential situation in which this court *has already adjudicated* Mr. Omar's proposed transfer, and found it illegal.  Under those circumstances, respondents will no longer have any legal ground to detain Mr. Omar.  These claims therefore concern a

situation the Supreme Court did not discuss, let alone rule on, and hence should not be dismissed but preserved pending adjudication of the logically anterior FARR Act claims.

## FACTUAL AND PROCEDURAL BACKGROUND

Shawqi Omar is a United States citizen who has served in the Minnesota National Guard.  He is married to a United States citizen.  He has six children, all United States citizens.  Am. Pet. For Habeas ¶¶ 15, 21 (dkt. No. 55).  Following the toppling of Saddam Hussein's dictatorship, Mr. Omar traveled to Iraq with his ten-year-old son Salahedin seeking contract work in the reconstruction of that country.  *Id*. ¶ 22.  On October 29, 2004, American forces seized Mr. Omar at his Baghdad home.  *Id*.  While his ten-year-old child stood by, U.S. soldiers ransacked Mr. Omar's house and beat him.  *Id.*  Omar sustained severe injuries in this and subsequent beatings at the hands of U.S. forces.  *See* Exhibits to Mot. for Preservation Order (dkt. no. 49) (showing injuries from beating).

U.S. forces initially imprisoned Mr. Omar at Camp Cropper.  They subsequently moved him between the prisons at Camp Bucca (near Basra), Abu Ghraib, and Camp Cropper.  Currently, he is detained at Camp Cropper. For more than a year, they denied him access to counsel despite his repeated requests.

Mr. Omar has repeatedly asserted his innocence.  Am. Pet. for Habeas ¶ 24 (dkt. no. 55). Through this litigation, respondents have submitted and relied on only one declaration that briefly enumerates inflammatory and uncorroborated hearsay allegations of criminal conduct to justify Mr. Omar's detention.  Exhibit 1 (Decl. of John G. Gardner) to Opp'n to Mot. for a TRO (dkt. no. 12).  The government has never supplemented this terse hearsay document, even though it has continued to make factual assertions about Mr. Omar and the manner in which he has been treated.  Indeed, some, if

not all, of the witnesses who supplied the hearsay evidence against Mr. Omar upon which the government relies have since recanted. *See* Br. for Federal Parties, *Munaf v. Geren*, 128 S. Ct. 2207, 2226 n.2 (2008) ("[I]n March 2007, some of the individuals who were seized with Omar recanted their previous statements implicating Omar in insurgent Activities."); *accord* Respondents' Mem. in Support of Resp'ts' Mot. to Dismiss Pet'rs' Am. Pet. for Writ of Habeas Corpus at 4 n.2 ("Mem. in Support of Motion to Dismiss").

On December 12, 2005, Mr. Omar's wife and son filed a next-friend Petition for a Writ of Habeas Corpus in this court. *See* Pet. for Habeas (dkt. no. 1). In January 2006, counsel learned that U.S. officials might be convening a legal proceeding against Mr. Omar and sought leave to participate. Respondents informed counsel that they intended to hand Mr. Omar over to Iraqi authorities and would not provide notice to counsel or to this court before doing so. Exhibit A (Decl. of Susan Burke) to Supplemental Mem. in Support of Mot. for TRO at 4-6 (dkt. no. 10). Counsel immediately filed an ex parte emergency motion, which this court granted, for a temporary restraining order prohibiting any transfer of Omar to Iraqi custody, where he would likely be tortured. Order Granting Ex Parte Mot. for TRO (dkt. no. 9); Mem. Op. Granting Mot. for TRO (dkt. no. 11). This court subsequently entered a preliminary injunction enjoining Respondents from transferring Mr. Omar to Iraqi custody. Order Granting Mot. for Prelim. Inj. (dkt. no. 21).

Before this court, the Court of Appeals for the District of Columbia Circuit, and the United States Supreme Court, the government contended that the federal courts lacked subject matter jurisdiction based on the Supreme Court's opinion in *Hirota v. MacArthur*, 338 U.S. 197 (1948) (per curium). *See* Resp't Opp'n to Pet'rs' Ex Parte Mot.

5

TRO at 12-13 (dkt. no. 12); Reply Br. for Appellants at 4-18, *Omar v. Harvey,* 479 F.3d 1 (D.C. Cir. 2007) (No. 06-5126); Br. for Federal Parties at 17-31, *Munaf v. Geren*, 128 S. Ct. 2207 (2008) (Nos. 06-1666 and 07-394). The Supreme Court firmly rejected this jurisdictional argument. *Munaf v. Geren*, 128 S. Ct. 2207, 2218 (2008).

Turning to the merits, the Supreme Court held that Iraq has a sovereign right to prosecute individuals for crimes committed in its territory and that U.S. courts normally would not interfere with this right. *Id.* at 2221-24. The Court did not accept Mr. Omar's argument that respondents could not transfer him to Iraqi custody in the absence of specific legal authority to do so. *Id.* at 2227-28. The Court said that it "[would] not consider the question" whether a substantial risk of torture would bar a transfer, instead finding that the issue had been insufficiently briefed. *Id.* at 2225-26. The Court specifically noted that the FARR Act had not been adequately raised in Omar's habeas petition (which had been filed before the prospect of transfer became known) and invited this amended petition. *Id.* at 2226 n.6.

Mr. Omar therefore amended his habeas petition, removing claims that the Court had rejected, adding the FARR Act claim, and preserving the ability to challenge any further detention when and if his transfer is declared unlawful. Am. Pet. for Habeas ¶¶ 37-53 (dkt. no. 55).

Mr. Omar is currently in the physical custody of U.S. forces at Camp Cropper. The United States has represented that Mr. Omar will remain in U.S. custody "pending investigation and prosecution in Iraqi courts under Iraqi law." Br. for Federal Parties at 3, *Munaf v. Geren*, 128 S. Ct. 2207 (2008) (Nos. 06-1666 and 07-394).

Adjudicating Mr. Omar's motions for a TRO and preliminary injunction in February 2006, this court received evidence—still uncontested—of torture and cruel, inhuman, and degrading treatment in Iraqi prisons, particularly involving Sunni Muslim prisoners such as Mr. Omar. *See* Exhibits to Supplemental. Mem. in Support of Mot. for TRO (dkt. no. 10). This evidence included declarations detailing the Iraqi government's systematic use of torture with electric shocks, strangulation, breaking of limbs, sexual abuse, cigarette burns, electric drills, and suffocation, as well as evidence that Mr. Omar "would be at grave and serious risk of being tortured" in Iraqi custody. Exhibit B (Decl. of Curt Goering) to Supp. Memo. in Support of Mot. for Temp. Restraining Ord. (dkt. no. 10). The evidence shows equally that Omar faces a likelihood of torture and cruel, inhuman, and degrading treatment if transferred to Iraqi custody.[2]

The Supreme Court, however, did not consider this or any of the ample evidence that Mr. Omar risks torture if transferred to Iraqi custody because it held that Mr. Omar had not adequately pleaded a claim in his initial habeas petition under the FARR Act. *Munaf*, 128 S. Ct. at 2226 & n.6. The Court invited Mr. Omar to amend his petition and seek relief under the FARR Act. *Id.*

---

[2] *See e.g.,* Amnesty International, *Security agreement puts 16,000 Iraqi detainees at risk of torture*, Nov. 28, 2008, http://www.amnesty.org/en/news-and-updates/news/security-agreement-puts-16000-iraqi-detainees-risk-torture-20081128; Jonathan Finer & Ellen Knickmeyer, *Shiite Militias Control Prisons, Officials Say*, Wash. Post, June 16, 2006 (Respondents' declarant, Major-General Gardner, promises military will not turn over *any* prisoners to Iraqi Justice Ministry prisons given substantial risk of torture); Supplemental Decl. of Curt Goering ¶¶ 4-5, (Exhibit 1) (torture, cruel, inhuman, and degrading treatment, continues at Justice Ministry facilities in Iraq); *Id.* ¶ 9 (substantial risk that Mr. Omar may subsequently be transferred to an Interior or Defense Ministry prison, which the government concedes uses torture. Reply Br. for Federal Parties at 24-26, *Munaf v. Geren,* 128 S. Ct. 2207 (2008) (Nos. 06-1666 & 07-394)); Supplemental Decl. of Curt Goering ¶¶ 10, 12 (Exhibit 1) (substantial risk that Omar may face a death penalty carried out in a manner that violates the bar on torture and cruel and unusual punishment).

**ARGUMENT**

**I.    MR. OMAR STATES A CLAIM UNDER THE FARR ACT.**

Section 2242(a) of the FARR Act provides that the United States shall not "expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." The government argues that the FARR Act is "irrelevant" because Mr. Omar "is physically located in the sovereign nation of Iraq." Mem. in Support of Mot. to Dismiss at 7. The government's argument, however, is inconsistent with the text and purpose of the FARR Act, and relies on authorities that Congress rejected when enacting the FARR Act.

The FARR Act specifically implements the United States' obligations under Article 3 of the United Nations Convention Against Torture and Other, Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). *Cf.* FARR Act § 2242(b). In the FARR Act, Congress included the all-encompassing phrase "expel, extradite, *or otherwise effect the involuntary return*" of a person to torture. Congress's use of this expansive catch-all phrase indicates its intent to prohibit without exception any transfer by U.S. personnel, wherever located, that ends in torture. Congress's intent is consistent with the understanding that the prohibition against transferring people to torture is a *jus cogens* norm that allows *no exceptions* under *any* circumstances.

Confirming this broad reach, the FARR Act's prohibition on transfers to torture applies on its face "regardless of whether the person is physically present in the United States." § 2242(a). Congress thus clearly and explicitly rejected the territorial limitation

8

on the 1951 Refugee Convention that the Supreme Court had applied five years before the FARR Act's passage. *See Sale v. Haitan Ctrs Council, Inc.*, 509 U.S. 155, 183 (1993). The government supplies no reason to ignore this clear statutory direction.

Moreover, the government's argument is plainly inconsistent with Congress's intent in enacting the FARR Act to "make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." CAT pmbl., S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. Congress stipulated that "the terms used [in FARR Act § 2242] have the meaning given those terms in the Convention." FARR Act § 2242(f)(2). The CAT in turn acknowledges "the obligation of nations under the United Nations Charter to 'promote universal respect for, and observance of, human rights and fundamental freedoms.'" CAT pmbl., S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. Its drafters thus crafted Article 3's prohibition on transfers to torture to apply to "any person who, *for whatever reasons,* is in danger of being subjected to torture if handed over to another country … [and to] *cover all measures* by which a person is physically transferred to another state." J. Herman Burgers & Hans Danelius, THE UNITED NATIONS CONVENTION AGAINST TORTURE: A HANDBOOK ON THE CONVENTION AGAINST TORTURE AND OTHER CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT ("Handbook on CAT") 125-26 (1988) (emphasis added).[3] The FARR Act

---

[3] This conclusion is confirmed by the Committee Against Torture, which was established under Article 17 of the Convention to provide persuasive interpretive guidance on the treaty. The Committee has stated that Article 3's prohibition on refoulement applies to all "transfers of a detainee within a State party's custody to the custody whether *de facto* or *de jure* of any other State," regardless of whether or not the individual is already present within the territory of the other state. U.N Committee Against Torture, *Conclusions and Recommendations: United Kingdom and Northern Ireland*, U.N Doc. CAT/C/CR/33/3 §5(e) (Dec. 10, 2004). The treaty, and by extension the FARR Act, thus applies whenever there is a change in *physical custody*—as there would be if Mr. Omar were transferred to Iraqi custody.

on the 1951 Refugee Convention that the Supreme Court had applied five years before the FARR Act's passage. *See Sale v. Haitan Ctrs Council, Inc.*, 509 U.S. 155, 183 (1993). The government supplies no reason to ignore this clear statutory direction.

Moreover, the government's argument is plainly inconsistent with Congress's intent in enacting the FARR Act to "make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." CAT pmbl., S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. Congress stipulated that "the terms used [in FARR Act § 2242] have the meaning given those terms in the Convention." FARR Act § 2242(f)(2). The CAT in turn acknowledges "the obligation of nations under the United Nations Charter to 'promote universal respect for, and observance of, human rights and fundamental freedoms.'" CAT pmbl., S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. Its drafters thus crafted Article 3's prohibition on transfers to torture to apply to "any person who, *for whatever reasons,* is in danger of being subjected to torture if handed over to another country … [and to] *cover all measures* by which a person is physically transferred to another state." J. Herman Burgers & Hans Danelius, THE UNITED NATIONS CONVENTION AGAINST TORTURE: A HANDBOOK ON THE CONVENTION AGAINST TORTURE AND OTHER CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT ("Handbook on CAT") 125-26 (1988) (emphasis added).[3] The FARR Act

---

[3] This conclusion is confirmed by the Committee Against Torture, which was established under Article 17 of the Convention to provide persuasive interpretive guidance on the treaty. The Committee has stated that Article 3's prohibition on refoulement applies to all "transfers of a detainee within a State party's custody to the custody whether *de facto* or *de jure* of any other State," regardless of whether or not the individual is already present within the territory of the other state. U.N Committee Against Torture, *Conclusions and Recommendations: United Kingdom and Northern Ireland*, U.N Doc. CAT/C/CR/33/3 §5(e) (Dec. 10, 2004). The treaty, and by extension the FARR Act, thus applies whenever there is a change in *physical custody*—as there would be if Mr. Omar were transferred to Iraqi custody.

should be interpreted in accordance with this well-settled interpretation of the CAT, which is confirmed by the plain statutory language. *Accord Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804).

The FARR Act's facial application to cases in which the United States has control and custody over individuals held extraterritorially demonstrates that Congress conceptualized the bar on torture in terms of *governmental custody* and not *physical location*. Indeed, in more mundane extraditions, individuals are not infrequently transferred to the custody of agents of a receiving state within that physical territory. For instance, the government of Mexico will on occasion hand over an individual to United States law enforcement officials within Mexico for the purpose of extradition to the United States. *See* Press Release, "Alleged Cop Killer Extradited from Mexico," United States Marshall Service, *available at* http://www.usmarshals.gov/news/chron/2007/010907.htm. The government's atextual construction would have the anomalous result of omitting such instances from the statutory prohibition in the FARR Act.

The government, finally, tries to shore up its implausible reading of the FARR Act by pointing to a fragment of the Supreme Court's discussion of the Act in *Munaf*, in which the Court noted that the Act "speaks to situations where a detainee is being 'returned' to 'a country.'" *Munaf,* 128 S. Ct. at 2226, n.6. But the Court neither made a decision on that point nor benefitted from briefing on the salient statutory and treaty material. To treat what is manifestly dicta as holding would be to short-circuit the process of federal-court adjudication of the law, especially since the meaning of the

FARR Act, for the reasons stated above, clearly extends to Mr. Omar and provides a sound jurisdictional basis for his habeas petition.

## II.   THIS COURT HAS HABEAS JURISDICTION OVER MR. OMAR'S FARR ACT CLAIM.

District courts have habeas jurisdiction when individuals allege they are held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *accord Munaf,* 128 S. Ct. at 2216-17.  The FARR Act is United States law, implementing a treaty signed by the United States.  Accordingly, it provides a claim cognizable in habeas jurisdiction.  *See*, *e.g.*, *Saint Fort v. Ashcroft*, 329 F.3d 191, 202 (1st Cir. 2003) ("FARRA [is] now the positive law of the United States, and, as such, [is] cognizable under habeas.") (superseded on other grounds by the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231).

The government argues that the FARR Act, or alternatively § 242(a)(4) of the INA, terminates this court's habeas jurisdiction.  These arguments are without merit.

As an initial matter, the government's argument with respect to both the FARR Act and INA § 242(a)(4) fails because neither provision contains the "superclear" language that the Supreme Court has instructed must be used if legislators wish to strip the federal courts of habeas jurisdiction.  *Demore v. Kim*, 538 U.S. 510, 517 (2003) ("Where a provision precluding review is claimed to bar habeas review, the Court has required a particularly clear statement that such is Congress' intent."); *St. Cyr*, 533 U.S. at 298-299 (noting, and applying, "the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction"); *accord Felker v. Turpin*, 518 U.S. 651, 660-661 (1996); *see also Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 546 (1992) (Scalia, J., concurring) ("[A]bsent unambiguous evidence of Congress's intent,

11

extraordinary constitutional powers are not invoked, or important constitutional protections eliminated.").

In *St. Cyr*, for example, the Court analyzed, *inter alia*, a provision stating that "[n]otwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed [certain criminal offenses]." 533 U.S. at 311. Despite this seemingly unequivocal language, the Court rejected the government's effort to terminate habeas jurisdiction, relying on both the clear-statement rule applied to jurisdiction-stripping statutes and the canon of constitutional avoidance. *St. Cyr*, 533 U.S. at 298-305 (applying canon of constitutional avoidance and citing, *inter alia*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg & Constr. Trades Council*, 485 U.S. 568, 575 (1988)) to conclude that "a serious Suspension Clause issue would be presented if we were to accept the INS' submission that the [provisions in question] have withdrawn [habeas jurisdiction] from federal judges and provided no adequate substitute for its exercise"). Neither the FARR Act nor INA § 242(a)(4) meet the exacting standard for stripping habeas jurisdiction.

> The government first relies on § 2242 (d) of the FARR Act, which provides that:
>
> [N]otwithstanding any other provision of law . . . nothing in [§ 2242] shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, or any other determination made with respect to the policy [forbidding the United States from transferring any person to a country where they face a substantial likelihood of being tortured], except as part of a review of a final order of removal pursuant to § 242 of the Immigration and Nationality Act.

*See* Respondent's Mem. in Support of Mot. to Dismiss at 9-10. (quoting FARR Act § 2242(d)).

12

But this provision, on its face, simply does not apply to statutes other than the FARR Act, let alone contain the clear statement needed to extinguish habeas jurisdiction. Rather, § 2242(d) bars courts solely from reading an implied cause of action into the FARR Act. Because jurisdiction in this case depends not on such an implied cause of action, but instead on the statutory ground of 28 U.S.C. § 2241 (which the Supreme Court has just confirmed, *see Munaf,* 128 S. Ct. at 2216-17), the FARR Act does not strip this court of power to adjudicate Mr. Omar's habeas petition.

Precedent overwhelmingly repudiates the government's reading of § 2242(d). Relying on *St. Cyr*, five of six circuits have concluded that § 2242 (d) does not preclude district courts from exercising habeas jurisdiction over FARR Act claims. *See Cadet v. Bulger*, 377 F.3d 1173, 1182-83 (11th Cir. 2004) (superseded by the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231[4]); *Singh v. Ashcroft*, 351 F.3d 435, 441 (9th Cir. 2003) (same); *Ogbudimpka v. Ashcroft*, 342 F.3d 207, 215-218 (3d Cir. 2003) (same); *Saint Fort*, 329 F.3d at 200-202 (same); *Wang v. Ashcroft*, 320 F.3d 130 (2d Cir. 2003); *see also Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1016 n.13 (9th Cir. 2000) (decided pre-*St. Cyr* but applying the same logic in the context of extradition proceedings); *but see Mironcescu v. Costner*, 480 F.3d 664 (4th Cir. 2007).[5] This logic has special force in

---

[4] In *Cadet*, the 11th Circuit held that criminal aliens could raise FARR Act claims on habeas in the absence of circuit court review. The REAL ID Act overhauled immigration procedure, in the process vesting circuit courts with jurisdiction over the FARR Act claims brought by criminal aliens that had previously been denied by statute. The REAL ID Act amended INA § 242(a)(4) to channel FARR Act claims brought by criminal aliens from habeas to the circuit courts, thereby rendering *Cadet*'s holding superfluous, though not its constitutional logic. INA § 242(a)(4) and the REAL ID Act are discussed in greater detail below.

[5] The Fourth Circuit Court of Appeals erred in *Mironcescu v. Costner* by holding that habeas review could be barred even though the statutory text did not mention habeas and even though § 2242(d) mirrors the provision at issue in *St. Cyr*. 480 F.3d at 676; *see infra* note 6 (comparing statutory texts). These conclusions are inconsistent with *St. Cyr* and the line of precedent starting with *Yerger*.

instances in which no jurisdictional avenue to raise a legal claim would otherwise be available.

These courts have also noted that, like the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") provision at issue in *St. Cyr*, § 2242(d) does not "explicitly mention[] habeas, or 28 U.S.C. § 2241." *See*, *e.g.*, *Ogbudimpka*, 342 F.3d at 216 (citing *St. Cyr*, 533 U.S. at 312). If the language of the IIRIRA provisions failed to "speak[] with sufficient clarity to bar jurisdiction pursuant to the general habeas statute," they have reasoned, then § 2242(d) of the FARR Act also lacks sufficient clarity to eliminate habeas review. *Cadet*, 377 F.3d at 1182-83; *Ogbudimpka*, 342 F.3d at 216 ("Guided by *St. Cyr* . . . we join the First, Second, and Ninth Circuits in concluding that, because § 2242 (d) of FARR ACT fails to state explicitly that a district court may not exercise jurisdiction over *habeas corpus* claims or mention 28 U.S.C. § 2241, the District Court retains that jurisdiction.").[6] The presence of a better and constitutionally more acceptable interpretation, the close correspondence between the text of § 2242(d) and the provision at issue in *St. Cyr*, and the weight of circuit precedent all compel the conclusion that § 2242(d) does not operate to bar habeas jurisdiction in this case.

The government also relies on § 242(a)(4) of the INA to buttress its new jurisdictional argument. *See* Mem. in Support of Mot. to Dismiss at 10-11. This argument is equally unpersuasive.

---

[6] The language of the IIRIRA provision considered in *St. Cyr* is nearly identical to that of § 2242(d). *Compare* 8 U.S.C. § 1252(a)(2)(C)(1996), *amended by* 8 U.S.C. § 1252(a)(2)(C) and (D)(2005) ("Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed [certain enumerated offenses].") *with* FARR Act § 2242(d) ("Notwithstanding any other provision of law . . . nothing in this section shall be construed as providing any court jurisdiction to consider claims under [the Convention Against Torture] or this section . . . except as part of the review of a final order of removal pursuant to section 242 of the [INA].").

14

At the threshold, § 242(a)(4) does not even apply to FARR Act claims, but only to "any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment." 8 U.S.C. § 1252(a)(4). Like FARR Act § 2242, INA § 242(a)(4) has the function and effect of disclaiming any implied right of action pursuant to CAT. Also like FARR Act § 2242, it lacks the clear statement necessary to terminate jurisdiction over a habeas petition seeking to enforce *the FARR Act*—a statute that operates independently of the CAT, the treaty that it was designed to implement.

The government, moreover, misconstrues § 242(a)(2) because it fails to recognize the limited purpose of that provision: streamlining the processing of CAT-related claims in the highly technical context of immigration review, as the title of that provision—"Judicial Review of Orders of Removal"—demonstrates.

Section 242(a)(4) was enacted as part of a comprehensive revision of immigration procedure in the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231. *See Kamara v. Att'y Gen. of the U. S.*, 420 F.3d 202, 209 (3d Cir. 2005) (explaining context of REAL ID Act's enactment). Section 242 (a)(4) streamlined the then-extant system of judicial review "to eliminate the district courts' habeas corpus jurisdiction (28 U.S.C. §§ 2241, 1361, and 1651) over final orders of removal in nearly all cases," while consolidating such review in the circuit courts. *Id.* Hence, another provision of the REAL ID Act provided that pending habeas petitions would be transferred to the courts of appeals, and the statutory filing deadline tolled. REAL ID Act § 106(c).

In so doing, Congress rationalized a previously disparate and disorganized system of judicial review of removal orders. *Accord Papageorgiou v. Gonzales,* 413 F.3d 356,

358 (3d Cir.2005). Congress was especially concerned with the "unfair and illogical" situation after *St. Cyr*, in which "[c]riminal aliens … can obtain review in two judicial forums, whereas non-criminal aliens may generally seek review only in the courts of appeals." H.R. Rep. 109-13, H.R. Rep. No. 72, at 174 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 240, 299 (Conf. Rep.) (noting also that such duplication "wastes scarce judicial and executive resources"). Section 242(a)(4) was aimed at ending both this unfairness and the "confusion in the federal courts as to what immigration issues can be reviewed, and which courts can review them." *Id.*[7]

Congress was acutely aware of the constitutional problems posed by INA § 242(a)(4). According to the conference report, the § 242 reforms "provide an 'adequate and effective' alternative to habeas corpus" by giving "every alien a day in the court of appeals, satisfying constitutional concerns." *Id.* Far from intending to invoke the far-reaching powers necessary to bar habeas jurisdiction over petitioners, like Mr. Omar, who would otherwise have no day in court, Congress intended only to clarify and simplify the judicial review process for aliens facing deportation in accordance with the Constitution.

Mr. Omar is a U.S. citizen, not an alien, and his claim under § 2242 of the FARR Act does not arise in the immigration context addressed by INA § 242. While § 242(a)(4) is clear enough to eliminate habeas jurisdiction for the aliens facing orders for removal that INA § 242 addresses, it does not contain the superclear statement required—

---

[7] The government cites *Hamid v. Gonzalez*, 417 F.3d 642 (7th Cir. 2005), for the proposition that § 242(a)(2) bars habeas review here. Mem. in support of Motion to Dismiss at 10-11. But *Hamid* concerned very different factual circumstances and a distinct procedural posture—court-of-appeals review of a final order of removal lodged against an aggravated felon. The *Hamid* court did not even purport to speak to the very different context of this case, let alone to address cases in which judicial review of CAT claims would be otherwise barred. 417 F.3d at 647.

nor, as the accompanying House report makes clear, was it intended—to eliminate habeas jurisdiction over U.S. citizens facing forcible transfer to the custody of other governments.[8] *Accord Hernandez v. Gonzales*, 424 F.3d 42, 42-43 (1st Cir. 2005) (holding that the REAL ID Act was "not intended to preclude habeas review over challenges to detention that are independent of challenges to removal orders") (citation and quotation marks omitted).

The canon of constitutional avoidance similarly requires that INA § 242(a)(4) apply solely to those immigration proceedings where Congress has already provided an avenue for judicial review of FARR Act claims. Extending INA § 242(a)(4) to preclude habeas jurisdiction in situations involving extradition or transfer to the custody of another government bars prisoners in those situations from pursuing any judicial recourse to review the legality of executive actions regarding their detention. Leaving prisoners without such recourse implicates the Suspension Clause, for "[a]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention." *St. Cyr*, 533 U.S. at 301. Interpreting INA § 242(a)(4) to bar habeas jurisdiction over petitioners who do not have access to an adequate substitute would therefore violate the Suspension Clause.

This court need not go so far. For "[t]he fact that the Court would be required to answer the difficult question of what the Suspension Clause protects is in and of itself a reason to avoid answering the constitutional questions that would be raised by concluding that review was barred entirely." *St. Cyr*, 533 U.S. at 301 n.13. Here, as in *St Cyr*,

---

[8] Though it misapplied *St. Cyr* and ultimately reached the wrong conclusion, the fact that the 4th Circuit did not consider INA § 242(a)(4) in *Mironcescu v. Costner* when assessing habeas jurisdiction over a claim brought by a petitioner facing extradition to Romania further demonstrates that the latter provision does not apply outside of the immigration context. 480 F.3d 664 (4th Cir. 2007).

17

another interpretation is "fairly possible." 533 U.S. at 300. The canon of constitutional avoidance therefore compels that INA § 242(a)(4) be read to strip habeas jurisdiction only in immigration proceedings where petitioners have recourse to judicial review in the circuit courts. To hold otherwise would not only ignore Congress's intent in enacting § 242(a)(4); it would also improperly "assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo,* 485 U.S. at 575.

Neither INA § 242(a)(4) nor FARR Act § 2242(d), in short, bar this court from exercising habeas jurisdiction over Petitioner's FARR Act claim.

### III. MR. OMAR'S CLAIMS AGAINST DETENTION SHOULD BE PRESERVED PENDING THE TIME THEY ARE PROPERLY BEFORE THE COURT.

The government argues on a variety of grounds that Mr. Omar's fourth, fifth, and sixth claims for relief, all respecting illegal detention, are barred or meritless. *See* Mem. In Support of Mot. to Dismiss at 14-20; Am. Pet. for Habeas ¶¶ 46-51. These claims explicitly address the situation in which this court *has adjudicated* Mr. Omar's proposed transfer under the FARR Act, and found it illegal. Under those circumstances, respondents will no longer have any legal ground to detain Mr. Omar. These claims therefore concern a situation the Supreme Court did not discuss, let alone rule on, and hence should not be dismissed but preserved pending adjudication of the logically anterior FARR Act claims.[9]

In any event, the government is thus incorrect to assert that the "mandate rule" bars consideration of these claims. Mem. in Support of Motion to Dismiss at 11, n.9.

---

[9] Mr. Omar however consents to the dismissal of his international law claims in Count six, Am. Pet. for Habeas ¶¶ 52-53.

18

The mandate rule does not apply when an "issue was not cleanly raised" before. *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 597 (D.C. Cir. 2001).  Here, the legality of Mr. Omar's detention in the *absence* of any authority to transfer Mr. Omar has never been presented before—let alone passed on—in this litigation.  This unlawful detention claim, therefore, has not been pressed or passed on yet, let alone "rejected."  Mem. in Support of Motion to Dismiss at 14-15.[10]

These claims, however, will arise only after this court has determined that Mr. Omar cannot be transferred.  This court, therefore, should address these legal issues only after it has adjudicated the legality of Mr. Omar's proposed transfer to torture in Iraqi custody.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's Motion to Dismiss.

Dated: Dec. 12, 2008                                                       Respectfully submitted,


                                                                           JOSEPH MARGULIES
                                                                           MACARTHUR JUSTICE CENTER
                                                                           NORTHWESTERN UNIVERSITY
                                                                              SCHOOL OF LAW
                                                                           357 East Chicago Avenue
                                                                           Chicago, IL 60611
                                                                           Telephone:   (312) 503-0890
                                                                           Facsimile:    (312) 503-1272

---

[10] The Government is also plainly incorrect to assert that the Non-Detention Act only applies to civilian detentions.  Mem. in Support of Motion to Dismiss at 16-18.  The text of the statute unambiguously applies to all detentions "by the United States except pursuant to an Act of Congress."  Further, as Justice Souter has explained, the Act's introduction and passage was motivated by concerns about military—and not civilian internment.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 542-45 (2004) (Souter, J., concurring in part, dissenting in part, and concurring in the result).  The government's reading, in short, manages to slight both the plain text and the manifest purpose of the Act.


Aziz Z. Huq
Emily Berman
BRENNAN CENTER FOR
   JUSTICE NEW YORK
UNIVERSITY SCHOOL OF LAW
161 Avenue of the Americas,
12th Floor
New York, NY  10013
Telephone:   (212) 998-6730
Facsimile:   (212) 995-4550

Jonathan Hafetz
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Fl.
New York, NY 10004
Telephone: (212) 284-7321

Susan L. Burke
Katherine Hawkins
BURKE O'NEIL LLC
4112 Station Street
Philadelphia, PA 19127
Telephone:   (215) 487-6590
Facsimile:   (215) 482-0874

Eric M. Freedman
250 West 94th Street
New York, NY  10025
Telephone:   (212) 665-2713
Facsimile:   (212) 665-2714

Vincent Moccio
Amy Magid
ROBINS, KAPLAN, MILLER &
   CIRESI L.L.P.
2800 LaSalle Plaza
Minneapolis, MN 55402
Telephone:   (612) 349-8500

*Counsel for Petitioners*